# EXHIBIT A



# National Credit Union Administration
## Region I
9 Washington Square, Washington Avenue Extension
Albany, NY  12205
(518) 862-7400

To Officials of MELROSE Credit Union:

We completed an insurance review of your credit union as of September 30, 2015.  Attached is our risk-focused examination report for your review and action.

**What does this risk-focused examination report cover?**
Our report covers major risk and regulatory compliance areas in your credit union.  We reviewed your financial condition, the quality of your management, risk exposure and areas of regulatory compliance as part of the examination.  This report documents our conclusions, and agreed upon corrective actions, if warranted.

**What are your responsibilities?**
You are responsible for taking appropriate and necessary action to address any deficiencies we identify in this report.

**What are the report's sources and limits?**
This report reflects the information we gathered from your records, officers and staff, and other sources we believe reliable.  This is not an audit.  Our reviews do not attest to the accuracy of your financial statements.  Our reviews may be limited to key areas of risk or compliance.

**What if you disagree with this report?**
You have appeal rights.  We encourage you to provide continuous and ongoing feedback during the exam, and to work with examiners to resolve disagreements before we deliver the final report. If you have a complaint regarding a rating or an administrative action you believe to be unjustified or not supported by the facts, NCUA offers numerous levels to appeal an examination report.

### Levels of Appeal

The purpose of our appeals structure is to encourage immediate dialogue with the individuals most closely associated with your credit union and most directly accessible by you.  You should follow the appeals order outlined below for most issues and complaints:

1. **Examiner.**  First approach your examiner.  This is usually the most effective method of resolving disagreements.  You have the right to challenge conclusions and receive support for conclusions.  We train examiners to support and communicate their conclusions to you.

2. **Supervisory Examiner.**  If you cannot resolve differences with your examiner, contact your supervisory examiner.  The supervisory examiner will provide an objective review of the facts.  Our supervisory examiners are knowledgeable of regulations, and examination

processes.  They can view your examination in context of standards applied during other examinations, and provide an objective review of the facts.

Your supervisory examiner is Gary Luvera.  You may contact your supervisory examiner at gluvera@ncua.gov or by calling 3155259367.

3. **Regional Office.**  You may also appeal formally in writing to the Regional Director within 30 days of receiving your final report.  The Regional Director will conduct an objective review of the facts and respond formally in writing.  Address your correspondence to:

> **Regional Director**
> **National Credit Union Administration – Region I**
> **9 Washington Square, Washington Avenue Extension**
> **Albany, NY  12205**
> **(518) 862-7400**
> **region1@ncua.gov**

4. **Supervisory Review Committee.**  The most definitive step in the appeals process is to contact NCUA's Supervisory Review Committee if you are dissatisfied with the Regional Director's response and your report meets the criteria of Interpretive Ruling and Policy Statement (IRPS) 12-1.  You must file your appeal within 30 days of the Regional Director's response (or within 60 days if your request for review receives no response) by mailing or delivering your written appeal to: Chairman, Supervisory Review Committee, National Credit Union Administration, 1775 Duke Street, Alexandria, VA 22314-3428.

The Supervisory Review Committee is comprised of three regular members of the NCUA's senior staff, as appointed by the Chairman.  This committee reconsiders and makes recommendations on material supervisory determinations.  Supervisory determinations are limited to:  (1) composite CAMEL ratings of 3, 4, and 5 and all component ratings of those composite ratings; (2) adequacy of Allowance for Loan and Lease Loss funding determinations; and (3) loan classifications on loans that are significant as determined by the appealing credit union.

You can find a full explanation of the Supervisory Review Committee appeals process in IRPS 12-1 at http://www.ncua.gov/Legal/Documents/IRPS/IRPS2012-1.pdf.

5. **NCUA Board.**  You can appeal Supervisory Review Committee decisions, other than the denial of a Technical Assistance Grant reimbursement, to the NCUA Board within 30 days of receiving the Supervisory Review Committee's decision.

To protect credit unions from reprisals, NCUA has a zero-tolerance retaliation policy.  Examiners may not take action against a credit union for using any formal or informal appeal channel.  If a supervisor discovers an examiner retaliated with unreasonable action against a credit union, that examiner will face disciplinary action.

**This report is strictly confidential and remains the property of NCUA.  You may not disclose its contents in any manner without NCUA's prior written authorization except as directed by the FCU Act.**

CONFIDENTIAL INFORMATION – Subject to Protective Order

Confidential

**Additional Contact Information:**  In addition to the appeal structure outlined above, you may also contact the following offices:

1. **Office of General Counsel.**  If you have a legal issue regarding your exam, you may write to the Office of General Counsel at ogcmail@ncua.gov at any time.

2. **Office of Examination and Insurance.**  If you have a question about examination policies or technical (e.g. financial or accounting) matters, you may write to the Office of Examination and Insurance at eimail@ncua.gov at any time.

**Reporting Unprofessional Behavior:**  If you feel an examiner has behaved inappropriately, you should immediately call the Office of the Inspector General at 800-778-4806.

<u>**Key Documents and Their Purpose**</u>

Please review the following items to understand your examination report.  This information will help to guide you through the various sections of our report and point you to documents that contain critical action plans.  You should contact your examiner with any questions about these key sections.

**Cover Letter** – This is a four page document in the front of the exam report that outlines the purpose of the report, your appeal rights, and key documents and their purpose.

**Table of Contents** – This document reflects the full set of documents and schedules an examiner provided to you in the written report.  You should receive everything listed in the Table of Contents.

**Examination Overview** – This is a narrative document designed to provide you a summary of the exam, key issues and items for consideration and place them in context of the credit union's overall condition.

**Document of Resolution** – This is one of the most critical documents for you.  It outlines the problems identified and corrective action plans that represent agreements reached with officials to correct concerns of the highest priority.  These plans are normally negotiated with you.  It is important that you take action on this document.  We expect faithful performance on all agreements reached and documented on this form.  You should work within the agreed timeframes and we strongly advise you to communicate with your examiner if you run into difficulties completing the agreements on time.  Failure to address items may result in an enforcement action.

**Document of Resolution Status** – This document notes your compliance with previously issued Documents of Resolution.

**Examiner's Findings** – This document reflects problems that management must address, but can do so in the normal course of business.  Management may determine the timeframe and approach for correcting these problems.

**This report is strictly confidential and remains the property of NCUA.  You may not disclose its contents in any manner without NCUA's prior written authorization except as directed by the FCU Act.**

Confidential                                                                                                USAOr_000311878

**Loan Exceptions –** This document reflects a listing of loan exceptions identified during a review of individual loan files.  These exceptions may include (**1**) documentation deficiencies, (**2**) loan processing exceptions, (**3**) violations of the *FCU Act* or *NCUA Rules and Regulations,* (**4**) violations of the credit union's lending policies, (**5**) violations of consumer compliance regulations, and (**6**) deficient credit practices.

**Supplementary Facts** – This is a multi-purpose form used for things like further background information related to specific examination concerns, information on new or proposed rules, and expanded  discussion about a topic discussed at a high level in the Examination Overview or elsewhere in the report.

Numerous other documents may be included in your report.  If you have questions regarding any of the key documents or supplementary forms and schedules, we encourage you to ask your examiner to provide an explanation.

<u>**Risk Ratings of Your Institution**</u>

NCUA uses two distinct classification tools during our examinations and insurance reviews:

1. Credit union composite and component CAMEL ratings; and
2. The Seven Risk Categories.

Each system provides an assessment of the risk in your credit union.  CAMEL is NCUA's version of the federal uniform financial institution rating system (UFIRS).  Each letter in CAMEL represents a specific risk component including, **C**apital Adequacy, **A**sset Quality, **M**anagement, **E**arnings, and **L**iquidity/Asset-Liability Management.  We rank each component on a scale of 1-5 with 1 being the lowest risk and 5 being the highest risk.  The five component ratings are accompanied by an overall composite rating which is also ranked on a scale of 1-5. You can find a complete description of the CAMEL rating system in Letter to Credit Unions 07-CU-12 on our website at www.NCUA.gov.

We also rate on a qualitative scale of low, medium or high the risk attributes of seven key functional areas of the credit union including Credit Risk, Interest Rate Risk, Liquidity Risk, Transaction Risk, Compliance Risk, Strategic Risk and Reputation Risk.  You can find a complete description of the Risk Categories in Letter to Federal Credit Unions 02-FCU-09 on our website at www.NCUA.gov.

Sincerely,


Brien Corbett
Examiner-in-Charge


**This report is strictly confidential and remains the property of NCUA.  You may not disclose its contents in any manner without NCUA's prior written authorization except as directed by the FCU Act.**

CONFIDENTIAL INFORMATION – Subject to Protective Order

Confidential

# Table of Contents

*Topic*                                                                                                    *Page*

**EXAMINATION REPORT**
    Examination Overview........................................................................................................... 1
    Document of Resolution......................................................................................................... 6
    Final Document of Resolution status 12.31.2014................................................................. 10

**FINANCIAL INFORMATION**
    Key Ratios........................................................................................................................... 28
    Financial History................................................................................................................. 29
    Statement of Financial Condition........................................................................................ 30
    Statement of Income........................................................................................................... 31

**LENDING INFORMATION**
    Loan Trends........................................................................................................................ 32
    Allowance Evaluation......................................................................................................... 34
    MBL loan exceptions.......................................................................................................... 35
    Loan Growth....................................................................................................................... 66
    Specialized Lending Trends................................................................................................ 74
    Specialized Lending Growth............................................................................................... 76
    Interest Rate Risk Trends................................................................................................... 80
    Liquidity Trends................................................................................................................. 82
    ALM Analysis..................................................................................................................... 83

**INVESTMENT INFORMATION**
    Investment Trends.............................................................................................................. 84

**SHARE INFORMATION**
    Share Trends....................................................................................................................... 85

CONFIDENTIAL INFORMATION – Subject to Protective Order

NCUA00359498

Confidential

USAOr_000311880

# Examination Overview

The National Credit Union Administration (NCUA) and the New York State Department of Financial Services (DFS) performed a joint supervision contact of Melrose Credit Union (MCU).  September 30, 2015, is the effective date of the supervision contact, which began November 30, 2015 and concluded December 17, 2015.

The purpose of the contact was to assess:
1)  Your compliance with the corrective actions included in the:
    a.  December 31, 2014, Examination Report Document of Resolution (DOR) and
    b.  Memorandum of Understanding (MOU) issued August 28, 2015,
2)  MCU's liquidity position and your cash flow projections.

Below are the corrective actions you have failed to address or your corrective actions were inadequate to resolve the concern.

## Business Planning

The MOU required you to revise your strategic business plan (Plan) within 90-days of the effective date (August 28, 2015) to **incorporate plans of action** including the strategic direction for managing the taxi medallion loan portfolio.  The MOU requires the board's objectives are appropriately analyzed, measured, and monitored noting progress or lack thereof in the board minutes.

You did hold a business planning meeting on September 29, 2015, which established a basic outline for the Plan.  The review did not note further work on the outline or the development of a Plan.

Considering MCU Taxi Medallion member business loans (MBL) total $1.51 billion, equal 75.81 percent of total assets and 413.52 percent of net worth, as of November 30, 2015, and material changes in market competition have and continue to negatively affect the taxi industry as seen by the material increase in loan delinquency and trouble debt restructured (TDR) loans, a Plan to manage the portfolio, credit, and concentration risks is critical.

You need to timely develop a Plan as required in the MOU.

## MBL underwriting

The MOU required you, within 120-days of the effective date of the MOU, to develop and implement policies or procedures to ensure proper financial analysis on borrowers, that assesses and calculates cash flow and balance sheet account changes (e.g. in account receivables, inventory, and accounts payables), which may impact cash flow.

Additionally, the MOU requires you to:
1)  Enhance all lending policies and procedures to identify and properly classify any loans refinanced as a TDR, and identify all loans that are TDRs,
2)  Analyze the structure of the MBL department and present to the board for approval a plan to reconfigure the department and

1

MELROSE

# Examination Overview

   3) Develop sufficient metrics and reporting to properly evaluate the quality, performance and risk associated with the MBL portfolio.

The supervision contact notes you did not achieve or implement the MOU requirements as demonstrated in our summary review and loan exceptions.

A review of your TDR listing as of November 30, 2015, shows a total of $362.07 million.  Of this, approximately $139.5 million have a debt service coverage ratio (DSCR) less than 1x (times) or a DSCR was not calculated.

During this supervision contact we reviewed 18 relationships totaling $164 million.  Of these, $149 million were TDRs (approximately 41 percent of TDRs reported as of November 30, 2015).  Also included were, two relationships totaling $4.2 million in new money taxi medallion MBLs and $10 million in matured taxi medallion MBLs, which are currently being reported as delinquent.

As a result of the numerous and material taxi medallion MBL underwriting exceptions noted during the review, we are extremely concerned with management's failure to soundly underwrite new, refinanced, and TDR taxi medallion MBLs as required in the MOU and the DOR.

NCUA Rules and Regulations (R&R) Parts 723, 741 Appendix C, Letter to Credit Union (CU) 14-CU-06, 10-CU-07, and 13-CU-03 set forth required and recommended sound loan underwriting practices.  You have not followed the requirements or guidance.

The review noted numerous cases where MCU is granting new, refinanced, matured ("rolled over"), and TDR medallion loans without appropriate:
   1) Credit analysis,
   2) Cross collateralization,
   3) Documented cash flow analysis or DSCRs to substantiate the borrower's ability to repay the loan,
   4) Analysis or documentation of the financial hardship qualifying the borrower for a TDR and
   5) Prepared credit memorandums.

Additionally, you are not correctly reporting new or TDR taxi medallion loans.  During the review management stated they had made only one new taxi medallion loan and granted no new taxi medallion TDRs on an existing TDR taxi medallion loan, but our limited review found MCU granted at least one of each.  Unsound practices include:

   1) Several new violations of NCUA R&R Part 723.7 as MCU granted new loans where the loan to value (LTV) exceeded the R&R 80 percent allowed maximum LTV,
   2) Instances where loan renewals were clearly TDRs, but are not being reported, tracked or impaired as such,

2

# Examination Overview

3) A new taxi medallion loan to Tricky Cab/Move Cab Corp. This is the second new taxi medallion loan MCU granted in 2015 which conflicts with the verbal statement only one new loan was granted,
4) Daniel Ojo taxi medallion loans were issued a TDR in July 2015, and again in November 2015 and
5) You are not reserving for the TDRs using collateral value as required in Accounting Standard Codification (ASC) 310-10 for individual loans.

Your failure to soundly underwrite new, refinanced or TDR taxi medallion MBLs and inability to accurately maintain basic loan information is a material concern and a violation of the MOU and DOR.

You must use sound taxi medallion MBL underwriting procedures and standards as set forth in NCUA R&R, and guidance, as well as, per the MOU and DOR. You must appropriately track, report, and monitor taxi medallion MBLs to ensure risk management and proper call reporting (new, refinanced, TDR, etc.)

**Liquidity and cash flow projections**
The review of MCU's liquidity position and your cash flow projections show significant concerns with the low liquidity position and insufficient liquidity monitoring.

As of September 30, 2015, on-balance sheet liquidity is minimal at 4.05 percent of assets (cash & equivalents and Available for Sale (AFS) investments). Remaining available contingent funding sources at Federal Home Loan Bank (FHLB) and Alloya Corporate CU total approximately $130 million. In total, on and off balance sheet liquidity is approximately 10 percent of assets which may be insufficient in a turbulent market with extensive TDR and delinquency concerns.

We note you could raise additional funds through brokered deposits; however, you must first resolve the issue of non-member deposits being over the regulatory limit. You plan to do this by making the purchasers of the share certificates MCU members.

A review of the:
1) Cash flow projections show you are not accurately reporting cash needs or planning ahead for projected liquidity shortfalls,
2) Liquidity policies show they are the "canned" policies provided by Brick & Associates and are not sufficient for the complexity of your institution, and
3) Compliance with policy limits show you do not track or report in the Asset Liability Management Committee (ALCO) meeting minutes compliance with the Policy limits. Of the five "guidelines" (many of these limits do not appear to have been changed from the Brick template) you are out of compliance with four of them as of September 30, 2015 and have not reported or provided plans to achieve policy compliance.

Your cash flow projections are not an accurate representation of the true cash position of MCU. The starting cash balances are not adjusted by the prior month's surplus or deficit; therefore, the starting cash position remains unchanged in all months.

3

# Examination Overview

Additionally, the share certificates maturing in each month are all projected to leave MCU as management does not know their retention rates and loan balloon payments appear to be included in the loan cash inflows; however, MCU expects to renew ("rollover") these loans. As a result, there is no actual cash flow. Also, interest payments on loans are not included in the cash flow.

The current projections show a significant deficit in January ($43 million) due to large amounts of share certificate maturities and borrowings becoming due; however, management does not note this in the ALCO minutes. Nor, is there documentation showing how management plans to fund the projected liquidity shortfall. Furthermore, the cash flow forecasts show an average monthly loan payment amount of approximately $40 million. November 2015, figures show monthly loan payments closer to $24.5 million.

The above noted factors bring into question the accuracy of management's current cash flow forecasting. You need to improve the cash flow projections by:

1) Developing reasonable deposit retention and loan payment assumptions,
2) Back testing the baseline liquidity forecast to ensure assumptions used as reasonable,
3) Using the baseline forecast to perform liquidity stress tests, which at a minimum, include:
   a. Increased deposit outflows,
   b. Lower loan payment amounts, and
   c. Restrictions on available borrowings.

Considering MCU's tight liquidity position, continued use of borrowed funds, reliance on the ability to pay a very competitive dividend rate to attract and maintain share certificates, insufficient monitoring practices and the potential for decreased loan cash flows, liquidity risk is expected to increase.

**Corrective actions**
This supervision contact report includes a DOR establishing required corrective actions. You must take the noted or other actions as deemed necessary to address the areas of concern.

Additionally, you must continue to address the December 31, 2014, Examination DOR and MOU required action items. Please refer to the DOR Status Document included within this report for the status of the DOR corrective actions.

**CAMEL Ratings**
With the exception of Asset Quality (AQ), the CAMEL codes remain as the December 31, 2014, Examination assigned them.

Because of the material increase in TDRs to $362.07 million, elevated loan delinquency ratio of 6.73 percent or $134.13 million, continued use of unsafe, unsound taxi medallion MBL underwriting and the lack of an experienced TDR/workout MBL officer, the Asset Quality CAMEL component is downgraded from a 3 to a 4.

4

Charter 62005                                MELROSE                            Eff. Date 9/30/2015

# Examination Overview

Please note the discrepancy in state and NCUA AQ component rating is because the DFS will only change CAMEL ratings following the completion of full examination.

|       | Capital | Asset Quality | Management | Earnings | Liquidity | Composite |
|-------|---------|---------------|------------|----------|-----------|-----------|
| NCUA  | 1       | 4             | 3          | 2        | 3         | 3         |
| DFS   | 1       | 3             | 3          | 2        | 2         | 3         |

### Risk Rating

With the exceptions of Liquidity risk, all other risks remain as the December 31, 2014, Examination assigned them.

| RISK            | Credit | IRR      | Liquidity | Transaction | Compliance | Strategic | Reputation |
|-----------------|--------|----------|-----------|-------------|------------|-----------|------------|
| NCUA Rating     | *High* | *Moderate* | *High*  | *High*      | *High*     | *High*    | *Moderate* |

Because of the limited available liquidity, continued use of borrowed funds, reliance on the ability to pay a very competitive dividend rate to attract and maintain share certificates, insufficient monitoring practices and the potential for decreased loan cash flows, liquidity risk is assessed as high.  This increased from a moderate assessment as of the December 31, 2014 Examination report.

BC/12-31-15/2pm

5

CONFIDENTIAL INFORMATION – Subject to Protective Order                                      NCUA00359503

Charter 62005        MELROSE        Eff. Date 9/30/2015

# Document of Resolution
### Matters Requiring Board Attention

| Time Frame for Completion | Responsible Person | Reference |
|---|---|---|
| Problems/Supporting Facts and Plans for Corrective Action | | |

### Underwriting of MBLs, TDRs and Modifications

| January 31, 2016 | Board of Directors | RR Parts 723 and 741 Appendix C and LCUs |
|---|---|---|

**\*Deficient MBL and TDR underwriting**
*Problems/Supporting Facts*
**Inadequate Underwriting of Modifications and TDRs**
*Problems/Supporting Facts*

As more fully described in the numerous and detailed loan exceptions, new loans, refinanced (matured balloon loans) and troubled debt restructurings (TDRs) are being granted without Melrose Credit Union (MCU) performing a full and detailed borrower and financial analysis.

Debt service coverage ratios are not consistently calculated, overall collateral evaluations are not performed, borrower and related financial statements are not analyzed, recent credit bureaus and personal financial statements are not always obtained, risks are not delineated, mitigated, and some TDRs evidenced no formal credit approvals.

There is no indication that an individual impairment analysis was performed for each TDR as required by Accounting Bulletin 06-01and there is no justification in the loan files for the impairments taken.

TDR payment relief and/or new cash out is being granted to borrowers to replace their taxi cabs, but the risk in the Melrose CU loans is not being mitigated, by at a minimum, taking the vehicles purchased as collateral or in the case of passive owners obtaining the guarantees of the management companies who own the vehicles or collect lease fees from drivers.

Borrowers are not required to demonstrate why they need a TDR/modification and Melrose CU has not performed an analysis of their historical, current, expected revenues and cash flows to support the basis for the TDR or the borrower's ability to repay under the modified terms.

Recent financial statements or other proof of recent/changing financial performance and detailed listings of all of the borrower's debts are not obtained or analyzed.  Melrose CU is not documenting how the concession improves the borrower's likelihood of repaying in full versus liquidating the collateral.

*Corrective Action*
Ensure:
     1)  Adequate documentation for the loan workout decision,

\* This is either a repeat or carry-over DOR. Please see the DOR Status Update document for specific information on individual DOR items.

6

CONFIDENTIAL INFORMATION – Subject to Protective Order      NCUA00359504

Confidential      USAOr_000311886

Charter 62005                                    MELROSE                              Eff. Date 9/30/2015

# Document of Resolution
## Matters Requiring Board Attention

| Time Frame for Completion | Responsible Person | Reference |
|---|---|---|
| Problems/Supporting Facts and Plans for Corrective Action | | |

2) Documentation notes communication with the borrower,
3) Borrower agreement to pay the loan in full, and
4) Borrower ability to repay the loan under the new terms,
5) New underwriting and repayment analysis is completed at the restructure point and supports the workout decision,
6) A cost-benefit analysis for granting the workout versus foreclosing is performed and documented,
7) The workout is consistent with industry best practices and GAAP requirements for the recognition of credit losses and
8) Future TDR/workout strategies contain timelines and future course of actions are documented in the event the modification is not successful.

### Member Business Loan (MBL) loan to values

| January 31, 2016 | Board of Directors | RR Part 723.7 |
|---|---|---|

**\*Loan to values exceed NCUA R&R Part 723.7**
*Problems/Supporting Facts*
**Regulatory Violations**
*Problems/Supporting Facts*
Regulatory Violations of 723.7(1) which states the maximum loan-to-value ratio for **all liens** must not exceed 80% unless the value in excess of 80% is covered through private mortgage insurance or equivalent type of insurance, or insured, guaranteed, or subject to advance commitment to purchase by an agency of the federal government, an agency of a state or any of its political subdivisions, but in no case may the ratio exceed 95%.

- Loans granted to Allen Weingarten to purchase New York City medallions involved having the seller take subordinated liens resulting in loan-to-values in excess of 80% on the day the loan was originated.
- April 30, 2015 loan to Raj Sukhdev was a refinance with cash-out for the purchase of a taxi cab which resulted in an LTV of 90%.
- June 8, 2015 loan to Krishan Gopal had an LTV of 81%.

In addition to being regulatory violations, this is an unsafe and unsound practice - especially in the current market. In the Weingarten case, the credit memorandum contains no disclosure or analysis of the terms for the 2nd liens or their effect on the borrower's ability to repay.

\* This is either a repeat or carry-over DOR. Please see the DOR Status Update document for specific information on individual DOR items.

7

CONFIDENTIAL INFORMATION – Subject to Protective Order                              NCUA00359505

Confidential                                                                          USAOr_000311887

Charter 62005            MELROSE            Eff. Date 9/30/2015

# Document of Resolution
### Matters Requiring Board Attention

| Time Frame for Completion | Responsible Person | Reference |
|---|---|---|
| **Problems/Supporting Facts and Plans for Corrective Action** | | |

*Corrective Action*
1. Scrub the MBL portfolio and identify all loans with this violation.
2. Cure the violation(s) by:
   - Having the borrower bring the loan into compliance,
   - Selling the loan, or
   - Performing a full and complete underwriting addressing the borrower's ability to repay, asking the Regional Office for forbearance, explaining why the first two options are not viable and how the loans will be brought into compliance over time.

### Liquidity

| January 31, 2016 | CEO and ALCO | RR Part 741.12 |
|---|---|---|

**\*Cash flow analysis and forecasting**
*Problems/Supporting Facts*
**Cash Flow Forecasting**
*Problems/Supporting Facts*
The current monthly cash flow analysis does not accurately project the short term funding needs of Melrose Credit Union (MCU). The projections assumes all maturing share certificates are not renewed, and loan payments include balloon payments. The projections do not incorporate all operating cash flow needs (expenses, dividend payments, etc.). The available cash figure is not adjusted by the prior month's cash inflows/outflows and provides an inaccurate picture of cash balance fluctuations over time.

*Corrective Action*
1. Revise monthly cash flow projections to represent management's expected sources and uses of cash throughout the various time horizons. Projections should include: appropriate estimates of share certificate retention, deposit growth/decline, loan principal and interest payments, and operating cash needs. Adjust the starting cash balance for each time horizon by adjusting the current available cash by the prior period's surplus or deficit.
2. Back test the projected cash flow analysis to actual results monthly to further enhance management's methodology and assumptions.
3. Ensure that all funding deficits identified in the cash flow projections are noted by the ALCO, and appropriate action plans are developed to fund the deficits over the next 90-days at a minimum.

\* This is either a repeat or carry-over DOR. Please see the DOR Status Update document for specific information on individual DOR items.

8

CONFIDENTIAL INFORMATION – Subject to Protective Order

Confidential

Charter 62005                          MELROSE                     Eff. Date 9/30/2015

# Document of Resolution
### Matters Requiring Board Attention

| Time Frame for Completion | Responsible Person | Reference |
|---|---|---|
| **Problems/Supporting Facts and Plans for Corrective Action** | | |

| January 31, 2016 | CEO and ALCO | RR Part 741.12 |
|---|---|---|

**Balance sheet liquid asset**
*Problems/Supporting Facts*
**Liquid Assets**
*Problems/Supporting Facts*
MCU maintains a low amount of on-balance sheet liquidity with cash and short-term investments representing only 0.73 percent of total assets as of September 30, 2015.  The current policy limit for the minimum amount of required liquid reserves (i.e. cash to total assets) is 0.05 percent of assets.  The policy limit is significantly low and would result in an insufficient level of on-balance sheet liquidity to fund anticipated loan growth and operational needs.

*Corrective Action*
1) Determine based on the revised monthly cash flow forecasts, a sufficient minimum amount of on-balance sheet liquidity needed to fund current and anticipated operating needs and
2) Revise the Liquidity Policy to include the new minimum required amount and monitor compliance with the policy limit at the regular ALCO meetings.

| January 31, 2016 | CEO and ALCO | RR Part 741.12 |
|---|---|---|

**Compliance with Liquidity Policy**
*Problems/Supporting Facts*
*Problems/Supporting Facts*
Compliance with Liquidity Policy guidelines are not being tracked or reported to the ALCO.  Melrose exceeds the following Liquidity Policy limits as of September 30, 2015:
- Loan to assets not to exceed 95 percent;
- Investment to assets not less than 5 percent;
- Non-Member Certificates to Total Liabilities & Net Worth Ratio should not to exceed 5 percent; and
- Borrowed Funds to Total Liabilities & Net worth Ratio should not exceed 5 percent.

*Corrective Action*
1) Monitor and document compliance with policy limits at each regular ALCO meeting and

2) Document strategies, with timeframes to remedy all out of compliance conditions.

BC/12-31-14/2pm

\* This is either a repeat or carry-over DOR. Please see the DOR Status Update document for specific information on individual DOR items.

9

CONFIDENTIAL INFORMATION – Subject to Protective Order                    NCUA00359507

Confidential                                                              USAOr_000311889

Charter 62005         MELROSE CREDIT UNION         Eff. Date 9/30/2015

# Document of Resolution Status
### Matters Requiring Board Attention

| Time Frame for Completion | Responsible Person | Reference |
| --- | --- | --- |
| Problems/Supporting Facts and Plans for Corrective Action | | |

### Bank Secrecy Act (BSA)

| August 31, 2015 | Board of Directors | RR 748.2c3 |
| --- | --- | --- |

**1. BSA/AML Compliance Officer**

*Problems/Supporting Facts*

Management responded to the prior examination finding by transferring the responsibilities of the BSA/AML officer from the in-house legal counsel to the prior director of human resources. However, the reassignment to the director of human resources does not meet the regulatory requirement. The newly appointed BSA/AML Officer does not presently have the expertise to satisfactorily complete the job. In accordance with regulatory guidance: "The appointment of a BSA compliance officer is not sufficient to meet the regulatory requirement if that person does not have the expertise, authority, or time to satisfactorily complete the job." The guidance also states that the BSA officer should be knowledgeable of the Act, all related regulations, the institution's products, services, entities, customers, geographic locations, and associated potential money laundering and terrorist financing risks. The institution's BSA/AML compliance program is inadequate, as described on the Examiner's Findings page, and the ability of the BSA officer to adequately advance the program may not be achievable in a timely manner.

*Corrective Action*

Recruit and appoint a qualified professional to the position of BSA officer to oversee the credit union's BSA/AML compliance program.

*Status and Comment*

**Compliance status as of 9/30/15** - Completed. The New York Department of Financial Services (DFS) review shows you complied with this requirement.

| August 31, 2015 | Board of Directors | RR 748.2c1 |
| --- | --- | --- |

**2. Internal Controls for BSA/AML Compliance**

*Problems/Supporting Facts*

The Board and management have not appropriately provided for an effective system of internal controls surrounding the BSA/AML program as indicated by several deficiencies related to BSA/AML risk assessment, and policies, procedures, and processes. The credit union is therefore not in compliance with Section 748.2(c)(1) of the NCUA BSA Regulations which directs the institution to maintain an effective system of internal controls, a key component of the Bank Secrecy Act compliance program. In addition, the system of controls is a necessary and initial step established by the Board and management toward ensuring compliance with the regulation.

*Corrective Action*

Develop and implement policies, procedures, and processes to adequately support the BSA/AML compliance program and bring about compliance with Rules and Regulations 748.2(c)(2).

CONFIDENTIAL INFORMATION – Subject to Protective Order         NCUA00359508

Confidential         USAOr_000311890

Charter 62005           MELROSE CREDIT UNION          Eff. Date 9/30/2015

# Document of Resolution Status
### Matters Requiring Board Attention

| Time Frame for Completion | Responsible Person | Reference |
|---|---|---|
| **Problems/Supporting Facts and Plans for Corrective Action** | | |

| |
|---|
| *Status and Comment* <br> **Compliance status as of 9/30/15** – To be reviewed during the full examination. |

| August 31, 2015 | Board of Directors | RR 748.2(c)(2) |
|---|---|---|

**3. BSA/AML - Independent Testing**
*Problems/Supporting Facts*

The credit union is not in compliance with Section 748.2(c)(2) of the NCUA BSA Regulations which requires independent testing of the BSA/AML program. The external audit firm Merrill I Rosen was engaged to conduct independent testing of the credit union's BSA/AML compliance program. However, the external audit firm has stated that the objective of the review is to examine management's assertion of the overall BSA/AML risk designation for the institution. Therefore, the scope and perspective of the external review does not meet the requirement for independent testing to assess the adequacy of the overall BSA/AML compliance program. The divergent objective of the review undertaken by the external auditor does not meet the regulatory requirement for independent testing.

*Corrective Action*

Promptly conduct independent testing of the BSA/AML compliance program.

*Status and Comment*
**Compliance status as of 9/30/15** – To be revised during the full examination.

### Loan to Values (LTVs)

| September 30, 2015 | Board of Directors | RR § 723.7(a)(1); NCUA LTR 14-CU-06 |
|---|---|---|

**4. Potential Violations**
*Problems/Supporting Facts*

a. During March, April and May 2014, the CU granted loans with 100% LTVs to Liya Levinsky and Gennady Nadelmann in apparent violation of NCUA Rules and Regulations. The CU calculated a 76% LTV by aggregating other loans to the same borrowers with lower LTVs, and asserting the loans are cross-collateralized, cross-guaranteed and cross-defaulted.

  The loan documentation does not support this position. For the loans to be enforceable and properly cross-collateralized, cross-guaranteed and cross-defaulted, the legal documentation needs to be more comprehensive.

11

CONFIDENTIAL INFORMATION – Subject to Protective Order      NCUA00359509

Confidential      USAOr_000311891

Charter 62005                    MELROSE CREDIT UNION                    Eff. Date 9/30/2015

# Document of Resolution Status
## Matters Requiring Board Attention

| Time Frame for Completion | Responsible Person | Reference |
|---|---|---|
| Problems/Supporting Facts and Plans for Corrective Action | | |

b. During February through May 2014, the CU granted 28 loans totaling $59,500,000 with 50 year amortization periods to the following borrowers: Liya Levinsky and Gennady Nadelmann, (these are the same loans referenced in the preceding DOR), Kareene Harari, Joelle Harari, Paula Bouzaglou, and Jimy Weinberger. Fifty year amortization periods are excessively long and not an industry standard. This represents an unsafe and unsound loan structure. During the time these loans were granted, collateral values were at an all-time high. The loans will only have a 2% principal reduction during the three year term of the balloon note (essentially interest only).

*Corrective Action*
a. Obtain an outside legal opinion by a law firm who has successfully litigated such cases in the State of New York as to the enforceability of the existing loan documentation.

b. For the 50 year amortization loans:

- When bullets mature, reset the amortization periods to reasonable levels i.e. not exceed 25 years;
- In the future, set amortization periods to ensure repayment over a reasonable timeframe and document rationale for the selection of amortization period in the credit memorandum;
- Cease underwriting Member Business Lending (MBL) with amortization periods exceeding 30 years.

*Status and Comment*
**Compliance status as of 9/30/15** - Not reviewed during this contact

## Recognition and Reporting of Troubled Debt Restructuring (TDRs)

| June 30, 2015 Ongoing | Board of Directors | RR 741.3(b) Appendix C, Acct Std 310-40-15 |
|---|---|---|

### 5. TDRs
*Problems/Supporting Facts*
During the examination, examiners identified the following loans as potentially being TDRs which occurred in the late third quarter or fourth quarter of 2014, but were not reported as such on the December 31, 2014 Call Report. There likely have been others. See the Supplementary facts section of the report for more supportive information on TDRs.

| ACCT No. | ID | TYPE | BALANCE | OPEN DATE |
|---|---|---|---|---|
| 22902 | 21 | 2 | $478,904.86 | 9/8/2014 |
| 47953 | 16 | 2 | $538,524.63 | 9/23/2014 |

CONFIDENTIAL INFORMATION – Subject to Protective Order                                    NCUA00359510

Confidential                                                                        USAOr_000311892

Charter 62005        MELROSE CREDIT UNION        Eff. Date 9/30/2015

# Document of Resolution Status
### Matters Requiring Board Attention

| Time Frame for Completion | Responsible Person | Reference |
|---|---|---|
| Problems/Supporting Facts and Plans for Corrective Action | | |

| | | | | |
|---|---|---|---|---|
| 57454 | 10 | 2 | $527,282.30 | 9/29/2014 |
| 34274 | 26 | 2 | $593,673.28 | 10/16/2014 |
| 31153 | 17 | 2 | $356,469.75 | 10/27/2014 |
| 51448 | 16 | 2 | $585,000.00 | 11/28/2014 |
| 26074 | 34 | 1 | $106,171.88 | 12/4/2014 |
| 26884 | 19 | 2 | $440,665.64 | 12/11/2014 |
| 61550 | 7 | 7 | $187,000.00 | 12/18/2014 |
| 57936 | 6 | 7 | $130,000.00 | 12/30/2014 |

*Corrective Action*
1. Report the above loans as TDRs on the call report.
2. Going forward, identify and track all TDRs as they occur and make sure they are promptly and accurately reported.
3. Audit each loan at the time of its next annual review to identify those loans that were granted in the past with refinance terms that a third party lender would not grant. Re-classify those loans as TDRs and report them on future call reports as they are identified.
4. Enhance all lending policies and procedures to identify and properly classify any loans refinanced as a TDR.
5. Work with the credit union's CPA firm to ensure that TDRs are being properly accounted for on the financial statements.

*Status and Comment*
**Compliance status as of 9/30/15** - Not all the above TDR loans were noted on the MCU TDR Report Additionally, this supervision contact noted TDRs, which management did not report as such. You must ensure you adequately address numbers 1 through 5 above.

1. Only one (account 57454-10) of the above referenced loans is on your TDR list as of 11/30/2015 but all of them are still outstanding according to the Aires download. At this contact, we identified three new loans that ballooned, evidenced stress, were renewed and granted concessions that should be classified as TDRs but are not on the TDR list (account 28038-22, 70604-01 and 70604-02). You have not enhanced lending policies and procedures to identify and properly classify as a modification or TDR the refinancing of any loan that should be classified as such.

13

Charter 62005                              MELROSE CREDIT UNION                              Eff. Date 9/30/2015

# Document of Resolution Status
### Matters Requiring Board Attention

| Time Frame for Completion | Responsible Person | Reference |
|---|---|---|
| Problems/Supporting Facts and Plans for Corrective Action | | |

2.  In addition, you are not adequately impairing your TDR loans.  You must maintain the ALLL at an appropriate level and document your analysis according to the standards set forth in:

    - NCUA Rules & Regulation 741, Appendix C
    - NCUA's 2002 Interpretive Ruling and Policy Statement (IRPS),
    - 2006 NCUA Accounting Bulletin 06-1,
    - Interagency Supervisory Guidance Addressing Certain Issues Related to Troubled Debt Restructurings dated 10/23/2013, and
    - Accounting Standards Codification (ASC) 310-10 for individual loans.

    Specifically, loans that are troubled debt restructurings (TDRs) must be individually evaluated for credit impairment.  Credit impairment of individually evaluated loans is based on one of the three impairment measurement methods specified under ASC 310-10:

    1. the present value of future cash flows using the loan's effective interest rate;
    2. the fair value of the collateral less selling cost; or
    3. Observable market value.

    However, if the individually evaluated loan is collateral dependent, the impairment can only be measured by the fair value method.

    Troubled debt restructured (TDR) taxi medallion loans should be considered collateral dependent because the sale or operation of the collateral is expected to be the sole source of repayment and repayment from other available sources, including guarantors, are expected to be no more than nominal (ASC 310-10-20).  Evaluating whether an impaired loan is collateral dependent is important because the CU must measure impairment on an impaired collateral-dependent loan based on the fair value of the collateral regardless of whether foreclosure is probable.  Given the information you have provided on your borrowers and the TDR portfolio, only on an exception basis, and then only based on documented and verified circumstances, would a medallion TDR not be considered collaterally impaired.

3.  Work with your CPA to ensure TDRs are accounted for consistent with GAAP.  Properly impair your TDRs by determining fair value in accordance with ASC 310-10-35 and recognizing income consistent with acceptable methods of income recognition for cases of deteriorating credit quality, Cash or Cost Recovery, in accordance with ASC 942-310.  Adequately fund the ALLL.  It should be noted that the same evaluations and approaches to value need to be applied to other categories in the portfolio that are not currently considered TDRs and the ALLL adjusted for those as well.

14

Charter 62005         MELROSE CREDIT UNION         Eff. Date 9/30/2015

# Document of Resolution Status
### Matters Requiring Board Attention

| Time Frame for Completion | Responsible Person | Reference |
|---|---|---|
| **Problems/Supporting Facts and Plans for Corrective Action** | | |

In the case of taxi medallions, transfer data has been too limited and too erratic for the transfer price to represent the price a reasonable investor would pay. Under ASC 310-10-35, absent an observable fair market value, the fair value should be determined by either using a reasonable capitalization rate (cap rate) for similarly risk rated assets applied to net annual operating income (NOI) or by computing the present value of cash flows expected as an ordinary annuity.

4. Ensure the credit union information systems are adequate and able to identify and document any loan that is re-aged, extended, deferred, renewed, or rewritten, including the frequency and extent such action has been taken consistent with the requirements in §741.3(b)(2) the NCUA Rules and Regulations and Appendix C, Interpretive Ruling and Policy Statement on Loan Workouts and Nonaccrual Policy, and Regulatory Reporting of Troubled Debt Restructured Loans (Appendix C)

5. Recognize losses on TDRs in the period they are identified. Under GAAP, a credit loss on a loan, should be charged off in the period in which the loan is deemed uncollectible. ASC 310-10-35-41

## Member Business Loan (MBL) Department Structure

| September 30, 2015 | Board of Directors | RR § 723.5 (a), § 723.6 (g) |
|---|---|---|

**6. MBL structure**
*Problems/Supporting Facts*
Currently Melrose CU does not have policies or procedures in place to ensure proper segregation of duties and checklists to provide for a quality control process which is adhered to throughout the various stages of the lending process, from initial application through closing and funding. Lack of proper segregation of duties and inadequate resources in the business lending department commonly lead to a poorly managed business lending program. Typically, for a business loan portfolio of any size, the credit union will have segregated staffing for:

- Department Supervision
- Commercial Lender/Loan Officer
- Credit Analysis
- Credit Administration
- Processor/Servicer
- Loan Closer/Document Preparation

15

CONFIDENTIAL INFORMATION – Subject to Protective Order      NCUA00359513

Confidential      USAOr_000311895

Charter 62005                       MELROSE CREDIT UNION                       Eff. Date 9/30/2015

# Document of Resolution Status
### Matters Requiring Board Attention

| Time Frame for Completion | Responsible Person | Reference |
|---|---|---|
| **Problems/Supporting Facts and Plans for Corrective Action** | | |

The board of directors has ultimate responsibility for the level of risk assumed by the credit union. The board must establish policy guidelines and approve the overall lending strategy that addresses the level and nature of exposure acceptable to the credit union.  This includes evaluating resources to ensure staffing levels are appropriate for the level and complexity of the portfolio.  Operational management needs to implement procedures and controls to effectively adhere to and monitor compliance with established lending policies, strategies and safe and sound lending practices.  A critical element for a well-run Member Business Lending program is the segregation of duties as well as a sound quality control process.

*Corrective Action*
  a.  Analyze the structure of your current member business loan department (consider using a qualified third party to assess the current MBL department's resources, and evaluate the internal training program.) This analysis must consider the complexity of the portfolio.  Emphasis must be focused on achieving and maintaining sound management control and oversight of the entire MBL taxi medallion program.
  b.  Ensure proper segregation of duties through the following:

  i)   Initial production checklist development thru pre-funding (For example - who sends closing instructions, who determines covenants, etc.);

  ii)  Pre-funding checklist (to be accomplished by loan administration - to determine regulatory violation/policy exceptions, valuation review, loan closing documentation, receipt and analysis of "approved subject to" items is completed and complies with approval terms, etc.);

  iii) Post-funding checklist (final completion of loan file - for example - check to ensure documents are properly signed and dated, collateral liens are filed and acknowledgements, all loan documents to complete files have been received, external legal review is accomplished, etc.); and

  iv)  Quality control performed by MBL department (procedures should be documented and prohibit the loan officer from being the sole reviewer of documents prior to closing).

*Status and Comment*
**Compliance status as of 9/30/15** - There is no evidence you; 1) analyzed the structure of your MBL department and 2) ensured proper segregation of duties.  Checklist are used.  However, the material loan exceptions noted during the review bring into question the effectiveness of the checklist.  You need to ensure the checklist are appropriate and effective.

16

CONFIDENTIAL INFORMATION – Subject to Protective Order                                              NCUA00359514

Confidential                                                                            USAOr_000311896

Charter 62005                  MELROSE CREDIT UNION                  Eff. Date 9/30/2015

# Document of Resolution Status
### Matters Requiring Board Attention

| Time Frame for Completion | Responsible Person | Reference |
|---|---|---|
| **Problems/Supporting Facts and Plans for Corrective Action** | | |

### Cash Flow Methodologies and Debt Service Coverage Ratios (DSCR)

| June 30, 2015 Ongoing | Board of Directors | RR 723.6 |
|---|---|---|

**7. DSCR**

*Problems/Supporting Facts*

Currently, Earnings Before Interest Taxes Depreciation and Amortization (EBITDA) is the primary cash flow calculation used by the credit union. However, the EBITDA calculation does not consider a business' balance sheet changes, including items such as receivables, inventory, and payables, which may impact cash flow. In addition, management is not accurately detailing and accounting for all principal and interest payments and balances due to other lenders and creditors when calculating the debt service coverage ratios or adjusting net worth calculations as necessary.

*Corrective Action*

Provide training for the member business lending department underwriters or seek additional expertise in this area. Ensure the credit analysts and loan officers attend at least one training class annually. At a minimum, the training will encompass the following concepts:

- Credit and cash flow analysis;
- Underwriting practices and credit memo preparation;
- Legal issues and loan documentation;
- Collection and workout strategies; and
- Loan and program management. This would include evaluating changes in credit risk that require action, assessing internal and external factors and management of problem loans.

*Status and Comment*

**Compliance status as of 9/30/15** - In process. Management reports training occurred. However, the loan material loan underwriting deficiencies noted on newly issued MBLs bring into question the effectiveness of the training. You need to ensure the training is focused and fully addresses the type of MBLs MCU offers.

17

Charter 62005                     MELROSE CREDIT UNION                   Eff. Date 9/30/2015

# Document of Resolution Status
## Matters Requiring Board Attention

| Time Frame for Completion | Responsible Person | Reference |
|---|---|---|
| Problems/Supporting Facts and Plans for Corrective Action | | |

| August 31, 2015 | Board of Directors | RR 723 |
|---|---|---|

**8. Member Business Lending - Underwriting**
*Problems/Supporting Facts*
Management has begun documenting Debt Service Coverage Ratio (DSCR) in its new credit memorandum. However, management is required to fully document a borrower's financial position in the credit memorandum. There is little or no documentation and reconciliation of borrowers' total debts, their verifiable net worth, or their level of liquidity; nor is there documented analysis of changes / trends in the borrower's individual, relationship or global cash flow.

*Corrective Action*
† - Document within the credit memorandum the borrower's financial position including;
- A reconciliation of the borrower's total debts
- Verify their Net Worth or Level of liquidity
- Document credit union's analysis of changes and/or trends in the borrower's individual, relationship, or global cash flow.
- Document compliance with NYS DFS and NCUA regulatory limits (i.e. LTV, concentration limits, etc.)

**Compliance status as of 9/30/15** - Not completed. Your underwriting for new, refinanced or TDR loans remains materially deficient and does not comply with the Memorandum of Understanding (MOU), dated August 28, 2015, NCUA Rules and Regulations Parts 723 and 714 Appendix C and NCUA letter to credit unions as noted in the Document of Resolution.

Credit Memorandums for taxi medallion loans are materially inadequate as documented in the extensive loan exceptions:
- Comprehensive analysis is not being performed for borrowers with complex corporate structures.
- If the borrower leases medallions through his own management company, it is not discussed and analyzed in the credit memorandum and corporate guarantees are still not being required from the operating companies that control the cash flows.
- Cash flows are not accurately segregated to identify where cash flow support actually lies.
- The potential negative effect on cash flow and collateral values when one of the two medallions in a mini-fleet is chosen as a WAV medallion are not addressed.
- Details of all the presently outstanding loans (open date, original amount, current balance, term & amortization, remaining term & amortization, payment, rate, collateral, LTV, etc.) are not disclosed nor reconciled.

18

Charter 62005         MELROSE CREDIT UNION        Eff. Date 9/30/2015

# Document of Resolution Status
### Matters Requiring Board Attention

| Time Frame for Completion | Responsible Person | Reference |
|---|---|---|
| **Problems/Supporting Facts and Plans for Corrective Action** | | |

- No detailed debt and cash flow listings are received from the borrower. For large complex borrowers, it is both a safe and sound, and a general industry practice, to require complex borrowers to provide a list comprised of the following: name, description, collateral, percentage of ownership, revenues, NOI, lender, debt service, DSCR, cash flow, percentage of cash flow, value, percentage of value, LTV, etc.
- Applications are not sufficiently completed, nor do files contain recent and detailed Personal Financial Statements.
- There is no analysis of personal tax returns, including detailed analysis of K-1s and personal cash flow.
- For newly purchased collateral, it is both prudent and a general industry practice to require an opening balance sheet as well as a projections for new corporate owners.

See revised Document of Resolution.

† This is either a repeat or carry-over DOR.

## Member Business Loan Monitoring and Metrics

| September 30, 2015 Ongoing | Board of Directors | LTR 10-CU-02; 14-CU-06 |
|---|---|---|

**9. MBL Portfolio monitoring and management**

*Problems/Supporting Facts*

For the size and complexity of the portfolio, Melrose CU lacks sufficient metrics and reporting to properly evaluate the quality, performance and risks of (or in) the MBL portfolio, and to identify changes in their risk. Management is not assessing potential concentrations by stratifying the portfolio into segments that have common risk characteristics or sensitivities to economic, financial, or business developments; such as loans with current loan-to-values greater than 70%, 80% and 90%, loans or with current Debt Service Coverage Ratios less than 1-to-1, 1-to-1.2, 1-to 1.3, credit scores, amortizations exceeding 25 years and changes in these metrics.

See the Supplementary Facts section of the report for more details in this area.

CONFIDENTIAL INFORMATION – Subject to Protective Order      NCUA00359517

Confidential      USAOr_000311899

Charter 62005                       MELROSE CREDIT UNION                  Eff. Date 9/30/2015

# Document of Resolution Status
### Matters Requiring Board Attention

| Time Frame for Completion | Responsible Person | Reference |
|---|---|---|
| Problems/Supporting Facts and Plans for Corrective Action | | |

*Corrective Action*

Develop a portfolio risk management program to include, at a minimum, the following portfolio monitoring reports and best practices and others which may be applicable due to the CU's various portfolios or industries served:

- Concentration reports in relation to net worth by LTV tranches (10-CU-02 and 10-CU-03)
- LTV migrations (10-CU-02);
- Risk rating migrations (10-CU-02);
- Stress testing such as performing break-even analysis for changes in revenues, changes in and increases in interest rates etc. (10-CU-02);
- Loans by geographic locations (10-CU-02 and 10-CU-03); and
- Rate Structure (adjustable vs fixed), maturity date, debt service coverage ratio
- Stress individual loans, relationships and the portfolio for changes in LTV, interest rates, debt service coverage, medallion lease rates and changing loan amortization periods.

*Status and Comment*

**Compliance status as of 9/30/15** - In process.  You have developed a quarterly medallion stress test report, which includes LTV.  However, there is no report, where 1) LTVs are measured by tranches or against net worth and 2) LTVs migrations are assessed, reported, or monitored.  You have not risked rated all the medallion loans as newly issued TDRs and medallion loans were not risk rated.  There is no report noting the rate structure, maturity date and debt service coverage ratios of the MBLs.  You are in the process of entering the loans on Sagework.  During this process you will update the risks rating and other information.  You did not perform ALM income simulations stress testing to assess the effect of changes in revenue.  However, management ran a what-if scenario showing the impact on earnings if TDRs rise to $1 billion at a rate of 2.5 percent.  The Base case and increased rate scenarios show negative net income over the next 3 years.  You need to understand the changes in income under different interest rates scenarios.  Finally, you have not stressed the largest individual loan concentrations' LTVs, interest rates and debt service coverage ratios.

20

Charter 62005        MELROSE CREDIT UNION        Eff. Date 9/30/2015

# Document of Resolution Status
### Matters Requiring Board Attention

| Time Frame for Completion | Responsible Person | Reference |
|---|---|---|
| Problems/Supporting Facts and Plans for Corrective Action | | |

### Member Business Loan Violation

| August 31, 2015 Until Resolved | Board of Directors | RR 723.8 |
|---|---|---|

**10. Concentration to Associated Members**

*Problems/Supporting Facts*

Melrose has loans to members associated with member Yury Treskunov that exceeds 15% of Net Worth. NCUA Rules and Regulations Part 723.8(a) states the aggregate amount of net member business loan balances to any one member or group of associated members must not exceed the greater of 15% of the credit union's net worth or $100,000 relationship with member.  As of December 31, 2014, Melrose CU's balance of loans associated with member Yury Treskunov totaled $71,175,349 or 17.71% of Net Worth.

Although Melrose CU has submitted a forbearance request for this relationship (and a waiver moving forward), the majority of the loans that caused the relationship to exceed the regulatory limit were granted in late April and May of 2014.  At this same time, Melrose was awaiting approval of another forbearance request to an associated member.

*Corrective Action*

1. Develop a plan by August 31, 2015, to bring member business loans to Mr. Trekunov and his associated borrowers to less than 15% of Net Worth.  This plan should include not renewing Mr. Trekunov's MBLs when the balloons come due, until the limit is below 15% of Net Worth.  Include in the plan all relevant information such as loan balances, balloon dates, possible participations, etc.
2. Submit the plan for approval to the Regional Director latest by August 31, 2015.  This plan must have a reasonable and clearly identified date in which the credit union will be in compliance with NCUA Rules and Regulations Part 723.8(a).  For example, 10 years to come into compliance would not be reasonable.

*Status and Comment*

**Compliance status as of 9/30/15** - Not completed.  Management in October 2015, refinanced a portion of Freidman loans as a Trouble Debt Restructure (TDR.)  The TDR exacerbated the violation by extending the maturity date of the loans and decreasing the principal payment.  The Regional Director (RD) in a letter dated October 26, 2015, noted your letter of September 25, 2015, outlines six strategies to cure the violation.  However, they do not constitute a plan.  The RD letter requires you to develop a Plan to bring the concentration within legal limits.

CONFIDENTIAL INFORMATION – Subject to Protective Order        NCUA00359519

Confidential        USAOr_000311901

Charter 62005        MELROSE CREDIT UNION        Eff. Date 9/30/2015

# Document of Resolution Status
### Matters Requiring Board Attention

| Time Frame for Completion | Responsible Person | Reference |
|---|---|---|
| Problems/Supporting Facts and Plans for Corrective Action | | |

| August 31, 2015 Ongoing | Board of Directors | RR §723.8 |
|---|---|---|

**11. Associated Borrowers**

*Problems/Supporting Facts*

The E. Freidman relationship continues to exceed 15% of the credit union's Net Worth. It is noted that the credit union currently has a forbearance request and future waiver for this relationship outstanding.

*Corrective Action*

1. Develop a plan by August 31, 2015, to bring member business loans to Mr. E. Freidman and his associated borrowers to less than 15% of Net Worth. This plan should include not renewing Mr. Freidman's and his associated borrower's MBLs when the balloons come due, until the limit is below 15% of Net Worth. Include in the plan all relevant information such as loan balances, balloon dates, possible participations, etc. †

2. Submit the plan for approval to the Regional Director latest by August 31, 2015. This plan must have a reasonable and clearly identified date in which the credit union will be in compliance with NCUA Rules and Regulations Part 723.8(a). For example, 10 years to come into compliance would not be reasonable.

*Status and Comment*

The credit union sent a letter to the NYS DFS requesting forbearance and a waiver going forward for the Freidman and Treskunov relationships on July 14, 2014. In December, it was referred to the NCUA for consideration since it was a request for forbearance from an NCUA regulation. The NCUA sent correspondence to Melrose Credit Union on 12/30/2014 asking for more information. The credit union is in the process of gathering this information and will stay in contact with the regional office regarding the forbearance and waiver request. Management is required to assess and identify associated relationships during each new or refinanced business loan and to report these associations as well aggregate amount and loan details in the loan file. Despite this requirement, the CU made new loans to the Treskunov relationship totaling 18.12% of NW ($71M) and resulting in a new Regulatory Violation of §723.8.

**Compliance status as of 9/30/15** – You have not developed or submitted a Plan. The Regional Director (RD) in a letter dated October 26, 2015, noted your letter of September 25, 2015, outlines six strategies to cure the violation. However, they do not constitute a plan. The RD letter requires you to develop a Plan to bring the concentration within legal limits.

Management in October 2015, refinanced a portion of Freidman loans as a Trouble Debt Restructure (TDR.) The TDR exacerbated the violation by extending the maturity date of the loans and decreasing the principal payment.

† This is either a repeat or carry-over DOR.

CONFIDENTIAL INFORMATION – Subject to Protective Order        NCUA00359520

Confidential        USAOr_000311902

Charter 62005        MELROSE CREDIT UNION        Eff. Date 9/30/2015

# Document of Resolution Status
### Matters Requiring Board Attention

| Time Frame for Completion | Responsible Person | Reference |
|---|---|---|
| **Problems/Supporting Facts and Plans for Corrective Action** | | |

### Allowance for Loan and Lease Losses (ALLL)

| June 30, 2015 Ongoing | Board of Directors | IRPS 02-3; Letter to Credit Unions 10-CU-02 |
|---|---|---|

**12. ALLL - Medallion Reserves**

*Problems/Supporting Facts*

The credit union's allowance for its medallion portfolio is not adequate. Despite an overall 20% decline in market collateral values by the end of 2014 and an increase in delinquency, management did not adjust their economic factors or increase ALLL to the appropriate level.

*Corrective Action*

a. Develop environmental factors commensurate with the size and complexity of your loans portfolios. Segment the MBL portfolio into risk pools based on a combination of any or all of the following:

    a) Geographic location;
    b) Current Loan-to-value;
    c) Most recent Debt Service Coverage Ratio;
    d) Risk Rating;
    e) Collateral Type;
    f) Modification or Trouble Debt Restructure status; and
    g) Amortization term.

Consider the impact of current environmental factors and then document which factors are used in your ALLL analysis and how those factors affect the loss measurements. Factors to consider in developing loss measurements include:

    a) Levels of and trends in delinquencies and impaired loans;
    b) Levels of and trends in charge-offs and recoveries;
    c) Trends in volume and terms of loans;
    d) Effects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures, and practices;
    e) Experience, ability, and depth of lending management and other relevant staff;
    f) National and local economic trends and conditions;
    g) Industry conditions; and
    h) Effects of changes in credit concentrations.

Maintain sufficient, objective evidence to support the amount of the adjustment and to explain why the adjustment is necessary to reflect current information, events, circumstances, and conditions in the loss measurements.

CONFIDENTIAL INFORMATION – Subject to Protective Order      NCUA00359521

Confidential      USAOr_000311903

Charter 62005        MELROSE CREDIT UNION        Eff. Date 9/30/2015

# Document of Resolution Status
### Matters Requiring Board Attention

| Time Frame for Completion | Responsible Person | Reference |
|---|---|---|
| **Problems/Supporting Facts and Plans for Corrective Action** | | |

b.  Increase the ALLL to appropriately reflect the current uncertainty in the market and the risk of continued downward pressures on collateral values and debt service coverage ratios.

***Status and Comment***
**Compliance status as of 9/30/15** - You revised the ALLL methodology in March 2015, and hired a CPA to review the methodology. The CPA opines the methodology is appropriate. However, at the time of the review MCU did not have a TDR. You must ensure the methodology is consistent ASC 310-10-35 and ASC 942-310.

| June 30, 2015 Ongoing | Board of Directors | IRPS 02-3 |
|---|---|---|

**13. ALLL - Real Estate Loans**
*Problems/Supporting Facts*
The ALLL methodology is not adequate for estimating loan losses on real estate loans. Management prepared a summary to support its consideration of environmental factors for residential and commercial real estate loans. But, the summaries focused primarily on the economy while other qualitative factors were not described and evaluated. In addition, each of the summaries acknowledged that there were a few loans, in the combined portfolios, where borrowers' either exhibited an inability to meet the repayment obligation or were delinquent. Yet, that declaration of inability to repay and delinquency was not complimented with an impairment analysis to determine the amount, if any, of required reserves for each of the loans.

Management's judgment in the credit analysis and review process must be combined with analysis to determine the amount of reserves. In accordance with the Interagency Policy Statement on the Allowance for Loan and Lease Losses, when a loan is deemed to be individually impaired, an analysis within the scope of ASC 310-10 is conducted using one of the three standard impairment measurement methods. Though management set the ALLL at 100 percent of exposure for the impaired residential real estate loans and is monitoring delinquency on the commercial real estate loan, the practice used to estimate the ALLL is not acceptable and in contravention of accounting rules.

*Corrective Action*
a.  Expand the evaluation of economic factors beyond the economy to consider the other environmental factors listed above.

b.  Identify and evaluate impaired loans individually under ASC 310-10 using one of the three impairment measurement methods.

CONFIDENTIAL INFORMATION – Subject to Protective Order      NCUA00359522

Confidential      USAOr_000311904

Charter 62005                   MELROSE CREDIT UNION                   Eff. Date 9/30/2015

# Document of Resolution Status
### Matters Requiring Board Attention

| Time Frame for Completion | Responsible Person | Reference |
| --- | --- | --- |
| Problems/Supporting Facts and Plans for Corrective Action | | |

| |
| --- |
| *Status and Comment* <br> **Compliance status as of 9/30/15** - Done.  See MBL ALLL compliance status comment. |

### Strategic Planning

| July 31, 2015 Ongoing | Board of Directors | |
| --- | --- | --- |

**14. Business Plan**
*Problems/Supporting Facts*
The credit union's business plan is complemented with a strategic plan and budget.  However, the plans are not robust, and strategic objectives are not appropriately analyzed, monitored, and reported. Inadequacies in the plan, as described below, can potentially result in delayed response to changing economic and competitive pressures.

- The business plan is primarily a description of existing operations, including technology and human resources, with only brief narrative of strengths, weaknesses, opportunities, threats, and potential future activities, products, and services.  In addition, challenges to growth initiatives are not sufficiently argued to provide a sound basis for decision making, and although stated in the business plan, a comprehensive analysis to identify specific growth opportunities has not been conducted.  This is only minimally considered in the business plan, despite competitive pressures from cell phone taxi applications and Uber, marketplace competition for taxi medallion lending.

- The concentration in taxi medallion is not supported with exit strategies, and competition has not been evaluated and details incorporated into the business plan.

- None of the goals and objectives, which are presented as action items in the business plan, are sufficiently detailed and aligned with target dates for accomplishment.  For example, to achieve the institution's targeted growth, enhancement of existing delivery channels is needed, yet the underlying methods are not at all addressed.

Discussions of the status of plan objectives are not transparent in the minutes of the Board and supported with analytical reports prepared by management.

25

Charter 62005                     MELROSE CREDIT UNION                   Eff. Date 9/30/2015

# Document of Resolution Status
## Matters Requiring Board Attention

| Time Frame for Completion | Responsible Person | Reference |
|---|---|---|
| Problems/Supporting Facts and Plans for Corrective Action | | |

*Corrective Action*

Reconstitute the business plan.  The revised version of the plan should, at a minimum, address all of the above mentioned weaknesses including:

(1) detailed analysis of opportunities, strengths, weaknesses, threats or competition;

(2) technology, human resources, delivery channels, and exit strategies for all current and potential products, services, business lines, and markets;

(3) clearly defined objectives;

(4) detailed analysis of risk and reward for existing and contemplated business line, products, and services.; and

(5) discussions of strategic objectives in the Board minutes should be transparent and supported by retained copies of analytical reports in Board packages.

The revised business plan needs to address the credit union's strategic direction for managing the taxi medallion loan portfolio within this current environment.

*Status and Comment*

You have not developed a Plan to address these issues.  Please see the December 31, 2014, Examination Report, Memorandum of Understanding (MOU) issued August 28, 2015, and this supervision contact's examination overview for required corrective actions.

## ALM Modeling

| June 30, 2015 Ongoing | Board of Directors | RR 748; Appendix B |
|---|---|---|

**15. ALM modeling for medallions**

*Problems/Supporting Facts*

Management has indicated that if interest rates rise, some borrowers may not be able repay their loans at the higher rates and the credit union might not be able to pass on the higher market rates. No stress testing has occurred to identify which portion of the portfolio might be so affected.  The examiners tested a few of loans with debt service coverage ratios of 1.30x and found the DSCR would drop below a 1.0x with as little as a 1.0-1.25% increase in interest rates.

This is a significant concern from an ALM perspective, as approximately a third of the portfolio has DSCRs under 1.3x and may not be able to re-price as expected in a rising rate environment.

26

Charter 62005                  MELROSE CREDIT UNION                Eff. Date 9/30/2015

# Document of Resolution Status
### Matters Requiring Board Attention

| Time Frame for Completion | Responsible Person | Reference |
|---|---|---|
| Problems/Supporting Facts and Plans for Corrective Action | | |

*Corrective Action*

1.  Model various percentages between 10% - 33% of Melrose's medallion portfolio as fixed rates and identify what the impact on NEV, liquidity and profitability would be.

2.  Develop plans to mitigate this potential risk.

*Status and Comment*
**Compliance status as of 9/30/15** - You have not done this.

bc/12-31-15/2pm

27

CONFIDENTIAL INFORMATION – Subject to Protective Order                                    NCUA00359525

Confidential                                                                      USAOr_000311907

Charter 62005 MELROSE Eff. Date 09/30/2015

# Key Ratios

PEER RATIOS
Over $500 Mill

| Period Ending: | 12/31/2012 | 12/31/2013 | 12/31/2014 | 09/30/2015 | 06/30/2015 |
|---|---|---|---|---|---|
| **CAPITAL ADEQUACY RATIOS** | | | | | |
| 1. Net Worth / Total Assets | **19.02%** | **20.22%** | **18.44%** | **17.30%** | **10.95%** |
| 2. Net Worth / PCA Optional Total Assets (if used) | 19.02% | 20.22% | 18.44% | 17.30% | 10.98% |
| 3. Total Delinquent Loans / Net Worth | 0.93% | 0.80% | 1.10% | 34.89% | 4.18% |
| 4. Solvency Evaluation (2) | 123.78% | 125.20% | 122.96% | 121.78% | 112.83% |
| 5. Impaired Assets / Net Worth (2) | 1.57% | 1.33% | 6.59% | 18.84% | 5.32% |
| **ASSET QUALITY RATIOS** | | | | | |
| 6. Delinquent Loans / Loans | **0.19%** | **0.18%** | **0.22%** | **6.28%** | **0.66%** |
| 7. Net Charge-Offs / Average Loans (4) | 0.03% | 0.01% | 0.07% | 0.04% | 0.39% |
| 8. Fair Value / Amortized Cost for HTM Investments | N/A | N/A | N/A | N/A | 100.99% |
| 9. Accumulated Unrealized G/L on AFS Securities (+ debits - credits) / Amortized Cost of AFS | 1.75% | -3.73% | -0.24% | -0.19% | 0.23% |
| 10. Delinquent Loans / Assets | 0.18% | 0.16% | 0.20% | 6.04% | 0.44% |
| **EARNINGS RATIOS** | | | | | |
| 11. Return on Average Assets (1) | **1.52%** | **1.40%** | **0.35%** | **-1.36%** | **0.83%** |
| 12. Gross Income / Average Assets (1) | 4.52% | 4.15% | 4.14% | 4.01% | 4.68% |
| 13. Yield on Average Loans (1) | 4.61% | 4.23% | 4.14% | 3.95% | 4.48% |
| 14. Yield on Average Investments (1) | 2.06% | 1.71% | 2.29% | 2.00% | 1.20% |
| 15. Fee & Other Op. Income / Average Assets (1) | 0.18% | 0.18% | 0.17% | 0.17% | 1.40% |
| 16. Cost of Funds / Average Assets (1) | 1.60% | 1.48% | 1.39% | 1.34% | 0.47% |
| 17. Net Margin / Average Assets (1) | 2.93% | 2.67% | 2.75% | 2.67% | 4.21% |
| 18. Operating Expenses / Average Assets (1) | 1.37% | 1.30% | 1.31% | 1.24% | 3.18% |
| 19. Provision for Loan Losses / Average Assets (1) | 0.09% | -0.02% | 1.09% | 2.79% | 0.25% |
| 20. Net Interest Margin / Average Assets (1) | 2.75% | 2.49% | 2.58% | 2.50% | 2.82% |
| 21. Operating Expenses / Gross Income | 30.22% | 31.42% | 31.78% | 30.99% | 67.19% |
| 22. Fixed Assets including FRAs / Assets | 1.25% | 1.23% | 1.08% | 1.07% | 2.42% |
| 23. Net Operating Expenses / Average Assets (1) | 1.19% | 1.13% | 1.15% | 1.08% | 2.48% |
| **ASSET / LIABILITY MANAGEMENT RATIOS** | | | | | |
| 24. Net Long-Term Assets / Assets | 96.28% | 97.37% | 98.92% | 100.24% | 35.12% |
| 25. Regular Shares / Total Shares & Borrowing | 12.72% | 12.47% | 9.99% | 9.42% | 32.51% |
| 26. Total Loans / Total Shares | 116.53% | 117.68% | 119.84% | 124.37% | 77.27% |
| 27. Total Loans / Total Assets | 91.15% | 91.79% | 93.63% | 96.16% | 65.68% |
| 28. Cash + Short-Term Investments / Assets (3) | 0.95% | 0.70% | 0.45% | 0.73% | 12.40% |
| 29. Total Shares, Deposits, & Borrowings / Earning Assets | 83.00% | 82.30% | 82.96% | 82.32% | 93.22% |
| 30. Reg Shares + Share Drafts/Total Shares and Borrowings | 13.91% | 13.81% | 11.30% | 10.70% | 47.16% |
| 31. Borrowings / Total Shares and Net Worth | 3.03% | 2.31% | 4.00% | 6.01% | 2.99% |
| **OTHER RATIOS** | | | | | |
| 32. Net Worth Growth (1) | 8.17% | 7.41% | 1.82% | -7.40% | 8.34% |
| 33. Market (Share) Growth (1) | 12.15% | 0.72% | 11.87% | -0.51% | 8.26% |
| 34. Loan Growth (1) | 12.34% | 1.72% | 13.91% | 4.51% | 9.96% |
| 35. Asset Growth (1) | 12.44% | 1.01% | 11.68% | 0.87% | 8.36% |
| 36. Investment Growth (1) | 17.63% | -12.79% | 1.47% | -12.81% | 9.94% |
| 37. Membership Growth (1) | 3.41% | -0.84% | -0.32% | -2.34% | 5.02% |

(1) Exam date ratios are annualized. (2) Prior year ratios are based on estimates. (3) This ratio relies on the maturity distribution of investments reported per 5300 instructions. Thus, the maturity distribution could be based on the repricing interval and not the actual interval of the investment. (4) Exam Date ratio: Net Charge Offs is YTD Net Losses plus (Average Monthly Net Losses from the prior year, multiplied by the number of months needed to equal a 12 month period). Example: If the exam date is 3/31/2009, the net charge off ratio for the exam date is: (YTD Net Losses) + (Average Monthly Net Losses for the year 2008, multiplied by 9). This is necessary to calculate 12 months worth of charge-offs with the available examination data.

28

CONFIDENTIAL INFORMATION – Subject to Protective Order

NCUA00359526

Confidential

USAOr_000311908

Charter 62005                              MELROSE                        Eff. Date 09/30/2015

# Financial History

| Period Ending: | 12/31/2011 | 12/31/2012 | 12/31/2013 | 12/31/2014 | 09/30/2015 |
|---|---|---|---|---|---|
| **BALANCE SHEET DATA** | | | | | |
| Total Assets | 1,632,043,570 | 1,835,079,891 | 1,853,553,514 | 2,070,129,745 | 2,083,690,217 |
| Average Assets | | 1,733,561,731 | 1,844,316,703 | 1,961,841,630 | 2,076,909,981 |
| **LOAN DATA** | | | | | |
| Total Loans (Gross) | 1,489,035,308 | 1,672,750,202 | 1,701,449,141 | 1,938,161,114 | 2,003,658,076 |
| Average Loans | | 1,580,892,755 | 1,687,099,672 | 1,819,805,128 | 1,970,909,595 |
| Allowance for Loan Losses | (4,356,796) | (5,465,651) | (5,000,427) | (25,141,465) | (68,114,506) |
| Delinquent Loans - 60 Days and Over | 1,789,881 | 3,231,910 | 2,987,436 | 4,218,593 | 125,788,698 |
| Collection Problem Loans | 4,356,796 | 5,465,651 | 5,000,427 | 25,141,465 | 67,917,412 |
| Provision for Loan Loss Expense | (1,330,318) | 1,522,209 | (322,774) | 21,393,103 | 43,504,403 |
| Charge Off Loans (Net, Last 12 Months) | 1,545,324 | 413,353 | 142,450 | 1,252,064 | 844,378 |
| Total Real Estate Loans | 309,743,243 | 320,200,940 | 321,902,948 | 404,194,451 | 464,240,799 |
| Adj/Repricable Real Estate Loans (5 yrs) | 4,520,784 | 5,401,057 | 4,948,168 | 4,885,697 | 5,324,944 |
| Loans Granted During Period (Debits) | 1,544,913,366 | 1,314,729,512 | 978,671,914 | 744,432,482 | 455,285,785 |
| **CASH/INVESTMENT DATA** | | | | | |
| Cash on hand | 791,863 | 854,888 | 800,059 | 1,004,870 | 809,538 |
| Investments Greater Than 1 Year | 69,573,588 | 105,294,857 | 94,015,556 | 99,471,232 | 83,031,520 |
| Total Inv.,Cash on Dep., Cash Equiv. | 103,538,229 | 121,796,844 | 106,215,310 | 107,772,422 | 97,418,057 |
| Fair Value of Total Investments | 103,538,229 | 121,796,844 | 106,215,310 | 107,772,422 | 97,418,057 |
| Fair Value of AFS and Trading Portfolio | 67,630,190 | 105,134,421 | 89,967,036 | 86,379,663 | 70,401,630 |
| Book Value of HTM + Non FAS 115 Invest. | 35,908,039 | 16,662,393 | 16,248,274 | 21,392,759 | 27,016,427 |
| Cost of Securities Available for Sale | 66,833,966 | 103,329,725 | 93,457,031 | 86,589,517 | 70,538,407 |
| Total Reverse Repurchase Agreements | 0 | 0 | 0 | 0 | 0 |
| **OTHER ASSET DATA** | | | | | |
| Non-Earning Assets | 43,826,829 | 45,998,526 | 50,889,490 | 49,337,674 | 50,728,590 |
| Fixed Assets (incl. FRAs & Future Lease Pmts) | 23,500,717 | 22,951,461 | 22,800,916 | 22,409,103 | 22,317,467 |
| Foreclosed and Repossessed Assets (FRA's) | 0 | 0 | 0 | 0 | 300,000 |
| Other Potential Losses & Devaluations | N/A | N/A | N/A | N/A | 0 |
| **SHARES & LIABILITIES** | | | | | |
| Total Borrowings | 30,000,000 | 54,000,000 | 42,000,000 | 80,000,000 | 118,521,863 |
| Regular Shares | 173,141,333 | 189,499,725 | 185,452,205 | 169,578,085 | 162,861,749 |
| Non-Member Shares | 0 | 0 | 0 | 303,965,446 | 357,964,872 |
| Total Shares and Deposits | 1,279,983,461 | 1,435,490,845 | 1,445,766,704 | 1,617,336,821 | 1,611,106,758 |
| **RESERVES** | | | | | |
| Net Worth | 322,749,110 | 349,107,289 | 374,962,992 | 381,778,645 | 360,576,456 |
| Undivided Earnings (includes net income) | 261,371,584 | 287,727,638 | 313,582,069 | 320,396,309 | 299,193,342 |
| Uninsured Secondary Capital | 0 | 0 | 0 | 0 | 0 |
| Total Reserves | 319,241,320 | 346,853,857 | 369,326,978 | 396,547,060 | 418,874,044 |
| **INCOME & EXPENSE DATA** | | | | | |
| Loan Income | 73,749,072 | 72,948,876 | 71,289,422 | 75,408,573 | 58,339,107 |
| Investment Income | 2,238,314 | 2,321,231 | 1,947,023 | 2,449,595 | 1,540,568 |
| Fee Income | 3,127,973 | 3,086,254 | 3,222,206 | 3,200,338 | 2,550,254 |
| Gross Income | 79,168,080 | 78,380,936 | 76,478,835 | 81,132,829 | 62,498,981 |
| Operating Expenses | 23,226,542 | 23,686,009 | 24,032,693 | 25,782,025 | 19,369,508 |
| Provision for Loan Losses (PLL) | (1,330,318) | 1,522,209 | (322,774) | 21,393,103 | 43,504,403 |
| Non-Operating Gain (Loss) | 203,936 | 850,983 | 371,149 | 46,955 | 80,184 |
| Interest on Borrowed Funds | 800,548 | 633,076 | 591,192 | 600,839 | 733,443 |
| Dividend Expense + Interest on Deposits | 24,576,540 | 27,032,446 | 26,693,171 | 26,588,164 | 20,174,000 |
| Net Income (Loss) | 32,098,704 | 26,358,179 | 25,855,702 | 6,815,653 | (21,202,189) |
| Reserve Transfer | 0 | 0 | 0 | 0 | 0 |
| Net Income (Loss) after Reserve Transfer | 32,098,704 | 26,358,179 | 25,855,702 | 6,815,653 | (21,202,189) |
| **Factor to Annualize** | 12 | 12 | 12 | 12 | 9 |

29

Charter 62005        MELROSE        Eff. Date 09/30/2015

## Statement of Financial Condition

| | Period Ending 12/31/2014 | % | Current Period Examination 09/30/2015 | % | Adjusted Balance | % |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| Cash and Cash Equivalents | | | | | | |
|   Cash on Hand | 1,004,870 | 0.05% | 809,538 | 0.04% | 809,538 | 0.04% |
|   Cash on Deposit | 6,951,190 | 0.34% | 12,278,943 | 0.59% | 12,278,943 | 0.59% |
|   Cash Equivalents | | | | | | |
| Investments: | | | | | | |
|   Trading | | | | | | |
|   Available for Sale | 86,379,663 | | 70,401,630 | | 70,401,630 | |
|   Held to Maturity | | | | | | |
|   Non FAS 115 | 14,441,569 | | 14,737,484 | | 14,737,484 | |
| Investments Net | 100,821,232 | 4.87% | 85,139,114 | 4.09% | 85,139,114 | 4.09% |
| Loans Held For Sale | | | | | | |
| Loans Receivable | 1,938,161,114 | | 2,003,658,076 | | 2,003,658,076 | |
| Less: Allowance for Loan Loss | (25,141,465) | | (68,114,506) | | (68,114,506) | |
| Loans Receivable, Net | 1,913,019,649 | 92.41% | 1,935,543,570 | 92.89% | 1,935,543,570 | 92.89% |
| Foreclosed and Repo'd Assets | | | 300,000 | 0.01% | 300,000 | 0.01% |
| Fixed Assets Net of Depreciation | 22,409,103 | 1.08% | 22,017,467 | 1.06% | 22,017,467 | 1.06% |
| NCUSIF Deposit | 15,021,185 | 0.73% | 15,742,736 | 0.76% | 15,742,736 | 0.76% |
| Intangible Assets | | | | | | |
| Other Assets | 10,902,516 | 0.53% | 11,858,849 | 0.57% | 11,858,849 | 0.57% |
| **Total Assets** | 2,070,129,745 | | 2,083,690,217 | | 2,083,690,217 | |
| **LIABILITIES** | | | | | | |
|   Borrowed Money & Interest Payable | 80,000,000 | 3.86% | 118,521,863 | 5.69% | 118,521,863 | 5.69% |
|   Non-Trading Derivative Liabilities, net | | | | | | |
|   Dividends & Interest Payable | | | | | | |
|   Payables & Liabilities | 1,387,329 | 0.07% | 3,302,058 | 0.16% | 3,302,058 | 0.16% |
| **Total Liabilities** | 81,387,329 | | 121,823,921 | | 121,823,921 | |
| **SHARES** | | | | | | |
|   Shares & Deposits | 1,617,336,821 | 78.13% | 1,611,106,758 | 77.32% | 1,611,106,758 | 77.32% |
| **Total Shares** | 1,617,336,821 | | 1,611,106,758 | | 1,611,106,758 | |
| **MEMBERS' EQUITY** | | | | | | |
|   Regular Reserves | 61,382,336 | 2.97% | 61,383,114 | 2.95% | 61,383,114 | 2.95% |
|   Other Reserves | | | | | | |
|   Undivided Earnings | 320,396,309 | 15.48% | 320,395,531 | 15.38% | 320,395,531 | 15.38% |
|   Equity Acquired in Merger | | | | | | |
|   Miscellaneous Equity | | | | | | |
|   Other Comprehensive Income | (10,163,196) | -0.49% | (9,680,141) | -0.46% | (9,680,141) | -0.46% |
|   Accumulated Unrealized Gains (Losses) on AFS Securities | (209,854) | -0.01% | (136,777) | -0.01% | (136,777) | -0.01% |
|   Accumulated Unrealized Losses on OTTI on HTM Securities | | | | | | |
|   Accumulated Unrealized Net Gains (Losses) on Cash Flow Hedges | | | | | | |
|   Current Earnings | | | (21,202,189) | -1.02% | (21,202,189) | -1.02% |
| **Total Members' Equity** | 371,405,595 | | 350,759,538 | | 350,759,538 | |
| **Total Liabilities, Shares, and Members' Equity** | 2,070,129,745 | | 2,083,690,217 | | 2,083,690,217 | |

**NOTES TO THE FINANCIAL STATEMENTS:**

| | |
|---|---|
| 1. The fair value of the Held to Maturity investment portfolio | |
| 2. Total Unfunded Commitments are | 4,658,185 |
| 3. The total balance of Reverse Repurchases included in assets and liabilities is | |
| 4. Contingent Liabilities are | |

CONFIDENTIAL INFORMATION – Subject to Protective Order

NCUA00359528

Confidential

USAOr_000311910

Charter 62005          MELROSE          Eff. Date 09/30/2015

## Statement of Income

| | For Period From: 01/01/2014 thru 12/31/2014 | % Average Assets | Current Period Examination 09/30/2015 | % Average Assets | Adjusted: 01/01/2015 thru 09/30/2015 | % Average Assets |
|---|---|---|---|---|---|---|
| **INTEREST INCOME:** | | | | | | |
| Interest on Loans (Gross) | 75,408,573 | 3.84% | 58,339,107 | 3.75% | 58,339,107 | 3.75% |
| Less: Interest Refunded | | | | | | |
| **Net Loan Income** | **75,408,573** | 3.84% | **58,339,107** | 3.75% | **58,339,107** | 3.75% |
| Income from Investments | 2,449,595 | 0.12% | 1,540,568 | 0.10% | 1,540,568 | 0.10% |
| Inc. (Loss) from Trading Sec. | | | | | | |
| **Total Interest Income** | **77,858,168** | 3.97% | **59,879,675** | 3.84% | **59,879,675** | 3.84% |
| **INTEREST EXPENSE:** | | | | | | |
| Dividends on Shares | 26,588,164 | 1.36% | 20,174,000 | 1.30% | 20,174,000 | 1.30% |
| Interest on Borrowed Money | 600,839 | 0.03% | 733,443 | 0.05% | 733,443 | 0.05% |
| **Total Interest Expense** | **27,189,003** | 1.39% | **20,907,443** | 1.34% | **20,907,443** | 1.34% |
| **Net Interest Income** | **50,669,165** | 2.58% | **38,972,232** | 2.50% | **38,972,232** | 2.50% |
| Provision for Loan & Lease Losses | 21,393,103 | 1.09% | 43,504,403 | 2.79% | 43,504,403 | 2.79% |
| **Net Interest Income After Provision for Loan & Lease Losses** | **29,276,062** | 1.49% | **(4,532,171)** | -0.29% | **(4,532,171)** | -0.29% |
| **NON-INTEREST INCOME:** | | | | | | |
| Fee Income | 3,200,338 | 0.16% | 2,550,254 | 0.16% | 2,550,254 | 0.16% |
| Other Operating Income | 74,323 | 0.00% | 69,052 | 0.00% | 69,052 | 0.00% |
| Gain (Loss) on Investments (excluding trading) | 2,313 | 0.00% | 48,684 | 0.00% | 48,684 | 0.00% |
| Gain (Loss) on Non-Trading Derivatives | | | | | | |
| Gain (Loss) on Disposition of Assets | 14,642 | 0.00% | | | | |
| Gain from Bargain Purchase (Merger) | | | | | | |
| Other Non Operating Inc. (Expense) | 30,000 | 0.00% | 31,500 | 0.00% | 31,500 | 0.00% |
| **Total Non-Interest Income** | **3,321,616** | 0.17% | **2,699,490** | 0.17% | **2,699,490** | 0.17% |
| **NON-INTEREST EXPENSE:** | | | | | | |
| Compensation & Benefits | 12,295,879 | 0.63% | 10,209,445 | 0.66% | 10,209,445 | 0.66% |
| Travel & Conference | 454,330 | 0.02% | 281,919 | 0.02% | 281,919 | 0.02% |
| Office Occupancy | 1,770,550 | 0.09% | 1,967,284 | 0.13% | 1,967,284 | 0.13% |
| Office Operations | 2,475,361 | 0.13% | 1,991,656 | 0.13% | 1,991,656 | 0.13% |
| Educational & Promotional | 5,550,047 | 0.28% | 1,614,009 | 0.10% | 1,614,009 | 0.10% |
| Loan Servicing | 778,798 | 0.04% | 491,362 | 0.03% | 491,362 | 0.03% |
| Professional & Outside Services | 1,363,349 | 0.07% | 2,252,592 | 0.14% | 2,252,592 | 0.14% |
| Member Insurance (including Premiums & Assessments) | 131,833 | 0.01% | 10,638 | 0.00% | 10,638 | 0.00% |
| Examination/Supervision Fees | 83,500 | 0.00% | 58,500 | 0.00% | 58,500 | 0.00% |
| Miscellaneous Operating Expenses | 878,378 | 0.04% | 492,103 | 0.03% | 492,103 | 0.03% |
| **Total Non-Interest Expenses** | **25,782,025** | 1.31% | **19,369,508** | 1.24% | **19,369,508** | 1.24% |
| **Net Income (Loss)** | **6,815,653** | 0.35% | **(21,202,189)** | -1.36% | **(21,202,189)** | -1.36% |
| **RESERVE TRANSFERS:** | | | | | | |
| Transfer to Regular Reserves | | | | | | |
| **OTHER CALCULATIONS:** | | | | | | |
| **Net Income (Loss) Excluding NCUSIF Premiums & TCCU Stabilization Fund Assessment** | **6,815,653** | 0.35% | **(21,202,189)** | -1.36% | **(21,202,189)** | -1.36% |

**NOTES TO THE FINANCIAL STATEMENTS:**

1. NCUSIF Premium Expense is
2. Temporary Corporate CU Stabilization Fund Assessment is

CONFIDENTIAL INFORMATION – Subject to Protective Order

NCUA00359529

Confidential

USAOr_000311911

Charter 62005                                MELROSE                        Eff. Date 09/30/2015

## Loan and Lease Trends

| | 12/31/2012 | % | 12/31/2013 | % | 12/31/2014 | % | 09/30/2015 | % |
|---|---|---|---|---|---|---|---|---|
| **LOAN PORTFOLIO MIX** | | | | | | | | |
| Unsecured Credit Card Loans | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| All Other Unsecured Loans | 142,898 | 0% | 126,015 | 0% | 83,668 | 0% | 60,064 | 0% |
| Payday Alternative Loans (PAL) FCU Only | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Non-Federally Guaranteed Student Loans | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| New Vehicle Loans | 175,786 | 0% | 215,557 | 0% | 183,745 | 0% | 202,058 | 0% |
| Used Vehicle Loans | 24,307 | 0% | 26,755 | 0% | 14,004 | 0% | 6,895 | 0% |
| First Mortgage Real Estate Loans | 315,907,258 | 19% | 318,088,209 | 19% | 400,952,206 | 21% | 461,311,180 | 23% |
| Other Real Estate Loans | 4,293,682 | 0% | 3,814,739 | 0% | 3,242,245 | 0% | 2,929,619 | 0% |
| Leases Receivables | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| All Other Loans | 1,352,206,271 | 81% | 1,379,177,866 | 81% | 1,533,685,246 | 79% | 1,539,148,260 | 77% |
| **Total Loans** | 1,672,750,202 | 100% | 1,701,449,141 | 100% | 1,938,161,114 | 100% | 2,003,658,076 | 100% |
| Number of Loans | 5,268 | | 5,140 | | 5,265 | | 5,222 | |
| **TOTAL DELINQUENT LOANS** | | | | | | | | |
| 30 to 59 Days | 13,655,271 | | 14,186,116 | | 22,368,469 | | 96,122,272 | |
| 60 to 179 Days | 1,477,588 | 46% | 1,787,039 | 60% | 2,435,541 | 58% | 123,020,950 | 98% |
| 180 to 359 Days | 725,558 | 22% | 496,355 | 17% | 1,174,820 | 28% | 2,101,957 | 2% |
| 360 Days and Over | 1,028,764 | 32% | 704,042 | 24% | 608,232 | 14% | 665,791 | 1% |
| **Total Reportable Delinquent Loans** | 3,231,910 | 100% | 2,987,436 | 100% | 4,218,593 | 100% | 125,788,698 | 100% |
| Number of Reportable Delinquent Loans | 63 | | 41 | | 45 | | 158 | |
| Percent of Loans 60 Days and Over Delinquent | 0.19% | | 0.18% | | 0.22% | | 6.28% | |
| **Total Loans Delinquent 30 Days and Over** | 16,887,181 | | 17,173,552 | | 26,587,062 | | 221,910,970 | |
| Percent of Loans 30 Days and Over Delinquent | 1.01% | | 1.01% | | 1.37% | | 11.08% | |
| **MISCELLANEOUS LOAN INFORMATION** | | | | | | | | |
| Maximum Indebtedness of a Member per NCUA Regulation | 172,321,848 | | 175,934,877 | | 193,773,313 | | 191,030,010 | |
| Estimated Loan Maturity (Turnover) In Months | 16 | | 21 | | 40 | | 45 | |
| Number of Days of Accrued Interest | 13 | | 16 | | 17 | | 18 | |
| Weighted Average Loan Interest Rate | 3.57% | | 3.87% | | 4.08% | | 4.09% | |
| Yield on Average Loans | 4.61% | | 4.23% | | 4.14% | | 3.95% | |
| Delinquent Loans to Net Worth | 0.93% | | 0.80% | | 1.10% | | 34.89% | |
| Troubled Debt Restructured Loans (TDRs) | 0 | | 0 | | 0 | | 219,463,355 | |
| Troubled Debt Restructured Loans to Loans | 0.00% | | 0.00% | | 0.00% | | 10.95% | |
| Troubled Debt Restructured Loans to Net Worth | 0.00% | | 0.00% | | 0.00% | | 60.86% | |
| Loans Charged-Off (Annualized) | 554,790 | | 318,515 | | 1,285,650 | | 900,143 | |
| Recoveries on Charged-Offs (Annualized) | 141,437 | | 176,065 | | 33,586 | | 55,765 | |
| Net Charge Offs (Annualized) | 413,353 | | 142,450 | | 1,252,064 | | 844,378 | |
| Net Charge Off Ratio (Annualized) | 0.03% | | 0.01% | | 0.07% | | 0.04% | |
| Amount of Loans Granted Year to Date | 1,314,729,512 | | 978,671,914 | | 744,432,482 | | 455,285,785 | |
| PAL Loans Granted YTD FCU Only | 0 | | 0 | | 0 | | 0 | |
| Non-Federally Guar. Student Loans in deferred status | 0 | | 0 | | 0 | | 0 | |
| Amount of Loans Outstanding to Officials | 468,233 | | 442,432 | | 415,713 | | 395,052 | |
| All Loans Charged off Due to Bankruptcy | 0 | | 0 | | 0 | | 2,812 | |
| Number of Members with Loans who have filed for: | | | | | | | | |
| Chapter 7 Bankruptcy YTD | 0 | | 0 | | 2 | | 0 | |
| Chapter 11 Bankruptcy YTD | 0 | | 0 | | 0 | | 0 | |
| Chapter 13 Bankruptcy YTD | 0 | | 0 | | 0 | | 0 | |
| Outstanding Loan Balances Subject to Bankruptcy | 0 | | 0 | | 348,498 | | 0 | |

| | | % of Loans | | % of Loans | | % of Loans | | % of Loans |
|---|---|---|---|---|---|---|---|---|
| **SPECIALIZED LENDING INFORMATION** | | | | | | | | |
| Credit Card Loans | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Real Estate Loans | 320,200,940 | 19% | 321,902,948 | 19% | 404,194,451 | 21% | 464,240,799 | 23% |
| Indirect Loans | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Member Business Loans Outstanding (Excl. Unused Commitments) | 1,502,415,651 | 90% | 1,506,160,261 | 89% | 1,743,925,710 | 90% | 1,814,020,820 | 91% |
| Participation Loans | 11,550,356 | 1% | 6,368,961 | 0% | 28,765,497 | 1% | 17,853,663 | 1% |

32

CONFIDENTIAL INFORMATION – Subject to Protective Order                                NCUA00359530

Confidential                                                                        USAOr_000311912

Charter 62005            MELROSE            Eff. Date 09/30/2015

## Loan and Lease Trends

|  | 12/31/2012 | % | 12/31/2013 | % | 12/31/2014 | % | 09/30/2015 | % |
|---|---|---|---|---|---|---|---|---|
| **LOAN INTEREST RATES** | | | | | | | | |
| Unsecured Credit Card Loans | 0.00% | | 0.00% | | 0.00% | | 0.00% | |
| All Other Unsecured Loans | 14.00% | | 14.00% | | 14.00% | | 14.00% | |
| Payday Alternative Loans (PAL) FCU Only | 0.00% | | 0.00% | | 0.00% | | 0.00% | |
| Non-Federally Guaranteed Student Loans | 0.00% | | 0.00% | | 0.00% | | 0.00% | |
| New Vehicle Loans | 6.00% | | 6.00% | | 6.00% | | 6.00% | |
| Used Vehicle Loans | 9.00% | | 9.00% | | 9.00% | | 9.00% | |
| First Mortgage Real Estate Loans | 3.88% | | 4.38% | | 4.38% | | 4.38% | |
| Other Real Estate Loans | 4.25% | | 4.25% | | 4.38% | | 4.63% | |
| Leases Receivables | 0.00% | | 0.00% | | 0.00% | | 0.00% | |
| All Other Loans | 3.50% | | 3.75% | | 4.00% | | 4.00% | |

33

CONFIDENTIAL INFORMATION – Subject to Protective Order      NCUA00359531

Confidential      USAOr_000311913

Charter 62005                                    MELROSE                              Eff. Date 09/30/2015

## Allowance for Loan and Lease Losses (ALLL) Adequacy Evaluation

| | Loan Balances | | | Amount Impaired |
|---|---|---|---|---|
| Pooling Impairment: | 1,991,335,431 | Pooling Impairment: | | 67,917,412 |
| Individual Impairment: | 0 | Individual Impairment: | | 0 |
| **TOTAL IMPAIRED LOANS:** | **1,991,335,431** | **TOTAL REQUIRED ALLL:** | | **67,917,412** |

| | |
|---|---|
| **Allowance Prior to Exam Adjustment** | 68,114,506 |
| **Prior to an Exam Adjustment, the Allowance is Adequate or Over Funded** | 197,094 |
| **Prior to an Exam Adjustment, Percentage Over Funded** | 0.29% |

| | |
|---|---|
| **Exam Adjustment** | 0 |
| **Allowance After Exam Adjustment** | 68,114,506 |
| **No Adjustment was made, the Allowance is Adequate or Over Funded** | 197,094 |
| **No Adjustment was made, Percentage Over Funded** | 0.29% |

---

## Allowance for Loan and Lease Losses (ALLL) Reasonability Evaluation

| | 12/31/2012 | 12/31/2013 | 12/31/2014 | 09/30/2015 | Current Dollar Change | Current Percent Change |
|---|---|---|---|---|---|---|
| ALLL Reserves | 5,465,651 | 5,000,427 | 25,141,465 | 68,114,506 | 42,973,041 | 170.92% |
| Delinquent Loans (30 to 59 Days) | 13,655,271 | 14,186,116 | 22,368,469 | 96,122,272 | 73,753,803 | 329.72% |
| Delinquent Loans (60 Days and Over) | 3,231,910 | 2,987,436 | 4,218,593 | 125,788,698 | 121,570,105 | 2881.77% |
| Delinquent Loans (30 Days and Over) | 16,887,181 | 17,173,552 | 26,587,062 | 221,910,970 | 195,323,908 | 734.66% |
| Loans Charged Off (C/O) (Annualized) | 413,353 | 142,450 | 1,252,064 | 844,378 | (407,686) | -32.56% |
| PLL Expense (Annualized) | 1,522,209 | (322,774) | 21,393,103 | 48,852,679 | 27,459,576 | 128.36% |
| Total Loans | 1,672,750,202 | 1,701,449,141 | 1,938,161,114 | 2,003,658,076 | 65,496,962 | 3.38% |

| | 12/31/2012 | 12/31/2013 | 12/31/2014 | 09/30/2015 | Peer |
|---|---|---|---|---|---|
| Percent of ALLL (Current Period - After Exam Adjust) to Delinquent Loans (30 to 59 Days) | 40.03% | 35.25% | 112.40% | 70.86% | 139.20% |
| Percent of ALLL (Current Period - After Exam Adjust) to Delinquent Loans (60 Days and Over) | 169.12% | 167.38% | 595.97% | 54.15% | 139.23% |
| Percent of ALLL (Current Period - After Exam Adjust) to Delinquent Loans (30 Days and Over) | 32.37% | 29.12% | 94.56% | 30.69% | 69.61% |
| Percentage of ALLL to Loan C/O (Annualized) | 1322.27% | 3510.30% | 2008.00% | 8066.83% | 207.01% |
| Percentage of PLLL to Loan C/O (Annualized) | 368.26% | -226.59% | 1708.63% | 5785.64% | 103.24% |
| Percentage of ALLL to Total Loans | 0.33% | 0.29% | 1.30% | 3.40% | 0.95% |

34

CONFIDENTIAL INFORMATION – Subject to Protective Order                                    NCUA00359532

Confidential                                                                                    USAOr_000311914

Charter   62005                              MELROSE                    Eff. Date        9/30/2015

# Loan Exceptions

| Account Number | Member Name | Date | Balance |
|---|---|---|---|
| **59728/66696** | **Evgeny Freidman & LLCs/Incs** | **Various** | **~$52,000,000** |

Melrose performed a modification/extension/TDR (TDR) on multiple Freidman loans on 10/26/15.   In performing the TDR, Melrose did not fully comply with:

- Letter to Credit Unions 14-CU-06, Taxi Medallion Lending, and Letter to Credit Unions 15-CU-03, Taxi Medallion Lending Questions and Answers
- Letter to Credit Unions 10-CU-07, Commercial Real Estate Loan Workouts (Commercial real estate is an income-producing asset; the principles outline in this letter may be helpful in evaluating risk associated with taxi medallion lending)
- Letter to Credit Unions 13-CU-03, Supervisory Guidance on Troubled Debt Restructuring
- Accounting Bulletin 06-01, Interagency Policy Statement on the Allowance for Loan and Lease Losses

- The 10/26/15 TDR was done without Melrose performing a full and detailed borrower and financial analysis, consequently no DSC ratio was calculated (before and after), no overall collateral evaluation was performed, borrower and related financial statements were not analyzed, risks were not delineated and mitigated, and the TDR carried no formal credit approval.
- There is no indication that an impairment analysis was performed for the TDRs, as required by Accounting Bulletin 06-01, and there is no justification in the file for the $1,441,204 in Freidman impairments taken.
- **Freidman has 74 Chicago medallions with Melrose.   Melrose used its 9/29/15 value memorandum for the October 2015 modifications.   This memorandum placed a value of $220,000 on a Chicago medallion.   Seventy-four medallions would sum to a total value of $16,280,000, vs. the $16,014,751 Freidman Chicago balance.   This is a collaterally dependent loan, and valuation per ASC 310-10 is fair value of collateral.   An LTV of 80% would result in loan amount of $13,024,000, and an impairment of $2,990,751, which is $2,387,290 greater than the Freidman Chicago impairment taken of $603,461.**
- **Freidman has 13 New York mini-fleets, one of which is a three medallion mini-fleet (total of 27 medallions) with Melrose.   Melrose used its 9/29/15 value memorandum for the October 2015 modifications.   This memorandum placed a value of $1,700,000 on a New York mini-fleet ($850,000 per medallion).   Twenty-seven medallions would sum to a total value of $22,950,000, vs. the $21,540,368 Freidman New York balance.   This is a collaterally dependent loan, and valuation per ASC 310-10 is fair value of collateral.   An LTV of 80% would result in loan amount of $18,360,000, and an impairment of $3,180,368, which is $2,501,741 greater than the Freidman New York impairment taken of $678,627.**
- **Freidman has 16 Philadelphia medallions with Melrose.   Melrose used its 9/29/15 value memorandum for the October 2015 modifications.   This memorandum placed a value of $300,000 on a Philadelphia medallion.   Sixteen medallions would sum to a total value of $4,800,000, vs. the $4,100,870 Freidman Philadelphia balance.   This is a collaterally dependent**

35

CONFIDENTIAL INFORMATION – Subject to Protective Order

Confidential

loan, and valuation per ASC 310-10 is fair value of collateral.   **An LTV of 80% would result in loan amount of $3,840,000, and an impairment of $260,870, which is $101,754 greater than the Freidman Philadelphia impairment taken of $159,116.**

- **The above calculations do not include approximately $10M in Freidman loans which are matured and currently in default, and should also be impaired, utilizing the fair value of collateral.**
- **The file does not indicate if any of the Freidman loans were on non-accrual prior to the TDR, or if the matured or past due Freidman loans are on non-accrual.   Since the loans were past due prior to undergoing a TDR and interest was forgiven, the Freidman loans should be on non-accrual status.**
- With the TDR, $674,146 in accrued interest was forgiven and reportedly written off however this reversal and charge-off is not documented in the file, and there is no discussion that Melrose intends to issue an IRS 1099 form in this amount to the borrower.
- The TDR contains no discussion as to how long the accounts will remain in non-accrual.   Until such time as Melrose performs a current, well-documented credit analysis supporting a return to accrual status based on the borrower's financial condition and prospects for repayment under the revised terms, the modified loans should be on non-accrual.
- The TDR loans were not risk rated upon moving to TDR status.
- Several of the Freidman loans remain in default with Melrose, and the TDR does not cure the default, nor indicate that negotiations have taken place or are underway to cure the defaults.
- The Extension and Modification Agreement is not properly executed in the middle right of this legal document.
- The borrower made a false statement when he signed the Extension and Modification Agreement: "There has been no significant, adverse changes in my financial situation since the date of the original loan."   This statement conflicts with the definition of a TDR.   The following indicates that the borrower has significant, adverse changes to his financial situation: being sued for divorce (~$5.4M, even with pre-nuptial), declaring bankruptcy on multiple corporations or LLCs where he is the owner/primary member and guarantor, having a judgment issued against him for $6.8M by CapitalOne Bank, having several LLCs being foreclosed upon due to unpaid real estate taxes, and having New York tax warrants against several management companies and listing on the NY State Top 250 Tax Delinquents.
- Melrose has not demonstrated a clear understanding of the complex borrower, or the performance of his various taxi-related firms and management companies.   The complex borrower does not provide a consolidated or consolidating statement, and Melrose has not worked with the borrower to develop an organization/corporate tree for all of Freidman's business interests, with ownership percentages, partners, entity type (with sufficient detail on the nature of the entity's purpose), etc.
- The TDR does not analyze the scope of the borrower's operations, how many cars he owns in each market, and how many he runs – through his various management companies.
- The TDR does not analyze the size or strength of each of the various markets that the borrower operates in, or effects that transportation network companies (TNV) have had in each market, with respect to medallion revenues and profitability, cash flows and medallion values.
- The status of performance and present terms with other lenders is unknown.
- A detailed listing of all of the borrower's debt was not obtained or analyzed, for all medallions, management companies, related taxi-industry operations, real estate and personal debt.   Said listing for this complex and highly levered borrower should include but not be limited to the following: borrower, ownership, lender, debt amount, monthly payment, interest rate, original date, maturity date, amortization, free cash flow and debt-specific DSCR (as appropriate), collateral/collateral value/LTV.

36

- Although the TDR has only a term of eighteen months, this term is still imprudent due to the lack of underwriting and mitigating of risks, the continued multiple financial and legal issues the borrower is facing or engaged in, and the lack of any recent financial statements or other proofs of financial performance.
- While TDR granted the borrower payment relief in order to purchase taxi cabs for Melrose's and other lenders' medallions, the risk to Melrose was increased, due to the extension or re-amortizing of all of the TDR loans.   The average remaining amortization was 256 months (21.3 years) prior to the TDR, and the average remaining amortization after the TDR is 300 months (25 years), an increase in the remaining amortization of an average of 42 months for the 58 loans.   The extension of the amortization does not assist in the clearing of the regulatory violation of loans to one borrower or associated borrowers.
- LTV on an overall basis, utilizing the Larry Fisher Medallion Values Memorandum dated 9/29/15 is 124%, or a collateral shortfall of $8,165,989 on the 58 loans for $41,655,989.   Current impairments, based upon cash flow valuations is only $1,441,204 however and this is not adequate for the amount of risk in these loans.
- The TDR does not address an A&B note structure, in order to retain an appropriate market rate on the performing portion of the loans, commensurate with the risk.
- The borrower has not demonstrated WHY he needs the TDR, and Melrose has not performed an analysis of historical, current and expected revenues and cash flows in the various markets to support the basis for the TDR or the borrower's ability to repay under the modified terms.
- For this large and complex borrower, the approval or covenants do not require the borrower to provide audited or reviewed financial statements.
- The interest rate was reduced on the 58 TDR loans to 1.5%, from the original 3.75%/4.00%/4.25%, in an attempt to increase the paydown of principal.   However, the reduction in the monthly payment concurrent with the re-amortization of all of the 58 loans to 25 years effectively decreased the monthly principal reductions and this is in conflict with the Melrose statement which was to more quickly reduce the principal and risk on the loans.
- Melrose granted the TDR which reduces the monthly payment on the 58 TDR loans by $71,900 or 30%.   The reason for the TDR was stated as this would allow the borrower the ability to utilize cash to pay for the required replacement of taxi cabs, however, this is a short-term need, which need does not match the 18-month term of the TDR.
- Granting the borrower cash flow relief through the reduction of his monthly payment, allowed the borrower to purchase new taxi cabs – in exchange for the relief, and the increasing of the risk in the Melrose loans was not mitigated, but rather was increased, by not taking the taxi cabs purchased with the reduction in the Melrose monthly payments as collateral.
- The borrower was not required to provide a detailed "taxi cab purchase" plan, which included numbers of cabs, for which medallions, for which lender, amount per cab, per cab listing of vendors – including closely held firms, and timing.   In addition, if cabs were replaced, the proceeds from the sale of the replaced cabs should have accrued to Melrose and the reduced payments applied to only those Melrose loans which had cabs replaced.
- With the TDR, the loans subject to the TDR - but not all Freidman loans - were cross corporate cross secured cross defaulted.
- The guarantees of the management companies were not obtained, nor a collateralized guarantee by these management companies, who run the cabs and collect lease payments from the cabs' lessees – the cash flows were not attached.
- Although payment and term relief was granted with the TDR, no additional collateral was obtained.
- The latest personal financial statement is dated 6/30/15, and differs substantially from the previously provided 3/31/14 PFS – without differences being vetted or explained.   Given the issues as above, it

37

is imperative to obtain a financial statement which is very recent, and said statement should be analyzed in depth.

- There is no analysis of the potential negative effect of the borrower's bankruptcy for multiples of his medallion LLCs, full pre-bankruptcy payments to Citi (vs. reduced payments granted in the Melrose TDR), and legal fees.
- The borrower's judgment to CapitalOne Bank for $6.8M remains unsatisfied.   The TDR does not outline the potential negative effects on the borrower, his liquidity (or that of his management firms), or his operations.
- A firm related to Madison Capital is foreclosing on multiple Freidman properties, through their related entity of NYCTL 2014-A Trust due to unpaid real estate taxes.   The TDR does not address how the borrower intends to cure this loan default.
- There is no analysis of the potential negative effects on the borrower or any of his operations, from his divorce proceedings.
- The borrower has demonstrated, over time and many instances, that he is a reputation risk:   he has bounced countless checks, defaulted on loans with multiple lenders, has had unpaid taxes and real estate taxes, has a court-ordered restraining order on him, and has transferred properties to foreign trustees – all without comment or analysis by Melrose.
- The credit memorandum does not address the potential negative effect on cash flow and collateral value of one of the four medallions being chosen as a WAV medallion.
- There is no discussion as to the number of medallions owned by other Melrose borrowers, which are leased to Freidman & related, or his management companies.   Additionally, there is no discussion or analysis as to the number of these medallions which are delinquent or have had TDRs (and why).


**69324**                          **Allen Weingarten**                          **11/17/15**                          **$2,800,000**

Melrose granted two new loans to present borrower Allen Weingarten on 11/15/15 for the acquisition of two min-fleets from a private party.   Weingarten is both a medallion owner and a fleet operator.   While underwriting the loans, Melrose did not fully comply with:

- NCUA R&R 723. § 723.7 What are the collateral and security requirements?
    (a) Except as provided in § 723.4 or unless your Regional Director grants a waiver, all member business loans, except those made under paragraphs (c), (d), and (e) of this section, must be secured by collateral as follows:
    (1) _**The maximum loan-to-value ratio for all liens must not exceed 80%**_ (emphasis added) unless the value in excess of 80% is covered through private mortgage insurance or equivalent type of insurance, or insured, guaranteed, or subject to advance commitment to purchase by an agency of the federal government, an agency of a state or any of its political subdivisions, but in no case may the ratio exceed 95%;

- Letter to Credit Unions 14-CU-06, Taxi Medallion Lending, and Letter to Credit Unions 15-CU-03, Taxi Medallion Lending Questions and Answers
- _**As a best practice:**_   LTC 10-CU-23 Best Practices in Real Estate Appraisals with ENCL: Interagency Appraisal and Evaluation Guidelines:   Value of Collateral (for Use in Determining Loan-to-Value Ratio) – According to the Agencies' real estate lending standards guidelines, the term "value" means an opinion or estimate set forth in an appraisal or evaluation, whichever may be appropriate, of the market value of real property, prepared in accordance with the Agencies' appraisal regulations and these Guidelines.   _**For loans to**_

38

CONFIDENTIAL INFORMATION – Subject to Protective Order

NCUA00359536

Confidential

USAOr_000311918

*purchase an existing property, "value" means the lesser of the actual acquisition cost or the estimate of value.*

- With the purchase of the two mini-fleets, Melrose financed 80% of the purchase price, and the sellers took back a note for the remainder of the purchase price, plus the $87,500 in transfer fees.   In effect, the borrower engaged in 100% ***plus*** financing.   This is a **_Regulatory Violation_** as above, and an unsafe and unsound practice – especially in the current market.   **_This Regulatory Violation needs to be cured._**   Additionally the credit memorandum contains no disclosure or analysis of the terms for the 2nd liens.

- The credit memorandum does not indicate if the sale of the two mini-fleets by the Sterns is an arms' length transaction, nor if Weingarten has leased these medallions from the Sterns in the past.

- The NYC medallion market can be described as turbulent at best.   Out of 13,486 medallions, approximately 58% are mini-fleets (or approximately 3,910 mini-fleets).   Only two mini-fleets have transferred in the last six months, May through October.   One mini-fleet sold in September for $1,610,000 and one mini-fleet sold in August for $1,750,000 – average of these two is $1,680,000, yet Melrose uses a 9/30/15 value for a mini-fleet of $1,700,000.   In a market which appears to be frozen, it may be more prudent to utilize a lower value and advance rate, possibly utilizing proven or expected discounted cash flows of the asset.

- A comprehensive analysis was not performed on the complex Weingarten corporate structure, i.e., no organization/corporate tree.   If the Weingarten family collectively runs the operation, the tree should include family entities.

- Each of the individual loans with Allen Weingarten stands alone.   A guaranty of all the borrowers with his other Melrose loans was not obtained, and a cross-corporate cross-security cross-default was not obtained.

- No guaranty by the borrower's other medallion firms or more importantly, the borrower's management companies was obtained, and these are the firms which lease out the medallions to drivers and collect the proceeds.   These firms include but are not limited to: FA Taxi Corp., Gateway Medallion Management LLC, Gateway Taxi Funding LLC.

- The only cash flow presented is a global cash flow.   For this complex borrower, the following cash flows & DSC ratios should be calculated, with calculations provided:   each individual loan, all Melrose medallion loans combined, borrower's global cash flow (may further be broken down, i.e. all taxi-related entities, and all real estate or investment entities, depending on the size and complexity of the borrower), and borrower on a personal basis.

- For this large and complex borrower, the approval or covenants do not require the borrower to provide audited or reviewed financial statements.

- The documentation does not indicate an assignment of lease or a copy of the lease agreement.   The credit memorandum does not disclose to whom the medallions are leased, the lease amount, or the lease term.   Additionally, the credit memorandum does not discuss the ability of the management company which will lease these medallions to operate them during the current driver shortage.   The credit memorandum does not address or analyze the management companies' current capacity and usage of all the vehicles it leases.

- With current market lease rates of approximately $2,400 monthly per corporate medallion (as disclosed in the current Freidman bankruptcy proceedings), or approximately $4,800 monthly for a mini-fleet, this is substantially less than the Melrose monthly payment of $7,391, which does NOT include any payment on the $437,500 2nd lien note (terms of the 2nd lien note are not disclosed or analyzed in the credit memorandum).   If the borrower leases them through his own management company, and is able to generate higher incomes, this is not discussed and analyzed in the credit memorandum.   The credit memorandum does not discuss the potential $2,591 minimum monthly cash flow shortage for each of the loans, nor the DSCR, which at a **_maximum_** of .65, except to state

CONFIDENTIAL INFORMATION – Subject to Protective Order

NCUA00359537

Confidential

USAOr_000311919