that the DSCR is 1.52 (which is on a calculated overall basis). If these calculations are incorrect, the correct calculations are not presented in the credit memorandum.

- The credit memorandum does not discuss if the medallions are leased with or without a car, and if leased with a car, details on ownership, debt and monthly payment, next replacement date, etc.
- The credit memorandum does not address the potential negative effect on cash flow and collateral value of one of the four medallions being chosen as a WAV medallion.
- The credit memorandum denotes that the greatest risk to these loans is market risk. Market risk is not further identified, nor is it mitigated. Market risk would indicate a turbulent market, declining values, declining cash flows, less than capacity usage, yet Melrose entered into a loan which has in excess of 100% financing, with a twenty-five year amortization, and possibly cash flow shortages and a less than 1.25 DSCR.
- Per the application, the borrower has five other loans with Melrose, for $7,777K. Per a system report, the borrower has 12 loans (12 mini-fleets) with Melrose for $18,708K. A listing in the file shows the borrower has 11 mini-fleets. The credit memorandum does not discuss any of the present outstandings (open date, original amount, present balance, term & amortization, remaining term & amortization, payment, rate, collateral, LTV, etc.), nor reconciled the disparities in the number of loans and amounts.
- No detailed debt and cash flow listing was received from the borrower. For large complex borrowers, it is both a safe and sound, and a general industry practice, to require complex borrowers to provide a list comprised of the following: name, description, collateral, percentage of ownership, revenues, NOI, lender, debt service, DSCR, cash flow, percentage of cash flow, value, percentage of value, LTV, etc. For a borrower like Weingarten, this list should include all of his medallion entities, all of his taxi & management entities, all of his commercial real estate entities, with separation by entity type.
- Although the file evidences an application, the application is not complete, nor does the file contain any recent and detailed PFS.
- There is no analysis of the personal tax return, including detailed analysis of K-1s, and personal cash flow.
- The loans are for newly purchased collateral for two newly formed Weingarten corporations, and it is both prudent and a general industry practice to require an opening balance sheet as well as a projection for situations like this. It does not appear that the borrower has any equity in the purchase of the medallions, and this may prevent the application of true sales accounting for the medallions.

| 60573-0004 | Alex Freidman | 2/18/15 | $2,554,098 |
| 60590-0009 | Jeffrey Sterin | 2/18/15 | $4,125,850 |
| 60590-0006 | Jeffrey Sterin | 6/18/13 | $4,553,405 |
| 60590-0007 | Jeffrey Sterin | 7/24/13 | $5,176,563 |
| 60590-0008 | Jeffrey Sterin | 7/24/13 | $894,124 |

- The original credit memorandum for the first two loans above does not make it clear that Melrose understands or is aware of the size and scope of the borrowers' operations, financial condition or operating performance, financial obligations or the potential to fully satisfy the Melrose debt under reasonable terms and conditions at a loan interest rate which properly reflects the risk in the individual loans or relationships. A personal financial statement of neither individual was obtained.
- There is no credit memorandum for the TDR on the Freidman loan, or the Sterin loans. Consequently, there is no indication why the first two loans with a 48% LTV and 2.79 DSC on

40

NCUA00359538

USAOr_000311920

2/18/15 requires a TDR with a lower payment and lower interest rate only seven months later. Additionally the 2/18/15 credit memorandum states that one of the obligors (it is unclear which one) has additional cash flow from rental real estate (in the event that medallion cash flow was insufficient).

- There is no indication that Melrose performed a cash flow analysis and DSC based upon **_current_** operating performance and lease rates, and no indication that the borrowers are able to maintain current status in the near term.

- There is no indication that an impairment analysis was performed for the TDR, as required by Accounting Bulletin 06-01, and there is no justification in the file for the $110,227 impairment on the Freidman loan, or the $321,817 on the Sterin loans, especially considering that the Freidman loan and the Sterin loan schedule 0009 had, per the 2/18/15 credit memorandum, a 48% LTV.

- **Alex Freidman has 12 Philadelphia medallions with Melrose.   Melrose used its 9/29/15 value memorandum for the market value.   This memorandum placed a value of $300,000 on a Philadelphia medallion.   Twelve medallions would sum to a total value of $3,600,000, vs. the $2,554,098 Freidman balance.   This is a collaterally dependent loan, and valuation per ASC 310-10 is fair value of collateral.   An LTV of 80% would result in loan amount of $2,880,000, hence no impairment is required, unless Melrose indicates there are weaknesses with the valuation.**

- **Jeffrey Sterin has 61 Philadelphia medallions with Melrose.   Melrose used its 9/29/15 value memorandum for the market value.   This memorandum placed a value of $300,000 on a Philadelphia medallion.   Sixty-one medallions would sum to a total value of $18,300,000, vs. the $14,749,941 balance.   This is a collaterally dependent loan, and valuation per ASC 310-10 is fair value of collateral.   An LTV of 80% would result in loan amount of $14,640,000, and an impairment of $109,941, which is less than the impairment taken, which indicates there are weaknesses with the valuation.**

- There is no indication that when the TDR was performed and the loans were extended, that the present loan documentation was reviewed, including collateral perfection, verification of no liens or torts, licensing and insurance being in order.   No cross-corporate cross-secure cross-default was effected.

- **The files contained no indications that Melrose is tracking the dollar amount of the loans which have undergone a TDR, and have a reduction in the interest rate, or the term of the interest rate reduction.   A reduction in the interest rate on a large portion of the portfolio will have a large negative effect on interest income, and the reduction in interest rates and income needs to be measured, monitored and projected on a month by month and year by year basis to determine it negative effect on the net interest margin and credit union profitability.**

- The 2/18/15 transactions were refinances of loans at First Niagara Bank ($6,530K) and balance of $270K was a cash out for business investment and cash flow.   The credit memorandum did not disclose why the loans were being moved from First Niagara – lower rate, better terms, lender did not wish to renew, etc.   The $270K cash-out for business investment was not further vetted – the business investment identified – or collateral taken – and there is no indication that loans with a 2.79 DSC requires additional sums for cash flow purposes.

- The various loans above have various co-borrowers (Inna Freidman & Gene Sterin for the Freidman loan and Lana Marcus & Gene Sterin for the Sterin loans), however the credit memorandum does not explain the reasoning for or relationship of the co-borrowers, nor does the credit memorandum contain a corporate tree for either complex borrower.

- The credit memorandum does not indicate the make/model/year/owner/lender/loan amount & terms for the taxi cabs which the various medallions will be affixed to.   There is no indication of expected replacement timing of any of the taxi cabs.

CONFIDENTIAL INFORMATION – Subject to Protective Order

NCUA00359539

Confidential

USAOr_000311921

- The files do not contain any personal financial statement on Alex Freidman, Jeffrey Sterin, Inna Freidman, Gene Sterin, or Lana Marcus, nor 2014 tax returns, interim financial statements, or any other financial statements.
- The first two loans above were granted with 60 month terms – this term was unsound considering the instability of the market at that time (February of 2015), in the Philadelphia marketplace.
- The files contained no leases for the medallions, and the credit memorandum did not include any indication of the monthly lease rate, the term of the lease, the management company or firm the medallions were leased to, and ownership of that management company or firm.   Additionally, the credit memorandum did not indicate the size or strength of the management company or firm.   The credit memorandum did not indicate if the medallions were remaining with the management company or firm, or moving to a new one; if remaining, the credit memorandum did not indicate how long the medallions had been leased to the management company or firm.
- Both Alex Freidman and Jeffrey Sterin have outside commercial real estate – the files contain no detail on the commercial real estate interests, i.e., what type of property, tenant if any, lease terms if any, location, value, lender, debt & terms, monthly or annual gross income/NOI/free cash flow.
- The Extension and Modification Agreements and the Ratification of Extension and Modification Agreements are not properly executed by all parties, in part, the medallion-owning corporations are not parties to these documents, not all co-borrowers have executed the documents, the Extension and Modification Agreements documents contain two agreements, the Extension and Modification Agreement and the Request for Modification.   Both of these documents are not properly executed with signatures in the proper place for all parties.   Some of the documents have cross-offs, with the corrections not being initialed by all parties.
- The Request for Modification contains the statement by the borrowers:   "There has been no significant, adverse changes in my financial situation since the date of the original loan."   This statement is inconsistent with the borrowers requesting a reduction in the interest rate and monthly payment as follows:

|        | Rate  |       |       | Payment  |          |         | Amort |      |
|--------|-------|-------|-------|----------|----------|---------|-------|------|
| Sch #  | Orig  | TDR   | Diff  | Orig     | TDR      | Diff    | Orig  | TDR  |
| 0004   | 4.50% | 2.75% | 1.75% | $14,454  | $12,038  | $2,415  | 300   | 293  |
| 0009   | 4.50% | 2.75% | 1.75% | $23,345  | $19,446  | $3,899  | 300   | 293  |
| 0006   | 3.50% | 2.75% | .75%  | $24,330  | $21,009  | $3,321  | 300   | 300  |
| 0007   | 3.75% | 2.75% | 1.00% | $28,286  | $23,884  | $4,402  | 300   | 300  |
| 0008   | 3.75% | 2.75% | 1.00% | $4,885   | $4,125   | $760    | 300   | 27   |

- Although the term (maturity) was reduced for several of the above loans, the amortization was reset (lengthened) by 16 months for 0006, by 27 months for 0007, and by 27 months for 0008, effectively increasing the risk in these schedules – without any underwriting, financial analysis or recent financial information or any additional collateral or support.
- Until such time as Melrose performs a current, well-documented credit analysis supporting a return to accrual status based on the borrower's financial condition and prospects for repayment under the revised terms, the modified loans should be on non-accrual.

**67276**            **Michelle Freidman**              **7/26/13**                 **$1,560,503**

- The original credit memorandum does not make it clear that Melrose understands or is aware of the size and scope of the borrowers' operations, financial condition or operating performance, financial

42

CONFIDENTIAL INFORMATION – Subject to Protective Order

NCUA00359540

Confidential

USAOr_000311922

obligations or the potential to fully satisfy the Melrose debt under reasonable terms and conditions at a loan interest rate which properly reflects the risk in the loan.   A personal financial statement of the borrower was not obtained.

- There is no credit memorandum for the TDR.   Consequently, there is no indication why the loan which was advanced in July of 2013 with a then 57% LTV and 1.99 DSC requires a TDR with a lower payment and lower interest rate.
- There is no indication that Melrose performed a cash flow analysis and DSC based upon ***current*** operating performance and lease rates, and no indication that the borrower is able to maintain current status in the near term.
- There is no indication that an impairment analysis was performed for the TDR, as required by Accounting Bulletin 06-01, and there is no justification in the file for the $36,125 impairment on the Freidman loan, especially considering that the loan had an original July of 2013 LTV of 57%.
- **The borrower has 7 Philadelphia medallions with Melrose.   Melrose used its 9/29/15 value memorandum for the market value.   This memorandum placed a value of $300,000 on a Philadelphia medallion.   Seven medallions would sum to a total value of $2,100,000, vs. the $1,560,503 balance.   This is a collaterally dependent loan, and valuation per ASC 310-10 is fair value of collateral.   An LTV of 80% would result in loan amount of $1,680,000, hence no impairment is required, unless Melrose indicates there are weaknesses with the valuation.**
- There is no indication that when the TDR was performed and the loan was extended, that the present loan documentation was reviewed, including collateral perfection, verification of no liens or torts, licensing and insurance being in order.
- The credit memorandum does not indicate the make/model/year/owner/lender/loan amount & terms for the taxi cabs which the various medallions will be affixed to.   There is no indication of expected replacement timing of any of the taxi cabs.
- The files do not contain any personal financial statement on Michelle Freidman, nor 2014 tax returns, interim financial statements, or any other financial statements.
- The file contained no leases for the medallions, and the credit memorandum did not include any indication of the monthly lease rate, the term of the lease, the management company or firm the medallions were leased to, and ownership of that management company or firm.   Additionally, the credit memorandum did not indicate the size or strength of the management company or firm.   The credit memorandum did not indicate if the medallions were remaining with the management company or firm, or moving to a new one; if remaining, the credit memorandum did not indicate how long the medallions had been leased to the management company or firm.
- The Extension and Modification Agreement and the Ratification of Extension and Modification Agreement are not properly executed by all parties, in part, the medallion-owning corporation is not a party to these documents, the Extension and Modification Agreements documents contain two agreements, the Extension and Modification Agreement and the Request for Modification.   Both of these documents are not properly executed with signatures in the proper place for all parties.
- The Request for Modification contains the statement by the borrower:   "There has been no significant, adverse changes in my financial situation since the date of the original loan."   This statement is inconsistent with the borrower requesting a reduction in the interest rate and monthly payment as follows:

| Sch # | Rate | | | Payment | | | Amort | |
|---|---|---|---|---|---|---|---|---|
| | Orig | TDR | Diff | Orig | TDR | Diff | Orig | TDR |
| 0002 | 3.75% | 2.75% | 1.00% | $8,485 | $7,199 | $1,287 | 300 | 300 |

43

CONFIDENTIAL INFORMATION – Subject to Protective Order

NCUA00359541

Confidential

USAOr_000311923

- The amortization was reset (lengthened) by 27 months, effectively increasing the risk in this schedule – without any underwriting, financial analysis or recent financial information or any additional collateral or support.
- Until such time as Melrose performs a current, well-documented credit analysis supporting a return to accrual status based on the borrower's financial condition and prospects for repayment under the revised terms, the modified loans should be on non-accrual.


| 57919-0009 | Viresh Ahuja | 1/23/15 | $829,433 |
| 57919-0010 | Viresh Ahuja | 1/23/15 | $662,574 |

- The original credit memorandum does not make it clear that Melrose understands or is aware of the size and scope of the borrowers' operations, financial condition or operating performance, financial obligations or the potential to fully satisfy the Melrose debt under reasonable terms and conditions at a loan interest rate which properly reflects the risk in the loan.   A personal financial statement of the borrower was not obtained.
- There is no credit memorandum for the TDR.   Consequently, there is no indication why the loans which were advanced in January of 2015 with a then 65% LTV and 1.35 DSC requires a TDR with a lower payment and lower interest rate ten months later.
- There is no indication that Melrose performed a cash flow analysis and DSC based upon *__current__* operating performance and lease rates, and no indication that the borrower is able to maintain current status in the near term.
- There is no indication that an impairment analysis was performed for the TDRs, as required by Accounting Bulletin 06-01, and there is no justification in the file for the $20,176 impairments on the loans, especially considering that the loans had an original January of 2015 LTV of 65%.
- **The borrower has 5 Philadelphia medallions with Melrose.   Melrose used its 9/29/15 value memorandum for the market value.   This memorandum placed a value of $300,000 on a Philadelphia medallion.   Five medallions would sum to a total value of $1,500,000, vs. the $1,492,007 Ahuja balance.   This is a collaterally dependent loan, and valuation per ASC 310-10 is fair value of collateral.   An LTV of 80% would result in loan amount of $1,200,000, and an impairment of $292,007.**
- There is no indication that when the TDR was performed and the loans were extended, that the present loan documentation was reviewed, including collateral perfection, verification of no liens or torts, licensing and insurance being in order.   No cross-corporate cross-secure cross-default was effected.
- The credit memorandum does not indicate the make/model/year/owner/lender/loan amount & terms for the taxi cabs which the various medallions will be affixed to.   There is no indication of expected replacement timing of any of the taxi cabs.
- The files do not contain any personal financial statement on Viresh Ahuja, nor 2014 tax returns, interim financial statements, or any other financial statements.
- The files contained no leases for the medallions, and the credit memorandum did not include any indication of the monthly lease rate, the term of the lease, the management company or firm the medallions were leased to, and ownership of that management company or firm.   Additionally, the credit memorandum did not indicate the size or strength of the management company or firm.   The credit memorandum did not indicate if the medallions were remaining with the management company or firm, or moving to a new one; if remaining, the credit memorandum did not indicate how long the medallions had been leased to the management company or firm.

44

- The borrower has outside commercial real estate – the files contain no detail on the commercial real estate interests, i.e., what type of property, tenant if any, lease terms if any, location, value, lender, debt & terms, monthly or annual gross income/NOI/free cash flow.
- The Extension and Modification Agreement and the Ratification of Extension and Modification Agreement are not properly executed by all parties, in part, the medallion-owning corporation is not a party to these documents, the Extension and Modification Agreements documents contain two agreements, the Extension and Modification Agreement and the Request for Modification.   Both of these documents are not properly executed with signatures in the proper place for all parties.   Some of the documents have cross-offs, with the corrections not being initialed by all parties.
- The Request for Modification contains the statement by the borrower:   "There has been no significant, adverse changes in my financial situation since the date of the original loan."   This statement is inconsistent with the borrower requesting a reduction in the interest rate and monthly payment as follows:

|  | Rate | | | Payment | | | Amort | |
|---|---|---|---|---|---|---|---|---|
| Sch # | Orig | TDR | Diff | Orig | TDR | Diff | Orig | TDR |
| 0009 | 4.50% | 3.00% | 1.50% | $4,696 | $3,934 | $762 | 300 | 300 |
| 0010 | 4.50% | 3.00% | 1.50% | $3,751 | $3,142 | $609 | 300 | 300 |

- The amortization was reset (lengthened) by 10 months, effectively increasing the risk in these schedules – without any underwriting, financial analysis or recent financial information or any additional collateral or support.
- Additionally, the two above loans, originally advanced 1/23/15, were refinances and cash-out refinances of Schedules 0006 and 0007, with no indications in the file or credit memorandums why these loans were being refinanced approximately 30 days after the granting of loans on 12/16/14.
- Until such time as Melrose performs a current, well-documented credit analysis supporting a return to accrual status based on the borrower's financial condition and prospects for repayment under the revised terms, the modified loans should be on non-accrual.


**60749-0010**          **Kuljit Singh**                **2/23/15**                **$2,753,569**

- The original credit memorandum does not make it clear that Melrose understands or is aware of the size and scope of the borrowers' operations, financial condition or operating performance, financial obligations or the potential to fully satisfy the Melrose debt under reasonable terms and conditions at a loan interest rate which properly reflects the risk in the loan.   A personal financial statement of the borrower was not obtained.
- There is no credit memorandum for the TDR.   Consequently, there is no indication why the loan which was advanced in February of 2015 with a then 71% LTV and 1.43 DSC requires a TDR with a lower payment and lower interest rate nine months later.
- There is no indication that Melrose performed a cash flow analysis and DSC based upon ***current*** operating performance and lease rates, and no indication that the borrower is able to maintain current status in the near term.
- There is no indication that an impairment analysis was performed for the TDR, as required by Accounting Bulletin 06-01, and there is no justification in the file for the $37,286 impairment on the loan, especially considering that the loan had an original February of 2015 LTV of 71%.

45

- **The borrower has 9 Philadelphia medallions with Melrose.   Melrose used its 9/29/15 value memorandum for the market value.   This memorandum placed a value of $300,000 on a Philadelphia medallion.   Nine medallions would sum to a total value of $2,700,000, vs. the $2,753,569 Singh balance.   This is a collaterally dependent loan, and valuation per ASC 310-10 is fair value of collateral.   An LTV of 80% would result in loan amount of $2,160,000, and an impairment of $593,569.**
- There is no indication that when the TDR was performed and the loan was extended, that the present loan documentation was reviewed, including collateral perfection, verification of no liens or torts, licensing and insurance being in order.
- The credit memorandum does not indicate the make/model/year/owner/lender/loan amount & terms for the taxi cabs which the various medallions will be affixed to.   There is no indication of expected replacement timing of any of the taxi cabs.
- The file does not contain any personal financial statement on Kuljit Singh, nor 2014 tax returns, interim financial statements, or any other financial statements.
- The files contained no leases for the medallions, and the credit memorandum did not include any indication of the monthly lease rate, the term of the lease, the management company or firm the medallions were leased to, and ownership of that management company or firm.   Additionally, the credit memorandum did not indicate the size or strength of the management company or firm.   The credit memorandum did not indicate if the medallions were remaining with the management company or firm, or moving to a new one; if remaining, the credit memorandum did not indicate how long the medallions had been leased to the management company or firm.
- The Extension and Modification Agreement and the Ratification of Extension and Modification Agreement are not properly executed by all parties, in part, the medallion-owning corporation is not a party to these documents, the Extension and Modification Agreements documents contain two agreements, the Extension and Modification Agreement and the Request for Modification.   Both of these documents are not properly executed with signatures in the proper place for all parties.   The documents have inconsistent dates, with the corrections not being initialed by all parties.
- The Request for Modification contains the statement by the borrower:  "There has been no significant, adverse changes in my financial situation since the date of the original loan."   This statement is inconsistent with the borrower requesting a reduction in the interest rate and monthly payment as follows:

| | Rate | | | Payment | | | Amort | |
|---|---|---|---|---|---|---|---|---|
| Sch # | Orig | TDR | Diff | Orig | TDR | Diff | Orig | TDR |
| 0010 | 4.50% | 3.00% | 1.50% | $15,563 | $13,060 | $2,503 | 300 | 300 |

- The amortization was reset (lengthened) by 9 months, effectively increasing the risk in this schedule – without any underwriting, financial analysis or recent financial information or any additional collateral or support.
- The February 2015 credit memorandum does not contain a detailed breakdown of the sources and uses of the loan proceeds, part of which was utilized to pay off debt, without obtaining a security interest in the underlying collateral on the paid off debt.
- The February 2015 credit memorandum states that Singh is an owner operator whose income and cash flow is derived from the applicant's revenue as an owner operator, however the loan is for a total of approximately eight medallions.
- Until such time as Melrose performs a current, well-documented credit analysis supporting a return to accrual status based on the borrower's financial condition and prospects for repayment under the revised terms, the modified loans should be on non-accrual.

46

**62461-0007**            **Gopal Krishan**                    **6/8/15**            **$1,021,409**

- **The June 8, 2015 new loan had an LTV of 81%, A Regulatory Violation of RR § 723.7 (a) (1).**
- The original credit memorandum does not make it clear that Melrose understands or is aware of the size and scope of the borrowers' operations, financial condition or operating performance, financial obligations or the potential to fully satisfy the Melrose debt under reasonable terms and conditions at a loan interest rate which properly reflects the risk in the loan.   A personal financial statement of the borrower was not obtained.
- There is no credit memorandum for the TDR.   Consequently, there is no indication why the loans which were advanced in June of 2015 with a then 81% LTV and 1.63 DSC requires a TDR with a lower payment and lower interest rate five months later.
- There is no indication that Melrose performed a cash flow analysis and DSC based upon *current* operating performance and lease rates, and no indication that the borrower is able to maintain current status in the near term.
- There is no indication that an impairment analysis was performed for the TDRs, as required by Accounting Bulletin 06-01, and there is no justification in the file for the $13,817 impairment on the loan.
- **The borrower has 3 Philadelphia medallions with Melrose.   Melrose used its 9/29/15 value memorandum for the market value.   This memorandum placed a value of $300,000 on a Philadelphia medallion.   Nine medallions would sum to a total value of $900,000, vs. the $1,021,409 Krishan balance.   This is a collaterally dependent loan, and valuation per ASC 310-10 is fair value of collateral.   An LTV of 80% would result in loan amount of $720,000, and an impairment of $301,409.**
- There is no indication that when the TDR was performed and the loan was extended, that the present loan documentation was reviewed, including collateral perfection, verification of no liens or torts, licensing and insurance being in order.
- The credit memorandum does not indicate the make/model/year/owner/lender/loan amount & terms for the taxi cabs which the various medallions will be affixed to.   There is no indication of expected replacement timing of any of the taxi cabs.
- The files do not contain any personal financial statement on Gopal Kirshan, nor 2014 tax returns, interim financial statements, or any other financial statements.
- The file contained no leases for the medallions, and the credit memorandum did not include any indication of the monthly lease rate, the term of the lease, the management company or firm the medallions were leased to, and ownership of that management company or firm.   Additionally, the credit memorandum did not indicate the size or strength of the management company or firm.   The credit memorandum did not indicate if the medallions were remaining with the management company or firm, or moving to a new one; if remaining, the credit memorandum did not indicate how long the medallions had been leased to the management company or firm.
- The borrower has outside commercial real estate – the file contains no detail on the commercial real estate interests, i.e., what type of property, tenant if any, lease terms if any, location, value, lender, debt & terms, monthly or annual gross income/NOI/free cash flow.
- The Extension and Modification Agreement and the Ratification of Extension and Modification Agreement are not properly executed by all parties, in part, the medallion-owning corporation is not a party to these documents, the Extension and Modification Agreements documents contain two agreements, the Extension and Modification Agreement and the Request for Modification.   The documents have inconsistent dates.

47

CONFIDENTIAL INFORMATION – Subject to Protective Order

NCUA00359545

Confidential

USAOr_000311927

- The Request for Modification contains the statement by the borrower:  "There has been no significant, adverse changes in my financial situation since the date of the original loan."  This statement is inconsistent with the borrower requesting a reduction in the interest rate and monthly payment as follows:

| | Rate | | | Payment | | | Amort | |
|---|---|---|---|---|---|---|---|---|
| Sch # | Orig | TDR | Diff | Orig | TDR | Diff | Orig | TDR |
| 0007 | 4.00% | 3.00% | 1.00% | $4,937 | $4,845 | $92 | 360 | 300 |

- Additionally, the above loan, originally advanced 6/8/15, was a refinance at that time of a current Melrose loan from September of 2013, which was a both a rate reduction, as well as an extension of the remaining amortization by six years and three months to a 30 year amortization.
- There are no indications in the file or credit memorandum why the loan was being refinanced only five months after the granting of the original loan on 6/18/15.
- Until such time as Melrose performs a current, well-documented credit analysis supporting a return to accrual status based on the borrower's financial condition and prospects for repayment under the revised terms, the modified loans should be on non-accrual.

| | | | |
|---|---|---|---|
| **62812-0006** | **Anis Nasr** | **12/9/13** | **$813,007** |
| **62812-0007** | **Anis Nasr** | **12/9/13** | **$435,373** |
| **62812-0009** | **Anis Nasr** | **8/7/15** | **$606,416** |
| **62812-0010** | **Anis Nasr** | **8/8/15** | **$278,378** |

- The original credit memorandum does not make it clear that Melrose understands or is aware of the size and scope of the borrowers' operations, financial condition or operating performance, financial obligations or the potential to fully satisfy the Melrose debt under reasonable terms and conditions at a loan interest rate which properly reflects the risk in the loan.   A personal financial statement of the borrower was not obtained.
- There is no credit memorandum for the TDR.   Consequently, there is no indication why the last two loans which were advanced in August of 2015 with a then 79% LTV and 1.65 DSC requires a TDR with a lower payment and lower interest rate only three months later.
- There is no indication that Melrose performed a cash flow analysis and DSC for the TDR based upon **_current_** operating performance and lease rates, and no indication that the borrower is able to maintain current status in the near term.
- There is no indication that an impairment analysis was performed for the TDRs, as required by Accounting Bulletin 06-01, and there is no justification in the file for the $28,847 impairments on the loans, especially considering that the loans had an original August of 2015 LTV of 79%.
- **The borrower has 8 Philadelphia medallions with Melrose.   Melrose used its 9/29/15 value memorandum for the market value.   This memorandum placed a value of $300,000 on a Philadelphia medallion.   Eight medallions would sum to a total value of $2,400,000, vs. the $2,133,174 Nasr balance.   This is a collaterally dependent loan, and valuation per ASC 310-10 is fair value of collateral.   An LTV of 80% would result in loan amount of $1,920,000, and an impairment of $213,174.**
- There is no indication that when the TDR was performed and the loans were extended, that the present loan documentation was reviewed, including collateral perfection, verification of no liens or torts, licensing and insurance being in order.   No cross-corporate cross-secure cross-default was effected.

48

- The credit memorandum does not indicate the make/model/year/owner/lender/loan amount & terms for the taxi cabs which the various medallions will be affixed to.   There is no indication of expected replacement timing of any of the taxi cabs.
- The files do not contain any personal financial statement on Anis Nasr, nor interim financial statements, or any other financial statements.
- The files contained no leases for the medallions, and the credit memorandum did not include any indication of the monthly lease rate, the term of the lease, the management company or firm the medallions were leased to, and ownership of that management company or firm.   Additionally, the credit memorandum did not indicate the size or strength of the management company or firm.   The credit memorandum did not indicate if the medallions were remaining with the management company or firm, or moving to a new one; if remaining, the credit memorandum did not indicate how long the medallions had been leased to the management company or firm.
- The borrower has outside commercial real estate – the files contain no detail on the commercial real estate interests, i.e., what type of property, tenant if any, lease terms if any, location, value, lender, debt & terms, monthly or annual gross income/NOI/free cash flow.
- The Extension and Modification Agreement and the Ratification of Extension and Modification Agreement are not properly executed by all parties, in part, the medallion-owning corporation is not a party to these documents, the Extension and Modification Agreements documents contain two agreements, the Extension and Modification Agreement and the Request for Modification.   Both of these documents are not properly executed with signatures in the proper place for all parties.   Some of the documents have cross-offs, with the corrections not being initialed by all parties.
- The Request for Modification contains the statement by the borrower:   "There has been no significant, adverse changes in my financial situation since the date of the original loan."   This statement is inconsistent with the borrower requesting a reduction in the interest rate and monthly payment as follows:

| Sch # | Rate | | | Payment | | | Amort | |
|---|---|---|---|---|---|---|---|---|
| | Orig | TDR | Diff | Orig | TDR | Diff | Orig | TDR |
| 0006 | 4.25% | 3.00% | 1.25% | $4,633 | $3,857 | $776 | 300 | 300 |
| 0007 | 4.25% | 3.00% | 1.25% | $2,530 | $2,064 | $466 | 300 | 300 |
| 0009 | 4.50% | 3.00% | 1.50% | $3,390 | $2,876 | $514 | 300 | 300 |
| 0010 | 4.50% | 3.00% | 1.50% | $1,536 | $1,320 | $236 | 300 | 300 |

- The amortization was reset (lengthened) by 23 months for each of the first two loans, and 3 months for each of the latter two loans, effectively increasing the risk in these schedules – without any underwriting, financial analysis or recent financial information or any additional collateral or support.
- Additionally, the latter two of the above loans, originally advanced 8/7/15, were purchase financings (purchase the interest of a partner, and purchase a medallion), with no indications in the file or credit memorandums why these loans were being extended and modified approximately 90 days after the granting of the new loans.
- Until such time as Melrose performs a current, well-documented credit analysis supporting a return to accrual status based on the borrower's financial condition and prospects for repayment under the revised terms, the modified loans should be on non-accrual.

49

**69908-0001**          **Merle Edward**                    **2/12/15**                    **$490,712**

- The above loan is a new purchase financings, from a third party and is a cash-out refi for Edward (new member and borrower), who is purchasing the medallion from the spouse of a deceased Melrose borrower.   The loan closed 2/12/15.   During the course of this Exam Contact, NCUA had inquired on several occasions if Melrose had done any new purchase financings, or "new" loans in 2015 other than the Weingarten loan, and were told on several occasions, that no, there had been no other purchase financings.
- The original credit memorandum does not make it clear that Melrose understands or is aware of the size and scope of the borrowers' operations, financial condition or operating performance, financial obligations or the potential to fully satisfy the Melrose debt under reasonable terms and conditions at a loan interest rate which properly reflects the risk in the loan.   A personal financial statement of the borrower was not obtained.
- There is no credit memorandum for the TDR.   Consequently, there is no indication why the loan which was advanced in February of 2015 with a then 62% LTV and 2.03 DSC requires a TDR with a lower payment and lower interest rate nine months later.
- There is no indication that Melrose performed a cash flow analysis and DSC based upon ***current*** operating performance and lease rates, and no indication that the borrower is able to maintain current status in the near term.
- There is no indication that an impairment analysis was performed for the TDRs, as required by Accounting Bulletin 06-01, and there is no justification in the file for the $8,632 impairments on the loans, especially considering that the loans had an original February of 2015 LTV of 62%.
- **The borrower has 1 New York individual medallion with Melrose.   Melrose used its 9/29/15 value memorandum for the market value.   This memorandum placed a value of $720,000 on a New York individual medallion.   One individual medallion would sum to a total value of $720,000, vs. the $490,712 Edward balance.   This is a collaterally dependent loan, and valuation per ASC 310-10 is fair value of collateral.   An LTV of 80% would result in loan amount of $576,000, hence no impairment is required, unless Melrose indicates there are weaknesses with the valuation.**
- There is no indication that when the TDR was performed and the loan was extended, that the present loan documentation was reviewed, including collateral perfection, verification of no liens or torts, licensing and insurance being in order.
- The credit memorandum does not indicate the make/model/year/owner/lender/loan amount & terms for the taxi cabs which the various medallions will be affixed to.   There is no indication of expected replacement timing of any of the taxi cabs.
- The files do not contain any personal financial statement on Merle Edward, nor 2014 tax return, interim financial statements, or any other financial statements.
- The files contained no lease for the medallion, the term of the lease, the management company or firm the medallions were leased to, and ownership of that management company or firm. Additionally, the credit memorandum did not indicate the size or strength of the management company or firm.   The credit memorandum did not indicate if the medallions were remaining with the management company or firm, or moving to a new one; if remaining, the credit memorandum did not indicate how long the medallions had been leased to the management company or firm.
- The borrower has outside commercial real estate – the file contains no detail on the commercial real estate interests, i.e., what type of property, tenant if any, lease terms if any, location, value, lender, debt & terms, monthly or annual gross income/NOI/free cash flow.
- The Extension and Modification Agreement and the Ratification of Extension and Modification Agreement are not properly executed by all parties, the Extension and Modification Agreements

50

documents contain two agreements, the Extension and Modification Agreement and the Request for Modification.   Both of these documents are not properly executed with signatures in the proper place for all parties.   Some of the documents have cross-offs, with the corrections not being initialed by all parties.

- The Request for Modification contains the statement by the borrower:  "There has been no significant, adverse changes in my financial situation since the date of the original loan."   This statement is inconsistent with the borrower requesting a reduction in the interest rate and monthly payment as follows:

| | Rate | | | Payment | | | Amort | |
|---|---|---|---|---|---|---|---|---|
| Sch # | Orig | TDR | Diff | Orig | TDR | Diff | Orig | TDR |
| 0001 | 4.00% | 3.50% | .50% | $2,639 | $2,451 | $188 | 300 | 301 |

- The amortization was reset (lengthened) by 9 months, effectively increasing the risk in this schedule – without any underwriting, financial analysis or recent financial information or any additional collateral or support.
- The TDR contains no discussion as to whether the accounts will remain in non-accrual.   Until such time as Melrose performs a current, well-documented credit analysis supporting a return to accrual status based on the borrower's financial condition and prospects for repayment under the revised terms, the modified loans should stay on non-accrual.
- Until such time as Melrose performs a current, well-documented credit analysis supporting a return to accrual status based on the borrower's financial condition and prospects for repayment under the revised terms, the modified loans should be on non-accrual.


**49790-0027**          **Sukhdev Raj**                    **4/30/15**                **$715,658**

- **The April 30,, 2015 loan was a refinance with cash-out for the purchase of a taxi cab.   The loan had an LTV of 90%, A Regulatory Violation of RR § 723.7 (a) (1).**
- The original credit memorandum does not make it clear that Melrose understands or is aware of the size and scope of the borrowers' operations, financial condition or operating performance, financial obligations or the potential to fully satisfy the Melrose debt under reasonable terms and conditions at a loan interest rate which properly reflects the risk in the loan.   A personal financial statement of the borrower was not obtained.
- There is no credit memorandum for the TDR.   Consequently, there is no indication why the loan which was advanced in April of 2015 with a then 90% LTV and 1.09 DSC requires a TDR with a lower payment and lower interest rate six months later.
- There is no indication that Melrose performed a cash flow analysis and DSC based upon ***current*** operating performance and lease rates for the TDR, and no indication that the borrower is able to maintain current status in the near term.
- There is no indication that an impairment analysis was performed for the TDRs, as required by Accounting Bulletin 06-01, and there is no justification in the file for the $355 impairment on the April of 2015 new loan.
- **The borrower has 1 New York individual medallion with Melrose.   Melrose used its 9/29/15 value memorandum for the market value.   This memorandum placed a value of $720,000 on a New York individual medallion.   One medallion would sum to a total value of $720,000, vs. the $715,658 balance.   This is a collaterally dependent loan, and valuation per ASC 310-10 is**

51

**fair value of collateral.   An LTV of 80% would result in loan amount of $576,000, and an impairment of $139,658.**

- There is no indication that when the TDR was performed and the loan was extended, that the present loan documentation was reviewed, including collateral perfection, verification of no liens or torts, licensing and insurance being in order.
- The credit memorandum does not indicate the make/model/year/owner/lender/loan amount & terms for the taxi cab which the medallion will be affixed to.   There is no indication of expected future replacement timing of the taxi cab.   When the loan was advanced in April of 2015, in part, to purchase a new taxi cab, no lien was taken by Melrose on the taxi cab.
- The files do not contain any personal financial statement on Sukhdev Raj, nor 2014 tax returns, interim financial statements, or any other financial statements.
- The files contained no lease for the medallion, and the credit memorandum did not include any indication of the monthly lease rate, the term of the lease, the management company or firm the medallions were leased to, and ownership of that management company or firm.   Additionally, the credit memorandum did not indicate the size or strength of the management company or firm.   The credit memorandum did not indicate if the medallions were remaining with the management company or firm, or moving to a new one; if remaining, the credit memorandum did not indicate how long the medallions had been leased to the management company or firm.
- The borrower has outside commercial real estate – the file contains no detail on the commercial real estate interests, i.e., what type of property, tenant if any, lease terms if any, location, value, lender, debt & terms, monthly or annual gross income/NOI/free cash flow.
- The Extension and Modification Agreement and the Ratification of Extension and Modification Agreement are not properly executed by all parties, the Extension and Modification Agreements documents contain two agreements, the Extension and Modification Agreement and the Request for Modification.   Both of these documents are not properly executed with signatures in the proper place for all parties.   Some of the documents have cross-offs, with the corrections not being initialed by all parties.
- The Request for Modification contains the statement by the borrower:   "There has been no significant, adverse changes in my financial situation since the date of the original loan."   This statement is inconsistent with the borrower requesting a reduction in the interest rate and monthly payment as follows:

| Sch # | Rate | | | Payment | | | Amort | |
|---|---|---|---|---|---|---|---|---|
| | Orig | TDR | Diff | Orig | TDR | Diff | Orig | TDR |
| 0027 | 4.25% | 1.00% | 3.25% | $3,900 | $2,697 | $1,203 | 300 | 300 |

- The amortization was reset (lengthened) by 6 months, effectively increasing the risk in this schedule – without any underwriting, financial analysis or recent financial information or any additional collateral or support.
- Melrose has refinanced Raj's loan many times over the years, with cash-outs on many occasions, in part to provide a down payment for a large house, and to financing the operations of a restaurant, without taking a lien position on the house, or the restaurant.
- Until such time as Melrose performs a current, well-documented credit analysis supporting a return to accrual status based on the borrower's financial condition and prospects for repayment under the revised terms, the modified loans should be on non-accrual.

CONFIDENTIAL INFORMATION – Subject to Protective Order

NCUA00359550

Confidential

USAOr_000311932

| 47690-0024 | Daniel Ojo | 5/10/13 | $619,240 |
| 47690-0026 | Daniel Ojo | 3/28/14 | $604,058 |
| 47690-0027 | Daniel Ojo | 7/22/14 | $542,938 |
| 47690-0028 | Daniel Ojo | 7/6/15 | $230,221 |

- Loan 0028 was a TDR refinance in July of 2015.   The loan was again subject to a TDR in November of 2015.   During the course of this Exam Contact, NCUA had inquired on several occasions if Melrose had any TDRs of a TDR, and were told on several occasions, that no, there had been no TDRs of a TDR, however, Loan 0028 is in fact one.
- The original credit memorandum for the July TDR does not make it clear that Melrose understands or is aware of the size and scope of the borrowers' operations, financial condition or operating performance, financial obligations or the potential to fully satisfy the Melrose debt under reasonable terms and conditions at a loan interest rate which properly reflects the risk in the loan.   A personal financial statement of the borrower was not obtained.
- There is no credit memorandum for the November TDR.   Consequently, there is no indication why the latest loan which was advanced in July of 2015 with a then global Melrose 56% LTV and .69 DSC requires a second TDR with a lower payment and lower interest rate four months later, as well as the borrower's other three loans requiring a lower payment and a lower interest rate.
- There is no indication that Melrose performed a cash flow analysis and DSC based upon *current* operating performance and lease rates for the November TDRs, and no indication that the borrower is able to maintain current status in the near term.
- There is no indication that an impairment analysis was performed for the TDRs, as required by Accounting Bulletin 06-01, and there is no justification in the file for the $35,192 impairments on the loans, especially considering that the loans had an original July of 2015 overall LTV of 56%.
- **The borrower has 2 New York min-fleets (4 medallions total) with Melrose.   Melrose used its 9/29/15 value memorandum for the market value.   This memorandum placed a value of $1,700,000 on a New York min-fleet.   Two mini-fleets would sum to a total value of $3,400,000, vs. the $1,996,457 Ojo balance.   This is a collaterally dependent loan, and valuation per ASC 310-10 is fair value of collateral.   An LTV of 80% would result in loan amount of $2,720,000, hence no impairment is required, unless Melrose indicates there are weaknesses with the valuation.**
- There is no indication that when the TDR was performed and the loans were extended, that the present loan documentation was reviewed, including collateral perfection, verification of no liens or torts, licensing and insurance being in order.   No cross-corporate cross-secure cross-default was effected.
- The credit memorandum does not indicate the make/model/year/owner/lender/loan amount & terms for the taxi cabs which the various medallions will be affixed to.   There is no indication of expected replacement timing of any of the taxi cabs.
- The files do not contain any personal financial statement on Daniel Ojo, nor 2014 tax returns, interim financial statements, or any other financial statements.
- The files contained no leases for the medallions, and the credit memorandum did not include any indication of the monthly lease rate, the term of the lease, the management company or firm the medallions were leased to, and ownership of that management company or firm.   Additionally, the credit memorandum did not indicate the size or strength of the management company or firm.   The credit memorandum did not indicate if the medallions were remaining with the management company or firm, or moving to a new one; if remaining, the credit memorandum did not indicate how long the medallions had been leased to the management company or firm.

53

CONFIDENTIAL INFORMATION – Subject to Protective Order

NCUA00359551

Confidential

USAOr_000311933

- The borrower has outside commercial real estate – the files contain no detail on the commercial real estate interests, i.e., what type of property, tenant if any, lease terms if any, location, value, lender, debt & terms, monthly or annual gross income/NOI/free cash flow.
- The Extension and Modification Agreement and the Ratification of Extension and Modification Agreement are not properly executed by all parties, in part, the medallion-owning corporation is not a party to these documents, the Extension and Modification Agreements documents contain two agreements, the Extension and Modification Agreement and the Request for Modification.   Both of these documents are not properly executed with signatures in the proper place for all parties.   Some of the documents have cross-offs, with the corrections not being initialed by all parties.
- The Request for Modification contains the statement by the borrower:   "There has been no significant, adverse changes in my financial situation since the date of the original loan."   This statement is inconsistent with the borrower requesting a reduction in the interest rate and monthly payment as follows:

| | Rate | | | Payment | | | Amort | |
|--------|-------|-------|-------|--------|--------|-------|------|------|
| Sch # | Orig | TDR | Diff | Orig | TDR | Diff | Orig | TDR |
| 0024 | 3.50% | 3.50% | 0.00% | $3,317 | $3,100 | $217 | 300 | 302 |
| 0026 | 3.75% | 3.00% | .75% | $3,240 | $3,024 | $216 | 300 | 278 |
| 0027 | 4.00% | 3.00% | 1.00% | $2,960 | $2,575 | $385 | 300 | 300 |
| 0028 | 4.00% | 3.50% | .50% | $1,225 | $1,225 | $0 | 300 | 274 |

- The amortization was reset (lengthened) by 32 and 17 months for loans 0024 and 0027 and reduced by 2 and 21 months for loans 0026 and 0028, effectively overall increasing the risk in this relationship – without any underwriting, financial analysis or recent financial information or any additional collateral or support.
- Melrose has refinanced Ojo's loan many times over the years, with cash-outs on many occasions, in part to provide a down payment for a house, and to finance business expenses, without taking a lien position on the house, or the business.
- Until such time as Melrose performs a current, well-documented credit analysis supporting a return to accrual status based on the borrower's financial condition and prospects for repayment under the revised terms, the modified loans should be on non-accrual.

| | | | |
|---|---|---|---|
| **70720-0001** | **Arun Agarwal/Tricky Cab** | **11/30/15** | **$710,200** |
| **70721-0001** | **Arun Agarwal/Move Cab** | **11/30/15** | **$722,350** |

- The two loans above are new purchase financings from a third party (paying off Montauk Credit Union) for the borrower which closed on 11/30/15.   During the course of this contact, NCUA had inquired on several occasions if Melrose had done any new purchase financings, or "new" loans in 2015 other than the Weingarten loans referenced above, and were told on several occasions, that no, there had been no other purchase financings. The two loans above increased the total loan exposure on Agarwal from 9 loans totaling $5.1 million to 11 loans totaling $6.5 million

- While underwriting the loans, Melrose did not fully comply with:

  - NCUA R&R 723. § 723.7 What are the collateral and security requirements?

54

(a) Except as provided in § 723.4 or unless your Regional Director grants a waiver, all member business loans, except those made under paragraphs (c), (d), and (e) of this section, must be secured by collateral as follows:

(1) ***The maximum loan-to-value ratio for all liens must not exceed 80%*** (emphasis added) unless the value in excess of 80% is covered through private mortgage insurance or equivalent type of insurance, or insured, guaranteed, or subject to advance commitment to purchase by an agency of the federal government, an agency of a state or any of its political subdivisions, but in no case may the ratio exceed 95%;

- Letter to Credit Unions 14-CU-06, Taxi Medallion Lending, and Letter to Credit Unions 15-CU-03, Taxi Medallion Lending Questions and Answers
- Letter to Credit Unions 10-CU-23 Best Practices in Real Estate Appraisals with ENCL: Interagency Appraisal and Evaluation Guidelines:  Value of Collateral (for Use in Determining Loan-to-Value Ratio) – According to the Agencies' real estate lending standards guidelines, the term "value" means an opinion or estimate set forth in an appraisal or evaluation, whichever may be appropriate, of the market value of real property, prepared in accordance with the Agencies' appraisal regulations and these Guidelines.  ***For loans to purchase an existing property, "value" means the lesser of the actual acquisition cost or the estimate of value.***

- **According to the credit memorandum, the borrower already had a 50% interest in each mini fleet and bought out his partner's interest. Melrose used $1.7 million as the collateral value for each mini fleet despite the fact that Agarwal purchased 50% of each mini-fleet for $600K (for a collateral value of $1.2 million).   In addition, the CU financed closing costs, including the $30K/medallion transfer tax) for the borrower.   This means the LTVs based on the loan amounts versus the purchase price were 118% and 120%, respectively.   These loans are therefore a violation of the maximum 80% LTV value contained in NCUA Reg. 723.7.**

- A comprehensive analysis was not performed on the complex Agarwal partnership/LLC structure, i.e., no organization/corporate tree.   It is impossible to discern from the write-up and the spreadsheets who owns what percentages of which medallions and what the total debt is owed against them.

- Each of the individual loans appears to stand alone.   A cross-corporate, cross-security, cross-default was not obtained.
- No guaranty by the borrower's other medallion LLCs was obtained nor an assignment of lease payments in the event of default.
- There is no cash flow for each individual loan or LLC. At least one of the cash flows should only contain Agarwal's share of the LLC's cash flows.   Without cross guaranties, you should not be relying heavily on the global cash flow to support the loans.   For this complex borrower, the following cash flows & DSC ratios should be calculated, with calculations provided:   each individual loan, all Melrose medallion loans combined, borrower's global cash flow (may further be broken down, i.e. all taxi-related entities, and all real estate or investment entities, depending on the size and complexity of the borrower), and borrower on a personal basis.
- For this large and complex borrower, the approval or covenants do not require the borrower to provide audited or reviewed financial statements.
- The documentation does not indicate an assignment of lease or a copy of the lease agreement. Additionally, the credit memorandum does not discuss the ability of the management company which will lease these medallions to operate them during the current driver shortage.   The credit

55

NCUA00359553

USAOr_000311935

memorandum does not address or analyze the management companies' current capacity and usage of all the vehicles it leases.

- There is no discussion as to the sustainability of the $3,000/medallion/month lease payment. With current market lease rates of approximately $2,400 monthly per corporate medallion (as disclosed in the current Freidman bankruptcy proceedings), this is substantially more than the market. Without per loan or per LLC cash flows, the correct DSCR calculations are not presented in the credit memorandum.
- The credit memorandum does not address the potential negative effect on cash flow and collateral value of one of the medallions being chosen as a WAV medallion.
- Melrose entered into an asset-based loan which has in excess of 100% financing and a twenty-five year amortization, and possibly cash flow shortages and a less than 1.25 DSCR when market risk would indicate a turbulent market, declining values, declining cash flows, less than capacity usage.
- The credit memorandum does not discuss in detail any of the present outstandings other than current balances (open date, original amount, present balance, term & amortization, remaining term & amortization, payment, rate, collateral, LTV, etc.).
- No detailed debt and cash flow listing was received from the borrower. For large complex borrowers, it is both a safe and sound, and a general industry practice, to require complex borrowers to provide a list comprised of the following: name, description, collateral, percentage of ownership, revenues, NOI, lender, debt service, DSCR, cash flow, percentage of cash flow, value, percentage of value, LTV, etc. For a borrower like Agarwal, this list should include all of his medallion entities, all of his taxi & management entities, all of his commercial real estate entities, with separation by entity type.
- Although the file evidences an application, the application is not complete, nor does the file contain a recent and detailed PFS.
- There is no analysis of the personal tax return, including detailed analysis of K-1s, and personal cash flow.

| | | | |
|---|---|---|---|
| **49369** | **Paul, Widmarck** | **3/30/2015** | **$5,737,150** |

Melrose performed a modification/extension/TDR (TDR) on March 30, 2015. In performing the TDR, Melrose did not fully comply with:

- Letter to Credit Unions 14-CU-06, Taxi Medallion Lending, and Letter to Credit Unions 15-CU-03, Taxi Medallion Lending Questions and Answers
- Letter to Credit Unions 10-CU-07, Commercial Real Estate Loan Workouts (Commercial real estate is an income-producing asset; the principles outline in this letter may be helpful in evaluating risk associated with taxi medallion lending)
- Letter to Credit Unions 13-CU-03, Supervisory Guidance on Troubled Debt Restructuring
- Accounting Bulletin 06-01, Interagency Policy Statement on the Allowance for Loan and Lease Losses

Owner of Chicago, New York and Philadelphia taxi medallions. Twelve loans at Melrose totaling $5,737,150 secured by 24 Chicago medallions. Nineteen related companies. His March 30, 2015 credit report reflects a credit score of 529, on 71 loans with monthly payments of $86,071, on debts totaling $15,501,562. Melrose calculated global DSCR of 0.96% based off 2013 tax returns. Currently delinquent with due dates of 7-31-2015 and 8-31-2015. Failed TDR that should be placed on non-

CONFIDENTIAL INFORMATION – Subject to Protective Order

Confidential

NCUA00359554

USAOr_000311936

accrual, further impaired, and classified doubtful. The 24 Chicago medallions are in the process of foreclosure. When collateral is obtained the balance over the fair market value less cost to sell must be charged off.

- Your loan covenant states, "It is hereby agreed by the Borrower that if at any time the loan balance shall exceed 80% of the collateral value, the Borrower shall provide additional collateral to secure the loan upon demand by the Lender. The additional collateral provided shall be of sufficient value to bring the loan to value ratio to 80%. The loan to value ratio shall be determined and based solely upon the Lender's good faith valuation of the collateral at any point in time." To be enforceable the covenant needs be based off an independent source of valuation. Further, when the TDR was made the LTV was calculated at 119% and no effort was made to obtain more collateral. The covenant was violated at inception and likely unenforceable.
- All twelve loans listed as TDRs. Troubled Debt Restructured loans should give relief to the borrower and strengthen your position. Giving 50 year amortizations, lower interest rates, and extended maturities to 18 months does not address the problem or strengthen your position. In fact it materially diminishes it. Management information systems must maintain adequate documentation for the loan workout decision.   Documentation should show communication with the borrower, borrower agreement to pay the loan in full, and borrower ability to repay the loan under the new terms. New underwriting and repayment analysis must be completed at the restructure point to support the workout decision. Repayment analysis should be based off an acceptable amortization and not 50 years.   You should stop this type of restructuring immediately.
- You do not have a risk rating matrix. The credit Memorandum has a table that scored the relationship as a 43, or a "4" which is acceptable. This borrowing relationship should be rated a "8", or "Doubtful".   Letter to CU 13-1 requires that you have an accurate regulatory risk rating system. You need to develop a matrix, accurately grade loans, and develop an accurate Board reporting system in order to comply with CU 13-1.
- The TDR was done without Melrose performing a full and detailed borrower and financial analysis with risk delineated and mitigated.
- There is no indication that an impairment analysis was performed for the TDRs, as required by Accounting Bulletin 06-01, and there is no justification in the file for the $138 in Paul impairments taken.
- **Paul has 24 Chicago medallions with Melrose.   Your memorandum placed a value of $202,000 on a Chicago medallion.   Twenty-four medallions would sum to a total value of $4,848,000, vs. the $5,737,150 Paul Chicago balance.   This is a collaterally dependent loan, and valuation per ASC 310-10 is fair value of collateral less cost to sell.   An LTV of 80% would result in loan amount of $3,878,400, and an impairment of $1,858,750, which is $1,858612 greater than the Paul Chicago impairment taken of $138.**
- **The file does not indicate if any of the Paul loans were on non-accrual prior to the TDR. Since the loans were past due prior to undergoing a TDR, are currently past due, and collateral is deficient, the Paul loans should be placed in non-accrual status.**
- Melrose has not demonstrated a clear understanding of the complex borrower, or the performance of his various taxi-related firms and management companies.   This complex borrower did not provide a consolidated or consolidating statement, and Melrose has not worked with the borrower to develop an organization/corporate tree for all of Paul business interests, with ownership percentages, partners, entity type (with sufficient detail on the nature of the entity's purpose), etc.
- The TDR does not analyze the scope of the borrower's operations, how many cars he owns in each market, and how many he runs – through his various management companies.

CONFIDENTIAL INFORMATION – Subject to Protective Order

NCUA00359555

Confidential

USAOr_000311937

- The TDR does not analyze the size or strength of each of the various markets that the borrower operates in, or effects that transportation network companies (TNV) have had in each market, with respect to medallion revenues and profitability, cash flows and medallion values.
- The status of performance and present terms with other lenders is unknown.
- The TDR does not address an A&B note structure, in order to retain an appropriate market rate on the performing portion of the loans, commensurate with the risk.
- The borrower has not demonstrated why he needs the TDR, and Melrose has not performed an analysis of historical, current and expected revenues and cash flows in the various markets to support the basis for the TDR or the borrower's ability to repay under the modified terms.
- For this large and complex borrower, the approval or covenants do not require the borrower to provide audited or reviewed financial statements.
- With the TDR, the loans subject to the TDR - but not all Paul loans - were cross corporate, cross secured, cross defaulted.
- Although payment and term relief was granted with the TDR, no additional collateral was obtained.
- The credit report lists five loans from Melrose totaling $8 million as current and open. These loans did not show up in AIRES. Further research indicated that these loan were paid off in March of 2013 by Doral Bank. A clinch in the credit reporting system supposedly caused the error and needs to be corrected.
- The DSC ratio was not calculated correctly. No allocation for living expenses and personal/corporate taxes not subtracted from available cash flow.

**70604-01 & 02**          **Level Trans Corp.**          **10/28/2015**          **$1,300,000**

Melrose performed a modification/extension/TDR (TDR) on 2 Level Trans Corp. loans on 10/28/15.   In performing the TDR, Melrose did not fully comply with:

- Letter to Credit Unions 14-CU-06, Taxi Medallion Lending, and Letter to Credit Unions 15-CU-03, Taxi Medallion Lending Questions and Answers
- Letter to Credit Unions 10-CU-07, Commercial Real Estate Loan Workouts (Commercial real estate is an income-producing asset; the principles outline in this letter may be helpful in evaluating risk associated with taxi medallion lending)
- Letter to Credit Unions 13-CU-03, Supervisory Guidance on Troubled Debt Restructuring
- Accounting Bulletin 06-01, Interagency Policy Statement on the Allowance for Loan and Lease Losses

- The 10/28/15 TDR was done without Melrose performing a full and detailed borrower and financial analysis, consequently none of the DSC ratios calculated show positive cash flow even after the modification, no overall collateral evaluation was performed (guarantors have substantial other real estate holdings with negative equity and negative cash flows, borrower and related financial statements were not analyzed, risks were not delineated and mitigated.
- There is no indication that an impairment analysis was performed for the TDRs, as required by Accounting Bulletin 06-01, and there is no justification in the file for the impairments taken.
- **Level Trans Corp. has a New York mini-fleet.   Melrose used its 9/29/15 value memorandum for the new November, 2015 loan.   This memorandum placed a value of $1,700,000 on a New York mini-fleet ($850,000 per medallion).   The ALCO determined this valuation.   However our review of the ALCO minutes and packet do not support quantification determinations for**

58

NCUA00359556

USAOr_000311938

**these values.   This is a collaterally dependent loan, and valuation per ASC 310-10 should be fair value of collateral.**

- **The file does not indicate if the loan was on non-accrual prior to the TDR.   Since the loan is a TDR it should be placed in non-accrual status.**
- With this TDR, there was some accrued interest capitalized into the new loan.
- The Level Trans Corp. TDR credit memorandum did not include discussion as to whether the account will remain in non-accrual, until such time as they as Melrose performs a current, well-documented credit analysis supporting a return to accrual status based on the borrower's financial condition and prospects for repayment under the revised terms.
- Melrose has not demonstrated a clear understanding of the complex borrowers, or the performance of their various companies.  The complex borrowers did not provide a consolidated or consolidating statement, and Melrose has not worked with the borrowers to develop an organization/corporate tree for all of Level Trans Corp's business interests, with ownership percentages, partners, entity type (with sufficient detail on the nature of the entity's purpose), etc.
- The TDR does not analyze the scope of the borrower's other business operations, how many homes he owns in each market, and how many he runs – or through management companies.
- The TDR does not analyze the size or strength of each of the various markets that the borrower operates in, or effects that real estate prices or rentals in each market, with respect to revenues and profitability, cash flows and values.
- The status of performance and present terms with other lenders is unknown as there were no personal credit reports maintained in the file.
- A detailed listing of all of the borrower's debt was not obtained or analyzed, for all medallions, companies, real estate and personal debt.   Said listing for this complex and highly levered borrower should include but not be limited to the following: borrower, ownership, lender, debt amount, monthly payment, interest rate, original date, maturity date, amortization, free cash flow and debt-specific DSCR (as appropriate), collateral/collateral value/LTV.
- The three year TDR term is imprudent due to the lack of underwriting and mitigating of risks, the continued multiple financial and legal issues the borrower is facing or engaged in, and the lack of any recent signed personal financial statements or other proofs of financial performance.
- The TDR does not address an A&B note structure, in order to retain an appropriate market rate on the performing portion of the loans, commensurate with the risk.
- The borrower has not demonstrated WHY he needs the TDR, and Melrose has not performed an analysis of historical, current and expected revenues and cash flows in the various markets to support the basis for the TDR or the borrower's ability to repay under the modified terms.
- For this more complex borrower, the approval or covenants do not require the borrower to provide audited or reviewed financial statements.
- There is no documentation of what relief the TDR provided; interest, cash flow, term, etc.
- The borrower was not required to provide a detailed "plan of action", addressing what specific steps will be taken to regain a positive cash flow moving forward– including closely held firms, real estate holdings and timing.   In addition, if assets were sold, the excess proceeds from the sale should have accrued to Melrose and the reduced payments applied to only Melrose loans.
- With the TDR all Level Trans Corp assets should have been cross corporate cross secured cross defaulted.
- Although some concession was granted with this TDR, no additional collateral was obtained.
- The latest personal financial statement do not appear complete and do not appear to be provided by the members).   The information in the credit memorandum appears to be stated values with no

CONFIDENTIAL INFORMATION – Subject to Protective Order

NCUA00359557

Confidential

USAOr_000311939

signed or vetted personal financial statement. Given the issues as above, it is imperative to obtain a financial statement which is very recent, and said statement should be analyzed in depth.
- The credit memorandum does not address the potential negative effect on cash flow and collateral value of one of the medallions being chosen as a WAV medallion.
- The documentation does not indicate an assignment of lease or a copy of the lease agreement.   The credit memorandum does not disclose to whom the medallions are leased, the lease amount, or the lease term.   Additionally, the credit memorandum does not discuss the ability of the management company which will lease these medallions to operate them during the current driver shortage.   The credit memorandum does not address or analyze the management companies' current capacity and usage of all the vehicles it leases.
- The credit memorandum does not discuss if the medallions are leased with or without a car, and if leased with a car, details on ownership, debt and monthly payment, next replacement date, etc.
- The guarantees of the management companies were not obtained, nor a collateralized guarantee by these management companies, who run the cabs and collect lease payments from the cabs' lessees – the cash flows were not attached.

**51258-14 & 47385-12      Sukhvinder Singh & Inderjit Singh  11/3/15          $516,000 & $514,000**

Melrose granted two new loans to present borrowers Sukhvinder Singh & Inderjit Singh on 11/3/15 for the refinance of ballooning loans of two NY taxi medallions.   The Singh borrowers were underwritten in one combined credit memorandum although they are two separate borrowers with no apparent relation other than name.   Both medallions are leased through separate management companies.   While underwriting the loans, Melrose did not fully comply with Letter to Credit Unions 14-CU-06, Taxi Medallion Lending, and Letter to Credit Unions 15-CU-03, Taxi Medallion Lending Questions and Answers

- There was no documentation of lease agreements in the file upon our initial review.   The credit union did obtain lease agreement documentation while we were on-site both were dated (12/17/2015) after the loan was granted.   Both lease agreements are for less than the loan memorandum amount.   One is for $2,400 and one is for $2,500.   This difference makes the credit unions combined DSCR right at or just under 1:1.0. With current market lease rates of approximately $2,400 monthly (per corporate medallion as disclosed in the current Melrose's other borrower Freidman bankruptcy proceedings and as seen in the monthly payments received) on both the Singh loans two months prior to closing, Melrose still gave the member credit for $2,800 a month leases.
- The credit memo does not fully address any additional information regarding the structure of these two borrowers.   The credit memo lacks a reason these two separate loans were underwritten with combined financials for the two borrowers who individually own the medallions.
- The management company appears to send the lease payments to Melrose CU and this is the source of repayment.   A review of the payment history (provided last day of the contact at 1pm) for the last several months show the lease payments sent have been reduced from $2,800 (the amount noted in memo too) down to $2,400 (payments 10/6 and 11/9).   However the credit memo and financials cited and projected lease payments of $2,800 a month.   This information indicates the loan was approved without verification of the current lease payments.
- Prior to these new loans, the ballooning notes did not have any documented annual reviews.
- The credit memorandum does not indicate the make/model/year/owner/lender/loan amount & terms for the taxi cabs which the various medallions will be affixed to.   There is no indication of expected replacement timing of any of the taxi cabs.

CONFIDENTIAL INFORMATION – Subject to Protective Order                                                    NCUA00359558

Confidential                                                                                              USAOr_000311940

- There is no calculation of the individual business' DSCR.   From the information provided (credit memorandum and Sage Works data), it is clear one of these medallion business is not going to have a positive cash flow.
- The credit memo does not address the DSCR for the medallion businesses, and the guarantors are combined to show a guarantor cash flow of 1.38.   However the global DSCR is 3.49.   Further explanation of both the individual borrowers and the individual medallions DSCR would be extremely prudent in this transaction.   For example S. Singh shows discretionary cash flow of only $4,755 (DSCR 1.14).   This amount does not include living expenses or personal documentation of personal debt.   Borrower I. Singh only has $28,188 (DSCR 1.46) personal discretionary cash flow without living expenses. While the DSCR may appear sound, the actual cash flow does not support normal living expenses in New York City.
- There are no member signed or presented personal financial statement despite the credits reliance on a global cash flow. The credit memo gives each borrower credit for personal "total net worth" without any verification of assets and liabilities or in a Personal Financial Statement. Melrose appeared to use only member stated incomes, expenses as well as asset and liability valuations.
- The financial review shows only one year (2014) of "current" cash flows and a proposed cash flow which are essentially the same numbers.   Further research into the 2015 operations is prudent for MBL underwriting. This additional updated information would have identified the decrease in contractual lease income from these two medallions.
- No discussion or analysis of full ownership explanation for the related joint business venture (liquor stores in Illinois).
- At least one of the two loans are dependent on the global relationship for positive cash flow however there is no cross collateralization to the liquor stores.
- The credit memo did not have any detailed discussion or analysis of the related parties' liquor stores financials.   For example the larger (more profitable) liquor store shows a large inventory valuation but they also show extended inventory days from 2013 to 2014 tax returns.
- The credit memo listed collateral valuation as: "According to the NY Taxi & Limousine Commission, the value of 11/3/15 of this underwriting it is reported to be $800,000 for each individual medallion."   However, the credit memo (sage works) shows a collateral appraisal date of 9/29/2015 with no source listed and no value documented.   These statements are inconsistent.

**28038-22**          **Cayo, C**                    **10/1/15**                **$108,000 or $91,000**

Melrose granted a new loan with cash out to present borrower C. Cayo 10/1/15 for the refinance of a NY taxi medallion. The borrower was forced by the management company to take back his medallion.   As such this borrower is now running his own medallion and needed to purchase a taxi.   In addition Melrose gave cash out to pay off credit card debt.   We noted the following concerns with underwriting for this loan which does not comply with Letter to Credit Unions 14-CU-06, Taxi Medallion Lending, and Letter to Credit Unions 15-CU-03, Taxi Medallion Lending Questions and Answers.

- The credit memorandum is unclear if the loan amount was $91,000 (requested on front page of credit memorandum) or $108,000 which was the amount discussed in the credit underwriting.
- The underwriting does not include discussion of the reason the medallion was forced back from the broker with no additional information provided to further explain the situation.
- The credit memorandum does not contain a detailed breakdown of the sources and uses of the loan proceeds, part of which was utilized to pay off debt, without obtaining a security interest in the

CONFIDENTIAL INFORMATION – Subject to Protective Order

NCUA00359559

Confidential

USAOr_000311941

underlying collateral purchased (vehicle) with this cash out money. No title taken on the new vehicle.   Cash out for payment of personal credit cards.
- The credit memorandum states that Cayo is an owner operator whose income and cash flow is derived from the applicant's revenue as an owner operator. There is no business DSCR calculate din the underwriting process which would support this statement.
- The memorandum states the spouse works and earns a W2 income.   Further information regarding the personal living expenses and debt is warranted given the negative personal (0.98) and negative global cash flows. The cash flow before financing shows the same amount as the proposed. Personal DSCR for 2014 was 1.09 but in in dollars was $6,945.   This amount is not sufficient for living expenses in NYC.   The underwriting did not include discussion of reasonableness test for personal DSCR.
- Based on the financial information in the credit memorandum, it appears this member increased his personal debt by $400,000 in 2014 however, this is not discussed in the memo.
- The loan included a cash out "to pay credit card" and purchase a new vehicle so the borrower could begin driving the medallion.
- The following underwriting statement is very illogical and inconsistent: "He also has an excellent credit history with all other lenders and his FICO score is 577 with $142,000 in revolving debt."
- Discussion of why the loan was approved with DSCR of 0.98. This loan could be considered a TDR if there were any concessions granted in loan approval, DSCR, Rate, term etc. It is clear the member is suffering financial stress.
- No full discussion or vetting of how the member will address the 2 short term debts coming due. The underwriting does not disclose what these debts are or if they are Melrose debts.   In addition, the memorandum states the member would improve their cash flow position with a refinance of these debts.   However, given the member's debt, negative cash flow and credit scores it is unlikely they will qualify for or be able to do the consolidation to a 25 year amortization and a 3 year balloon.
- The guarantor is shown with $988,000 NW.   There is no supporting information for the stated total assets and total liabilities.
- The collateral value was obtained 7/21/15 from the NY Taxi & Limousine Commission (unclear why this was used due to the current lawsuit between Melrose and the Commission regarding fraudulent maintenance of values).   However this loan was not closed until 10/1.  Given the market changes the credit union should have revivified the collateral value.


**67013/65309/53771        Garber, Symon & Elina, et al        Various        ~$51,000,000**

Melrose performed a modification/extension/TDR (TDR) on multiple Garber loans on 4/16/15.   In performing the TDR, Melrose did not fully comply with:

- Letter to Credit Unions 14-CU-06, Taxi Medallion Lending, and Letter to Credit Unions 15-CU-03, Taxi Medallion Lending Questions and Answers
- Letter to Credit Unions 10-CU-07, Commercial Real Estate Loan Workouts (Commercial real estate is an income-producing asset; the principles outline in this letter may be helpful in evaluating risk associated with taxi medallion lending)
- Letter to Credit Unions 13-CU-03, Supervisory Guidance on Troubled Debt Restructuring
- Accounting Bulletin 06-01, Interagency Policy Statement on the Allowance for Loan and Lease Losses

CONFIDENTIAL INFORMATION – Subject to Protective Order

NCUA00359560

Confidential

USAOr_000311942

- The 4/16/15 TDR was done without Melrose performing a full and detailed borrower and financial analysis, consequently only one DSC ratio was calculated, an overall collateral evaluation was performed indicating an 84% LTV on page 2 and an 85% LTV on page 6 but not indicating what collateral value was used in each market or detailing LTVs by loan, market or borrowing entity.
- While changes in cash flows between 4th quarter 2013 and 2014 were provided and discussed, the analysis lacked depth and did not identify how the borrower intended to restructure his business during the TDR period to bring the loans back into commercially reasonable repayment terms. In addition, borrower and related financial statements were only minimally analyzed, risks were not mitigated, and additional collateral was not sought despite the borrower apparently having other resources.
- There is no indication that an impairment analysis was performed for the TDRs, as required by Accounting Bulletin 06-01, and there is no justification in the file for the $46K in impairments taken.
- **Garber, et al have 10 loans totaling $17.25 million secured by an undisclosed number of Chicago medallions with Melrose.   The memo is unclear what collateral value was assigned to each Chicago medallion but the calculation indicates an 84% LTV.   This is a collaterally dependent loan, and valuation per ASC 310-10 should be based on the fair value of collateral, not the present value of future cash flows using the loan's effective interest rate.**
- **Garber, et al also have 21 loans totaling approximately $34 million secured by 43 NYC medallions with Melrose.   At the time the TDR was granted, Melrose placed a value of $1,850,000 on a New York mini-fleet ($925,000 per medallion) and the memo indicates an LTV of 84% but calculates out to 85%. This is a collaterally dependent loan, and valuation per ASC 310-10 should be based on the fair value of collateral, not the present value of future cash flows using the loan's effective interest rate.**
- The file does not indicate if any of the Garber related loans were on non-accrual prior to the TDR. If the loans were past due prior to undergoing a TDR the loans should be on non-accrual status.
- The TDR contains no discussion as to how long the accounts will remain in non-accrual.   Until such time as Melrose performs a current, well-documented credit analysis supporting a return to accrual status based on the borrower's financial condition and prospects for repayment under the revised terms, the modified loans should be on non-accrual.
- The TDR loans were risk rated 50 upon moving to TDR status. This rating does not adequately reflect the risk of a TDR with a 50 year amortization period and a borrower who is experiencing payment stress.
- The status of performance and present terms with other lenders is unknown.
- A detailed listing of all of the borrower's assets and liabilities was not obtained or analyzed.   In addition to the debt service, the debt listing for this complex and highly levered borrower should include the following: ownership percentage, lender, original loan amount, interest rate, original date, maturity date, amortization, loan-specific DSCR, collateral/collateral value/LTV and what, if any, concessions other lenders have granted.
- The TDR does not address an A&B note structure, in order to retain an appropriate market rate and amortization on the performing portion of the loans, commensurate with the risk.
- Melrose has not performed an analysis of historical, current and expected revenues and cash flows in the various markets to support the basis for the TDR or the borrower's ability to repay under the modified terms.
- For this large and complex borrower, the approval or covenants do not require the borrower to provide audited or reviewed financial statements.
- The loans subject to the TDR were not cross corporate, cross secured, and cross defaulted.

63

CONFIDENTIAL INFORMATION – Subject to Protective Order

Confidential

- The guarantees of the management companies were not obtained, nor a collateralized guarantee by these management companies, who run the cabs and collect lease payments from the cabs' lessees – the cash flows were not attached.
- Although payment and term relief was granted with the TDR, no additional collateral was obtained.
- The credit memorandum does not address the potential negative effect on the borrower's NYC cash flows and collateral values if any of his medallions is chosen to be a WAV medallion.
- There is no discussion as to the number of medallions owned by other Melrose borrowers, which are leased to Garber & related, or his management companies.   Additionally, there is no discussion or analysis as to the number of these medallions which are delinquent or have had TDRs (and why).

| 68347 L13-24 | **Tudor, Florina** | 3/24/2015 | $9,650,542 |
|---|---|---|---|

Melrose performed a modification/extension/TDR (TDR) on March 24, 2015. In performing the TDR, Melrose did not fully comply with:

- Letter to Credit Unions 14-CU-06, Taxi Medallion Lending, and Letter to Credit Unions 15-CU-03, Taxi Medallion Lending Questions and Answers
- Letter to Credit Unions 10-CU-07, Commercial Real Estate Loan Workouts (Commercial real estate is an income-producing asset; the principles outline in this letter may be helpful in evaluating risk associated with taxi medallion lending)
- Letter to Credit Unions 13-CU-03, Supervisory Guidance on Troubled Debt Restructuring
- Accounting Bulletin 06-01, Interagency Policy Statement on the Allowance for Loan and Lease Losses

Owner of Chicago tax medallions for 18 years with husband Adrian. Twelve loans at Melrose totaling $9,650,542 secured by 38 Chicago medallions. Eighty two related medallion companies and five commercial real estate operating companies. Florina February 27, 2015 credit report reflects a credit score of 608, and Adrian 678. Melrose calculated global DSCR of 1.93x based off forty one 2013 tax returns and projections for the remaining thirty eight. The thirty eight were for medallions purchased late in 2012 and early 2013 that had tax return filing extensions.

- Your loan covenant states, "It is hereby agreed by the Borrower that if at any time the loan balance shall exceed 80% of the collateral value, the Borrower shall provide additional collateral to secure the loan upon demand by the Lender. The additional collateral provided shall be of sufficient value to bring the loan to value ratio to 80%. The loan to value ratio shall be determined and based solely upon the Lender's good faith valuation of the collateral at any point in time." To be enforceable the covenant needs be based off an independent source of valuation. Further, when the TDR was made the LTV was calculated at 85% and no effort was made to obtain more collateral. The covenant was violated at inception and likely unenforceable.
- All twelve loans listed as TDRs. Troubled Debt Restructured loans should give relief to the borrower and strengthen your position. Giving 50 year amortizations, lower interest rates, and extended maturities to 18 months does not address the problem or strengthen your position. In fact it materially diminishes it. Management information systems must maintain adequate documentation for the loan workout decision.   Documentation should show communication with the borrower, borrower agreement to pay the loan in full, and borrower ability to repay the loan under the new terms. New underwriting and repayment analysis must be completed at the restructure point to support the workout decision. Repayment analysis should be based off an

64

CONFIDENTIAL INFORMATION – Subject to Protective Order

NCUA00359562

Confidential

USAOr_000311944

acceptable amortization and not 50 years.   You should stop this type of restructuring immediately.

- You do not have a risk rating matrix. The credit Memorandum has a table that scored the relationship as a 55, or a "5" which is acceptable. This borrowing relationship should be rated a "7", or "Substandard".   Letter to CU 13-1 requires that you have an accurate regulatory risk rating system. You need to develop a matrix, accurately grade loans, and develop an accurate Board reporting system in order to comply with CU 13-1.

- The TDR was done without Melrose performing a full and detailed borrower and financial analysis with risk delineated and mitigated. 2014 tax returns and CPA audited statements should be obtained to adequately calculate cash flow.

- There is no indication that an impairment analysis was performed for the TDRs, as required by Accounting Bulletin 06-01, and there is no justification in the file for the $72,378 in Tudor impairments taken.

- **Tudor has 38 Chicago medallions with Melrose.   Your memorandum placed a value of $300,000 on a Chicago medallion.   A week later $202,000 was used to value Widmarck Paul's TDR medallions. Thirty-eight medallions valued at $202,000 would sum to a total value of $7,676,000, vs. the $9,650,542 Tudor Chicago balance.   This is a collaterally dependent loan, and valuation per ASC 310-10 is fair value of collateral less cost to sell.   An LTV of 80% would result in loan amount of $6,140,800, and an impairment of $3,509,742, which is $3,437,364 greater than the Tudor Chicago impairment taken of $72,378.**

- Melrose has not demonstrated a clear understanding of the complex borrower, or the performance of his various taxi-related firms and management companies.   This complex borrower did not provide a consolidated or consolidating statement, and Melrose has not worked with the borrower to develop an organization/corporate tree for all of Tudor's business interests, with ownership percentages, partners, entity type (with sufficient detail on the nature of the entity's purpose), etc.

- The TDR does not analyze the scope of the borrower's operations, how many cars he owns in each market, and how many he runs – through his various management companies.

- The TDR does not analyze the size or strength of the Chicago market that the borrower operates in, or effects that transportation network companies (TNV) have had in each market, with respect to medallion revenues and profitability, cash flows and medallion values.

- The status of performance and present terms with other lenders is unknown.

- The TDR does not address an A&B note structure, in order to retain an appropriate market rate on the performing portion of the loans, commensurate with the risk.

- The borrower has not demonstrated why he needs the TDR, and Melrose has not performed an analysis of historical, current and expected revenues and cash flows in the Chicago market to support the basis for the TDR or the borrower's ability to repay under the modified terms.

- For this large and complex borrower, the approval or covenants do not require the borrower to provide audited or reviewed financial statements.

- With the TDR, the loans subject to the TDR - but not all Tudor loans - were cross corporate cross secured cross defaulted.

- Although payment and term relief was granted with the TDR, no additional collateral was obtained.

- The DSC ratio at 1.93x was not calculated correctly. No allocation for living expenses and personal/corporate taxes not subtracted from available cash flow. Further, sales/property taxes paid were added back to cash flow in the amount of $196,751 and $3,136,516 in debt service obligations on medallions purchased in late 2012 and early 2013 were not included. Correcting for the last two errors changed the DSC ratio to an unacceptable 0.94x.

65

Charter 62005                                    MELROSE                                    Eff. Date 09/30/2015

## Loan and Lease Growth Analysis

| Dollars of Growth | 12/31/2012 | 12/31/2013 | 2013 Dollar Change | 12/31/2014 | 2014 Dollar Change |
|---|---|---|---|---|---|
| **LOAN PORTFOLIO MIX** | | | | | |
| Unsecured Credit Card Loans | 0 | 0 | 0 | 0 | 0 |
| All Other Unsecured Loans | 142,898 | 126,015 | (16,883) | 83,668 | (42,347) |
| Payday Alternative Loans (PAL) FCU Only | 0 | 0 | 0 | 0 | 0 |
| Non-Federally Guaranteed Student Loans | 0 | 0 | 0 | 0 | 0 |
| New Vehicle Loans | 175,786 | 215,557 | 39,771 | 183,745 | (31,812) |
| Used Vehicle Loans | 24,307 | 26,755 | 2,448 | 14,004 | (12,751) |
| First Mortgage Real Estate Loans | 315,907,258 | 318,088,209 | 2,180,951 | 400,952,206 | 82,863,997 |
| Other Real Estate Loans | 4,293,682 | 3,814,739 | (478,943) | 3,242,245 | (572,494) |
| Leases Receivables | 0 | 0 | 0 | 0 | 0 |
| All Other Loans | 1,352,206,271 | 1,379,177,866 | 26,971,595 | 1,533,685,246 | 154,507,380 |
| **Total Loans** | 1,672,750,202 | 1,701,449,141 | 28,698,939 | 1,938,161,114 | 236,711,973 |
| Number of Loans | 5,268 | 5,140 | (128) | 5,265 | 125 |
| **TOTAL DELINQUENT LOANS** | | | | | |
| 30 to 59 Days | 13,655,271 | 14,186,116 | 530,845 | 22,368,469 | 8,182,353 |
| 60 to 179 Days | 1,477,588 | 1,787,039 | 309,451 | 2,435,541 | 648,502 |
| 180 to 359 Days | 725,558 | 496,355 | (229,203) | 1,174,820 | 678,465 |
| 360 Days and Over | 1,028,764 | 704,042 | (324,722) | 608,232 | (95,810) |
| **Total Reportable Delinquent Loans** | 3,231,910 | 2,987,436 | (244,474) | 4,218,593 | 1,231,157 |
| Number of Reportable Delinquent Loans | 63 | 41 | (22) | 45 | 4 |
| Percent of Loans 60 Days and Over Delinquent | 0.19% | 0.18% | -0.02% | 0.22% | 0.04% |
| **Total Loans Delinquent 30 Days and Over** | 16,887,181 | 17,173,552 | 286,371 | 26,587,062 | 9,413,510 |
| Percent of Loans 30 Days and Over Delinquent | 1.01% | 1.01% | 0.00% | 1.37% | 0.36% |
| **MISCELLANEOUS LOAN INFORMATION** | | | | | |
| Maximum Indebtedness of a Member per NCUA Regulation | 172,321,848 | 175,934,877 | 3,613,029 | 193,773,313 | 17,838,436 |
| Estimated Loan Maturity (Turnover) In Months | 16 | 21 | 5 | 40 | 19 |
| Weighted Average Loan Interest Rate | 3.57% | 3.87% | 0.29% | 4.08% | 0.21% |
| Yield on Average Loans | 4.61% | 4.23% | -0.39% | 4.14% | -0.08% |
| Delinquent Loans to Net Worth | 0.93% | 0.80% | -0.13% | 1.10% | 0.31% |
| Troubled Debt Restructured (TDRs) Loans | 0 | 0 | 0 | 0 | 0 |
| TDRs to Loans | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| TDRs to Net Worth | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Loans Charged-Off (Annualized) | 554,790 | 318,515 | (236,275) | 1,285,650 | 967,135 |
| Recoveries on Charged-Offs (Annualized) | 141,437 | 176,065 | 34,628 | 33,586 | (142,479) |
| Net Charge Offs (Annualized) | 413,353 | 142,450 | (270,903) | 1,252,064 | 1,109,614 |
| Net Charge Off Ratio (Annualized) | 0.03% | 0.01% | -0.02% | 0.07% | 0.06% |
| Amount of Loans Granted YTD | 1,314,729,512 | 978,671,914 | (336,057,598) | 744,432,482 | (234,239,432) |
| PAL Loans Granted YTD FCU Only | 0 | 0 | 0 | 0 | 0 |
| Non-Federally Guar. Student Loans in deferred status | 0 | 0 | 0 | 0 | 0 |
| Amount of Loans to Officials | 468,233 | 442,432 | (25,801) | 415,713 | (26,719) |
| All Loans Charged off Due to Bankruptcy | 0 | 0 | 0 | 0 | 0 |
| Number of Members with Loans who have filed for: | | | | | |
| Chapter 7 Bankruptcy YTD | 0 | 0 | 0 | 2 | 2 |
| Chapter 11 Bankruptcy YTD | 0 | 0 | 0 | 0 | 0 |
| Chapter 13 Bankruptcy YTD | 0 | 0 | 0 | 0 | 0 |
| Outstanding Loan Balances Subject to Bankruptcy | 0 | 0 | 0 | 348,498 | 348,498 |
| **SPECIALIZED LENDING INFORMATION** | | | | | |
| Credit Card Loans | 0 | 0 | 0 | 0 | 0 |
| Real Estate Loans | 320,200,940 | 321,902,948 | 1,702,008 | 404,194,451 | 82,291,503 |
| Indirect Loans | 0 | 0 | 0 | 0 | 0 |
| Member Business Loans Outstanding (Excl. Unused Commitments) | 1,502,415,651 | 1,506,160,261 | 3,744,610 | 1,743,925,710 | 237,765,449 |
| Participation Loans | 11,550,356 | 6,368,961 | (5,181,395) | 28,765,497 | 22,396,536 |

CONFIDENTIAL INFORMATION – Subject to Protective Order                                    NCUA00359564

Confidential                                    USAOr_000311946

Charter 62005                                    MELROSE                                    Eff. Date 09/30/2015

## Loan and Lease Growth Analysis

| Dollars of Growth | 12/31/2012 | 12/31/2013 | 2013 Dollar Change | 12/31/2014 | 2014 Dollar Change |
|---|---|---|---|---|---|
| **LOAN INTEREST RATES** | | | | | |
| Unsecured Credit Card Loans | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| All Other Unsecured Loans | 14.00% | 14.00% | 0.00% | 14.00% | 0.00% |
| Payday Alternative Loans (PAL) FCU Only | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Non-Federally Guaranteed Student Loans | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| New Vehicle Loans | 6.00% | 6.00% | 0.00% | 6.00% | 0.00% |
| Used Vehicle Loans | 9.00% | 9.00% | 0.00% | 9.00% | 0.00% |
| First Mortgage Real Estate Loans | 3.88% | 4.38% | 0.50% | 4.38% | 0.01% |
| Other Real Estate Loans | 4.25% | 4.25% | 0.00% | 4.38% | 0.13% |
| Leases Receivables | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| All Other Loans | 3.50% | 3.75% | 0.25% | 4.00% | 0.25% |

67

Charter 62005                                                MELROSE                                           Eff. Date 09/30/2015

## Loan and Lease Growth Analysis

| Percentage of Growth | 12/31/2012 | 12/31/2013 | 2013 % Change | 12/31/2014 | 2014 % Change |
|---|---|---|---|---|---|
| **LOAN PORTFOLIO MIX** | | | | | |
| Unsecured Credit Card Loans | 0 | 0 | 0.00% | 0 | 0.00% |
| All Other Unsecured Loans | 142,898 | 126,015 | -11.81% | 83,668 | -33.60% |
| Payday Alternative Loans (PAL) FCU Only | 0 | 0 | 0.00% | 0 | 0.00% |
| Non-Federally Guaranteed Student Loans | 0 | 0 | 0.00% | 0 | 0.00% |
| New Vehicle Loans | 175,786 | 215,557 | 22.62% | 183,745 | -14.76% |
| Used Vehicle Loans | 24,307 | 26,755 | 10.07% | 14,004 | -47.66% |
| First Mortgage Real Estate Loans | 315,907,258 | 318,088,209 | 0.69% | 400,952,206 | 26.05% |
| Other Real Estate Loans | 4,293,682 | 3,814,739 | -11.15% | 3,242,245 | -15.01% |
| Leases Receivables | 0 | 0 | 0.00% | 0 | 0.00% |
| All Other Loans | 1,352,206,271 | 1,379,177,866 | 1.99% | 1,533,685,246 | 11.20% |
| **Total Loans** | 1,672,750,202 | 1,701,449,141 | 1.72% | 1,938,161,114 | 13.91% |
| Number of Loans | 5,268 | 5,140 | -2.43% | 5,265 | 2.43% |
| **TOTAL DELINQUENT LOANS** | | | | | |
| 30 to 59 Days | 13,655,271 | 14,186,116 | 3.89% | 22,368,469 | 57.68% |
| 60 to 179 Days | 1,477,588 | 1,787,039 | 20.94% | 2,435,541 | 36.29% |
| 180 to 359 Days | 725,558 | 496,355 | -31.59% | 1,174,820 | 136.69% |
| 360 Days and Over | 1,028,764 | 704,042 | -31.56% | 608,232 | -13.61% |
| **Total Reportable Delinquent Loans** | 3,231,910 | 2,987,436 | -7.56% | 4,218,593 | 41.21% |
| Number of Reportable Delinquent Loans | 63 | 41 | -34.92% | 45 | 9.76% |
| Percent of Loans 60 Days and Over Delinquent | 0.19% | 0.18% | -9.12% | 0.22% | 23.96% |
| **Total Loans Delinquent 30 Days and Over** | 16,887,181 | 17,173,552 | 1.70% | 26,587,062 | 54.81% |
| Percent of Loans 30 Days and Over Delinquent | 1.01% | 1.01% | -0.02% | 1.37% | 35.91% |
| **MISCELLANEOUS LOAN INFORMATION** | | | | | |
| Maximum Indebtedness of a Member per NCUA Regulation | 172,321,848 | 175,934,877 | 2.10% | 193,773,313 | 10.14% |
| Estimated Loan Maturity (Turnover) In Months | 16 | 21 | 33.75% | 40 | 90.32% |
| Weighted Average Loan Interest Rate | 3.57% | 3.87% | 8.23% | 4.08% | 5.45% |
| Yield on Average Loans | 4.61% | 4.23% | -8.43% | 4.14% | -1.94% |
| Delinquent Loans to Net Worth | 0.93% | 0.80% | -13.94% | 1.10% | 38.69% |
| Troubled Debt Restructured (TDRs) Loans | 0 | 0 | 0.00% | 0 | 0.00% |
| TDRs to Loans | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| TDRs to Net Worth | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Loans Charged-Off (Annualized) | 554,790 | 318,515 | -42.59% | 1,285,650 | 303.64% |
| Recoveries on Charged Offs (Annualized) | 141,437 | 176,065 | 24.48% | 33,586 | -80.92% |
| Net Charge Offs (Annualized) | 413,353 | 142,450 | -65.54% | 1,252,064 | 778.95% |
| Net Charge Off Ratio (Annualized) | 0.03% | 0.01% | -67.71% | 0.07% | 714.85% |
| Amount of Loans Granted YTD | 1,314,729,512 | 978,671,914 | -25.56% | 744,432,482 | -23.93% |
| PAL Loans Granted YTD FCU Only | 0 | 0 | 0.00% | 0 | 0.00% |
| Non-Federally Guar. Student Loans in deferred status | 0 | 0 | 0.00% | 0 | 0.00% |
| Amount of Loans to Officials | 468,233 | 442,432 | -5.51% | 415,713 | -6.04% |
| All Loans Charged off Due to Bankruptcy | 0 | 0 | 0.00% | 0 | 0.00% |
| Number of Members with Loans who have filed for: | | | | | |
| Chapter 7 Bankruptcy YTD | 0 | 0 | 0.00% | 2 | 0.00% |
| Chapter 11 Bankruptcy YTD | 0 | 0 | 0.00% | 0 | 0.00% |
| Chapter 13 Bankruptcy YTD | 0 | 0 | 0.00% | 0 | 0.00% |
| Outstanding Loan Balances Subject to Bankruptcy | 0 | 0 | 0.00% | 348,498 | 0.00% |
| **SPECIALIZED LENDING INFORMATION** | | | | | |
| Credit Card Loans | 0 | 0 | 0.00% | 0 | 0.00% |
| Real Estate Loans | 320,200,940 | 321,902,948 | 0.53% | 404,194,451 | 25.56% |
| Indirect Loans | 0 | 0 | 0.00% | 0 | 0.00% |
| Member Business Loans Outstanding (Excl. Unused Commitments) | 1,502,415,651 | 1,506,160,261 | 0.25% | 1,743,925,710 | 15.79% |
| Participation Loans | 11,550,356 | 6,368,961 | -44.86% | 28,765,497 | 351.65% |

68

CONFIDENTIAL INFORMATION – Subject to Protective Order                                        NCUA00359566

Confidential                                                                                              USAOr_000311948

Charter 62005                                           MELROSE                                    Eff. Date 09/30/2015

## Loan and Lease Growth Analysis

| Percentage of Growth | 12/31/2012 | 12/31/2013 | 2013 % Change | 12/31/2014 | 2014 % Change |
|---|---|---|---|---|---|
| **LOAN INTEREST RATES** | | | | | |
| Unsecured Credit Card Loans | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| All Other Unsecured Loans | 14.00% | 14.00% | 0.00% | 14.00% | 0.00% |
| Payday Alternative Loans (PAL) FCU Only | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Non-Federally Guaranteed Student Loans | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| New Vehicle Loans | 6.00% | 6.00% | 0.00% | 6.00% | 0.00% |
| Used Vehicle Loans | 9.00% | 9.00% | 0.00% | 9.00% | 0.00% |
| First Mortgage Real Estate Loans | 3.88% | 4.38% | 12.76% | 4.38% | 0.11% |
| Other Real Estate Loans | 4.25% | 4.25% | 0.00% | 4.38% | 3.06% |
| Leases Receivables | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| All Other Loans | 3.50% | 3.75% | 7.14% | 4.00% | 6.67% |

CONFIDENTIAL INFORMATION – Subject to Protective Order                                    NCUA00359567

Confidential                                                                          USAOr_000311949

| 09/30/2015 | 2015 Dollar Change |
|---:|---:|
| 0 | 0 |
| 60,064 | (23,604) |
| 0 | 0 |
| 0 | 0 |
| 202,058 | 18,313 |
| 6,895 | (7,109) |
| 461,311,180 | 60,358,974 |
| 2,929,619 | (312,626) |
| 0 | 0 |
| 1,539,148,260 | 5,463,014 |
| 2,003,658,076 | 65,496,962 |
| 5,222 | (43) |
| 96,122,272 | 73,753,803 |
| 123,020,950 | 120,585,409 |
| 2,101,957 | 927,137 |
| 665,791 | 57,559 |
| 125,788,698 | 121,570,105 |
| 158 | 113 |
| 6.28% | 6.06% |
| 221,910,970 | 195,323,908 |
| 11.08% | 9.70% |
| 191,030,010 | (2,743,303) |
| 45 | 5 |
| 4.09% | 0.01% |
| 3.95% | -0.20% |
| 34.89% | 33.78% |
| 219,463,355 | 219,463,355 |
| 10.95% | 10.95% |
| 60.86% | 60.86% |
| 900,143 | (385,508) |
| 55,765 | 22,179 |
| 844,378 | (407,686) |
| 0.04% | -0.03% |
| 455,285,785 | (289,146,697) |
| 0 | 0 |
| 0 | 0 |
| 395,052 | (20,661) |
| 2,812 | 2,812 |
| 0 | (2) |
| 0 | 0 |
| 0 | 0 |
| 0 | (348,498) |
| 0 | 0 |
| 464,240,799 | 60,046,348 |
| 0 | 0 |
| 1,814,020,820 | 70,095,110 |
| 17,853,663 | (10,911,834) |

CONFIDENTIAL INFORMATION – Subject to Protective Order

NCUA00359568

Confidential

USAOr_000311950

Charter 62005                                    MELROSE                                    Eff. Date 09/30/2015

| 09/30/2015 | 2015 Dollar Change |
|---|---|
| 0.00% | 0.00% |
| 14.00% | 0.00% |
| 0.00% | 0.00% |
| 0.00% | 0.00% |
| 6.00% | 0.00% |
| 9.00% | 0.00% |
| 4.38% | 0.00% |
| 4.63% | 0.25% |
| 0.00% | 0.00% |
| 4.00% | 0.00% |

71

CONFIDENTIAL INFORMATION – Subject to Protective Order                    NCUA00359569

Confidential                                                                USAOr_000311951

Charter 62005                                    MELROSE                                    Eff. Date 09/30/2015

| | 09/30/2015 | Annualized 2015 % Change |
|---|---|---|
| | 0 | 0.00% |
| | 60,064 | -37.62% |
| | 0 | 0.00% |
| | 0 | 0.00% |
| | 202,058 | 13.29% |
| | 6,895 | -67.69% |
| | 461,311,180 | 20.07% |
| | 2,929,619 | -12.86% |
| | 0 | 0.00% |
| | 1,539,148,260 | 0.47% |
| | 2,003,658,076 | 4.51% |
| | 5,222 | -1.09% |
| | 96,122,272 | 439.63% |
| | 123,020,950 | 6,601.43% |
| | 2,101,957 | 105.22% |
| | 665,791 | 12.62% |
| | 125,788,698 | 3,842.36% |
| | 158 | 334.81% |
| | 6.28% | 3,712.40% |
| | 221,910,970 | 979.54% |
| | 11.08% | 943.17% |
| | 191,030,010 | -1.42% |
| | 45 | 11.28% |
| | 4.09% | 0.22% |
| | 3.95% | -4.76% |
| | 34.89% | 3,057.10% |
| | 219,463,355 | 0.00% |
| | 10.95% | 0.00% |
| | 60.86% | 0.00% |
| | 900,143 | -29.99% |
| | 55,765 | 66.03% |
| | 844,378 | -32.56% |
| | 0.04% | -37.73% |
| | 455,285,785 | -18.45% |
| | 0 | 0.00% |
| | 0 | 0.00% |
| | 395,052 | -6.63% |
| | 2,812 | 0.00% |
| | 0 | -100.00% |
| | 0 | 0.00% |
| | 0 | 0.00% |
| | 0 | -133.33% |
| | 0 | 0.00% |
| | 464,240,799 | 19.81% |
| | 0 | 0.00% |
| | 1,814,020,820 | 5.36% |
| | 17,853,663 | -50.58% |

CONFIDENTIAL INFORMATION – Subject to Protective Order                                    NCUA00359570

Confidential                                    USAOr_000311952

Charter 62005                                    MELROSE                              Eff. Date 09/30/2015

| | 09/30/2015 | Annualized 2015 % Change |
|---|---|---|
| | 0.00% | 0.00% |
| | 14.00% | 0.00% |
| | 0.00% | 0.00% |
| | 0.00% | 0.00% |
| | 6.00% | 0.00% |
| | 9.00% | 0.00% |
| | 4.38% | 0.00% |
| | 4.63% | 5.71% |
| | 0.00% | 0.00% |
| | 4.00% | 0.00% |

CONFIDENTIAL INFORMATION – Subject to Protective Order                                    NCUA00359571

Confidential                                                              USAOr_000311953

Charter 62005          MELROSE          Eff. Date 09/30/2015

## Specialized Lending Trends

| | 12/31/2012 | % | 12/31/2013 | % | 12/31/2014 | % | 09/30/2015 | % |
|---|---|---|---|---|---|---|---|---|
| **CREDIT CARD LOANS** | | | | | | | | |
| Unsecured Credit Card Loans | 0 | | 0 | | 0 | | 0 | |
| **Total Credit Card Loans** | 0 | | 0 | | 0 | | 0 | |
| **DELINQUENT CREDIT CARD LOANS** | | | | | | | | |
| 30 to 59 Days | 0 | | 0 | | 0 | | 0 | |
| 60 to 179 Days | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| 180 to 359 Days | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| 360 Days and Over | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| **Total Reportable Delinquent Credit Cards** | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Percent of Credit Cards 60 Days & Over Delinq. | N/A | | N/A | | N/A | | N/A | |
| **Total Credit Cards Delinq. 30 Days & Over** | 0 | | 0 | | 0 | | 0 | |
| Percent of Credit Cards 30 Days & Over Delinq. | N/A | | N/A | | N/A | | N/A | |
| **MISCELLANEOUS CREDIT CARD LOAN INFORMATION** | | | | | | | | |
| Credit Card Loan Net Charge-Offs | 0 | | 0 | | 0 | | 0 | |
| Credit Card Loan Charge-Off Ratio (Annualized) | 0.00% | | 0.00% | | 0.00% | | 0.00% | |
| **REAL ESTATE (RE) LOAN MIX** | | | | | | | | |
| First Mortgage: Fixed Rate > 15 Years | 117,747,916 | 37% | 136,004,374 | 42% | 137,029,824 | 34% | 137,413,729 | 30% |
| Fixed Rate 15 Years or Less | 196,866,508 | 61% | 180,967,688 | 56% | 263,185,764 | 65% | 323,212,287 | 70% |
| Balloon/Hybrid > 5 Years | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Other Fixed Rate | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| **Total Fixed Rate First Mortgages** | 314,614,424 | 98% | 316,972,062 | 98% | 400,215,588 | 99% | 460,626,016 | 99% |
| Adjustable Rate 1 Year or Less | 759,889 | 0% | 737,069 | 0% | 364,513 | 0% | 318,560 | 0% |
| Adjustable Rate > 1 Year | 532,945 | 0% | 379,078 | 0% | 372,105 | 0% | 366,604 | 0% |
| Balloon/Hybrid 5 Years or Less | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| **Total Adjustable Rate First Mortgages** | 1,292,834 | 0% | 1,116,147 | 0% | 736,618 | 0% | 685,164 | 0% |
| Other Real Estate: Closed-End Fixed Rate | 288,531 | 0% | 307,311 | 0% | 278,238 | 0% | 225,779 | 0% |
| Closed-End Adj. Rate | 627,037 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Open-End Adj. Rate | 3,378,114 | 1% | 2,363,082 | 1% | 2,241,368 | 1% | 2,102,841 | 0% |
| Open-End Fixed Rate | 0 | 0% | 1,144,346 | 0% | 722,639 | 0% | 600,999 | 0% |
| Other | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| **Total Real Estate Loans** | 320,200,940 | 100% | 321,902,948 | 100% | 404,194,451 | 100% | 464,240,799 | 100% |
| **DELINQUENT REAL ESTATE LOANS (ALL)** | | | | | | | | |
| 30 to 59 Days | 4,168,272 | | 4,000,558 | | 4,489,967 | | 555,505 | |
| 60 to 179 Days | 1,416,235 | 49% | 1,754,078 | 59% | 805,484 | 51% | 2,467,725 | 60% |
| 180 to 359 Days | 438,410 | 15% | 496,355 | 17% | 483,193 | 30% | 1,075,683 | 26% |
| 360 Days and Over | 1,028,764 | 36% | 704,042 | 24% | 298,567 | 19% | 559,654 | 14% |
| **Total Reportable Delinquent Real Estate** | 2,883,409 | 100% | 2,954,475 | 100% | 1,587,244 | 100% | 4,103,062 | 100% |
| Percent of Real Estate 60 Days & Over Delinq. | 0.90% | | 0.92% | | 0.39% | | 0.88% | |
| **Total Real Estate Delinq. 30 Days & Over** | 7,051,681 | | 6,955,033 | | 6,077,211 | | 4,658,567 | |
| Percent of Real Estate 30 Days & Over Delinq. | 2.20% | | 2.16% | | 1.50% | | 1.00% | |
| **DELINQUENT FIRST MORTGAGE LOANS** | | | | | | | | |
| 30 to 59 Days | 4,150,649 | | 3,455,375 | | 4,442,708 | | 490,552 | |
| 60 to 179 Days | 1,143,185 | 47% | 1,666,923 | 61% | 742,613 | 54% | 2,367,450 | 62% |
| 180 to 359 Days | 311,608 | 13% | 437,474 | 16% | 462,853 | 34% | 1,055,852 | 27% |
| 360 Days and Over | 995,561 | 41% | 616,906 | 23% | 173,003 | 13% | 420,810 | 11% |
| **Total Reportable Delinquent First Mortgages** | 2,450,354 | 100% | 2,721,303 | 100% | 1,378,469 | 100% | 3,844,112 | 100% |
| Percent of First Mortgages 60 Days & Over Delinq. | 0.78% | | 0.86% | | 0.34% | | 0.83% | |
| **Total First Mortgages Delinq. 30 Days & Over** | 6,601,003 | | 6,176,678 | | 5,821,177 | | 4,334,664 | |
| Percent of First Mortgages 30 Days & Over Delinq. | 2.09% | | 1.94% | | 1.45% | | 0.94% | |

CONFIDENTIAL INFORMATION – Subject to Protective Order

NCUA00359572

Confidential

USAOr_000311954

Charter 62005                                     MELROSE                                    Eff. Date 09/30/2015

## Specialized Lending Trends

| | 12/31/2012 | % | 12/31/2013 | % | 12/31/2014 | % | 09/30/2015 | % |
|---|---|---|---|---|---|---|---|---|
| **DELINQUENT OTHER REAL ESTATE LOANS** | | | | | | | | |
| 30 to 59 Days | 17,623 | | 545,183 | | 47,259 | | 64,953 | |
| 60 to 179 Days | 273,050 | 63% | 87,155 | 37% | 62,871 | 30% | 100,275 | 39% |
| 180 to 359 Days | 126,802 | 29% | 58,881 | 25% | 20,340 | 10% | 19,831 | 8% |
| 360 Days and Over | 33,203 | 8% | 87,136 | 37% | 125,564 | 60% | 138,844 | 54% |
| **Total Reportable Delinquent Other Real Estate** | 433,055 | 100% | 233,172 | 100% | 208,775 | 100% | 258,950 | 100% |
| | | | | | | | | |
| Percent of Other Real Est. 60 Days & Over Delinq. | 10.09% | | 6.11% | | 6.44% | | 8.84% | |
| | | | | | | | | |
| **Total Other Real Estate Delinq. 30 Days & Over** | 450,678 | | 778,355 | | 256,034 | | 323,903 | |
| | | | | | | | | |
| Percent of Other Real Est. 30 Days & Over Delinq. | 10.50% | | 20.40% | | 7.90% | | 11.06% | |
| **MISCELLANEOUS REAL ESTATE LOAN INFORMATION** | | | | | | | | |
| Real Estate Net Charge-Offs (All) | 246,286 | | 185,462 | | 1,233,342 | | 291,850 | |
| Real Estate Charge-Off Ratio (All) (Annualized) | 0.08% | | 0.06% | | 0.34% | | 0.14% | |
| First Mortgage Net Charge-Offs | 0 | | 70,234 | | 1,196,271 | | 183,025 | |
| First Mortgage Charge-Off Ratio (Annualized) | 0.00% | | 0.02% | | 0.33% | | 0.11% | |
| Other Real Estate Net Charge-Offs | 246,286 | | 115,228 | | 37,071 | | 108,825 | |
| Other Real Estate Charge-Off Ratio (Annualized) | 5.28% | | 2.84% | | 1.05% | | 3.83% | |
| Real Estate Loans Foreclosed Year-to-Date | 0 | | 0 | | 0 | | 0 | |
| 1st Mortgages Sold on Secondary Market YTD | 0 | | 0 | | 0 | | 0 | |
| Real Estate to Refi/Reprice/Mature in 5 Yrs | 5,401,057 | | 4,948,168 | | 4,885,697 | | 5,324,944 | |
| Interest Only & Payment Option 1st Mort. Loans | 0 | | 0 | | 0 | | 0 | |
| Interest Only & Payment Option Other RE Loans | 0 | | 0 | | 0 | | 0 | |

CONFIDENTIAL INFORMATION – Subject to Protective Order                    NCUA00359573

Confidential                                                                                      USAOr_000311955

Charter 62005                                    MELROSE                                    Eff. Date 09/30/2015

## Specialized Lending Growth Analysis

| Dollars of Growth | 12/31/2012 | 12/31/2013 | 2013 Dollar Change | 12/31/2014 | 2014 Dollar Change | 09/30/2015 | 2015 Dollar Change |
|---|---|---|---|---|---|---|---|
| **CREDIT CARD LOANS** | | | | | | | |
| Unsecured Credit Card Loans | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Credit Card Loans** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **DELINQUENT CREDIT CARD LOANS** | | | | | | | |
| 30 to 59 Days | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 60 to 179 Days | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 180 to 359 Days | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 360 Days and Over | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Reportable Delinquent Credit Cards** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Percent of Credit Cards 60 Days & Over Delinq. | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| **Total Credit Cards Delinq. 30 Days & Over** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Percent of Credit Cards 30 Days & Over Delinq. | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| **MISCELLANEOUS CREDIT CARD LOAN INFORMATION** | | | | | | | |
| Credit Card Loan Net Charge-Offs | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Credit Card Loan Charge-Off Ratio (Annualized) | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| **REAL ESTATE LOANS** | | | | | | | |
| First Mortgage: Fixed Rate > 15 Years | 117,747,916 | 136,004,374 | 18,256,458 | 137,029,824 | 1,025,450 | 137,413,729 | 383,905 |
| Fixed Rate 15 Years or Less | 196,866,508 | 180,967,688 | (15,898,820) | 263,185,764 | 82,218,076 | 323,212,287 | 60,026,523 |
| Balloon/Hybrid > 5 Years | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Fixed Rate | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Fixed Rate First Mortgages** | 314,614,424 | 316,972,062 | 2,357,638 | 400,215,588 | 83,243,526 | 460,626,016 | 60,410,428 |
| Adjustable Rate 1 Year or Less | 759,889 | 737,069 | (22,820) | 364,513 | (372,556) | 318,560 | (45,953) |
| Adjustable Rate > 1 Year | 532,945 | 379,078 | (153,867) | 372,105 | (6,973) | 366,604 | (5,501) |
| Balloon/Hybrid 5 Years or Less | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Adjustable Rate First Mortgages** | 1,292,834 | 1,116,147 | (176,687) | 736,618 | (379,529) | 685,164 | (51,454) |
| Other Real Estate: Closed-End Fixed Rate | 288,531 | 307,311 | 18,780 | 278,238 | (29,073) | 225,779 | (52,459) |
| Closed-End Adj. Rate | 627,037 | 0 | (627,037) | 0 | 0 | 0 | 0 |
| Open-End Adj. Rate | 3,378,114 | 2,363,082 | (1,015,032) | 2,241,368 | (121,714) | 2,102,841 | (138,527) |
| Open-End Fixed Rate | 0 | 1,144,346 | 1,144,346 | 722,639 | (421,707) | 600,999 | (121,640) |
| Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Real Estate Loans** | 320,200,940 | 321,902,948 | 1,702,008 | 404,194,451 | 82,291,503 | 464,240,799 | 60,046,348 |
| **DELINQUENT REAL ESTATE LOANS (ALL)** | | | | | | | |
| 30 to 59 Days | 4,168,272 | 4,000,558 | (167,714) | 4,489,967 | 489,409 | 555,505 | (3,934,462) |
| 60 to 179 Days | 1,416,235 | 1,754,078 | 337,843 | 805,484 | (948,594) | 2,467,725 | 1,662,241 |
| 180 to 359 Days | 438,410 | 496,355 | 57,945 | 483,193 | (13,162) | 1,075,683 | 592,490 |
| 360 Days and Over | 1,028,764 | 704,042 | (324,722) | 298,567 | (405,475) | 559,654 | 261,087 |
| **Total Reportable Delinquent Real Estate** | 2,883,409 | 2,954,475 | 71,066 | 1,587,244 | (1,367,231) | 4,103,062 | 2,515,818 |
| Percent of Real Estate 60 Days & Over Delinq. | 0.90% | 0.92% | 0.02% | 0.39% | -0.53% | 0.88% | 0.49% |
| **Total Real Estate Delinq. 30 Days & Over** | 7,051,681 | 6,955,033 | (96,648) | 6,077,211 | (877,822) | 4,658,567 | (1,418,644) |
| Percent of Real Estate 30 Days & Over Delinq. | 2.20% | 2.16% | -0.04% | 1.50% | -0.66% | 1.00% | -0.50% |
| **DELINQUENT FIRST MORTGAGE LOANS** | | | | | | | |
| 30 to 59 Days | 4,150,649 | 3,455,375 | (695,274) | 4,442,708 | 987,333 | 490,552 | (3,952,156) |
| 60 to 179 Days | 1,143,185 | 1,666,923 | 523,738 | 742,613 | (924,310) | 2,367,450 | 1,624,837 |
| 180 to 359 Days | 311,608 | 437,474 | 125,866 | 462,853 | 25,379 | 1,055,852 | 592,999 |
| 360 Days and Over | 995,561 | 616,906 | (378,655) | 173,003 | (443,903) | 420,810 | 247,807 |
| **Total Reportable Delinquent First Mortgages** | 2,450,354 | 2,721,303 | 270,949 | 1,378,469 | (1,342,834) | 3,844,112 | 2,465,643 |
| Percent of First Mortgages 60 Days & Over Delinq. | 0.78% | 0.86% | 0.08% | 0.34% | -0.51% | 0.83% | 0.49% |
| **Total First Mortgages Delinq. 30 Days & Over** | 6,601,003 | 6,176,678 | (424,325) | 5,821,177 | (355,501) | 4,334,664 | (1,486,513) |
| Percent of First Mortgages 30 Days & Over Delinq. | 2.09% | 1.94% | -0.15% | 1.45% | -0.49% | 0.94% | -0.51% |

76

CONFIDENTIAL INFORMATION – Subject to Protective Order

NCUA00359574

Confidential

USAOr_000311956

Charter 62005                                         MELROSE                                    Eff. Date 09/30/2015

## Specialized Lending Growth Analysis

| Dollars of Growth | 12/31/2012 | 12/31/2013 | 2013 Dollar Change | 12/31/2014 | 2014 Dollar Change | 09/30/2015 | 2015 Dollar Change |
|---|---|---|---|---|---|---|---|
| **DELINQUENT OTHER REAL ESTATE LOANS** | | | | | | | |
| 30 to 59 Days | 17,623 | 545,183 | 527,560 | 47,259 | (497,924) | 64,953 | 17,694 |
| 60 to 179 Days | 273,050 | 87,155 | (185,895) | 62,871 | (24,284) | 100,275 | 37,404 |
| 180 to 359 Days | 126,802 | 58,881 | (67,921) | 20,340 | (38,541) | 19,831 | (509) |
| 360 Days and Over | 33,203 | 87,136 | 53,933 | 125,564 | 38,428 | 138,844 | 13,280 |
| **Total Reportable Delinquent Other Real Estate** | 433,055 | 233,172 | (199,883) | 208,775 | (24,397) | 258,950 | 50,175 |
| Percent of Other Real Est. 60 Days & Over Delinq. | 10.09% | 6.11% | -3.97% | 6.44% | 0.33% | 8.84% | 2.40% |
| **Total Other Real Estate Delinq. 30 Days & Over** | 450,678 | 778,355 | 327,677 | 256,034 | (522,321) | 323,903 | 67,869 |
| Percent of Other Real Est. 30 Days & Over Delinq. | 10.50% | 20.40% | 9.91% | 7.90% | -12.51% | 11.06% | 3.16% |
| **MISCELLANEOUS REAL ESTATE LOANS** | | | | | | | |
| Real Estate Net Charge-Offs (All) | 246,286 | 185,462 | (60,824) | 1,233,342 | 1,047,880 | 291,850 | (941,492) |
| Real Estate Charge-Off Ratio (All) (Annualized) | 0.08% | 0.06% | -0.02% | 0.34% | 0.28% | 0.14% | -0.20% |
| First Mortgage Net Charge-Offs | 0 | 70,234 | 70,234 | 1,196,271 | 1,126,037 | 183,025 | (1,013,246) |
| First Mortgage Charge-Off Ratio (Annualized) | 0.00% | 0.02% | 0.02% | 0.33% | 0.31% | 0.11% | -0.22% |
| Other Real Estate Net Charge-Offs | 246,286 | 115,228 | (131,058) | 37,071 | (78,157) | 108,825 | 71,754 |
| Other Real Estate Charge-Off Ratio  (Annualized) | 5.28% | 2.84% | -2.44% | 1.05% | -1.79% | 3.83% | 2.78% |
| Real Estate Loans Foreclosed Year-to-Date | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1st Mortgages Sold on Secondary Market YTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Real Estate to Refi/Reprice/Mature in 5 Yrs | 5,401,057 | 4,948,168 | (452,889) | 4,885,697 | (62,471) | 5,324,944 | 439,247 |
| Interest Only & Payment Option 1st Mort. Loans | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Interest Only & Payment Option Other RE Loans | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

CONFIDENTIAL INFORMATION – Subject to Protective Order                                    NCUA00359575

Confidential                                                                              USAOr_000311957

Charter 62005                                    MELROSE                                  Eff. Date 09/30/2015

## Specialized Lending Growth Analysis

| Percentage of Growth | 12/31/2012 | 12/31/2013 | 2013 % Change | 12/31/2014 | 2014 % Change | 09/30/2015 | Annualized 2015 % Change |
|---|---|---|---|---|---|---|---|
| **CREDIT CARD LOANS** | | | | | | | |
| Unsecured Credit Card Loans | 0 | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| **Total Credit Card Loans** | 0 | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| **DELINQUENT CREDIT CARD LOANS** | | | | | | | |
| 30 to 59 Days | 0 | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| 60 to 179 Days | 0 | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| 180 to 359 Days | 0 | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| 360 Days and Over | 0 | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| **Total Reportable Delinquent Credit Cards** | 0 | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| Percent of Credit Cards 60 Days & Over Delinq. | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| **Total Credit Cards Delinq. 30 Days & Over** | 0 | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| Percent of Credit Cards 30 Days & Over Delinq. | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| **MISCELLANEOUS CREDIT CARD LOAN INFORMATION** | | | | | | | |
| Credit Card Loan Net Charge-Offs | 0 | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| Credit Card Loan Charge-Off Ratio (Annualized) | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| **REAL ESTATE LOANS** | | | | | | | |
| First Mortgage: Fixed Rate > 15 Years | 117,747,916 | 136,004,374 | 15.50% | 137,029,824 | 0.75% | 137,413,729 | 0.37% |
| Fixed Rate 15 Years or Less | 196,866,508 | 180,967,688 | -8.08% | 263,185,764 | 45.43% | 323,212,287 | 30.41% |
| Balloon/Hybrid > 5 Years | 0 | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| Other Fixed Rate | 0 | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| **Total Fixed Rate First Mortgages** | 314,614,424 | 316,972,062 | 0.75% | 400,215,588 | 26.26% | 460,626,016 | 20.13% |
| Adjustable Rate 1 Year or Less | 759,889 | 737,069 | -3.00% | 364,513 | -50.55% | 318,560 | -16.81% |
| Adjustable Rate > 1 Year | 532,945 | 379,078 | -28.87% | 372,105 | -1.84% | 366,604 | -1.97% |
| Balloon/Hybrid 5 Years or Less | 0 | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| **Total Adjustable Rate First Mortgages** | 1,292,834 | 1,116,147 | -13.67% | 736,618 | -34.00% | 685,164 | -9.31% |
| Other Real Estate: Closed-End Fixed Rate | 288,531 | 307,311 | 6.51% | 278,238 | -9.46% | 225,779 | -25.14% |
| Closed-End Adj. Rate | 627,037 | 0 | -100.00% | 0 | 0.00% | 0 | 0.00% |
| Open-End Adj. Rate | 3,378,114 | 2,363,082 | -30.05% | 2,241,368 | -5.15% | 2,102,841 | -8.24% |
| Open-End Fixed Rate | 0 | 1,144,346 | 0.00% | 722,639 | -36.85% | 600,999 | -22.44% |
| Other | 0 | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| **Total Real Estate Loans** | 320,200,940 | 321,902,948 | 0.53% | 404,194,451 | 25.56% | 464,240,799 | 19.81% |
| **DELINQUENT REAL ESTATE LOANS (ALL)** | | | | | | | |
| 30 to 59 Days | 4,168,272 | 4,000,558 | -4.02% | 4,489,967 | 12.23% | 555,505 | -116.84% |
| 60 to 179 Days | 1,416,235 | 1,754,078 | 23.86% | 805,484 | -54.08% | 2,467,725 | 275.15% |
| 180 to 359 Days | 438,410 | 496,355 | 13.22% | 483,193 | -2.65% | 1,075,683 | 163.49% |
| 360 Days and Over | 1,028,764 | 704,042 | -31.56% | 298,567 | -57.59% | 559,654 | 116.60% |
| **Total Reportable Delinquent Real Estate** | 2,883,409 | 2,954,475 | 2.46% | 1,587,244 | -46.28% | 4,103,062 | 211.34% |
| Percent of Real Estate 60 Days & Over Delinq. | 0.90% | 0.92% | 1.92% | 0.39% | -57.21% | 0.88% | 166.76% |
| **Total Real Estate Delinq. 30 Days & Over** | 7,051,681 | 6,955,033 | -1.37% | 6,077,211 | -12.62% | 4,658,567 | -31.12% |
| Percent of Real Estate 30 Days & Over Delinq. | 2.20% | 2.16% | -1.89% | 1.50% | -30.41% | 1.00% | -44.34% |
| **DELINQUENT FIRST MORTGAGE LOANS** | | | | | | | |
| 30 to 59 Days | 4,150,649 | 3,455,375 | -16.75% | 4,442,708 | 28.57% | 490,552 | -118.61% |
| 60 to 179 Days | 1,143,185 | 1,666,923 | 45.81% | 742,613 | -55.45% | 2,367,450 | 291.73% |
| 180 to 359 Days | 311,608 | 437,474 | 40.39% | 462,853 | 5.80% | 1,055,852 | 170.82% |
| 360 Days and Over | 995,561 | 616,906 | -38.03% | 173,003 | -71.96% | 420,810 | 190.98% |
| **Total Reportable Delinquent First Mortgages** | 2,450,354 | 2,721,303 | 11.06% | 1,378,469 | -49.35% | 3,844,112 | 238.49% |
| Percent of First Mortgages 60 Days & Over Delinq. | 0.78% | 0.86% | 10.30% | 0.34% | -59.81% | 0.83% | 189.84% |
| **Total First Mortgages Delinq. 30 Days & Over** | 6,601,003 | 6,176,678 | -6.43% | 5,821,177 | -5.76% | 4,334,664 | -34.05% |
| Percent of First Mortgages 30 Days & Over Delinq. | 2.09% | 1.94% | -7.07% | 1.45% | -25.23% | 0.94% | -47.04% |

78

CONFIDENTIAL INFORMATION – Subject to Protective Order

NCUA00359576

Confidential

USAOr_000311958

Charter 62005                                   MELROSE                                   Eff. Date 09/30/2015

## Specialized Lending Growth Analysis

| Percentage of Growth | 12/31/2012 | 12/31/2013 | 2013 % Change | 12/31/2014 | 2014 % Change | 09/30/2015 | Annualized 2015 % Change |
|---|---|---|---|---|---|---|---|
| **DELINQUENT OTHER REAL ESTATE LOANS** | | | | | | | |
| 30 to 59 Days | 17,623 | 545,183 | 2,993.59% | 47,259 | -91.33% | 64,953 | 49.92% |
| 60 to 179 Days | 273,050 | 87,155 | -68.08% | 62,871 | -27.86% | 100,275 | 79.32% |
| 180 to 359 Days | 126,802 | 58,881 | -53.56% | 20,340 | -65.46% | 19,831 | -3.34% |
| 360 Days and Over | 33,203 | 87,136 | 162.43% | 125,564 | 44.10% | 138,844 | 14.10% |
| **Total Reportable Delinquent Other Real Estate** | 433,055 | 233,172 | -46.16% | 208,775 | -10.46% | 258,950 | 32.04% |
| Percent of Other Real Est. 60 Days & Over Delinq. | 10.09% | 6.11% | -39.40% | 6.44% | 5.35% | 8.84% | 49.69% |
| **Total Other Real Estate Delinq. 30 Days & Over** | 450,678 | 778,355 | 72.71% | 256,034 | -67.11% | 323,903 | 35.34% |
| Percent of Other Real Est. 30 Days & Over Delinq. | 10.50% | 20.40% | 94.39% | 7.90% | -61.30% | 11.06% | 53.34% |
| **MISCELLANEOUS REAL ESTATE LOANS** | | | | | | | |
| Real Estate Net Charge-Offs (All) | 246,286 | 185,462 | -24.70% | 1,233,342 | 565.01% | 291,850 | -68.45% |
| Real Estate Charge-Off Ratio (All) (Annualized) | 0.08% | 0.06% | -26.12% | 0.34% | 488.08% | 0.14% | -59.31% |
| First Mortgage Net Charge-Offs | 0 | 70,234 | 0.00% | 1,196,271 | 1,603.26% | 183,025 | -79.60% |
| First Mortgage Charge-Off Ratio (Annualized) | 0.00% | 0.02% | 0.00% | 0.33% | 1,401.81% | 0.11% | -66.39% |
| Other Real Estate Net Charge-Offs | 246,286 | 115,228 | -53.21% | 37,071 | -67.83% | 108,825 | 291.41% |
| Other Real Estate Charge-Off Ratio (Annualized) | 5.28% | 2.84% | -46.20% | 1.05% | -63.03% | 3.83% | 264.24% |
| Real Estate Loans Foreclosed Year-to-Date | 0 | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| 1st Mortgages Sold on Secondary Market YTD | 0 | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| Real Estate to Refi/Reprice/Mature in 5 Yrs | 5,401,057 | 4,948,168 | -8.39% | 4,885,697 | -1.26% | 5,324,944 | 11.99% |
| Interest Only & Payment Option 1st Mort. Loans | 0 | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| Interest Only & Payment Option Other RE Loans | 0 | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |

CONFIDENTIAL INFORMATION – Subject to Protective Order          NCUA00359577

Confidential                                                              USAOr_000311959

Charter 62005 | MELROSE | Eff. Date 09/30/2015

## Interest Rate Risk Analysis and Trends

| | 12/31/2012 | % | 12/31/2013 | % | 12/31/2014 | % | 09/30/2015 | % |
|---|---|---|---|---|---|---|---|---|
| **FINANCIAL INFORMATION** | | | | | | | | |
| Net Worth | 349,107,289 | | 374,962,992 | | 381,778,645 | | 360,576,456 | |
| Total Loans | 1,672,750,202 | | 1,701,449,141 | | 1,938,161,114 | | 2,003,658,076 | |
| Total Assets | 1,835,079,891 | | 1,853,553,514 | | 2,070,129,745 | | 2,083,690,217 | |
| **REAL ESTATE INFORMATION** | | | | | | | | |
| Fixed Rate Real Estate Loans | 314,902,955 | 98% | 318,423,719 | 99% | 401,216,465 | 99% | 461,452,794 | 99% |
| Variable Rate Real Estate | 5,297,985 | 2% | 3,479,229 | 1% | 2,977,986 | 1% | 2,788,005 | 1% |
| **Total Real Estate Loans** | 320,200,940 | 100% | 321,902,948 | 100% | 404,194,451 | 100% | 464,240,799 | 100% |
| **INVESTMENT TYPES** | | | | | | | | |
| Trading Investments | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Available for Sale Investments | 105,134,421 | 86% | 89,967,036 | 85% | 86,379,663 | 80% | 70,401,630 | 72% |
| Held to Maturity Investments | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Non-FAS 115 Investments, Cash on Deposit and Cash Equivalents | 16,662,393 | 14% | 16,248,274 | 15% | 21,392,759 | 20% | 27,016,427 | 28% |
| Other Investments | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| **Total Investments** | 121,796,814 | 100% | 106,215,310 | 100% | 107,772,422 | 100% | 97,418,057 | 100% |
| **INVESTMENT MATURITIES** | | | | | | | | |
| Less Than or Equal to 1 Year | 16,501,957 | 14% | 12,199,754 | 11% | 8,301,190 | 8% | 14,386,537 | 15% |
| 1 Year to 3 Years | 30,400,013 | 25% | 10,447,311 | 10% | 11,683,752 | 11% | 21,010,818 | 22% |
| 3 Years to 5 Years | 51,108,782 | 42% | 11,512,093 | 11% | 23,881,836 | 22% | 31,341,196 | 32% |
| 5 Years to 10 Years | 21,680,186 | 18% | 51,922,555 | 49% | 50,679,190 | 47% | 25,202,187 | 26% |
| More Than 10 Years | 2,105,876 | 2% | 20,133,597 | 19% | 13,226,454 | 12% | 5,477,319 | 6% |
| **Total Investments** | 121,796,814 | 100% | 106,215,310 | 100% | 107,772,422 | 100% | 97,418,057 | 100% |
| **MISCELLANEOUS INTEREST RATE RISK INFORMATION** | | | | | | | | |
| Real Estate Loans Repricing in < 5yrs & are not Member Business Loans (MBLs) | 5,401,057 | 2% | 4,948,168 | 2% | 4,885,697 | 1% | 5,324,944 | 1% |
| Real Estate Loans that are also MBLs | 161,837,410 | 51% | 138,760,801 | 43% | 220,582,047 | 55% | 284,045,854 | 61% |
| Real Estate Loans Repricing in > 5 yrs & are not MBLs | 152,962,473 | 48% | 178,193,979 | 55% | 178,726,707 | 44% | 174,870,001 | 38% |
| Real Estate Loans to Loans | 19.14% | | 18.92% | | 20.85% | | 23.17% | |
| Real Estate Loans to Assets | 17.45% | | 17.37% | | 19.53% | | 22.28% | |
| Real Estate Loans to Net Worth | 91.72% | | 85.85% | | 105.87% | | 128.75% | |
| Net Long-Term Assets / Assets | 96.28% | | 97.37% | | 98.92% | | 100.24% | |
| Total Loans / Total Shares | 116.53% | | 117.68% | | 119.84% | | 124.37% | |
| Total Loans / Total Assets | 91.15% | | 91.79% | | 93.63% | | 96.16% | |
| Cash + Short-Term Investments / Assets | 0.95% | | 0.70% | | 0.45% | | 0.73% | |
| Total Shares, Deposits, & Borrowings / Earning Assets | 83.00% | | 82.30% | | 82.96% | | 82.32% | |
| Regular Shares / Total Shares & Borrowing | 12.72% | | 12.47% | | 9.99% | | 9.42% | |
| Reg Shares + Share Drafts/Total Shares & Borrowings | 13.91% | | 13.81% | | 11.30% | | 10.70% | |
| Borrowings / Total Shares & Net Worth | 3.03% | | 2.31% | | 4.00% | | 6.01% | |
| Short Term Liabilities/Shares & Borrowings | 30.33% | | 34.25% | | 37.28% | | 43.15% | |
| Complex Assets/Total Assets | 4.75% | | 3.80% | | 3.29% | | 2.92% | |
| Yield on Average Loans | 4.61% | | 4.23% | | 4.14% | | 3.95% | |
| Yield on Average Investments | 2.06% | | 1.71% | | 2.29% | | 2.00% | |

80

Charter 62005                                           MELROSE                                    Eff. Date 09/30/2015

## Interest Rate Risk Analysis and Trends

| | 12/31/2012 | % | 12/31/2013 | % | 12/31/2014 | % | 09/30/2015 | % |
|---|---|---|---|---|---|---|---|---|
| **NET LONG-TERM ASSETS** | | | | | | | | |
| Real Estate Loans > 5 Years (Excluding MBL Real Estate) | 152,962,473 | | 178,193,979 | | 178,726,707 | | 174,870,001 | |
| Member Business Loans | 1,502,415,651 | | 1,506,160,261 | | 1,743,925,710 | | 1,814,020,820 | |
| Investments > 3 Years | 74,894,844 | | 83,568,245 | | 87,787,480 | | 62,020,702 | |
| Land and Building | 21,938,043 | | 21,577,575 | | 21,089,292 | | 20,676,157 | |
| Other Fixed Assets | 1,013,418 | | 1,223,341 | | 1,319,811 | | 1,341,310 | |
| NCUSIF | 13,676,160 | | 14,160,430 | | 15,021,185 | | 15,742,736 | |
| **Total Net Long-Term Assets** | 1,766,900,589 | | 1,804,883,831 | | 2,047,870,185 | | 2,088,671,726 | |
| | | | | | | | | |
| **NET LONG-TERM ASSETS RATIO COMPONENTS** | | | | | | | | |
| Real Estate Loans > 5 Years (Excluding MBL Real Estate) | 8.34% | | 9.61% | | 8.63% | | 8.39% | |
| Member Business Loans | 81.87% | | 81.26% | | 84.24% | | 87.06% | |
| Investments > 3 Years | 4.08% | | 4.51% | | 4.24% | | 2.98% | |
| Land and Building | 1.20% | | 1.16% | | 1.02% | | 0.99% | |
| Other Fixed Assets | 0.06% | | 0.07% | | 0.06% | | 0.06% | |
| NCUSIF | 0.75% | | 0.76% | | 0.73% | | 0.76% | |
| **Total Net Long-Term Assets Ratio** | 96.28% | | 97.37% | | 98.92% | | 100.24% | |
| | | | | | | | | |
| **17/4 TEST CALCULATIONS** | | | | | | | | |
| Net Worth | 349,107,289 | | 374,962,992 | | 381,778,645 | | 360,576,456 | |
| Book Net Worth Ratio | 19.02% | | 20.22% | | 18.44% | | 17.30% | |
| Fixed Rate Real Estate Loans | 314,902,955 | | 318,423,719 | | 401,216,465 | | 461,452,794 | |
| Loss on Fixed Rate Real Estate Loans | 53,533,502 | | 54,132,032 | | 68,206,799 | | 78,446,975 | |
| Variable Rate Real Estate Loans | 5,297,985 | | 3,479,229 | | 2,977,986 | | 2,788,005 | |
| Loss on Variable Rate Real Estate Loans | 211,919 | | 139,169 | | 119,119 | | 111,520 | |
| Total Investments | 121,796,814 | | 106,215,310 | | 107,772,422 | | 97,418,057 | |
| Estimated Loss on Investments | 10,692,427 | | 11,863,826 | | 11,073,655 | | 7,981,301 | |
| Total Estimated devaluation | 64,437,849 | | 66,135,028 | | 79,399,573 | | 86,539,796 | |
| Net Worth Ratio with 17/4 Real Estate Devaluation | 16.58% | | 17.82% | | 15.65% | | 14.06% | |
| Net Worth Ratio with 17/4 Real Estate & Investment Devaluation | 16.07% | | 17.27% | | 15.18% | | 13.72% | |
| Total Change to Net Worth | 18.46% | | 17.64% | | 20.80% | | 24.00% | |

**PRICING TABLES CALCULATIONS**

| | |
|---|---|
| Book Net Worth | Pricing Tables Information not Input |
| Book Net Worth Ratio | Pricing Tables Information not Input |
| | |
| Current Net Worth Adjusted for Market Value of Real Estate Loans | N/A |
| | |
| Net Worth Ratio with Pricing Table Real Estate and Investment Devaluation | N/A |
| | |
| Change in Market Value Net Worth ($) After Pricing Table Real Estate and Investment Devaluation | N/A |

CONFIDENTIAL INFORMATION – Subject to Protective Order                                    NCUA00359579

Confidential                                                                                                        USAOr_000311961

Charter 62005                          MELROSE                          Eff. Date 09/30/2015

## Liquidity Trends

| | 12/31/2012 | % | 12/31/2013 | % | 12/31/2014 | % | 09/30/2015 | % |
|---|---|---|---|---|---|---|---|---|
| **PORTFOLIO MIX** | | | | | | | | |
| Cash on Hand | 854,888 | 5% | 800,059 | 6% | 1,004,870 | 11% | 809,538 | 5% |
| Cash on Deposit | 9,307,659 | 54% | 9,036,087 | 70% | 6,951,190 | 75% | 12,278,943 | 81% |
| Cash Equivalents | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Other Investments < 1 year | 7,194,298 | 41% | 3,163,667 | 24% | 1,350,000 | 15% | 2,107,594 | 14% |
| **Total Liquidity** | 17,356,845 | 100% | 12,999,813 | 100% | 9,306,060 | 100% | 15,196,075 | 100% |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **MISCELLANEOUS LIQUIDITY INFORMATION** | | | | | | | | |
| Total Borrowings | 54,000,000 | | 42,000,000 | | 80,000,000 | | 118,521,863 | |
| Non-Member Deposits | 0 | | 0 | | 303,965,446 | | 357,964,872 | |
| Total Lines of Credit | 174,000,000 | | 245,182,258 | | 248,885,066 | | 248,229,644 | |
| Borrowings Against LOCs | 54,000,000 | | 42,000,000 | | 80,000,000 | | 118,521,863 | |
| **Available/Remaining LOCs** | 120,000,000 | | 203,182,258 | | 168,885,066 | | **129,707,781** | |
| **Percent of Available/Remaining LOC** | 68.97% | | 82.87% | | 67.86% | | **52.25%** | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **FUNDAMENTAL CRITERIA** | | | | | | | | |
| Loan to Assets | 91.15% | | 91.79% | | 93.63% | | 96.16% | |
| Cash+Short-Term Investments/Assets | 0.95% | | 0.70% | | 0.45% | | 0.73% | |
| Regular Shares and Share Drafts / Total Shares and Borrowings | 13.91% | | 13.81% | | 11.30% | | 10.70% | |
| Borrowings & Non-member Deposits / Total Shares and Liabilities | 3.62% | | 2.82% | | 22.60% | | 27.50% | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **SUPPLEMENTAL CRITERIA** | | | | | | | | |
| Loan to Shares | 116.53% | | 117.68% | | 119.84% | | 124.37% | |
| Net Liquid Assets / Total Liabilities & Shares | 7.51% | | 6.68% | | 5.55% | | 4.72% | |
| Volatile Liabilities / Cash & Short Term Investments | 2,244.23% | | 3,367.40% | | 5,928.35% | | 4,357.37% | |
| Growth in Volatile Liabilities / Assets | -1.47% | | 2.60% | | 5.50% | | 7.07% | |
| Investment Loss Ratio | 1.75% | | -3.73% | | -0.24% | | -0.19% | |
| Estimated Loan Maturity | 16 | | 21 | | 40 | | 45 | |
| Investments < 1 Year / Total Investments | 13.55% | | 11.49% | | 7.70% | | 14.77% | |
| Liquidity / Borrowings & Non-Member Deposits | 32.14% | | 30.95% | | 2.42% | | 3.19% | |
| Non-Member Deposits/Total Deposits | 0.00% | | 0.00% | | 18.79% | | 22.22% | |
| Cash + Short-Term Investments / Total Investments + Cash | 14.15% | | 12.15% | | 8.56% | | 15.47% | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **UNFUNDED COMMITMENTS & CONTINGENT LIABILITIES** | | | | | | | | |
| Unfunded Commitments | 1,566,598 | | 2,546,427 | | 1,310,425 | | 4,658,185 | |
| Contingent Liabilities (Not including Unfunded Commitments) | 0 | | 0 | | 0 | | 0 | |
| Unfunded Commitments / Cash + Short Term Investments | 9.03% | | 19.59% | | 14.08% | | 30.65% | |
| Unfunded Commitments / Cash and Fair Value (FV) of Investments | 1.28% | | 2.38% | | 1.20% | | 4.74% | |
| Unfunded Commitments / Assets | 0.09% | | 0.14% | | 0.06% | | 0.22% | |
| Unfunded Commitments & Contingent Liabilities / Cash + Short Term Investments | 9.03% | | 19.59% | | 14.08% | | 30.65% | |
| Unfunded Commitments & Contingent Liabilities / Cash and FV of Investments | 1.28% | | 2.38% | | 1.20% | | 4.74% | |
| Unfunded Commitments & Contingent Liabilities / Assets | 0.09% | | 0.14% | | 0.06% | | 0.22% | |

82

CONFIDENTIAL INFORMATION – Subject to Protective Order

Confidential

Charter 62005                          MELROSE                          Eff. Date 09/30/2015

## 17-4 Test

| | |
|---|---|
| **BOOK NET WORTH** | **360,576,456** |

| | |
|---|---|
| **TOTAL ASSETS** | **2,083,690,217** |

| | |
|---|---|
| **BOOK NET WORTH RATIO** | **17.30%** |

| | | | |
|---|---|---|---|
| **FIXED RATE REAL ESTATE LOANS** | 461,452,794 | 17% | 78,446,975 |

| | | | |
|---|---|---|---|
| **VARIABLE RATE REAL ESTATE LOANS** | 2,788,005 | 4% | 111,520 |

| | |
|---|---|
| **REAL ESTATE GROSS DEVALUATION** | 78,558,495 |

Net Worth Less Real Estate Gross Devaluation                              282,017,961
Loss on Securities After 300 bp Shock
        Estimated Loss                    (7,981,301)
        Examiner Input                            0
                                                                  (7,981,301)
Adjusted Net Worth                                                              274,036,660

Total Assets (-) Real Estate Gross Devaluation                      2,005,131,722
Total Assets (-) Real Estate & Investment Devaluation          1,997,150,421

| | |
|---|---|
| **NET WORTH RATIO  WITH 17/4 R/E DEVALUATION** | **14.06%** |
| **NET WORTH RATIO  WITH 17/4 R/E & INVESTMENT DEVALUATION** | **13.72%** |

| | |
|---|---|
| **CHANGE FROM BOOK VALUE NET WORTH ($) AFTER 17/4 R/E & INVESTMENT DEVALUATION** | **24.00%** |

CONFIDENTIAL INFORMATION – Subject to Protective Order                          NCUA00359581

Confidential                                                                                              USAOr_000311963

Charter 62005                                        MELROSE                                Eff. Date 09/30/2015

## Investment Trends

|  | 12/31/2012 | % | 12/31/2013 | % | 12/31/2014 | % | 09/30/2015 | % |
|---|---|---|---|---|---|---|---|---|
| **INVESTMENT PORTFOLIO MIX** | | | | | | | | |
| U.S. Govt Obligations | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Federal Agency Securities | 85,852,947 | 70% | 77,620,736 | 73% | 76,975,018 | 71% | 63,953,200 | 66% |
| Other Mortgage Backed Securities | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Mutual Funds and Common Trusts | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Non-FAS 115 Investments, Cash on Deposit and Cash Equivalents | 35,943,867 | 30% | 28,594,574 | 27% | 30,797,404 | 29% | 33,464,857 | 34% |
| **Total Portfolio** | 121,796,814 | 100% | 106,215,310 | 100% | 107,772,422 | 100% | 97,418,057 | 100% |
| | | | | | | | | |
| **CLASSIFICATION OF INVESTMENTS** | | | | | | | | |
| Trading Investments | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Available for Sale Investments | 105,134,421 | 86% | 89,967,036 | 85% | 86,379,663 | 80% | 70,401,630 | 72% |
| Held to Maturity Investments | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Non-FAS 115 Investments, Cash on Deposit and Cash Equivalents | 16,662,393 | 14% | 16,248,274 | 15% | 21,392,759 | 20% | 27,016,427 | 28% |
| **Total Investments** | 121,796,814 | 100% | 106,215,310 | 100% | 107,772,422 | 100% | 97,418,057 | 100% |
| | | | | | | | | |
| **MATURITY OF INVESTMENTS** | | | | | | | | |
| Less Than or Equal to 1 Year | 16,501,957 | 14% | 12,199,754 | 11% | 8,301,190 | 8% | 14,386,537 | 15% |
| 1 Year to 3 Years | 30,400,013 | 25% | 10,447,311 | 10% | 11,683,752 | 11% | 21,010,818 | 22% |
| 3 Years to 5 Years | 51,108,782 | 42% | 11,512,093 | 11% | 23,881,836 | 22% | 31,341,196 | 32% |
| 5 Years to 10 Years | 21,680,186 | 18% | 51,922,555 | 49% | 50,679,190 | 47% | 25,202,187 | 26% |
| More Than 10 Years | 2,105,876 | 2% | 20,133,597 | 19% | 13,226,454 | 12% | 5,477,319 | 6% |
| **Total Investments** | 121,796,814 | 100% | 106,215,310 | 100% | 107,772,422 | 100% | 97,418,057 | 100% |
| | | | | | | | | |
| **MORTGAGE BACKED SECURITIES** | | | | | | | | |
| Collateralized Mortgage Obligations/Real Estate Mortgage Investment Conduits (CMOs/REMICs) | 12,701,917 | | 19,370,504 | | 19,567,038 | | 15,861,994 | |
| Commercial Mortgage Backed Securities | 0 | | 0 | | 0 | | 0 | |
| | | | | | | | | |
| **MISCELLANEOUS INVESTMENT INFORMATION** | | | | | | | | |
| Market Value of Total Investment Portfolio | 121,796,814 | | 106,215,310 | | 107,772,422 | | 97,418,057 | |
| Complex Investments-Per Rules and Regulations 703 | 81,823,575 | | 66,963,776 | | 65,056,959 | | 57,957,255 | |
| Membership Capital at Corporate Credit Unions (Nonperpetual Capital) | 2,000,000 | | 0 | | 0 | | 0 | |
| Paid-In Capital at Corporate Credit Unions (Perpetual Contributed Capital) | 0 | | 2,000,000 | | 2,000,000 | | 2,000,000 | |
| Investments used to Fund Employee Benefits or Deferred Compensation Plans | N/A | | 0 | | 9,808,169 | | 9,949,995 | |
| Investments used to Fund Employee Benefits or Deferred Compensation Plans to Net Worth | N/A | | 0.00% | | 2.57% | | 2.76% | |
| Repurchase Agreements | 0 | | 0 | | 0 | | 0 | |
| Total Reverse Repurchase Agreements | 0 | | 0 | | 0 | | 0 | |
| Total of all Investments in CUSOs | 5,636,910 | | 5,745,404 | | 5,635,383 | | 5,635,383 | |
| Percentage of Investments in CUSOs to Unimpaired Capital & Surplus | 0.37% | | 0.33% | | 0.32% | | 0.29% | |
| Total of all Loans to CUSOs | 128,929 | | 55,011 | | 0 | | 0 | |
| Percentage of Loans to CUSOs to Unimpaired Capital & Surplus | 0.01% | | 0.00% | | 0.00% | | 0.00% | |

84

Charter 62005                                     MELROSE                                     Eff. Date 09/30/2015

# Share Trends

| | 12/31/2012 | % | 12/31/2013 | % | 12/31/2014 | % | 09/30/2015 | % |
|---|---|---|---|---|---|---|---|---|
| **SHARE ACCOUNT MIX** | | | | | | | | |
| Share Drafts | 17,715,286 | 1% | 20,016,675 | 1% | 22,187,406 | 1% | 22,220,290 | 1% |
| Regular Shares | 189,499,725 | 13% | 185,452,205 | 13% | 169,578,085 | 10% | 162,861,749 | 10% |
| Money Market Shares | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Share Certificates | 1,046,612,391 | 73% | 1,055,748,161 | 73% | 933,083,759 | 58% | 879,359,312 | 55% |
| IRA/Keogh Shares | 181,663,443 | 13% | 184,549,663 | 13% | 188,522,125 | 12% | 188,700,535 | 12% |
| Other Shares | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| **Total Shares of Members** | 1,435,490,845 | 100% | 1,445,766,704 | 100% | 1,313,371,375 | 81% | 1,253,141,886 | 78% |
| Non-Member Deposits | 0 | 0% | 0 | 0% | 303,965,446 | 19% | 357,964,872 | 22% |
| **Total Shares and Deposits** | 1,435,490,845 | 100% | 1,445,766,704 | 100% | 1,617,336,821 | 100% | 1,611,106,758 | 100% |
| | | | | | | | | |
| **MATURITY** | | | | | | | | |
| **Share Certificates** | | | | | | | | |
| Less Than 1 Year | 367,527,297 | 35% | 407,756,042 | 39% | 426,887,298 | 46% | 409,950,659 | 47% |
| 1 to 3 Years | 405,188,294 | 39% | 476,049,021 | 45% | 389,417,700 | 42% | 323,244,235 | 37% |
| More than 3 Years | 273,896,800 | 26% | 171,943,098 | 16% | 116,778,761 | 13% | 146,164,418 | 17% |
| **Total** | 1,046,612,391 | 100% | 1,055,748,161 | 100% | 933,083,759 | 100% | 879,359,312 | 100% |
| | | | | | | | | |
| **IRA/Keogh Shares** | | | | | | | | |
| Less Than 1 Year | 62,199,067 | 34% | 71,862,837 | 39% | 81,006,974 | 43% | 84,253,454 | 45% |
| 1 to 3 Years | 64,580,030 | 36% | 76,515,057 | 41% | 76,869,637 | 41% | 61,288,588 | 32% |
| More than 3 Years | 54,884,346 | 30% | 36,171,769 | 20% | 30,645,514 | 16% | 43,158,493 | 23% |
| **Total** | 181,663,443 | 100% | 184,549,663 | 100% | 188,522,125 | 100% | 188,700,535 | 100% |
| | | | | | | | | |
| **Other Shares** | | | | | | | | |
| Less Than 1 Year | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| 1 to 3 Years | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| More than 3 Years | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| **Total** | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| | | | | | | | | |
| **Non-Member Deposits** | | | | | | | | |
| Less Than 1 Year | 0 | 0% | 0 | 0% | 112,808,069 | 37% | 170,198,674 | 48% |
| 1 to 3 Years | 0 | 0% | 0 | 0% | 160,875,594 | 53% | 153,842,590 | 43% |
| More than 3 Years | 0 | 0% | 0 | 0% | 30,281,783 | 10% | 33,923,608 | 9% |
| **Total** | 0 | 0% | 0 | 0% | 303,965,446 | 100% | 357,964,872 | 100% |
| | | | | | | | | |
| **DIVIDEND RATES** | | | | | | | | |
| Share Drafts | 0.25% | | 0.25% | | 0.25% | | 0.25% | |
| Regular Shares | 0.50% | | 0.75% | | 0.50% | | 0.50% | |
| Money Market Shares | 0.00% | | 0.00% | | 0.00% | | 0.00% | |
| Share Certificates | 0.95% | | 1.10% | | 1.15% | | 1.25% | |
| IRA/Keogh Shares | 0.95% | | 1.10% | | 1.15% | | 1.25% | |
| Other Shares | 0.00% | | 0.00% | | 0.00% | | 0.00% | |
| Non-Member Deposits | 0.00% | | 0.00% | | 1.05% | | 1.15% | |
| | | | | | | | | |
| **MISCELLANEOUS SHARE AND MEMBER INFORMATION** | | | | | | | | |
| Business Share Accounts | N/A | | 4,053,966 | | 4,135,449 | | 5,764,051 | |
| Negative Shares (Included in Loans) | N/A | | 2,044 | | 107 | | 2,717 | |
| Weighted Average Share Dividend Rate | 0.88% | | 1.04% | | 1.05% | | 1.14% | |
| Dividends & Interest on Deposits to Average Shares | 1.99% | | 1.85% | | 1.74% | | 1.67% | |
| Cost of Funds to Ave. Assets | 1.60% | | 1.48% | | 1.39% | | 1.34% | |
| Members | 24,635 | | 24,427 | | 24,348 | | 23,921 | |
| Potential Members | 50,000 | | 50,000 | | 50,000 | | 50,000 | |
| Members to Potential Members | 49.27% | | 48.85% | | 48.70% | | 47.84% | |

85

CONFIDENTIAL INFORMATION – Subject to Protective Order                                     NCUA00359583

Confidential                                     USAOr_000311965