UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                            :
UNITED STATES OF AMERICA                    :
                                            :
            - v. -                          :        19 Cr. 504 (CM)
                                            :
ALAN KAUFMAN, and                           :
TONY GEORGITON,                             :
                                            :
            Defendants.                     :
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


**[CORRECTED] MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT ALAN KAUFMAN'S MOTIONS *IN LIMINE***


PETRILLO KLEIN & BOXER LLP
Nelson A. Boxer
Mirah E. Curzer
Max M. Africk
655 Third Avenue
New York, NY 10017
Telephone: (212) 370-0330

*Attorneys for Alan Kaufman*

## TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................................................1

BACKGROUND .....................................................................................................................1

ARGUMENT ..........................................................................................................................2

    I.   The Court Should Preclude the Government from Introducing Three Reports
        Relating to MCU's Conservatorship and Liquidation .........................................2

        A.      The NCUA Reports..............................................................................2

        B.      The FinPro Report...............................................................................7

    II.  The Court Should Preclude the Government from Referring to the Checks that
        Mr. Kaufman signed for Mr. Georgiton as Forgeries .........................................9

    III. The Court Should Preclude the Government from Making any Argument or
        Introducing any Evidence Relating to the Financial, Personal, or Professional
        Impact of MCU's Conservatorship or Liquidation ............................................9

    IV. The Court Should Preclude the Government from Utilizing the Phrase
        "Rent-Free" in Reference to Mr. Kaufman's Use of the House in Jericho......................10

CONCLUSION.......................................................................................................................11

# TABLE OF AUTHORITIES

**Cases**                                                 **Page(s)**

*Gilbert v. United States,*
370 U.S. 650 (1962) ................................................................................ 9

*United States v. McGovern,*
661 F.2d 27 (3d Cir. 1981) ..................................................................... 9

*United States v. Metzger,*
778 F.2d 1195 (6th Cir. 1985) ............................................................... 6

*United States v. Murgio,*
2017 WL 365496 (S.D.N.Y. Jan. 20, 2017) .............................. *passim*

*United States v. Oates,*
560 F.2d 45 (2d Cir. 1977) ........................................................... 4, 6, 8

*United States v. Reyes,*
239 F.R.D. 591 (N.D. Cal. 2006). ......................................................... 8

**Statutes**                                                 **Page(s)**

18 U.S.C. § 215 ........................................................................... 1, 5, 9

18 U.S.C. § 371 .................................................................................. 1

18 U.S.C. § 495 ................................................................................... 9

N.Y. Penal Law §§ 170.05 .................................................................. 9

N.Y. Penal Law §§ 170.10 .................................................................. 9

N.Y. Penal Law §§ 170.15 .................................................................. 9

**Rules**                                                     **Page(s)**

Fed. R. Evid. 403 ...................................................................... 2, 3, 7, 10

Fed. R. Evid. 803 ......................................................................... *passim*

**INTRODUCTION**

Mr. Kaufman moves *in limine* for an Order:  (1) precluding the introduction into evidence of three reports relating to Melrose Credit Union's ("MCU") conservatorship and liquidation; (2) precluding the government from referring to the checks that Mr. Kaufman signed for Mr. Georgiton as "forgeries"; (3) precluding the government from making arguments or introducing evidence relating to the financial, personal, or professional impact of MCU's conservatorship and liquidation; and (4) precluding the government from utilizing the phrase "rent-free" in reference to Mr. Kaufman living at a house in Jericho, New York.

**BACKGROUND**

Defendant Alan Kaufman is charged with two bank bribery "schemes":  the first, involving co-defendant Tony Georgiton, charges one count of bank bribery (Count Two) in violation of 18 U.S.C. § 215(a)(2), and one count of conspiracy to commit bank bribery (Count One) in violation of 18 U.S.C. § 371; and the second, involving certain media and sports companies, charges one count of bank bribery (Count Four), in violation of 18 U.S.C. § 215(a)(2).  *See* Ind. at ¶¶ 7-23. 26-30.

The first bank bribery scheme alleges that Mr. Georgiton purchased and allowed Mr. Kaufman to reside in and pay only the expenses associated with a house in Jericho, Long Island, in exchange for Mr. Kaufman's support of three transactions:  (1) a June 2011, MCU refinancing of over $60 million worth of loans, including an additional $5 million cash loan, for Queens Medallion Leasing ("QML"), a company owned, in part, by Mr. Georgiton, at the "favorable" interest rate of 4.5% and a 50-year amortization period (Ind. at ¶ 9); (2) an October 2012, MCU refinancing of approximately $26 million worth of loans for QML, including an additional $2.5 million cash loan, at a "favorable" interest rate of 3.25% and 50-year amortization (Ind. at ¶ 10);

and (3) a September 2011, Naming Rights Agreement MCU executed with a company owned, in part, by Mr. Georgiton (Harama Entertainment), whereby MCU purchased the naming rights to an entertainment venue located in Astoria, Queens, at an annual cost of $400,000 for five years. (Ind. at ¶¶12, 15).

The second bank bribery scheme alleges that Mr. Kaufman received promotional trips – specifically, six trips between August 2010 and 2015 – and gifts from two media companies and one sports company in exchange for increased MCU advertising spending.  *See* Ind. at ¶¶ 27-29.

## ARGUMENT

I.     **The Court Should Preclude the Government from Introducing Three Reports Relating to MCU's Conservatorship and Liquidation.**

The National Credit Union Administration ("NCUA") and FinPro, Inc. ("FinPro"), have collectively authored three reports relating to MCU's conservatorship and liquidation, each of which occurred after the MCU Board terminated Mr. Kaufman on June 28, 2016.  The government should be precluded from admitting into evidence these reports, which are inadmissible hearsay, not subject to a hearsay exception, and otherwise inadmissible under Rule 403.[1]

A.     **The NCUA Reports**

In 2015 and 2019, the NCUA issued reports relating to Melrose's conservatorship and liquidation. The first was styled as a Document of Resolution, *see* August 18, 2020 Declaration of

---

[1] Recognizing that the Court has not yet set a date for the government to produce its exhibit list, Mr. Kaufman moves *in limine* with respect to these documents in their entirety.  *See United States v. Murgio*, No. 15-CR-769(AJN), 2017 WL 365496, at * 9 (S.D.N.Y. Jan. 20, 2017) (after "[a]nalyzing the NCUA reports . . . it is evident that, whether or not the *entirety* of any given report need be excluded as evaluative, each report includes determinations that are properly understood as factual findings from a legally authorized investigation and are thus inadmissible for their truth").

Max M. Africk ("Decl."), Ex. A; the second was styled as a Material Loss Review.  *See* Decl., Ex.
B.

The government should not be permitted to introduce into evidence at trial either of these
reports.  First, they contain inadmissible hearsay not subject to an exception in the Federal Rules
of Evidence, as they are neither public records, *see* Fed. R. Evid. 803(8), nor business records, *see*
Fed. R. Evid. 803(6).  Second, even if they were admissible pursuant to a hearsay exception, their
probative value is substantially outweighed by the danger of unfair prejudice. *See* Fed. R. Evid.
403.

The Document of Resolution ("DOR") was a MCU "risk focused examination report"
produced by the NCUA for the period ending September 30, 2015.  *See* Decl., Ex. A at 1, 6.  The
DOR served, in effect, as the vehicle through which the NCUA formally "outline[d] [its]
problems" with MCU.  *Id*. at 3.  For example, in the DOR, the NCUA found that "MCU's liquidity
position and [MCU's] cash flow projections [raise] significant concerns" relating to MCU's
financial position, and noted that even MCU "[m]anagement" was concerned that "if interest rates
rise, some [MCU] borrowers may not be able repay their loans."  *Id*. at 8, 31. The DOR further
described the risk associated with MCU's lack of liquidity as "high" and proposed that MCU
implement a number of liquidity-related "corrective actions," which effectively required MCU to,
among other things, "[r]evise [MCU's] Liquidity Policy to include [a] new minimum required
amount and monitor compliance with the policy limit at the regular ALCO [(Asset Liability
Management Committee)] meetings."  *Id*. at 10, 14; *see also id*. at 13 ("Liquidity"); *id*. at 9 (The
"DOR establish[es] required corrective actions. You must take the noted or other actions as
deemed necessary to address the areas of concern.").

The Material Loss Review ("MLR") was the result of a NCUA investigation into MCU's failure. *See* Decl., Ex. B.  The MLR "determined" that MCU failed because too many of MCU's "loans [were] collateralized by taxi medallions, [MCU utilized] unsafe and unsound lending practices, and [MCU had] weak Board and management oversight and inadequate risk management practices." *Id.* at 2.  The MLR also "determined" that "the lack of governance shown by Melrose's Board allowed [MCU] management to make questionable decisions" and, in that context, repeated three findings "revealed" as part of an internal investigation conducted three years earlier by a private law firm (the "Law Firm") retained by the Board. *Id*. at 20.  Specifically, the MLR recounted that Mr. Kaufman: (1) "allegedly received improper benefits from substantial borrowers, . . . in violation of the Bank Bribery Act," and "approved several large loans for these borrowers against the recommendations of Melrose's Chief Lending Officer"; (2) "allegedly received improper benefits from certain Melrose [advertising] vendors" while "leverag[ing] the amount of money [MCU] spent with [those] vendors [in order] to obtain [those] benefits"; and (3) allegedly charged "excessive . . . expenses" to MCU that "personally benefited" himself and his "family and friends." *Id*.

The findings, conclusions, and proposed "corrective actions" in the DOR and MLR are hearsay not subject to an exception under the Federal Rules of Evidence, and therefore should be inadmissible at trial.  Neither can be admitted as a public record, because the Federal Rules of Evidence prohibit the government from introducing into evidence in a criminal trial a report containing "factual findings from a legally authorized investigation." *See* Fed. R. Evid. 803(8).  And neither can be admitted as a business record, because the Second Circuit has held that "factual findings from a legally authorized investigation" are no more admissible under Rule 803(6) than they are under 803(8). *See United States v. Oates*, 560 F.2d 45, 67, 77 (2d Cir. 1977) (holding that although the "chemist's documents might appear to be within the literal language of FRE 803(6), . . . the legislative intent underlying FRE 803(6) [makes] clear that the only way to . . . interpret FRE 803(6) [is to hold that]

evaluative reports not satisfying the standards of FRE 803(8) . . . may not qualify for admission under FRE 803(6) or any of the other exceptions to the hearsay rule").

*United States v. Murgio*, No. 15-CR-769(AJN), 2017 WL 365496 (S.D.N.Y. Jan. 20, 2017), is instructive. In *Murgio*, like here, the defendant previously served as an officer of a credit union that was liquidated by the NCUA and was charged with bank bribery in violation of 18 U.S.C. § 215. *See id*. at **1, 3. The defendant moved to preclude the admission of certain NCUA records, including a NCUA Document of Resolution, which was described as a "risk-focused examination report" of the credit union. *Id*. at *4. The government argued that the NCUA records (including the NCUA Document of Resolution), "though hearsay, are admissible under both the public records hearsay exception, *see* Fed. R. Evid. 803(8), and the business records exception, *see* Fed. R. Evid. 803(6)." *Id*. at *6. The district court disagreed, and held that NCUA records generally (and the NCUA Document of Resolution specifically) cannot be admitted into evidence in a criminal case, because the text of "Rule 803(8) draws a distinction between 'matter[s] observed while under a legal duty to report,' on the one hand [which the government can admit under Rule 803(8)], and 'factual findings from a legally authorized investigation,' on the other [which the government cannot]." *Id.* at *7 (quoting Fed. R. Evid. 803(8)); *see also id*. at *9 (holding that NCUA records "contain[ing] at least one, and often a myriad, of evaluative conclusions, legal conclusions, . . . recommendations" and "*required actions*," are inadmissible under Rule 803(8) (emphasis in original). The court found that the government can only admit a public record in a criminal case if it was produced by non-law enforcement personnel and does nothing more than record "simple matters observed." *Id*.

The court in *Murgio* also rejected the government's argument that, "even if the NCUA records contain findings of fact and thus may not come in as public records, they can nevertheless

come in under the business records exception to the hearsay rule." *Id*. at *12.  Rather, the Court

held that "evaluative reports may [not] come in under Rule 803(6) [even] when the author

testifies," and cited the Second Circuit's decision in in *Oates*, 560 F.2d at 72, 83-84, for the

proposition that it was the "manifest [and] clear intention of Congress" that "reports of public

agencies setting forth factual findings resulting from investigations made pursuant to authority

granted by law cannot satisfy the standards of *any* hearsay exception if those reports are sought to

be introduced against the accused," including Rule 803(6).  *Id*. at **13-14 (quoting *Oates*, 560

F.2d at 72, 83-84) (emphasis added); *see also United States v. Metzger*, 778 F.2d 1195, 1201 (6th

Cir. 1985) ("In *Oates* the Second Circuit read Rule 803(6) (records of regularly conducted activity)

in conjunction with Rule 803(8)([iii]) and [held] that . . . FRE 803(6) and other hearsay exceptions

[should be interpreted] in such a way that police and evaluative reports not satisfying the standards

of FRE 803(8)([ii]) and ([iii]) may not qualify for admission under FRE 803(6) or any of the other

exceptions to the hearsay rule.").[2]  "Because the [NCUA] records [at issue in *Murgio*] contain[ed]

factual findings by the NCUA made pursuant to a legally authorized investigation," the court held

that "they [were] no more admissible under Rule 803(6) [as business records]. . . than [they were]

under Rule 803(8) [as public records]." *Id*. at *15.

Here, like in *Murgio*, the NCUA records are inadmissible, as the DOR and MLR both

contain broad fact findings and "a myriad of evaluative conclusions." *See id*. at *9.  Indeed, the

DOR can only justify its proposed corrective actions by making supportive findings of fact. *See*

Decl., Ex. A at 8-9 ("The review of MCU's liquidity position and your cash flow projections show

significant concerns with the low liquidity position and insufficient liquidity monitoring. . . . You

must take the [corrective] actions . . . deemed necessary to address the areas of concern.").

---

[2] *See Murgio*, 2017 WL 365496, at *7 n.9 (S.D.N.Y. Jan. 20, 2017) ("Rules 803(8)(A)(ii) and 803(8)(A)(iii)
were . . . Rules 803(8)(B) and 803(8)(C), respectively," when *Oates* was decided.).

Likewise, the MLR is designed to reach a conclusion, intended to diagnose the cause (or causes) of MCU's failure.  *See* Decl., Ex. B at 4 (noting that the MLR is intended to:  "(1) determine the cause(s) of the [MCU's] failure and the resulting estimated . . . loss to the National Credit Union Share Insurance Fund (Share Insurance Fund); (2) assess NCUA's supervision of [MCU]; and (3) provide appropriate suggestions and/or recommendations to mitigate future losses").  Neither of these reports should be admissible under Rules 803(6) or 803(8).

Finally, the DOR and MLR are inadmissible under Rule 403.  *See Murgio*, 2017 WL 365496 at **15–16.  As the Court stated in *Murgio*, NCUA records weigh on the defendant's "culpability" by, for example, showing that the defendant "breached his fiduciary duties" to the credit union.  *Id*. at *16.  Accordingly, the DOR and the MLR, if admitted, would be "highly prejudicial, . . . given that . . . the only effect of introducing [their] conclusions for their truth would be to place the NCUA's imprimatur on the Government's preferred interpretation of the evidence." *Id*.

For all of these reasons, the government should not be permitted to introduce into evidence either the DOR or the MLR.

### B.      The FinPro Report

In 2016, the MCU Board of Directors hired FinPro, Inc., pursuant to a Consent Order entered into by and among MCU and the New York State Department of Financial Services ("DFS") requiring an "independent third party analysis of the Credit Union's management needs." *See* Decl., Ex. C at 3.  After conducting an investigation, FinPro issued a report (the "FinPro Report") which, among other things, engaged in broad fact-finding as to the conduct of numerous MCU board members and executives, including Mr. Kaufman, as well as some witnesses who presumably will testify at trial.  *Id*. at 9-31.  For example, the FinPro Report found that Mr.

Kaufman "clearly . . . has not demonstrated the ethical competencies necessary to remain on the [MCU] Board" and should be removed, based in part because Mr. Kaufman violated his "[d]uty of [l]oyalty" to MCU by engaging in the very conduct charged in Counts One, Two, and Four of the Indictment. *Id.* at 28-29, 31 (describing the "loan transactions with Tony Georgiton," MCU's decision to "purchas[e] the naming rights" to the Ballroom, and the "gifts Mr. Kaufman received from vendors" as either generating "[q]uestions" or "[q]uestionable").

"Second Circuit precedent suggests" that "evaluative reports may [not] come in under Rule 803(6)." *Murgio*, 2017 WL 365496 at \*13; *see also United States v. Reyes*, 239 F.R.D. 591, 600 (N.D. Cal. 2006) ("Documents produced in a full-fledged, one-time internal investigation into alleged corporate malfeasance do not fall under [Rule 803(6)] . . . for good reason: they lack the hallmarks of reliability that justify the admission of run-of-the-mill business records."). Indeed, "[i]n *Oates*, the Second Circuit held . . . it [to be] 'manifest that it was the clear intention of Congress to make evaluative and law enforcement reports *absolutely* inadmissible against [all] defendants in criminal cases," including where those reports are offered for admission under Rule 803(6). *Murgio*, 2017 WL 365496 at \*13 (quoting *Oates*, 560 F.2d at 72) (emphasis added).

Finally, the FinPro Report, if admitted, would be "highly prejudicial," as its admission "would not only allow the Government to place the [FinPro's] imprimatur on the factual conclusions it wants the jury to reach, but also put its own charging instruments before the jury in the guise of corroborating evidence from an independent" entity. *Id.* at \*16.

For all of these reasons, the government should also not be permitted to introduce into evidence the FinPro Report.

## II.   The Court Should Preclude the Government from Referring to the Checks that Mr. Kaufman signed for Mr. Georgiton as Forgeries.

The government has (repeatedly) alleged that Mr. Kaufman committed "forgery" when he "opened an account in Georgiton's name, deposited his own money into the account, and [] wrote checks from the account in order to pay for certain taxes and fees for the Jericho Residence."  *See* Dkt. 104 at 5 n.1.  These facts, if proven true, are insufficient to constitute forgery, as they lack a specific "intent to defraud" – to take money or property from or otherwise deceive or fool a victim – an essential element of forgery under both New York and federal law.  *See Gilbert v. United States*, 370 U.S. 650, 652, 655–58 (1962) (Title 18, Section 215's prohibition on forgery must be constrained by forgery's "definition under the common law"); *United States v. McGovern*, 661 F.2d 27, 29 (3d Cir. 1981) (a prosecution brought under 18 U.S.C. § 495 requires proof that the defendant acted with an "intent to defraud," consistent with the "[c]ommon law [definition of] forgery"); N.Y. Penal Law §§ 170.05, 170.10, and 170.15 (each requires an "intent to defraud")

The government's allegation neither evidences a specific intent by Mr. Kaufman to defraud the payee of the checks or to defraud MCU, where the checking account was held, as Mr. Kaufman funded the account to cover the checks.  Neither does the government's allegation show an intent by Mr. Kaufman to defraud Mr. Georgiton.  Accordingly, the Court should preclude the government from referring to Mr. Kaufman's signing of these checks as "forgery" or the checks themselves as "forgeries."

## III.   The Court Should Preclude the Government from Making any Argument or Introducing any Evidence Relating to the Financial, Personal, or Professional Impact of MCU's Conservatorship or Liquidation.

The Court should preclude the government from making any argument or introducing any evidence relating to the financial, personal, or professional impact of MCU's conservatorship or liquidation, including on MCU's "approximately 20,000 members."  *See* Ind. at ¶ 1.   It is not

9

alleged that the QML loans or the Naming Rights Agreement, *see* Ind. at ¶¶ 9-10, 12, contributed (in whole or in part) to the conservatorship or liquidation of MCU.[3]  And, even assuming relevance, the probative value of any argument or evidence relating to the financial, personal, or professional impact of MCU's conservatorship or liquidation on MCU's approximately 20,000 depositors or members "is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, [and] wasting time."  Fed. R. Evid. 403.

## IV.    The Court Should Preclude the Government from Utilizing the Phrase "Rent-Free" in Reference to Mr. Kaufman's Use of the House in Jericho.

The Court should preclude the government from utilizing the phrase "rent-free" in reference to Mr. Kaufman's use of the house in Jericho from November 2010 through February 2013.  *See* Ind. at ¶¶ 8, 16. This phrase appears throughout the Indictment, *see, e.g.*, Ind. at ¶ 8 ("After GEORGITON acquired the Jericho Residence, GEORGITON permitted KAUFMAN to live in the house rent-free for over two years."), and the government has invoked it in Memoranda to the Court.  *See* Dkts. 34 at 5, 89 at 6, and 104 at 12.

The phrase, however, is misleading, as it fails to acknowledge (as the government has in other filings) that Mr. Kaufman paid "certain taxes and fees for the Jericho Residence" during the time Mr. Georgiton owned the house.  *See* Dkt. 104 at 5, n.1.  Indeed, Mr. Kaufman paid the assessed condominium association fees and property taxes, and also paid for improvements to the house.  All of this consideration renders the phrase "rent-free" misleading and unfairly prejudicial.

The term "rent" is not constrained to a check that a tenant disburses to a landlord each month.  Rather, it includes *any* "[c]onsideration paid . . . for the use or occupancy of property." *See* BLACK'S LAW DICTIONARY (11th ed. 2019).  The government's use of the phrase "rent-free" is both unfairly prejudicial and misleading, *see* Fed. R. Evid. 403, and, accordingly, the

---

[3] Neither DFS, MCU's regulator, nor the NCUA, its insurer, has made such an allegation.

government should not be permitted to deploy it in its remarks to the jury or in its questions to witnesses.

## CONCLUSION

For the reasons set out above, Mr. Kaufman's motion *in limine* should be granted.

Dated: August 18, 2020                   Respectfully submitted,
       New York, New York

PETRILLO KLEIN & BOXER LLP

By:
      Nelson A. Boxer
      Mirah E. Curzer
      Max M. Africk
      655 Third Avenue
      New York, NY 10017
      Telephone: (212) 370-0330
      nboxer@pkbllp.com
      mcurzer@pkbllp.com
      mafrick@pkbllp.com

*Attorneys for Alan Kaufman*