UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                  :

UNITED STATES OF AMERICA         :

                                  :

            - v. -              :       19 Cr. 504 (LAK)

                                  :

ALAN KAUFMAN,                :

                                  :

               Defendant.       :

                                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


**SENTENCING MEMORANDUM ON BEHALF OF ALAN KAUFMAN**

PETRILLO KLEIN & BOXER LLP
Nelson A. Boxer
Christina Karam
Paul-Gabriel D. Morales
655 Third Avenue
New York, NY 10017
Telephone: (212) 370-0330

*Attorneys for Alan Kaufman*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................1

LEGAL STANDARD..................................................................................................1

ARGUMENT ...............................................................................................................2

I.   A NON-CUSTODIAL SENTENCE IS APPROPRIATE UNDER
     18 U.S.C. § 3553(A) ......................................................................................2

     A.   The Nature and Circumstances of the Offense Favor a Non-custodial
          Sentence (18 U.S.C. § 3553(a)(1)) .......................................................2

     B.   Mr. Kaufman's History and Characteristics Favor a Non-custodial
          Sentence (18 U.S.C. § 3553(a)(1)) .......................................................6

     C.   A Non-custodial Sentence Would Afford Adequate Deterrence
          to Criminal Conduct (18 U.S.C. § 3553(a)(2)(B))...............................11

     D.   A Non-custodial Sentence Is Within Mr. Kaufman's Correctly Calculated
          Guidelines Range of 0-6 Months' Imprisonment (18 U.S.C. § 3553(a)(4))..........12

          i.    Background ................................................................................12

          ii.   Twenty Levels Should Not Be Added Under Section 2B4.1(b)(1)
                Because the Enhancement Does Not Apply to a Gratuity Conviction ......13

          iii.  Two Levels Should Not Be Added for Obstruction of Justice .................18

          iv.   Two Levels Should Not Be Added for Abuse of a Position of Trust .......22

          v.    The PSR Incorrectly Describes Portions of "The Offense Conduct" ........22

     E.   A Non-custodial Sentence Would Reflect the Seriousness of the Offense,
          Promote Respect for the Law, Provide Just Punishment for the Offense, and
          Avoid Unwarranted Sentence Disparities Between Mr. Kaufman and
          Mr. Georgiton (18 U.S.C. §§ 3553(a)(2)(A) and (a)(6)) ......................................23

II.  THE COURT SHOULD NOT ASSESS RESTITUTION OR A FINE, OR ISSUE
     AN ORDER OF FORFEITURE..................................................................................24

     A.   Restitution ..............................................................................................24

     B.   Fine .........................................................................................................24

i

C.       Forfeiture ...................................................................................................26

CONCLUSION.................................................................................................................28

APPENDIX A ..................................................................................................................29

## TABLE OF AUTHORITIES

**Cases**                                                               **Page(s)**

*Alli-Balogun v. United States*,
    114 F. Supp. 3d 4 (E.D.N.Y. 2015) ................................................................ 17

*Gall v. United States*,
    552 U.S. 38 (2007)........................................................................................ 1, 12

*Kimbrough v. United States*,
    552 U.S. 85 (2007)............................................................................................ 12

*Nelson v. United States*,
    555 U.S. 350 (2009).......................................................................................... 12

*Pepper v. United States*,
    562 U.S. 476 (2011)............................................................................................ 1

*Ratzlaf v. United States*,
    510 U.S. 135 (1994).................................................................................... 13, 14

*United States v. Bajakajian*,
    524 U.S. 321 (1998).......................................................................................... 27

*United States v. Bank of New York Mellon*,
    941 F. Supp. 2d 438 (S.D.N.Y. 2013)................................................... 14, 16, 17

*United States v. Ben-Shimon*,
    249 F.3d 98 (2d Cir. 2001)............................................................................... 19

*United States v. Bonds*,
    933 F.2d 152 (2d Cir. 1991)........................................................................ 19, 21

*United States v. Booker*,
    543 U.S. 220 (2005).......................................................................................... 12

*United States v. Bourne*,
    2005 WL 1994423 (S.D. Ind. Feb. 24, 2005). ................................................. 4

*United States v. Capoccia*,
    503 F.3d 103 (2d Cir. 2007).............................................................................. 27

*United States v. Cardenas,*
    598 F. App'x 264 (5th Cir. 2015) ............................................................ 13, 14, 17

*United States v. Castello,*
    611 F.3d 116 (2d Cir. 2010) ........................................................................ 28

*United States v. Catano-Alzate,*
    62 F.3d 41 (2d Cir. 1995) ........................................................................... 19

*United States v. Cavera,*
    550 F.3d 180 (2d Cir. 2008) ........................................................................ 12

*United States v. Cusack,*
    66 F. Supp. 2d 493 (S.D.N.Y. 1999) ............................................................ 20

*United States v. Dorvee,*
    616 F.3d 174 (2d Cir. 2010) ...................................................................... 6, 12

*United States v. Dunnigan,*
    507 U.S. 87 (1993) ................................................................................ 18, 19

*United States v. Fitzhugh,*
    78 F.3d 1326 (8th Cir. 1996) ....................................................................... 14

*United States v. Jones,*
    531 F.3d 163 (2d Cir. 2008) ..................................................................... 1, 12

*United States v. Kelly,*
    147 F.3d 172 (2d Cir. 1998) ........................................................................ 18

*United States v. Maria,*
    186 F.3d 65 (2d Cir. 1999) ..................................................................... 14, 16

*United States v. Millar,*
    79 F.3d 338 (2d Cir. 1996) ......................................................................... 13

*United States v. Montani,*
    204 F.3d 761 (7th Cir. 2000) ....................................................................... 14

*United States v. Parkins,*
    935 F.3d 63 (2d Cir. 2019) .......................................................................... 17

*United States v. Pena*,
   751 F.3d 101 (2d Cir. 2014) ............................................................................ 11, 18

*United States v. Pope*,
   554 F.3d 240 (2d Cir. 2009) ............................................................................ 13

*United States v. Roberts*,
   660 F.3d 149 (2d Cir. 2011) ............................................................................ 27

*United States v. Sergentakis*,
   307 F. App'x 520 (2d Cir. 2009) .................................................................... 14

*United States v. Simpson*,
   319 F.3d 81 (2d Cir. 2002) .............................................................................. 17

*United States v. Sloley,*
   464 F.3d 355 (2d Cir. 2006) ............................................................................ 13

*United States v. Sun-Diamond Growers of Cal.*,
   526 U.S. 398 (1999) ........................................................................................ 16

*United States v. Thomas*,
   751 F. Supp. 315 (D. Mass. 1990) .................................................................. 22

*United States v. Thompson*,
   808 F.3d 190 (2d Cir. 2015) ............................................................................ 18

*United States v. Yang Chia Tien*,
   638 F. App'x 19  (2d Cir. 2015) ...................................................................... 16

**Sentencing Guidelines**

U.S.S.G. § 2B4.1 .............................................................................................. 12-17, 25

U.S.S.G. § 2C1.1 .............................................................................................. 15, 16

U.S.S.G. § 2C1.2 .............................................................................................. 15, 16

U.S.S.G. § 2E5.1 .............................................................................................. 16, 17

U.S.S.G. § 3B1.3 .............................................................................................. 12, 22

U.S.S.G. § 3C1.1 ................................................................................................ 12, 18, 19

U.S.S.G. § 5B1.1 ................................................................................................ 13

U.S.S.G. § 5E1.2 ................................................................................................ 24, 25

**Statutes & Rules**

18 U.S.C. § 201 ................................................................................................ 16

18 U.S.C. § 215 ................................................................................................ 1, 13, 15

18 U.S.C. § 1621 ................................................................................................ 18

18 U.S.C. § 1954 ................................................................................................ 17

18 U.S.C. § 3553 ................................................................................................ *passim*

18 U.S.C. § 3561 ................................................................................................ 13, 28

18 U.S.C. § 3782 ................................................................................................ 25

18 U.S.C. § 371 ................................................................................................ 1

Fed. R. Crim. P. 32 ................................................................................................ 26, 27

**Other Authorities**

*Reviving the Federal Crime of Gratuities*,
  55 Ariz. L. Rev. 417 (2013) ................................................................................................ 16

## PRELIMINARY STATEMENT

We respectfully submit this Memorandum on behalf of Alan Kaufman in connection with his sentencing on September 13, 2021.  On March 31, 2021, a jury acquitted Mr. Kaufman of one count of conspiracy to commit bank bribery, in violation of 18 U.S.C. § 371 (Count One), and convicted him of two counts of bank bribery based on accepting gratuities, in violation of 18 U.S.C. § 215(a)(2) (Counts Two (Tony Georgiton) and Four (vendor of Melrose Credit Union ("Melrose"))).  Dkt. No. 219 (marked jury verdict form); Tr. 1229-30.

As set forth in more detail below, we respectfully submit that a non-custodial sentence would be just and in accordance with the requirements of 18 U.S.C. § 3553(a).

## LEGAL STANDARD

In imposing a sentence, the court "must make an 'individualized assessment' of the sentence warranted by [18 U.S.C.] § 3553(a) 'based on the facts presented.'"  *United States v. Jones*, 531 F.3d 163, 170 (2d Cir. 2008) (quoting *Gall v. United States*, 552 U.S. 38, 50 (2007)); *see also Pepper v. United States*, 562 U.S. 476, 487 (2011) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.") (internal quotation marks omitted).  Specifically, the court must consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . (5) any pertinent policy statement issued by the Sentencing

1

Commission . . . (6) the need to avoid unwarranted sentence disparities among [similar] defendants . . . and (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

## **ARGUMENT**

I. **A NON-CUSTODIAL SENTENCE IS APPROPRIATE UNDER 18 U.S.C. § 3553(A)**

A. **The Nature and Circumstances of the Offense Favor a Non-custodial Sentence (18 U.S.C. § 3553(a)(1))**

The nature and circumstances of the two counts of conviction do not warrant a sentence of incarceration.

Mr. Kaufman was convicted of accepting two gratuities, one from a friend and Melrose customer (Mr. Georgiton) whose company repaid its loans when it left Melrose for better terms at other financial institutions, and the other from a major media company who included Mr. Kaufman and his wife on a trip to the Super Bowl that it also afforded to numerous other of its top clients as part of a company-wide sales incentive program.[1]  Neither of these actions imperiled Melrose or were contrary to its best interests.  As hard as the government tries to portray Mr. Kaufman's behavior as it charged in the Indictment—that his actions as Melrose CEO and Treasurer were corrupted in exchange for bribes (*see*, *e.g.*, Ind. ¶¶ 7, 26), and that his actions harmed Melrose (*see*, *e.g.*, Ind. ¶¶ 14, 15)—the jury rejected those claims, presumably because the evidence at trial refuted them.  The loans to Mr. Georgiton's company were within

---

[1]     The sole gratuity theory that the government advanced with respect to Count Four was that Mr. Kaufman's 2013 trip to the Super Bowl was a gratuity from CBS Radio.  *See* Tr. 1078-83 (government's summation) ("Now, in fact, we have actually already seen that [Mr. Kaufman] has been subject to the incremental spend policy before and he has engaged in the *quid pro quo* on the Paris and Hawaii trips, which do require a[n] incremental spend.  But that's not what he is saying here [regarding the Super Bowl trip].  Here he's soliciting a reward. . . . So he solicits the reward and accepts the reward.  He and his wife get the free trip to the Super Bowl in New Orleans.").  *See also* Tr. 563-67 (Elkisch cross) (trips were generally "national" in scope and included "a lot of . . . guests" from "top markets"); 974 (Kaufman direct) (trips generally included "50 or 60" people).

2

Melrose policy or were secured by additional collateral, profited Melrose, and were all repaid[2];

the Melrose Ballroom was vetted by Melrose's General Counsel and the Melrose Board, who

understood that Mr. Georgiton and his business partner, Basil Messados, were owners[3]; and

advertisements on CBS Radio drove traffic to Melrose's website and were effective marketing

expenditures.[4]  The juxtaposition of the conservatorship of Melrose with Mr. Kaufman's alleged

misconduct[5] was also unfounded and unfair:  Mr. Georgiton's company's loans were long

extinguished by the time the NCUA conserved Melrose,[6] an action taken because of the impact

Uber and Lyft had on the value of the security (NYC taxi medallions) for most of Melrose's

commercial loans.

   Other facts and circumstances justify a non-custodial sentence.  The jury apparently

accepted the fact that Mr. Kaufman did not understand that Mr. Georgiton offered him financial

assistance in order to influence him with respect to Mr. Georgiton's business at Melrose.  *See*

---

[2]    *See supra.*

[3]    Melrose's General Counsel, Mitchell Reiver, testified that he performed "diligence" for Melrose about naming rights agreements, specifically, that he "did a search of naming rights agreements to get a general idea of what they were worth and what other properties paid for naming rights at various venues." Tr. 661.  He also testified that, "[w]hen the [naming rights] proposal was first submitted to the board by [Mr.] Kaufman, he made it clear that Mr. Georgiton and Mr. Messados were going to be the people behind the venue."  Tr. 660; *see also* Ex. 207R (proposal signed by Mr. Messados).  Melrose Board member Lori Benjamin testified that she "thought the idea of branding Melrose was a good idea" and "acceptable way to advertise," that the Board "spoke about comparable amounts [for] . . . naming rights for other venues close by" in considering the naming rights proposal, and that she ultimately concluded that "$2 million over five years for the Melrose [Ballroom] naming rights agreement was reasonable."  Tr. 254-56.

[4]    It was undisputed at trial that advertising with CBS Radio benefitted Melrose.  Melrose's Marketing Director, Robert Nemeroff, himself confirmed that the advertising "helped with name recognition" and "drove hits to [Melrose's] website."  Tr. 198-99.  Melrose Board member Paul Woldar also confirmed that "advertising on CBS led to referrals to Melrose," and explained that the Board looked "at the amount of traffic that CBS delivered to Melrose's website at every board meeting."  Tr. 808-09.

[5]    *See* Ind. ¶ 1; Dkt. No. 116 (government's opposition to Mr. Kaufman's motions *in limine*, arguing that Mr. Kaufman's "corrupt financial decisions as the CEO of Melrose had (predictable) financial consequences to the financial stability of Melrose," and that, accordingly, the government should be permitted to admit evidence and testimony concerning Melrose's conservatorship).

[6]    Indeed, this is why the NCUA is not seeking restitution.  *See* Dkt. No. 227, Presentence Investigation Report ("PSR") ¶ 22.

Dkt. No. 129 (Tr. of Georgiton Plea Hearing) at 19-21 ("[P]art of my motivation in this action was to influence Alan relating to my business with Melrose[.]").[7]  Indeed, by the time of Mr. Georgiton's $240,000 loan to Mr. Kaufman in 2013, Mr. Kaufman had no reason to think that the loan was meant to influence him, as by then Mr. Georgiton had largely moved all of his business from Melrose for better terms at other financial institutions.  Tr. 960.

The record is also replete with evidence that Mr. Kaufman and Mr. Georgiton were old, close friends, Tr. 922, 924—the lens through which, rightly or wrongly, Mr. Kaufman understood Mr. Georgiton's 2010 purchase of the Jericho Residence (Ind. ¶ 8) for Mr. Kaufman to live there (and pay all its expenses)[8] and Mr. Georgiton's 2013 loan of $240,000 to Mr. Kaufman.  Mr. Kaufman and Mr. Georgiton met through Melrose.  Mr. Georgiton purchased his first New York City taxi medallion with a loan from Melrose and grew his business, through Melrose, into a taxi empire, becoming very wealthy.  Tr. 923-24.  Over the years, Mr. Kaufman and Mr. Georgiton regularly socialized:  they went out to dinner together, vacationed together with their families, and went to each other's family events.[9]  Tr. 924-25.  Mr. Georgiton, for example, attended Mr. Kaufman's wedding to his second wife, Debi.  Tr. 924.

Additionally, Mr. Georgiton was not a "shaky borrower," as in the "paradigm case of bank bribery."  *United States v. Bourne*, No. IP 04-15-CR-01 H/F, 2005 WL 1994423, at *5 (S.D. Ind. Feb. 24, 2005).  He was one of Melrose's largest depositors and largest and best customers.  Indeed, between 2010 and 2015, Mr. Georgiton had approximately $7 million in a personal Melrose share account, Tr. 926, earning very little interest and affording Melrose the

---

[7]       Mr. Georgiton also stated that he acted "first" out of "friendship and loyalty" to Mr. Kaufman. Dkt. No. 129 at 20; *see also* Dkt. No. 152 (Georgiton sentencing memorandum) at 16 ("In part, Tony was driven by generosity, friendship, and loyalty to Mr. Kaufman . . . .").

[8]       The expenses amounted to more than $50,000 over the approximately two years Mr. Georgiton owned the house. Exs. AEE, 310.

[9]       We are prepared to submit photographs of some of these events if deemed pertinent.

opportunity to lend those deposits at profitable rates.[10]  Mr. Georgiton and his company also paid millions of dollars in interest and fees to Melrose over the years.[11]

While the government and the United States Probation Department ("Probation") contend that Mr. Kaufman "placed [Melrose] at risk" by approving the Georgiton company loans at issue and could not have known that the loans would ultimately be repaid, PSR at 39, *see* Tr. 1086 (government's summation), the evidence at trial showed that Melrose took measures to mitigate any "risk" associated with these loans (which, again, were to one of Melrose's largest and best customers, with no history of default).  For example, after Mitchell Reiver, Melrose's General Counsel and Chief Compliance Officer, raised to Mr. Kaufman that the 2011 refinancing of loans to Mr. Georgiton's company did not comply with Melrose's loan-to-value ("LTV") limits, Mr. Reiver drafted an addendum to the promissory note that required Mr. Georgiton's company to post additional collateral should the loans' LTV ratios exceed a certain threshold.[12]  The government's NCUA witness and principal examiner of Melrose during the pertinent time period, Ezra Teitelbaum, confirmed that the addendum "would protect the credit union."  Tr. 334.  Similarly, Mr. Reiver testified that money in a borrower's Melrose share account could "compensate for any loan amount that would have otherwise been above [Melrose's] loan-to-value limits," Tr. 653; trial evidence showed that Mr. Georgiton held millions of dollars in

---

[10]      Dr. Guedj, Mr. Kaufman's loan expert, performed a quantitative analysis of Melrose's net income from holding Mr. Georgiton's deposits between 2010 and 2013 and using them to originate loans; he concluded that Melrose earned approximately $1 million.  *See* Ex. A, Dkt. No. 185-1 at 20, 30-31 (Guedj slides).

[11]      Dr. Guedj also performed a similar analysis of Melrose's net income from lending money to Mr. Georgiton's company between 2010 and 2013, and concluded that Melrose earned approximately $3.8 million.  *See id.* at 19, 30-31.

[12]      Ex. 701 (June 23, 2011, email between M. Reiver and A. Kaufman regarding LTV on QML loans); Ex. AAE (fixed rate balloon note and addendum, dated July 1, 2011, providing that "[b]orrower shall . . . provide additional collateral . . . upon demand by the Lender . . . of sufficient value to bring the loan to value ratio to 80%").

compensating balances at Melrose.[13]  And government witnesses testified that Melrose was "performing well" in 2011 and 2012, Tr. 100 (Myers cross), and that it was "one of the most outstanding credit unions in the world up until the advent of Uber and Lyft . . . , which adversely affected the credit union" by "caus[ing] . . . medallion values to drop precipitously."  Tr. 684 (Rosen cross).  The notion that Mr. Kaufman, in 2010, should have anticipated the advent of Uber and Lyft in 2015/2016—what caused the demise of Melrose—and that somehow, loans to one of Melrose's most reliable customers, which were paid in full years before that time, put Melrose at risk is not a fact and circumstance of the instant offense.

Mr. Kaufman should not be sentenced for conduct the government alleged and clings to despite the jury's verdict, and despite trial evidence to the contrary.  The facts and circumstances of Mr. Kaufman's conviction of accepting two gratuities establish that a non-custodial sentence would be "sufficient, but not greater than necessary[,] to comply with the specific purposes set forth at 18 U.S.C. § 3553(a)(2)."  *United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010) (internal quotation marks omitted).

### B.  Mr. Kaufman's History and Characteristics Favor a Non-custodial Sentence (18 U.S.C. § 3553(a)(1))

Mr. Kaufman's personal history and characteristics disfavor a sentence of imprisonment.  *See* 18 U.S.C. § 3553(a)(1).

Mr. Kaufman's life has revolved around his commitment to his family, the Melrose Credit Union and its members, and his community.  A devoted husband, father, and brother, Mr. Kaufman has always put his family first.  He and his wife Debi have been married for more than

---

[13]   Tr. 653 (Reiver cross); Tr. 926 (Kaufman direct); Ex. AAE at ¶ 11 (July 1, 2011, fixed rate balloon note, providing borrower "pledge[s] . . . all shares and deposits . . . for the payment of any present or future debt with [Melrose]," who "may apply the[] shares and deposits . . . in the event [of borrower's] default"); Ex. AAF at ¶ 11 (December 1, 2012 fixed rate balloon note, providing for same).

eight years, and despite the stress and uncertainty of Mr. Kaufman's present circumstances, he and Debi have never been closer.  In an interview with Probation, Debi described her husband as a "good guy, who is very calm and considerate [and] cares for others," and she noted that he has been "depressed since his arrest for the instant offense."  PSR ¶ 78.  She continues to be supportive of her husband.  *Id.*

Mr. Kaufman has three children from a prior marriage, Melissa (age 29), Brandon (27), and Rachel (25).  Brandon, who also spoke with Probation, described his dad as "amazing" and recounted how Mr. Kaufman "was home every night after work to cook for the family and always made time for him and his siblings."  PSR ¶ 79.  He stated that "he has found himself to be more and more like his father as he has grown older, particularly that he has developed a love for fishing from his father and also a love to cook after watching his father every night."  *Id.* Brandon noted that he and his father "have been close throughout [Brandon's] life"; indeed, even though Brandon currently lives in California, "they remain close and speak weekly," *id.*, and Mr. Mr. Kaufman and Debi visited Brandon in California earlier this month.  Like Debi, Brandon noted that his father has become "depressed" by his present circumstances.  *Id.*  Brandon also continues to be supportive of his father and "hopes they can move past this difficult time soon." *Id.*

Mr. Kaufman's sister, Roni Rathgeber, told Probation that her brother "has always been a kind and sensitive individual."  PSR ¶ 74.  She described Mr. Kaufman as "an excellent father who was always hands on with the children," explaining that "he financially supported the household, cooked, shopped for the family, and was active in the children's lives."  *Id.*  She also explained that since her husband passed away, Mr. Kaufman has been "a huge source of support" to "her and her children."  *Id.*

7

Mr. Kaufman dedication extended to Melrose, which he has described as his "life."  Tr.

981.  Mr. Kaufman promoted lending practices that accounted for "subjective standards" in

addition to a person's credit score or cash flow, which made credit available to more members,

many of whom were immigrants.  Mr. Reiver, Melrose's General Counsel, touted that practice in

a roundtable discussion with the House Committee on Financial Services, saying:

> [A]s credit unions we do know our members.  And that gives us this – a unique
> ability, as a financial institution, to really evaluate each – each loan, taking into
> account factors that we only know by virtue of our relationship with our
> member[s].  I guess that's what we would refer to as "subjective standards,"
> something other than debt to income, cash flow ratios, credit score.

Ex. B at 27, *Examining Credit Union Regulatory Burdens:  Hearing Before the Subcomm. on*

*Fin. Insts. & Consumer Credit of the H. Comm. on Fin. Insts.*, 113th Cong. 11 (2013).  A long-

serving Melrose Board member, Alan Plafker, summed up Mr. Kaufman's stewardship of

Melrose as a time when Melrose was the "good guy[] in a business with a lot of predators."

Aaron Elstein, *The Rise and Fall of a Taxi Kingdom*, Crain's New York Bus. (Mar. 29. 2021),

2021 WLNR 10656711.

Similarly, Mr. Kaufman pushed for greater community engagement.  For example, he

organized a Melrose scholarship program for high school students and arranged Melrose's

sponsorship of local charities, such as the Beauty Foundation for Cancer Care and Vet-I-Care.

*See, e.g.*, *HS Sports Notebook, De Meno Honored*, Staten Island Advance (Mar. 17, 2010), 2010

WLNR 5693824 (Melrose MVP Scholarship Program); *Rally for Athlete and Those who Aided*

*Him*, Asbury Park Press (Sept. 10, 2010), 2010 WLNR 18284637 (Melrose sponsoring event for

Children's Specialized Hospital in New Brunswick, NJ); Ex. C, *International Polo Club of Colts*

*Neck Supports Local Charities at Kings Polo Classic*, PR Newswire (Aug. 14, 2012); *High*

*School Sports Extra*, Newsday (Apr. 7, 2013), 2013 WLNR 8455800.  In 2004, when a local

senior citizen community center was forced to close, Mr. Kaufman volunteered space in

Melrose's new headquarters for the center's new home, free of charge. *Oldies Find Goodies & New Home*, New York Daily News (Oct. 27, 2004), 2004 WLNR 21466930.

These facts illustrate that Mr. Kaufman's life cannot be defined by his conviction in this case. Moreover, given Mr. Kaufman's family circumstances, any term of incarceration would have devastating consequences—particularly for his wife Debi, his daughter Melissa, and his sister's family. In addition to Melissa's ██████████████, PSR ¶ 76, Debi suffers from█ ████████████████████████████████████████████████████ ████████████████████, *id.* ¶ 77. As a result of her condition, ██████████████ ████████ for several days at a time, during which Mr. Kaufman is her sole caretaker. *Id.* ¶ 77. Like Debi, Mr. Kaufman's sister and her children also continue to depend on him for ████████ emotional support.

Mr. Kaufman's own physical and mental health further counsel against incarceration. ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████Ex. D, █████████████████████ █████████████.█████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████Ex. E, █████████████████████████████████



Ex. F,

Finally, the present circumstances of the COVID-19 pandemic, coupled with Mr. Kaufman's own physical condition, justify a non-custodial sentence. The Department of Justice has recognized that COVID-19 poses significant potential danger to inmates, particularly to populations that are most vulnerable to becoming seriously ill in the event that they are infected. The Centers for Disease Control has recognized that individuals (like Mr. Kaufman) who suffer from ▮▮▮▮▮▮ face an increased risk of severe illness or death from COVID-19. Ctrs. for Disease Control & Prevention, People with Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (updated Aug. 20, 2021). The reality of rising COVID-19 cases nationwide, including the Delta variant, and Mr. Kaufman's vulnerability to serious illness if infected ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ underscore that a non-custodial sentence would be appropriate in this case.

Taking the full measure of Mr. Kaufman, we respectfully submit that his personal history and characteristics weigh heavily in favor of a sentence without a term of imprisonment.

### C.  A Non-custodial Sentence Would Afford Adequate Deterrence to Criminal Conduct (18 U.S.C. § 3553(a)(2)(B))

In the circumstances of this case, a non-custodial sentence would serve the purpose of deterrence.  *See* 18 U.S.C. § 3553(a)(2)(B).

With respect to specific deterrence, as Probation observed, there is scant risk of recidivism in Mr. Kaufman's case, due to his lack of criminal history.  *See* PSR at 39 ("The defendant has otherwise led a law-abiding life and his lack of criminal history leaves us with the belief that his risk of recidivism is low.").

Nor is a term of incarceration necessary to further the goal of general deterrence.  A reasonable, objective person in the community viewing this case would understand its gargantuan cost to Mr. Kaufman, independent of any prison term.  Aside from the enormous pain and stress this case has visited upon him and his family, Mr. Kaufman lost his job at the credit union his grandfather founded, where his father worked his entire professional life, and where Mr. Kaufman worked his entire adult life, as well as his ability (to date) to secure employment and earn a living.  In fact, by reason of a public Notice of Prohibition, the NCUA banned Mr. Kaufman from "participating, directly or indirectly, in any manner in the conduct [or] the affairs of any credit union."[14]  The NCUA has also brought a civil action against Mr. Kaufman, which has been stayed pending resolution of this criminal prosecution, seeking equitable and monetary relief, including restitution of at least $3.5 million and a civil money penalty of $1 million.[15]  No

---

[14]       Administrative Order:  In the Matter of Alan S. Kaufman, No. 18-0074-ER (CBM), Notice of Prohibition (Aug. 30, 2019), *available at:*  https://www.ncua.gov/regulation-supervision/enforcement-actions/administrative-orders/2019/administrative-order-matter-alan-s-kaufman.

[15]       In addition, as discussed *infra*, the NCUA has effectively frozen Mr. Kaufman's pension, savings accrued over his thirty-plus years of employment at Melrose.

rational person would take any message from this case other than that similar conduct risks devastating, life-altering consequences.

> **D.  A Non-custodial Sentence Is Within Mr. Kaufman's Correctly Calculated Guidelines Range of 0-6 Months' Imprisonment (18 U.S.C. § 3553(a)(4))**
>
>> **i.  Background**

The Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), made "'emphatically clear' that the Sentencing 'Guidelines are guidelines—that is, they are truly advisory.'"  *Dorvee*, 616 F.3d at 183 (quoting *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*)).  In fact, "[t]he Guidelines are . . . not to be *presumed* reasonable," *Nelson v. United States*, 555 U.S. 350, 352 (2009) (emphasis in original), and a court, after giving the Guidelines "fair consideration," *Jones*, 531 F.3d at 170, may vary from the Guidelines range "based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (internal quotation marks omitted); *see also Gall*, 552 U.S. at 47 (court need not find "extraordinary circumstances to justify a sentence outside the Guidelines range") (internal quotation marks omitted).

Probation calculated a total offense level of 30, consisting of (i) a base offense level of 8 pursuant to Section 2B4.1(a), plus (ii) an upward adjustment of 20 levels pursuant to Section 2B4.1(b)(1) "[b]ecause the value of the improper benefit was . . . more than $9,500,000, but less than $25,000,000," plus (iii) a second upward adjustment of 2 levels pursuant to Section 3B1.3 for abuse of a position of private trust.  PSR ¶¶ 50-60.  Probation did not apply a 2-level enhancement for obstruction of justice pursuant to Section 3C1.1, as requested by the government, but deferred to the Court on the issue.  *Id.* ¶¶ 47, 56.  Based on a total offense level of 30 and a criminal history category of I, Probation calculated a Guidelines range for Mr. Kaufman of 97 to 121 months' imprisonment.  *Id.* ¶ 111.

We take issue with several of Probation's determinations, calculations, and descriptions, which we understand have been pressed by the government.  Correctly calculated, Mr. Kaufman's total offense level should be 8, and his Guidelines range 0 to 6 months' imprisonment.[16]

### ii.   Twenty Levels Should Not Be Added Under Section 2B4.1(b)(1) Because the Enhancement Does Not Apply to a Gratuity Conviction

Section 2B4.1 applies to both bribery and gratuity convictions under 18 U.S.C. § 215. Subsection (a) defines the base offense level of 8, and, by its plain language, the fraud-table (Section 2B1.1(b)(1)) enhancement under Subsection (b)(1) applies only to a bribery conviction, not a gratuity conviction.  Because Mr. Kaufman's convictions under 18 U.S.C. § 215 were based only on accepting gratuities, the fraud-table enhancement should not apply.

Traditional canons of statutory construction guide the interpretation of the Sentencing Guidelines.  *See United States v. Pope*, 554 F.3d 240, 246 (2d Cir. 2009).  "As with statutory language, the plain and unambiguous language of the Sentencing Guidelines affords the best recourse for their proper interpretation."  *United States v. Millar*, 79 F.3d 338, 346 (2d Cir. 1996) (internal quotation marks omitted); *see Pope*, 554 F.3d at 246 ("[W]e have stated that we will 'give the Guidelines language its plain meaning and force.'") (alteration omitted) (quoting *United States v. Sloley*, 464 F.3d 355, 359 (2d Cir. 2006)).

As with statutory language, there is a "strong presumption" that a term appearing in several places in the Guidelines has the same meaning each time it appears.  *See United States v. Cardenas*, 598 F. App'x 264, 268 (5th Cir. 2015) (explaining that the presumption in *Ratzlaf v. United States*, 510 U.S. 135, 143 (1994), that a "term appearing in several places in a statutory

---

[16]       For this range, a sentence of probation is authorized by the Guidelines, U.S.S.G. § 5B1.1(a)(1), but not permitted by the offense of conviction, which is a Class B felony, *id.* § 5B1.1(b)(1) (citing 18 U.S.C. § 3561(a)(1)).

text is generally read the same way each time it appears," "inform[s]" the court's interpretation

of the Guidelines).  *Cf. United States v. Bank of New York Mellon*, 941 F. Supp. 2d 438, 453 n.91

(S.D.N.Y. 2013) (Kaplan, J.) (stating, in the context of statutory interpretation in a civil action,

that the *Ratzlaf* presumption is a "strong presumption").  Similarly, the Sentencing

Commission's use of *different* words in different places in the Guidelines "strongly suggests that

different meanings were intended."  *United States v. Maria*, 186 F.3d 65, 71 (2d Cir. 1999) ("[I]t

is concluded that where the Sentencing Commission chose the word 'should' instead of 'shall' or

'must,' the Commission meant what it said and said what it meant."); *Cardenas*, 598 F. App'x at

268 (holding that sentencing enhancement based on unlawful "use" of means of identification

was improper based on "possession," reasoning that, because "[o]ther guideline provisions

distinguish between possession and use, . . . the two terms have distinct meanings").

Applying these canons of statutory construction, it is clear that the Subsection (b)(1)

Guidelines enhancement, of adding to the base offense level of 8 based upon "the value of the

bribe" or "the improper benefit" given "in return for the bribe," applies only to a bribery

conviction.  Subsection (b)(1) and its Application Note explicitly use the noun "bribe":

Subsection (b)(1) provides for an increase to the base offense level based on "the greater of the

value of" (i) "the *bribe*" or (ii) "the improper benefit to be conferred," and Application Note 2

specifies that "the improper benefit to be conferred" "refers to the value of the action to be taken

or effected *in return for the bribe*."  U.S.S.G. § 2B4.1(b)(1) & Application Note 2 (emphasis

added); *see also United States v. Sergentakis*, 307 F. App'x 520, 522 (2d Cir. 2009) ("'The

severity of a *bribery offense* . . . is measured by the amount of the improper benefit conferred *in*

*return for the bribe* (or by the amount of the *bribe*, if greater).'" (emphasis added) (quoting

*United States v. Fitzhugh*, 78 F.3d 1326, 1331 (8th Cir. 1996))); *United States v. Montani*, 204

14

F.3d 761, 771 (7th Cir. 2000) (explaining that Subsection (b)(1) "serves to trigger an enhancement to a *bribery conviction* based on the size of the crime, but allows for situations where small bribes may cause great harm or large bribes unexpectedly may result in small improper benefits") (emphasis added).  Indeed, Application Note 2 cites as authority Section 2C1.1, which applies to a conviction for "Offering, Giving, Soliciting, or Receiving *a Bribe*" (emphasis added) involving a public official; Application Note 2 makes no mention of Section 2C1.2, which applies to a gratuity conviction involving a public official ("Offering, Giving, Soliciting, or Receiving *a Gratuity*") (emphasis added).  Finally, the Background section in the Commentary to Section 2B4.1 provides that, "[a]s with non-commercial bribery, this guideline considers not only the amount of the *bribe* but also the value of the action received in return." U.S.S.G. § 2B4.1 Commentary, Background (emphasis added).

The Guidelines' sole inclusion of the noun "bribe" in Subsection (b)(1) and Application Note 2 is not an accident.  By contrast, another sentencing enhancement in Section 2B4.1, the Subsection (b)(2)(A) "gross receipts enhancement" (inapplicable here), and its corresponding Application Note, both use the noun "offense" rather than the noun "bribery," and as a result covers both bribery and gratuity convictions.  *See* U.S.S.G. § 2B4.1(b)(2)(A) & Application Note 4(B).  Similarly, the Background section in the Commentary to Section 2B4.1 provides that "[o]ne of the more commonly prosecuted *offenses* to which this guideline applies is offering or accepting a *fee* in connection with procurement of a loan from a financial institution in violation of 18 U.S.C. § 215," U.S.S.G. § 2B4.1, Commentary, Background (emphasis added); the Sentencing Commission's use of the nonspecific noun "fee," rather than "bribe," in conjunction with "offenses," further evidences that both bribery and gratuity convictions are "offenses."

Another provision in the same chapter of the Guidelines, Section 2E5.1, includes Application Notes that define the terms "bribe" and "gratuity," underscoring that each has a distinct meaning in the Guidelines.  Specifically, "bribe" "refers to the offer or acceptance of an unlawful payment with the specific understanding that it will corruptly *affect* an official action of the recipient," U.S.S.G. § 2E5.1, Application Note 1 (emphasis added), while "gratuity" "refers to the offer or acceptance of an unlawful payment *other than a bribe*," *id.* Application Note 2 (emphasis added).  Because there is a "strong presumption" that a term appearing in several places in the Guidelines has the same meaning each time it appears, *cf. Bank of New York Mellon*, 941 F. Supp. 2d at 453 n.91, and that the Sentencing Commission "meant what it said and said what it meant" when it chose to use different words, *Maria*, 186 F.3d at 71, "bribe" in Section 2B4.1(b)(1) should mean the same as "bribe" is defined in Section 2E5.1 and should not include a gratuity.

Finally, Subsection (b)(1)'s more severe treatment of a bribery conviction than a gratuity conviction is consistent with the Guidelines'—and the law's[17]—recognition that a gratuity is a less severe offense than a bribery.  For example, the Guidelines make this distinction, with respect to a conviction under 18 U.S.C. § 201, at Sections 2C1.1 and 2C1.2:  Section 2C1.1 provides a base offense level of 14 for a bribery involving a public official (and 12 if a bribery but a non-public official), while Section 2C1.2 provides a base offense level of 11 for a gratuity

---

[17]     *See, e.g.*, *United States v. Yang Chia Tien*, 638 F. App'x 19, 24 (2d Cir. 2015) (stating, in the context of discussing 18 U.S.C. § 201:  "Our case law explains that an illegal gratuity is a lesser-included offense of bribery that lacks bribery's 'corrupt intent' element—in other words, bribery requires that the defendant specifically intend a *quid pro quo*, while an illegal gratuity does not. . . . The offense of giving a gratuity was designed primarily to apply to situations where payment is not made until after official action is taken and the element of a corrupt bargain is absent or unprovable.") (alteration, citations, and internal quotation marks omitted); Sarah Welling, *Reviving the Federal Crime of Gratuities*, 55 Ariz. L. Rev. 417, 426 (2013) ("Congress intended bribery and gratuities to be different crimes, with bribery being the more serious.") (discussing bribery and gratuities under 18 U.S.C. § 201 and citing *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404-08 (1999)).

involving a public official (and 9 if a gratuity but a non-public official).  Similarly, a bribery

conviction under 18 U.S.C. § 1954 has a base offense level of 10 under Section 2E5.1, while a

gratuity conviction under the same statute has a base offense level of 6.  Probation's reading of

Subsection (b)(1) yields a result of treating bribery and gratuity convictions in the same manner

in Section 2B4.1 but differently in other sections of Chapter 2 and is thus inconsistent with the

strong presumption that a term appearing in several places in the Guidelines has the same

meaning each time it appears.  *Cardenas*, 598 F. App'x 264, 268; *Bank of New York Mellon*, 941

F. Supp. 2d at 453 n.91.[18]

In sum, the plain language of Section 2B4.1(b)(1) and Application Note 2, and of other

Guidelines provisions in Chapter 2, establishes that the Subsection (b)(1) enhancement does not

apply to a gratuity conviction.[19]

---

[18]     Probation's application of the fraud table—increasing Mr. Kaufman's base offense level by 20
levels pursuant to Section 2B1.1(b)(1)(K) based on an alleged improper benefit to Mr. Georgiton of
$9,827,704 (PSR ¶¶ 43, 53)—is also incorrect.  To determine the appropriate increase to Mr. Georgiton's
offense level, Probation used an amount of $286,663.65—the value of the *bribe* Mr. Georgiton admitted
he provided to Mr. Kaufman, not the value of any improper benefit Mr. Georgiton allegedly received,
which the government agreed could not be reliably calculated.  *See* U.S.S.G. § 2B4.1, Commentary,
Background (providing that if "the value of the action received in return" for the bribe cannot be
estimated, "the amount of the bribe" should be used to determine the appropriate increase in offense
level); Dkt. No. 152 (Georgiton sentencing memorandum) at 43 ("As reflected in the Plea Agreement, the
Guidelines calculation is here premised on the value of the bribe provided by Tony, rather than the value
of the benefit he received.  The $286,663.65 in agreed-upon forfeiture . . . is calculated based on the
notion that any benefit to Tony, *which cannot otherwise be calculated reliably*, would have been at least
equal to the amount of the bribe.") (emphasis added).  The PSR's use of all of the "cash out" obtained by
Mr. Georgiton's company as part of its loan transactions as an improper benefit is also unsupported by the
trial evidence:  Larry Fisher, Melrose's loan department supervisor, testified that cash-out components in
loan refinancings were "[a]bsolutely" "a common occurrence around the time of 2011 and 2012 . . . for
borrowers besides [Mr.] Georgiton" and his business partner, in part because interest rates were
decreasing and the prices of taxi medallions were increasing.  Tr. 420 (Fisher cross).
[19]     Moreover, the rule of lenity applies to the Sentencing Guidelines.  *See United States v. Simpson*,
319 F.3d 81, 86 (2d Cir. 2002); *see, e.g.*, *United States v. Parkins*, 935 F.3d 63, 66 (2d Cir. 2019)
(applying rule of lenity to resolve ambiguity in Application Note 1 to Section 5F1.3 of the Guidelines in
defendant's favor); *Alli-Balogun v. United States*, 114 F. Supp. 3d 4, 48 (E.D.N.Y. 2015) (applying rule
of lenity to resolve ambiguity in Section 1B1.10(e) of the Guidelines in defendant's favor).

### iii.   Two Levels Should Not Be Added for Obstruction of Justice

The government's request for a two-level enhancement for obstruction of justice under Section 3C1.1 is inappropriate.

According to the PSR, the government takes the position that the obstruction enhancement is warranted because Mr. Kaufman "made numerous false statements and statements inconsistent with the documentary record" during his trial testimony.  PSR ¶ 46.  The government identified seven such statements, which are described in subparagraphs (a) through (g) of Paragraph 46 of the PSR.  Probation ultimately "defer[red] to the Court" on this matter and declined to include an obstruction enhancement in its Guidelines calculation.  *Id.* ¶¶ 47, 56.

Where, as here, the obstruction enhancement is based on allegedly perjurious testimony, "courts must apply the federal criminal perjury statute, 18 U.S.C. § 1621, which is violated if '[a] witness testifying under oath or affirmation . . . gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'"  *United States v. Thompson*, 808 F.3d 190, 194 (2d Cir. 2015) (alteration in original) (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)).  "Thus, before applying an obstruction enhancement based on perjury, the sentencing court must find by a preponderance of the evidence that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter."  *Id.* at 194-95 (internal quotation marks omitted).

"The intent to obstruct must be unambiguous."  *United States v. Pena*, 751 F.3d 101, 105 (2d Cir. 2014); *see United States v. Kelly*, 147 F.3d 172, 178 (2d Cir. 1998) (same).  "[N]ot all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice."  U.S.S.G. § 3C1.1, Application Note 2.  Further, "[w]here . . . the testimony [of the defendant] relates to matters that do not, in themselves, determine the defendant's guilt or innocence, the

jury could reasonably return a verdict of guilty even if it believes that the defendant's testimony was truthful.  Under those circumstances, a judgment of conviction alone would ordinarily be an insufficient basis for imposing a [S]ection 3C1.1 upgrade."  *United States v. Bonds*, 933 F.2d 152, 155 (2d Cir. 1991).

The government seeks an obstruction enhancement based upon Mr. Kaufman's trial testimony that he did not approve favorable loans to Mr. Georgiton, or present and sign the naming rights agreement for the Melrose Ballroom, "in exchange for" the use of the Jericho Residence, and his trial testimony that he did not approve spending with CBS Radio "in exchange for" trips.  PSR ¶ 46(e)-(g); *see* Tr. 981.  In other words, the government's basis for the enhancement is Mr. Kaufman's denial of guilt under oath of the bribery offenses charged in Counts Two and Four—offenses of which he was *acquitted*.  Therefore, the testimony in subparagraphs (e) through (g) cannot be a basis for an obstruction enhancement.  *Compare United States v. Ben-Shimon*, 249 F.3d 98, 104 (2d Cir. 2001) (obstruction enhancement unfounded where PSR "treat[ed] [the] defendant's denial of guilt under oath as tantamount to obstruction of justice" *following his conviction*); *United States v. Catano-Alzate*, 62 F.3d 41, 42 (2d Cir. 1995) ("*Dunnigan*'s requirement of fact-finding insures that courts will not automatically enhance sentences whenever the accused takes the stand and is thereafter found *guilty*.") (emphasis added).

The statements about alleged obstruction in subparagraphs (a) through (d) are similarly inadequate to support an obstruction enhancement.  In subparagraphs (a) and (c), the government equates, in an entirely conclusory manner, allegedly *inconsistent* testimony with *false* testimony, but it has not even proven the alleged inconsistencies.  Specifically, in subparagraph (a), Mr. Kaufman's trial testimony about having discussed his living arrangements with a Melrose Board

member and about the involvement of Mr. Reiver in the closing on the Jericho Residence is not inconsistent with testimony during a deposition that he never made a formal disclosure of the Jericho Residence to Melrose's Board.  PSR ¶ 46(a); *see* Tr. 927, 930.  Similarly, in subparagraph (c), Mr. Kaufman's trial testimony that he relied on Constantine (Dino) Velentzas, a Melrose loan officer, to determine whether Georgiton company loans complied with Melrose's loan policies, was not, as the government claims, inconsistent with unspecified "documentary evidence" that allegedly demonstrates that Mr. Kaufman was "warned" by *other* individuals that the Georgiton loans did not comply with Melrose's loan policies.  PSR ¶ 46(c); *see* Tr. 946-47. In fact, one of the government's own exhibits shows that, like Mr. Kaufman, Melrose's loan department supervisor, Mr. Fisher, himself relied on Mr. Velentzas to determine whether the Georgiton company loans complied with Melrose's loan policies.  *See* Ex. 721 (June 7, 2013, email from L. Fisher to D. Velentzas and M. Reiver, copying A. Kaufman) ("I would like to know if these loans are exceptions to policies, cash flow, or credit wise . . . ."); *id.* (June 8, 2013, response from D. Velentzas) ("Each loan qualifies based on cash flow, loan policy and credit report.").

As for subparagraph (b), Mr. Kaufman testified at trial that, during his 2016 interview with Dechert attorneys, he had forgotten about a checking account that in 2011 and 2012 he maintained in Mr. Georgiton's name.  PSR ¶ 46(b); *see* Tr. 936-37.  Mr. Kaufman's trial testimony regarding his lack of memory in 2016 of a checking account he had maintained in 2011 and 2012 was not perjurious.[20]  Nor was it necessary for the jury to disbelieve Mr.

---

[20]     Mr. Kaufman's prior statement to the Dechert attorneys that he had forgotten about the checking account cannot be the basis for an obstruction enhancement in the instant prosecution, as it was not made under oath.  *See United States v. Cusack*, 66 F. Supp. 2d 493, 501-02 (S.D.N.Y. 1999), *aff'd*, 229 F.3d 344 (2d Cir. 2000) (holding that false statements not made under oath could not support an obstruction-of-justice enhancement based on perjury).

Kaufman's testimony that he did not recall the checking account, in order for it to convict him of the gratuity offense charged in Count Two. *See Bonds*, 933 F.2d at 155. Specifically, with respect to Count Two, the jury could have convicted Mr. Kaufman of accepting a $240,000 gratuity from Mr. Georgiton in 2013, subsequent to when Mr. Kaufman used the checking account to pay housing expenses in 2011 and 2012.[21]

Finally, as for subparagraph (d), the government claims that Mr. Kaufman's trial testimony distinguishing "interest only" loans from 50-year amortization loans was perjurious because "[t]he record was clear that 'interest only' loans referred to 50-year amortization loans and that the policy reflected in the Loan Policy document was the policy for those loans." PSR ¶ 46(d); *see* Tr. 961. To the contrary, trial evidence demonstrated that the phrase "interest only" meant interest only (and not a 50-year amortization period); indeed, the government's own witnesses, including Mr. Teitelbaum of the NCUA and Melrose's comptroller, Robin Myers, described as distinct "interest only" and 50-year amortization loans. Tr. 53-54, 110-11, 330, 337; *see also* Ex. NK (Nov. 29, 2011, ALCO meeting minutes) ("The committee discussed changing our 50-year medallion amortization loans to true interest-only loans. . . . While this product is available from our competition, it was generally felt that we could compete with what we have and it is not worth taking out any additional risk."). On this record, the government has not proven that Mr. Kaufman's testimony about "interest only" loans was inaccurate, let alone deliberately false.

---

[21] The government argued three gratuity theories to the jury during summation: (1) Mr. Kaufman accepted $240,000 from Mr. Georgiton in 2013 as a reward for having approved "favorable" loans for Mr. Georgiton's company; (2) Mr. Kaufman accepted $240,000 from Mr. Georgiton in 2013 as a reward for having "arranged" the naming rights deal for the Melrose Ballroom; and (3) Mr. Kaufman accepted "rent-free" housing from Mr. Georgiton in 2010 as a reward for having approved "favorable" loans for his company "in 2008 and 2009." Tr. 1072, 1099-1100, 1113.

### iv.  Two Levels Should Not Be Added for Abuse of a Position of Trust

The PSR improperly applied the enhancement under Section 3B1.3 for abuse of a

position of trust.[22]  PSR ¶ 55; *see id.* ¶ 43.  While Mr. Kaufman undoubtedly occupied a position

of trust at Melrose, the evidence did not show that he abused that position of trust, as the jury did

not convict Mr. Kaufman of having made corrupt decisions with respect to loans to Mr.

Georgiton's company, the naming rights agreement, or advertising with CBS Radio, *in exchange

for* things of value from Mr. Georgiton and CBS Radio.  *See United States v. Thomas*, 751 F.

Supp. 315, 316 (D. Mass. 1990) (holding that abuse-of-trust enhancement was not warranted

where defendant, a credit union vice-president, pleaded guilty to accepting payments as a reward

for having made meritorious loans because the government had not proven that those loan

decisions were improperly influenced).  There was also ample evidence of the benefits to

Melrose of both the naming rights agreement and advertising with CBS Radio,[23] and, as the PSR

notes, the Georgiton company loans were repaid.  PSR ¶ 122.

### v.  The PSR Incorrectly Describes Portions of "The Offense Conduct"

After receiving the draft PSR, we noted, in a letter to Probation, various errors and

omissions in the description of "The Offense Conduct."  In some instances, the PSR was

corrected, but several errors remain, to which we continue to object.  In particular, the PSR

describes the offense conduct as corrupt "exchange[s]" between Mr. Kaufman and Mr.

Georgiton, PSR ¶ 20, and between Mr. Kaufman and CBS Radio, *id.* ¶ 35 (Mr. Kaufman

"directed . . . funds [to CBS Radio] *for the purpose of* receiving and continuing to receive luxury

vacations" for him and his wife) (emphasis added), despite the fact that Mr. Kaufman was not

---

[22]   Following Mr. Kaufman's objections to the draft PSR, Probation removed the "special skill" wording and clarified that the enhancement under Section 3B1.3 was based solely on "abuse of trust." PSR at 34.

[23]   *See, e.g.*, Tr. 193-95, 198 (Nemeroff cross); Tr. 808 (Woldar cross); Ex. ADP (map of taxi-related businesses in Astoria, Queens, near the Melrose Ballroom).

convicted of bribery in Counts Two and Four.  Mr. Kaufman's objections to the PSR's

description of "The Offense Conduct" are listed in Appendix A.

> **E.   A Non-custodial Sentence Would Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment for the Offense, and Avoid Unwarranted Sentence Disparities Between Mr. Kaufman and Mr. Georgiton (18 U.S.C. §§ 3553(a)(2)(A) and (a)(6))**

A non-custodial sentence would be sufficient, but not greater than necessary, to provide

just punishment, reflect the seriousness of the offense, and promote respect for the law.  *See* 18

U.S.C. § 3553(a)(2)(A).  While Probation recommended a sentence of 36 months' imprisonment,

PSR at 40, which was below the low end of the Guidelines range it calculated (97 to 121 months,

*id.* ¶ 111), that result would not serve the statutory purposes of sentencing, because it is unjustly

harsh given the verdict, the facts and circumstances of this case, Mr. Kaufman's history and

characteristics (including the fact that, in 2018, his physician concluded that Mr. Kaufman is

"disabled," Ex. F), and the devastating collateral consequences he has already suffered, including

the loss of his job and livelihood.  Indeed, Probation recognized that a "significant variance"

from the Guidelines range was warranted in light of several "mitigating factors," including Mr.

Kaufman's "personal characteristics, his employment history, his familial obligations, and his

lack of a criminal history."  *Id.* at 39-40, *see id.* ¶ 129.  The Guidelines range *itself*, however, was

artificially high, driven up largely by improperly applying the fraud-table enhancement to Mr.

Kaufman's gratuity convictions and, further still, holding him responsible for the value of the

alleged improper benefit to Mr. Georgiton, when the government previously agreed that this

amount could not be calculated.  *See supra* n.18.

Furthermore, a non-custodial sentence would avoid unwarranted sentencing disparities

between Mr. Kaufman and Mr. Georgiton.  *See* 18 U.S.C. § 3553(a)(6).  The Court sentenced

Mr. Georgiton to a three-year term of probation and nine months' home confinement for

conspiracy to commit bank bribery, *see* Dkt. No. 161 (Tr. of Georgiton Sentencing Hearing) at 35-36, and in doing so rejected the government's arguments that a custodial sentence was necessary to reflect the seriousness of the offense and promote respect for the law, *see* Dkt. No. 153 (government's sentencing submission for Mr. Georgiton).  The less serious nature of Mr. Kaufman's gratuity offense—the jury did not convict him of corrupt action as CEO and Treasurer of Melrose in exchange for a thing of value from Mr. Georgiton or from CBS Radio— does not merit greater punishment, and, just as in Mr. Georgiton's case, a custodial sentence would accrue no additional benefit to the public.  Indeed, the fact that this case led to the publicized charging and conviction of Mr. Kaufman broadcast a strong message to credit union and banking executives of the government's view of the seriousness of the offense.

A sentence that does not include a term of incarceration serves as the best option to permit Mr. Kaufman the opportunity to resume a productive life, with the "strong support system" he has in Debi and his children, PSR at 39, without further delay.

## II.   THE COURT SHOULD NOT ASSESS RESTITUTION OR A FINE, OR ISSUE AN ORDER OF FORFEITURE

### A.  Restitution

As reflected in the PSR, the NCUA is not seeking restitution in this case because the Georgiton company loans were repaid to Melrose.  PSR ¶¶ 45, 122.

### B.  Fine

Imposing any fine—let alone the $30,000 fine that Probation recommended, PSR at 40— would be inappropriate in this case.

*First*, Probation's fine recommendation was procedurally flawed.  Probation calculated a fine range of $30,000 to $1 million, based on a total offense level of 30, and recommended that Mr. Kaufman pay a fine at the low end of that range.  PSR ¶ 120 (citing U.S.S.G. § 5E1.2(c)(3)-

(4)); *id.* at 38.  But Probation incorrectly calculated Mr. Kaufman's total offense level, in large

part because it accepted the government's position that the fraud-table enhancement in Section

2B4.1(b)(1) applies to a gratuity conviction.  *See supra*.  When Mr. Kaufman's total offense

level is correctly calculated as 8, the applicable minimum fine is not $30,000, but $2,000.

U.S.S.G. § 5E1.2(c)(3).

     *Second*, imposing any fine on Mr. Kaufman would be unduly harsh in light of his current

financial condition and the economic consequences he has already suffered.  *See* 18 U.S.C.

§ 3782.  Mr. Kaufman lost his job and his livelihood as a result of this case.  He has not worked

in over five years, and he can never again work at a credit union, the only work experience he

has.  His total monthly cash flow is ███████████, PSR ¶ 103, and, in 2020, his and Debi's

gross income was approximately █████████████████████████████████

███████████ Additionally, █████████████████████████████████

████████████████████████████████████████████████

███████████████████████ *Id.* ¶¶ 103, 108.  Mr. Kaufman never received his

deferred compensation plan benefits as a result of this case, and the NCUA has refused to permit

him to access and roll over his retirement pension benefits—which he earned over the course of

his nearly 30-year employment at Melrose.  *See id.* ¶ 106.

     In imposing a fine of $95,000 on Mr. Georgiton, the Court was sensitive to his

"substantial financial assets."  Dkt. No. 153 (government's sentencing submission for Mr.

Georgiton) at 6 & n.6; Dkt. No. 161 (Tr. of Georgiton Sentencing Hearing) at 35.  Mr.

Kaufman's assets are anything but "substantial," and given his already tenuous financial

condition, a $30,000 fine would be very hard on Mr. Kaufman and those financially reliant on

him.

### C. Forfeiture

The Indictment alleges that, "[a]s a result of committing one or more of the offenses charged in Counts One, Two, and Four," Mr. Kaufman shall forfeit: (i) "a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses"; and (ii) the Jericho Residence. Ind. ¶ 33. While the government has not indicated whether it will seek forfeiture of any money or property, and we reserve the right to further address this topic if the government does so, any forfeiture order on this record would be inappropriate.

At the close of summations, and before the Court charged the jury, defense counsel moved to dismiss the forfeiture allegations in the Indictment, arguing that "[t]here has been no evidence" from the government on forfeiture, "no proffer o[n] it," and "no motion practice about it." Tr. 1154-55. In fact, it was defense counsel who first raised the issue of forfeitability during trial, to make clear that Mr. Kaufman did not consent to waive the presentation of evidence on forfeitability to the jury. Tr. at 1155-56; *see* Fed. R. Crim. P. 32.2(b)(5)(A) (providing that the court "must determine before the jury begins deliberating whether either party requests that the jury be retained to determine the forfeitability of specific property if it returns a guilty verdict"). The Court deferred judgment on defense counsel's motion, Tr. 1156, and the jury deliberated without an instruction concerning whether the Jericho Residence should be forfeited, returned a verdict, and was dismissed. On this record, the forfeiture allegations should be dismissed: Mr. Kaufman, like all defendants, is entitled to have factual determinations concerning forfeiture of specific assets made by a jury, and Mr. Kaufman did not consent to take the forfeiture issue away from the jury. *See* Fed. R. Crim. P. 32.2(b)(5)(A).

Furthermore, even if the forfeiture question had been preserved, the Jericho Residence should not be subject to forfeiture. Where the government seeks forfeiture of specific property,

the sentencing court must be satisfied that the "government has established the requisite nexus between the property and the offense"—here, the gratuity conviction in Count Two—by a preponderance of the evidence.  Fed. R. Crim. P. 32.2(b)(1)(A)-(B); *see United States v. Roberts*, 660 F.3d 149, 165 (2d Cir. 2011) (articulating burden of proof); *United States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007) (explaining that the government must "link assets" to "the specific violation[] of which [the defendant] was convicted").  The government, however, did not argue at trial, much less establish, that the Jericho Residence *itself* was an unlawful gratuity from Mr. Georgiton to Mr. Kaufman.  To the contrary, the Indictment alleged, and the government argued, that Mr. Kaufman corruptly accepted (1) "rent-free" *housing* at the Jericho Residence between 2011 and early 2013, and (2) money, specifically, $240,000, in 2013.  *See* Ind. ¶¶ 7-8, 16; Tr. 15, 1072, 1099-1100, 1113 and *supra* n.21 (describing government's gratuity theories in summation).[24]  Indeed, it is undisputed that Mr. Kaufman funded approximately two-thirds of the cost of the Jericho Residence with his own cash and a $200,000 loan from Melrose that Mr. Kaufman promptly repaid.  Tr. 939.

Finally, as discussed *supra*, the nature and circumstances of this case are such that requiring Mr. Kaufman to forfeit his and his wife's *home*, including as a substitute asset, would be "grossly disproportional to the gravity of [the] offense" and thus unconstitutional.  *United States v. Bajakajian*, 524 U.S. 321, 334 (1998) (holding forfeiture imposed at culmination of criminal proceeding, which requires conviction of underlying felony, to be punishment subject to

---

[24]    Mr. Georgiton's Guidelines offense level, to which the government and Mr. Georgiton stipulated, underscores that the Jericho Residence *itself* was not a gratuity from Mr. Georgiton to Mr. Kaufman.  The offense level was calculated based on the amount of the bribe that Mr. Georgiton admitted he paid to Mr. Kaufman, approximately $286,000, which is the sum of (1) the $240,000 loan to Mr. Kaufman in 2013 and (2) the estimated fair market value of the *rent* for the Jericho Residence between 2011 and 2013 minus the house expenses paid by Mr. Kaufman.  *See* Dkt. No. 153 (government's sentencing submission for Mr. Georgiton) at 2-3; Dkt. No. 161 (Tr. of Georgiton Sentencing Hearing) at 32.

Excessive Fines Clause); *United States v. Castello*, 611 F.3d 116, 120 (2d Cir. 2010) (identifying factors relevant to the proportionality assessment of a challenged criminal forfeiture, including "the nature of the harm caused by the defendant's conduct").

## **CONCLUSION**

Because Mr. Kaufman was convicted of a Class B felony, a term of probation is impermissible.  PSR ¶ 116 (citing 18 U.S.C. § 3561(a)(1)); *id.* at 38.  For all of the reasons set forth above, and in accordance with 18 U.S.C. § 3553(a), we respectfully request that the Court sentence Mr. Kaufman to time served (the day he was arrested, prior to his release on bail, July 11, 2019) and a term of supervised release, and that it not assess restitution or a fine or issue an order of forfeiture.

Dated:       August 30, 2021                          Respectfully submitted,
             New York, New York

                                                       PETRILLO KLEIN & BOXER LLP

                                                 By: */s/ Nelson A. Boxer*
                                                       Nelson A. Boxer
                                                       Christina Karam
                                                       Paul-Gabriel D. Morales
                                                       655 Third Avenue
                                                       New York, NY 10017

                                                       *Attorneys for Alan Kaufman*

## APPENDIX A

### Mr. Kaufman's Objections to the PSR's Description of "The Offense Conduct"

- **Paragraph 20:** We object to the entirety of this paragraph, which describes a *quid-pro-quo* "exchange" between Mr. Kaufman and Mr. Georgiton, because Mr. Kaufman was not convicted of bribery in Count Two. We also object to the phrase "other things of value, *including* free housing" (emphasis added), as overbroad, because the government did not argue at trial that Mr. Kaufman accepted things of value from Mr. Georgiton other than the use of the Jericho Residence and $240,000. Finally, we object to the phrase "free housing," as the evidence showed that Mr. Kaufman paid a total of over $50,000 in housing expenses for the Jericho Residence in 2011 and 2012. *See* Exs. AEE, 310.

- **Paragraph 21:** This paragraph should be deleted from the PSR because the dinners in New York City that it describes are irrelevant to Mr. Kaufman's gratuity conviction on Count Two. The Indictment alleges that these dinners were overt acts in furtherance of the conspiracy charged in Count One, *see* Ind. ¶ 21(a)-(b), of which Mr. Kaufman was acquitted.

- **Paragraph 22:** For the reasons discussed *supra*, we object to the characterization of Mr. Kaufman's trial testimony about discussing his living arrangements with a Melrose Board member, and the involvement of Mr. Reiver in the closing on the Jericho Residence, as "inconsistent with," or "contradict[ory]" to, his prior deposition testimony.

- **Paragraph 23:** "In an alleged effort to conceal this financial arrangement" should be deleted from this paragraph, as the government did not prove this allegation at trial.

- **Paragraph 25:** The statement that Melrose's Marketing Director, Robert Nemeroff, told Mr. Kaufman that "the naming rights for the [Melrose] [B]allroom were worth only $50,000 a year, and that the Marketing Director would have declined to acquire the naming rights because they were of minimal marketing value to Melrose CU," is inaccurate and incomplete. Mr. Nemeroff's email to Mr. Kaufman makes clear that he was only "ventur[ing] an estimate" of the value of the naming rights deal, that his estimate was based on incomplete information, and that he would have declined to acquire the naming rights in the counterfactual scenario where Mr. Georgiton and his business partner "weren't associated w/ Melrose." Ex. 791. Mr. Nemeroff's statement also does not account for the fact that Mr. Georgiton and his business partner had started to pay off their loans and move their considerable business from Melrose; as Mr. Kaufman testified at trial, the Board considered and discussed the price of the naming rights agreement "in relation to what . . . [Melrose was] earning from these members," who they "were trying to keep" at Melrose. Tr. 966-67.

- **Paragraph 26:** Following our objection to the characterization of Mr. Kaufman's actions as "directing" Melrose's comptroller to issue a $400,000 payment for the Melrose Ballroom, Probation changed the word "directed" to "authorized" in the second sentence of this paragraph but did not change the terms "directive" and "directed," which also appear in the same paragraph. We continue to object to these terms where they appear.

- **Paragraphs 28, 30, and 31:**

  - We object to the PSR's characterization of the loans to Mr. Georgiton's company as "favorable" and not in compliance with Melrose's policies on 50-year amortization loans, as 50-year amortization periods for taxi-medallion loans were expressly authorized by Melrose policy and included in Melrose rate sheets. *See, e.g.*, Exs. XJ (2008-2009 Melrose Member Business Loan Policy), YH (2011 Melrose Member Business Loan Policy), YE & AAB (rate sheet), YJ & YI (rate sheet).

  - We object to Paragraph 28(c) to the extent that both the loan refinancing amount and the cash-out amount appear to be based on calculations, and the PSR provides no evidence in support of those calculations.

  - We object to the statement in Paragraph 30 that "[t]he 50-year amortization periods put the credit union at risk," as this was not proven at trial, and, as the PSR notes, the Georgiton company loans were repaid.  PSR ¶ 122.

  - We object to the statement in Paragraph 31 that Mr. Kaufman "falsely stated" information in an email to the NCUA, as the government did not prove a deliberately false statement.[25]

- **Paragraph 35:**  We object to the statement that Mr. Kaufman "directed . . . funds [to CBS Radio] for the purpose of receiving and continuing to receive luxury vacations" for him and his wife.  The jury did not convict Mr. Kaufman of bribery on Count Four, and there was ample evidence of the benefits that CBS Radio advertising provided to Melrose.  *See, e.g.*, Tr. 198 (Nemeroff cross); Tr. 808-09 (Woldar cross).

- **Paragraph 39:**  We object to the sentence "In 2013, KAUFMAN solicited from Melrose CU's vendors, *including* CBS Radio and ESPN, free trips to the Super Bowl" (emphasis added) as overbroad, because there is no evidence that Mr. Kaufman asked any vendor other than CBS Radio and ESPN for a trip to the Super Bowl in 2013.

- **Paragraph 41:**  For the reasons discussed *supra*, Mr. Kaufman objects to the characterization of his statements in the Dechert interview as "false."

---

[25]    We did not previously raise this objection to Probation.