UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------x
UNITED STATES OF AMERICA,

-against-

19-cr-504 (LAK)

ALAN KAUFMAN,

Defendant.
------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/8/21

**MEMORANDUM OPINION**

Appearances:

Dina McLeod
Michael McGinnis
Nicholas W. Chiuchiolo
Assistant United States Attorneys
AUDREY STRAUSS
UNITED STATES ATTORNEY

Nelson A. Boxer
Christina Karam
Paul-Gabriel D. Morales
PETRILLO KLEIN & BOXER LLP
*Attorneys for Defendant*

LEWIS A. KAPLAN, *District Judge.*

After a two-week jury trial, Alan Kaufman, the former chief executive officer and treasurer of Melrose Credit Union ("Melrose"), was convicted of two violations of 18 U.S.C. § 215(a)(2). The first involved Kaufman's corrupt acceptance of gratuities from one of Melrose's members. The second involved his corrupt acceptance of gratuities from certain of Melrose's

2

vendors.  Kaufman now moves under Federal Rule of Criminal Procedure 29 for judgments of acquittal or, in the alternative, for a new trial under Federal Rule of Criminal Procedure 33.  For the following reasons, Kaufman's motion is denied in its entirety.

*Facts*

I.      *The Indictment*

In July 2019, a grand jury indicted Kaufman on three counts.[1]  Count One charged Kaufman with conspiring to commit bank bribery in violation of 18 U.S.C. § 371.  Counts Two and Four charged him with corruptly accepting bribes and gratuities as an officer of a financial institution in violation of 18 U.S.C. § 215(a)(2).  The indictment alleged that Kaufman participated in two bank bribery schemes as Melrose's chief executive officer and treasurer.

The first scheme was charged, in relevant part, in Counts One and Two.  It alleged that Kaufman conspired to corruptly accept, and corruptly accepted, "free housing," money, and other things of value from Tony Georgiton in exchange, or as a reward, for engaging Melrose in two groups of transactions that benefitted Georgiton.[2]  It alleged that Kaufman gave Georgiton millions of dollars in loans with "favorable" interest rates and 50-year amortization periods, on which Melrose's loan supervisor refused to "sign off" because their interest rates were "too favorable" and

---

[1]      *See* Dkt. 1. Unless otherwise noted, all page references with respect to filings available on the docket in this case are to ECF-stamped page numbers.

[2]      Indict. ¶¶ 7, 22-23.  Georgiton also was charged with the first bribery scheme. In Count One, he was charged with conspiring to commit bank bribery in violation of 18 U.S.C.§ 371.  In Count Three, he was charged with giving bribes and illegal gratuities to an officer of a financial institution in violation of 18 U.S.C. § 215 (a)(1).  Georgiton pleaded guilty to Count One in September 2020 and was sentenced to three years probation in January 2021. Dkts. 133, 157.  Count Three subsequently was dismissed. Dkt. 157.

because they "did not comply with [Melrose's] loan policy."[3]  It alleged also that Kaufman caused Melrose to pay Georgiton's company $2 million to buy naming rights to an entertainment venue known as the "Melrose Ballroom," which Melrose's marketing director thought was of "minimal marketing value" to Melrose.[4]

The second scheme was charged in Count Four.  It alleged that Kaufman corruptly accepted "lavish" vacations and other things of value from Melrose vendors, including CBS Radio, in exchange, or as a reward, for increasing Melrose's spending with such vendors.[5]

## II.    The Evidence

The trial took place from March 16 to March 31, 2021.  Ten witnesses testified for the government, including an examiner from the National Credit Union Administration ("NCUA"),[6] a senior account executive from CBS Radio, and Melrose's comptroller, director of marketing, loan department supervisor, general counsel, auditor, outside counsel, and two of its board members.[7] Kaufman called two witnesses and testified in his own defense.[8]  The evidence, viewed in the light

---

[3]
　　Indict. ¶¶ 7-11.

[4]
　　*Id.* ¶¶ 12-15.

[5]
　　*Id.* ¶¶ 26, 32.  In the indictment, CBS Radio was referred to as "Media Company-1."

[6]
　　The NCUA regulates and insures federal and state credit unions.  Tr. 278.

[7]
　　The government also admitted Kaufman's sworn testimony from a deposition with the NCUA in January 2018.

[8]
　　Kaufman's witnesses included a paralegal from Petrillo Klein & Boxer LLP (Kaufman's defense counsel), who testified about summary exhibits, and a former Melrose board member.

most favorable to the government, established the following.

### A.    *Melrose Credit Union*

Melrose was a federally-insured, state-chartered credit union located in Briarwood, Queens.[9] It provided financial services and products to its customers – known as "members" – most of whom were taxi medallion owners.[10]  One of Melrose's "special[ties]" was taxi medallion lending.[11]  Around 80 percent of Melrose's loans were issued to purchase taxi medallions.[12]

Kaufman spent most of his adult life working at Melrose.  He started in the 1980s, while his father was the chief executive officer.[13]  When his father retired in around 1998, Kaufman took over as chief executive officer and, at some point, became treasurer.[14]  He held these roles until he was terminated in 2016.[15]

---

[9]
    *Id.* 123, 904, 917.

[10]
    *Id.* 49-50.

[11]
    *Id.* 906.  In New York City, taxi medallions are licenses that permit a taxi to operate on the street or at the various New York City airports.  *Id.* 355.  Between 2010 and 2014, an individual taxicab medallion cost around $1 million, and a minifleet medallion cost about $1.3 million.  *Id.*  Around 2016, due to the widespread use of rideshare apps such as Uber, the value of taxi medallions plummeted, causing Melrose to suffer financially.  *See id.* 225, 457, 684-85.  In 2018, following the collapse in value of the taxi medallion, Melrose was liquidated by the NCUA.  Dkt. 232 at 4.

[12]
    Tr. 98-99.

[13]
    *Id.* 581, 900-904.  Kaufman's father succeeded Kaufman's grandfather as chief executive officer.  Kaufman's grandfather chartered the credit union.  *Id.* 674, 900-02.

[14]
    *Id.* 581, 674.

[15]
    *Id.* 587.

Kaufman was trained on Melrose's bank bribery policy, which prohibited all employees from "[s]oliciting" or "accepting anything of value from anyone in connection with the business of the Credit Union, either before or after a transaction is discussed or consummated."[16] Melrose's bank bribery policy had limited exceptions, including for certain gifts of "modest value" under $100.[17] Credit union employees who received or were offered "something of value beyond what [wa]s expressly authorized by [the] policy," were required to disclose such instances to Melrose's board of directors.[18]

In line with the bank bribery policy, Melrose's employee handbook prohibited all employees from receiving "any gift or gratuity" worth over $100 from any of Melrose's members, vendors, and suppliers.[19] Kaufman confirmed that he understood the policies and rules outlined in the employee handbook by signing copies in 2002 and 2016.[20]

---

[16]

Id. 59, 828; see also GX 117 (Melrose's bank bribery policy).

[17]

GX 117. Other exceptions included "[g]ifts based on obvious family or personal relationship (such as those between the parents, children or spouse of a Credit Union official) where the circumstances make it clear that it is those relationships, rather than the business of the Credit Union . . . are motivation factors," "[m]eals, refreshments, or entertainment of reasonable value" – i.e., worth under $100 – " in the course of a meeting or other occasion, the purpose of which is to hold bona fide business discussion," and "[a]dvertising or promotional material of nominal value, such as pens, pencils, note pads, key chains, calendars, and similar items." Id.

[18]

Id. Melrose's board had authority to approve "gift[s] in connection with Credit Union business" so long as the gift and all relevant circumstances were disclosed to the board. The policy stated that, "[i]f the Board does not approve acceptance of the gift, it must be refused, returned or reimbursed." Id.

[19]

Tr. 57-58; see also GX 137 at 19 (Melrose's employee handbook).

[20]

GXs 114, 123; Tr. 57.

B.      *The First Bribery Scheme*

The first scheme related to things of value Kaufman accepted from Georgiton, one of his close friends, in the period 2010 to 2015.[21]  Georgiton had been a Melrose member since at least the early 1990s and was one of the credit union's largest taxi medallion borrowers.[22]  He owned several businesses, including a taxi medallion leasing operation and an interest in an entertainment company, which he "grew" with Melrose's financial help.[23]

1.      *The Jericho Residence*

Around the fall of 2010, Georgiton offered to buy Kaufman a house.[24]  Kaufman, who was going through a divorce and purportedly having financial issues, accepted his offer.[25]  Kaufman selected a house in a gated community with a pool and tennis courts in Jericho, Queens (the "Jericho Residence"), which Georgiton bought in his own name for $630,000 in December 2010.[26]  The closing – which Kaufman attended with Georgiton – occurred at a law firm on Park Avenue in Manhattan.[27]  At Kaufman's request, Melrose's general counsel, Mitchell Reiver,

---

[21]     *Id.* 924.

[22]     *Id.* 356, 922-23.

[23]     *Id.* 225, 419, 617, 657, 923.

[24]     *Id.* 84, 596.

[25]     *Id.* 596, 926-27.

[26]     *Id.* 595-98, 625, 982; GX 306.

[27]     GX 306; Tr. 930.

represented Georgiton at the closing without charging a fee for his services.[28]  Likewise, a member of Melrose's supervisory committee, Paul Cynamon, acted as the real estate broker.[29]

Kaufman lived at the Jericho Residence without paying rent for over two years, from around 2011 to 2013.[30]  Despite the fact that Georgiton was one of Melrose's largest borrowers, Kaufman never disclosed to Melrose's board that he lived – without paying rent – in a house that Georgiton bought.[31]  Moreover, although Kaufman apparently paid taxes and homeowners' association fees on the Jericho Residence while living there rent-free, Kaufman made it appear as if such payments had been made by Georgiton.  To accomplish this, he opened an account at Melrose in Georgiton's name and deposited his own money into the account.[32]  Kaufman then drew checks on the account, which he signed with Georgiton's name without power of attorney.[33]  From 2011 to 2012, he did so on over 50 checks to pay taxes and fees on the Jericho Residence.[34]

---

[28]   *Id.* 623-25.  Reiver testified that he occasionally represented Melrose employees in connection with residential real estate transactions without charging a fee.

[29]   *Id.* 634.

[30]   *Id.* 596-97.

[31]   *Id.* 222, 793.  Reiver, who acted as the board's assistant secretary,  testified that Kaufman told him he would be living in the Jericho Residence, but that he did not know that Kaufman would be living there without paying rent.  *Id.* 625, 630.

[32]   *Id.* 600-01, 830-31.

[33]   *Id.* 78-82, 596-97, 600-01; GX 310.

[34]   GX 310.  Kaufman testified that he may have paid also for various expenses in relation to the Jericho Residence, including for painting, cleaning, and repairs, from Georgiton's account.  Additionally, Kaufman purchased two insurance policies on the house: a homeowner's policy for Georgiton and a renter's policy for himself.  Tr. 933-35.

8

### 2. Georgiton's Melrose Loans

Before and while living at the Jericho Residence rent-free, Kaufman approved millions of dollars of loans for Georgiton and his companies. The government sought to prove that these loans were given as part of a corrupt *quid pro quo* – or in connection with a corrupt reward – because they had "favorable" 50-year amortization periods and did not comply with Melrose's policies. Accordingly, both parties presented a significant amount of evidence about Melrose's 50-year amortization loans and policies related to such loans.

### a. 50-Year Amortization Loans

A loan's amortization period is the length of time used to calculate the borrower's monthly principal payments.[35] Loans with longer amortization periods require smaller monthly principal payments than loans with shorter amortization periods.[36] Longer amortization periods thus are more favorable to the borrower from a monthly payment perspective.[37] At Melrose, a typical taxi medallion loan included a 25-year amortization period and a three-year "balloon," which is the point at which the borrower either has to pay off the loan or refinance.[38]

Fifty-year amortization loans were not "common" or "regular" at Melrose.[39] They

---

[35]

*Id.* 287-89.

[36]

*Id.*

[37]

*See id.*

[38]

*Id.* 299, 357.

[39]

*Id.* 103.

were also riskier to the credit union than loans with shorter amortization periods.[40]  This was so because 50-year amortization loans required the borrower to pay off very little of the loan's principal balance on a monthly basis, resulting in higher outstanding loan balances for the credit union for longer periods of time.[41]  Higher loan balances are correlated with higher risk that the value of the property securing the repayment of the loan – *e.g.*, the taxi medallion – would drop below the loan's principal balance.[42]  In such an instance, the credit union would be "[un]protect[ed]" if the borrower defaulted.[43]

To mitigate this risk, Melrose's loan policies stated that 50-year amortization loans should be issued only if certain requirements were met.[44]  These requirements included:

> (i) the loan's "loan-to-value" ratio – *i.e.*, the ratio between the loan amount and the property value (typically the taxi medallion) – must not exceed 66 to 70 percent,[45]
>
> (ii) the loan's balloon term must not exceed two years.[46]

Additionally, Melrose's policies required all loans' "debt service coverage" ratios – *i.e.*, the ratio

---

[40]  *Id.* 361-62.

[41]  *See id.* 289-90, 295-97, 361-62.

[42]  *See id.*

[43]  *See id.* 296.

[44]  *Id.* 361-62; *see also* GX 122 at 16 (Melrose's Loan Policies and Procedures (revised October 2011)).

[45]  Tr. 295-97, 361-62.  If the loan was secured by mini fleet medallions, the loan-to-value ratio must not have exceeded 66 percent.  If the loan was secured by individual taxi medallions, the loan-to-value ratio must not have exceeded 70 percent.  *Id.* 362.

[46]  *Id.* 361-62.

between the borrower's net income and the loan amount – to be at least one-to-one.[47]

There was evidence that Melrose offered 50-year amortization loans in lieu of interest-only loans,[48] which required the borrower to pay only the loan's interest on a monthly basis.[49] They thus have even smaller monthly payments than 50-year amortization loans.[50] Kaufman testified that some of Melrose's borrowers, including Georgiton, requested that Melrose provide them with interest-only loans.[51] Around 2011, when competition among lenders was at a high point – and, according to Kaufman, borrowers like Georgiton were "shopping around" to find better deals – Melrose's board discussed whether it should offer true interest-only loans.[52] But the board determined not to do so because it believed they were unnecessarily risky.[53]

### b.   Kaufman's Approval of Georgiton's Loans

From 2010 to 2012, Kaufman repeatedly approved 50-year amortization loans – many of which did not comply with Melrose's policies regarding such loans – for Georgiton and his

---

[47]   *Id.* 284-87; GX 122 at 5.

[48]   *E.g.*, Tr. 120.

[49]   *Id.* 53-54.  Because an interest-only loan results in no repayment of the loan's principal balance, an interest-only loan is known also as a "non-amortizing loan." *See id.* 114-16.

[50]   *Id.* 53-54. Given their similarities, the terms "interest-only loan" and "50-year amortization loan" were used by Melrose employees interchangeably. *See id.* 361, 408-09; *see also* GX 122 at 16.

[51]   Tr. 954-55.

[52]   *Id.* 120, 949-56.

[53]   *Id.* 120.

companies, despite the fact that the NCUA and Kaufman's colleagues expressed concerns about them.

In June 2010, Kaufman approved a group of loans worth over $53 million for Georgiton, many of which had 50-year amortization periods.[54] Around the spring of 2011, Melrose's loan department supervisor, Larry Fisher, told Kaufman that he was "not in favor" of providing Georgiton with 50-year amortization loans.[55] Nevertheless, in June 2011, Kaufman approved another group of loans worth over $60 million for Georgiton, all of which had 50-year amortization periods.[56] Fisher testified that the June 2011 loans had a loan-to-value ratio of 80 percent, which exceeded Melrose's policies.[57] Moreover, Kaufman approved the June 2011 loans less than a week after Reiver told him they were out-of-policy and risky.[58]

In early November 2011, Kaufman approved more loans aggregating over $46 million for Georgiton and his business partner, Basil Messados, all of which had 50-year amortization periods.[59] Fisher testified that the November 2011 loans had out-of-policy loan-to-value

---

[54]      *Id.* 365-66; *see also* GX 402.

[55]      Tr. at 367-70, 372-73.

[56]      *Id.* 373-76; GX 403.

[57]      Tr. 374-75. As this group of loans was secured by minifleet medallions, they were required to have a loan-to-value ratio of 66 percent. *Id.* 375-76.

[58]      *See* GX 701. Reiver warned Kaufman that Melrose's "aggressive lending" practices and high loan-to-value ratios—including with respect to the "Messados/Georgiton loans"—were "clearly" a risk to the credit union.

[59]      *See* Tr. 378-84; GX 404-12.

ratios, debt service coverage ratios, and balloon terms.[60]

Around the time that Kaufman approved the November 2011 loans, the NCUA issued a formal corrective action directing Melrose not to use amortization periods exceeding 25 years.[61] The NCUA, which has a duty to ensure that credit unions operate in a "safe-and-sound" manner, determined that Melrose's 50-year amortization loans exposed the credit union to too much risk.[62] On November 23, 2011, Kaufman told the NCUA that all of Melrose's 50-year amortization loans complied with Melrose's loan-to-value requirements, even though he had approved the November 2011 loans – which had out-of-policy loan-to-value ratios – for Georgiton and his business partner just a few weeks earlier.[63]

Melrose revised its policies to prohibit 50-year amortization loans in July 2012.[64] In October 2012, Kaufman – still living rent-free at the Jericho Residence – approved another $26 million in 50-year amortization loans for Georgiton.[65]

---

[60]

Tr. 380, 384.

[61]

*Id.* 293-95. The record is not clear with respect to whether the NCUA's corrective action regarding 50-year amortization loans occurred before or after Kaufman approved the November 2011 loans. *Id.* 295.

[62]

*See id.* 279, 293-95.

[63]

*Id.* 296-98; GX 704.

[64]

Tr. 361-63.

[65]

*Id.* 390-91; GX 413. The October 2012 loans had out-of-policy loan-to-value ratios and balloon terms. Tr. 390-91.

### 3.    The Naming Rights Agreement

In September 2011, while living at the Jericho Residence rent-free, Kaufman presented Melrose's board with a proposal under which Melrose would pay $2 million for the naming rights to an entertainment venue, later called the Melrose Ballroom, from an entity owned in part Georgiton.[66] Relying on Kaufman's representations about the purported value of the naming rights, the board approved the agreement on the condition that no payments be made to Georgiton's company until construction on the ballroom was finished.[67] The final naming rights agreement required Melrose to pay $2 million to Georgiton's company over five years, in $400,000 installments.[68]

Kaufman executed the agreement in October 2011.[69]   One week later, Melrose's marketing director, Robert Nemeroff – whom Kaufman did not consult in presenting the deal to the board – told Kaufman that the naming rights were worth only $50,000 annually.[70] Nemeroff further told Kaufman that he would have "decline[d]" the deal because he did not "see any value to market Melrose in a community that is physically and logistically not in [its] realm of influence."[71] Kaufman replied: "I didn't ask your opinion (not that it isn't valued) [sic] . . . the building is what's

---

[66]      Id. 73-77, 218-19, 657.

[67]      Id. 218-21.

[68]      Id. 74, 219.

[69]      GX 602.

[70]      Tr. 161-63; GX 791.

[71]      Id.

14

happening now."[72]  Later, in a 2018 deposition, Kaufman told the NCUA that "it was really Rob Nemeroff who said he thought [the naming rights agreement] would be a good idea."[73]

By December 2012, construction on the Melrose Ballroom had not yet been completed.[74]  Nevertheless – despite the board's insistence that no payments be made until construction was finished – Kaufman directed Melrose's comptroller to pay Georgiton's company the first $400,000 installment.[75]  Over the next four years, Melrose paid Georgiton's company each of the remaining installments.[76]

### 4.   Kaufman's Purchase of the Jericho Residence

In January 2013, Kaufman bought the Jericho Residence from Georgiton for $630,000 – the same price that Georgiton paid for it in 2010.[77]  Kaufman effectively obtained more than half of the $630,000 he paid for the Jericho Residence from Georgiton himself.  First, Kaufman took out a $200,000 loan from Melrose that was cosigned by Georgiton and secured by Georgiton's

---

[72]

Id.

[73]

Tr. 579, 617-18.

[74]

See GXs 778, 778A.

[75]

Tr. 74-78, GX 601.

[76]

Tr. 223-25.

[77]

Id. 601-02.

Melrose shares.[78] Next, Kaufman "borrowed" $240,000 from Georgiton.[79] To this day — and despite Kaufman's 2014 purchase of a Maserati worth over $100,000 — Kaufman has not paid back any of the $240,000 Georgiton purportedly "lent" him.[80] Kaufman did not disclose to Melrose's board that he financed his purchase of the Jericho Residence with loans from Georgiton.[81]

C.      *The Second Bribery Scheme*

           The second scheme related to things of value that Kaufman accepted primarily from one of Melrose's advertising vendors, CBS Radio, from 2010 to 2015. During that period, Kaufman accepted a number of luxury vacation packages from CBS Radio under CBS's "incentive vacation plan."[82] Under that program, CBS Radio offered its clients vacations if they incrementally increased their advertising spend with CBS Radio over a certain amount of time.[83] By way of an hypothetical example, if a client spent $100,000 with CBS Radio in the first quarter of a fiscal year, the client perhaps would qualify for a vacation if it increased its spending to $125,000 in the second quarter.[84]

---

[78]
           *Id.* 90, 939.

[79]
           *Id.* 939. To enable himself to "lend" Kaufman $240,000, Georgiton took out a loan from Melrose for the same amount, which he then transferred to Kaufman. *Id.* 87-89.

[80]
           *Id.* 940, 1021-22.

[81]
           *Id.* 793.

[82]
           *Id.* 470.

[83]
           *Id.* 471, 543.

[84]
           *Id.* 543.

Kaufman accepted vacation packages under CBS Radio's incentive program expressly because he increased Melrose's spending on CBS Radio's advertising services.[85]

The vacation packages that Kaufman accepted from CBS Radio included luxury hotel stays, airfare, dinners, activities, and excursions.[86]  In 2010, CBS Radio gave Kaufman and his wife a vacation to Paris.[87]  The Paris package included round trip transportation from New York to Paris, a six-day stay at the Four Seasons, and activities such as cooking classes, cocktail receptions, three-course dinners, private tours, trips to the Palace of Versailles and the Champagne region, and rounds of golf.[88]  In 2012, CBS Radio gave Kaufman and his wife a vacation to Hawaii.[89]  That package included a five-day stay at the Four Seasons and activities such as "sunrise *tai chi*," a "whale watch catamaran sail," spa treatments, cocktail receptions, dinners, and rounds of golf.[90]

In addition to accepting vacations from CBS Radio pursuant to its incentive program, Kaufman also solicited other personal benefits from CBS Radio and another vendor, ESPN Radio, expressly because of Melrose's past business.[91]  For instance, in 2013, Kaufman solicited a trip to

---

[85]
> *Id.* 484, 486.

[86]
> *See id.* 471.

[87]
> GXs 797, 797A; Tr. 477-79.

[88]
> GX 797A.

[89]
> GXs 777, 777A; Tr. 480-81.

[90]
> GX 777A.

[91]
> Tr. 544-53.

the Super Bowl from CBS Radio.[92]   When a representative from CBS Radio asked what the

corresponding "investment requirement [from Melrose] will be," Kaufman responded, "[y]ou better

tread carefully here . . . . I spent $620K last year and committed over 240K just last week. My

patience is growing thin and time is running out."[93]

### D.   Melrose's Internal Investigation

In April 2016, Melrose's external auditor, Merrill I. Rosen & Company CPA P.C.

("Merrill Rosen"), advised Melrose's board of directors of "unusual transactions" it had discovered

during a review of Kaufman's personal accounts.[94] These related to a deferred compensation plan,[95]

"a loan with a member of a credit union," and a "purchase of a residence," among other things.[96]

---

[92]

    *Id.*; GX 774.

[93]

    *Id.*; *see also* GX 788 (Kaufman requesting Super Bowl tickets from ESPN Radio because he is "a great client").

[94]

    Tr. 253, 694-97.

[95]

    Evidence of Kaufman's deferred compensation plan was admitted under Federal Rule of Evidence 404(b). *See* Dkts 154, 176. Kaufman caused Melrose to pay him nearly $8 million under a deferred compensation plan that was not approved by a majority of Melrose's board of directors, as required by law. Tr. 233-37, 1195-96. Melrose's auditors told Kaufman that he needed to get approval from a majority of the board in order to obtain such a plan. *Id.* 1020-21. In connection with this evidence, the jury was instructed that Kaufman was "not charged with any crime based on any lack of proper approval of the deferred compensation plan," and that the evidence was before the jury "only for the purpose of considering Mr. Kaufman's motives in doing anything with which he is charged in the indictment, whether he acted with a corrupt intent in respect of any of those crimes and whether he intentionally and knowingly acted with respect to the crimes with which he is charged." *Id.* 1196.

[96]

    *Id.* 697.  When Kaufman found out about Merrill Rosen's letter, he called Merrill Rosen's president and said, in sum and substance, "what the eff did you do to me?" *Id.* 726-27.

After receiving the April 2016 letter, the board asked an outside law firm, Dechert LLP ("Dechert"), to undertake an internal investigation.[97]  Dechert interviewed Kaufman in connection with its investigation.  During the interview, Kaufman told Dechert that he had had no role in approving loans for Georgiton.[98]  After attorneys from Dechert confronted Kaufman with a credit memorandum showing that some of Georgiton's loans were approved "as per AK," Kaufman admitted that he had approved some of Georgiton's loans – due in part to their size – but that he did not typically approve loans.[99]

Dechert's attorneys asked Kaufman also about the Jericho Residence.[100]  Kaufman told them that he never had used one of Georgiton's Melrose accounts nor signed Georgiton's name on checks.[101]  After the attorneys confronted Kaufman with checks he had signed in Georgiton's name to pay for fees and taxes on the Jericho Residence, Kaufman took a break to speak to his lawyer.[102]  Subsequently, Kaufman admitted that he had signed the checks.[103]

---

[97]  *Id.* 253, 812-13.

[98]  *Id.* 823.

[99]  *Id.* 825.

[100]  *Id.* 826-30.

[101]  *Id.* 828-29.

[102]  *Id.*

[103]  *Id.* 830.

Melrose's board terminated Kaufman after Dechert's investigation concluded.[104]

## III.    *The Verdict*

At the close of trial, the government argued that Kaufman was guilty of conspiring to accept and accepting bribes, *i.e.*, things of value accepted as part of a corrupt *quid pro quo*, and illegal gratuities, *i.e.*, things of value corruptly accepted as rewards, in connection with Melrose's business.  Using a special verdict form, the jury convicted Kaufman of Counts Two and Four – the substantive counts – on an illegal gratuities theory only.  It acquitted Kaufman of Count One, the conspiracy count.[105]  This motion timely followed.

## *Discussion*

## I.    *Motion for Judgments of Acquittal*

Federal Rule of Criminal Procedure 29(c)(2) provides that, "'[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal.'"[106]  "A Rule 29 motion should be granted only if the district court concludes there is 'no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt.'"[107]  Kaufman moves for judgments of acquittal under Rule 29 on both Counts Two and Four.

---

[104]      *Id.* 253, 988.

[105]      Dkt. 219.

[106]      Fed. R. Crim. P. 29(c).

[107]      *United States v. Irving*, 452 F.3d 110, 117 (2d Cir. 2006) (quoting *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir.1972)); *accord, e.g.*, *United States v. White*, 7 F.4th 90, 2021 WL 3354983, at *5 (2d Cir. Aug. 3, 2021).

"A defendant bears a 'heavy burden' when he attacks a criminal conviction on the basis of insufficient evidence."[108] The Court should overturn a conviction on sufficiency grounds "only if, after viewing the evidence in the light most favorable to the Government and drawing all reasonable inferences in its favor, it determines that no rational trier of fact could have concluded that the Government met its burden of proof."[109] In evaluating a sufficiency challenge, the Court must not "assess witness credibility, resolve inconsistent testimony against the verdict, or otherwise weigh the significance of the evidence."[110] Ultimately, "the [C]ourt may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'"[111]

A.   *Count Two*

With respect to Count Two, Kaufman argues that there was insufficient evidence that (i) he acted with the requisite corrupt intent and (ii) that venue in the Southern District of New York was proper. Each of these arguments fails.

---

[108]

*United States v. Delgado*, 972 F.3d 63, 72 (2d Cir. 2020), *as amended* (Sept. 1, 2020) (quoting *United States v. Tanner*, 942 F.3d 60, 64 (2d Cir. 2019)), *cert. denied sub nom. Anastasio v. United States*, 141 S. Ct. 1114 (2021).

[109]

*United States v. Pugh*, 945 F.3d 9, 19 (2d Cir. 2019) (quoting *United States v. Glenn*, 312 F.3d 58, 63 (2d Cir. 2002) (alterations and quotation marks omitted)); *accord White*, 2021 WL 3354983, at *5.

[110]

*United States v. Ullah*, No. 18-cr-16 (RJS), 2021 WL 21902, at *2 (S.D.N.Y. Jan. 4, 2021) (citing *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000)); *accord White*, 2021 WL 3354983, at *5.

[111]

*United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (quoting *United States v. White*, 673 F.2d 299, 301 (10th Cir. 1982)).

### 1.      *Corrupt Intent*

Kaufman contends that his conviction for accepting illegal gratuities under Count Two cannot stand because no rational juror could have found that he "'accepted' money or 'free housing' from Mr. Georgiton'" with the requisite level of intent, that is, *"corruptly,* knowing it was a reward for the specific, allegedly corrupt dealings with Mr. Georgiton with which he was charged." The Court disagrees.

At the outset, it will be helpful to place Kaufman's substantive convictions in the context of the statutory scheme.   Section 215 proscribes two types of crimes that are"distinguish[ed]" by their intent elements: bribery and illegal gratuity.[112] "[A] payment made to 'influence' connotes bribery, whereas a payment made to 'reward' connotes an illegal gratuity."[113] Section 215(a)(1) proscribes the giving, offering, or promising of bribes and illegal gratuities, while Section 215(a)(2) – the provision under which Kaufman was convicted – proscribes the solicitation, acceptance, or agreement to accept bribes and illegal gratuities.  Although the government argued

---

[112]

*United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 404 (1999). Although the Second Circuit has not addressed directly whether § 215 reaches both bribes and gratuities, it has held that virtually identical language in 18 U.S.C. § 666 – the statute proscribing bribery concerning programs receiving federal funds – reaches both bribes and gratuities. *See, e.g., United States v. Bahel*, 662 F.3d 610, 636 (2d Cir. 2011); *compare* 18 U.S.C. § 666(a)(1)(B) *with* 18 U.S.C. § 215(a)(2).  The Court sees no reason to interpret the identical language in § 215 differently, especially given the parties' assumption throughout this case that § 215 reaches both bribes and gratuities.

The Court notes also that, given the relative dearth of cases interpreting 18 U.S.C. § 215, the instant opinion relies in large part on other federal bribery statutes, including § 666.

[113]

*United States v. Ganim*, 510 F.3d 134, 150 (2d Cir. 2007) (citing *United States v. Bonito*, 57 F.3d 167, 171 (2d Cir.1995) and *Sun-Diamond*, 526 U.S. at 404-05).

at trial that Kaufman was guilty of accepting both bribes and illegal gratuities, the jury convicted him only on an illegal gratuities theory.

Section 215(a)(2) makes it unlawful, in pertinent part, for any "officer . . . of a financial institution" to "corruptly accept[] or agree[] to accept, anything of value from any person . . . intending to be influenced or rewarded in connection with any business or transaction of such institution." "When a statute uses the word 'corruptly,' the government must prove . . . that a defendant acted 'with the bad purpose of accomplishing either an unlawful end or result, or a lawful end or result by some unlawful method or means.'"[114]

In the bribery context, the "bad purpose" that the government must prove in connection with the corrupt intent element fundamentally is the "'inten[t] to be improperly influenced in . . . official duties.'"[115] Put another way, "[t]he 'corrupt' intent necessary to a bribery conviction is in the nature of a *quid pro quo* requirement; that is, there must be 'a specific intent to give . . . something of value *in exchange* for an official act.'"[116]

"Paying an unlawful gratuity is a subset of bribery that does not include the element of a specific *quid quo pro* intent."[117] To prove corrupt intent in the gratuities context, "it is enough

---

114

　　United States v. Ng Lap Seng, 934 F.3d 110, 142 (2d Cir. 2019), *cert. denied*, 141 S. Ct. 161, 207 L. Ed. 2d 1098 (2020) (interpreting the word "corruptly" as used in 18 U.S.C. § 666 and the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-2, 78dd-3) (quoting *United States v. McElroy*, 910 F.2d 1016, 1021-22 (2d Cir. 1990)).

115

　　*Ng Lap Seng*, 934 F.3d at 144 (quoting *United States v. Rooney*, 37 F.3d 847 (2d Cir. 1994) (emphasis omitted)).

116

　　*United States v. Alfisi*, 308 F.3d 144, 149 (2d Cir. 2002) (quoting *Sun-Diamond*, 526 U.S. at 404-05 (emphasis in original)).

117

　　*Id.* at 152 (citing *Sun-Diamond*, 526 U.S. at 404).

that the payment be a reward" for a past or future act in connection with the official's duties,[118] so long as the government proves "a link between" the alleged gratuity "and a specific . . . act."[119] In the case of both bribes and illegal gratuities, evidence of corrupt intent "is usually circumstantial," because bribes and illegal gratuities "are seldom accompanied by written contracts, receipts or public declarations of intentions."[120]   A juror therefore reasonably can infer corrupt intent "from evidence of benefits received and subsequent favorable treatment, as well as from behavior indicating consciousness of guilt."[121]

The Court charged the jury in line with this authority.  It instructed that:

"[t]o act corruptly . . . simply means to act voluntarily and intentionally with an improper motive or purpose to be influenced in connection with or rewarded for some business or transaction of Melrose . . . . This involves conscious wrongdoing[,] or as it sometimes is expressed[,] a bad or evil state of mind, a hope or an expectation

---

[118]

*Id.* (citations omitted); *see also Bahel*, 662 F.3d at 637-38 (no error in § 666 jury instruction that stated "it is the law that if an employee of the UN conducts certain UN business in a perfectly honest and proper manner and later accepts a financial benefit *intending to be rewarded* for that past activity") (emphasis added); *Bonito*, 57 F.3d at 171 (no plain error in § 666 jury instruction that defined corrupt intent as "acting 'voluntarily and intentionally and with the purpose, at least in part, of accomplishing either an unlawful end result or a lawful end result by some unlawful method or means. *A person acts corruptly, for example, when he gives or offers to give something of value intending to influence or reward* a government agent in connection with his official duties.'") (emphasis added).

[119]

*See  Sun-Diamond*, 526 U.S. at 414 (quotations omitted); *see also Bahel*, 662 F.3d at 637 (applying *Sun-Diamond* to 18 U.S.C. § 666); *United States v. Ford*, 435 F.3d 204, 210 (2d Cir. 2006) (same).

[120]

*United States v. Friedman*, 854 F.2d 535, 554 (2d Cir. 1988) (citations omitted); *see also United States v. Bruno*, 661 F.3d 733, 744-45 (2d Cir. 2011).

[121]

*Bruno*, 661 F.3d at 744-45.

of either financial gain or some other benefit to one's self is a motive to act corruptly."[122]

The Court further instructed that, to convict Kaufman of accepting illegal gratuities, the jury

> "must find that Mr. Kaufman had the intent to be rewarded for or because of some past, present, or future business or transaction of Melrose that the defendant has or will take or had even determined at that moment to take. This theory requires the government to prove only that there was a link between the thing of value conferred on the defendant and a specific act in connection with the business of the credit union for or because of which he solicited or accepted the payment."[123]

Notably, Kaufman does not claim any instructional error in this regard.

There was ample evidence from which a rational juror could have inferred that Kaufman accepted things of value from Georgiton with the improper intent to be rewarded for specific acts at Melrose.  The government showed that Kaufman engaged in a pattern of behavior in which he (i) accepted lavish gifts from Georgiton, including free housing at the Jericho Residence, a $200,000 loan, and $240,000, (ii) provided Georgiton with favorable treatment in connection with Melrose transactions, including the 50-year amortization loans and the naming rights agreement, and (iii) engaged in conduct exhibiting consciousness of guilt, including concealment of his payment of the Jericho Residence's taxes and fees by signing Georgiton's name to the checks, by making false

---

[122]   Tr. 1164-65.

[123]   *Id.* 1165-66.

statements to Melrose's outside counsel and the NCUA,[124] and by failing to disclose the gifts he received from Georgiton despite Melrose's bank bribery and employee policies.[125]

   Kaufman does not dispute that he accepted lavish gifts from Georgiton or that he tried to hide their relationship and interactions in various ways. Instead, he argues – as he did at trial – that there was insufficient evidence of corrupt intent because the loans he approved for Georgiton were not "risky" or out-of-policy and because the naming rights agreement was valuable to Melrose, approved by the board, and negotiated at arm's length.[126]  The import of this argument is that the loans and naming rights agreement were not actually favorable to Georgiton, which he contends would negate – in part – the government's theory that Kaufman acted corruptly because he accepted benefits from Georgiton, provided Georgiton with favorable treatment, and exhibited consciousness of guilt.  But a rational juror could have inferred that Kaufman acted corruptly regardless of the degree of "favorability" of Kaufman's actions – especially in light of the lavish nature of the gifts

---

[124]   Kaufman made multiple false statements to Dechert and the NCUA relating to his relationship with Georgiton from which a rational juror could have inferred conscious wrongdoing. First, Kaufman told Dechert that he never signed Georgiton's name on checks. Second, Kaufman told Dechert that he never approved Georgiton's loans. Third, Kaufman told the NCUA that Melrose did not have any loans with out-of-policy loan-to-value ratios, despite approving such loans for Georgiton weeks earlier. And finally, Kaufman told the NCUA – during a sworn deposition – that the naming rights agreement was Nemeroff's idea, when, in fact, Nemeroff was not involved in the proposal and told Kaufman he did not think the agreement was a good idea.

[125]   *See United States v. Sinclair*, 74 F.3d 753, 761 (7th Cir. 1996) (finding evidence about defendant's "compliance with [financial institution's] code of conduct could tend to prove the purity or corrupt nature of his intentions" under § 215(a)(2)).

[126]   Dkt. 222 at 24-25.

Kaufman accepted from Georgiton and his efforts to hide that behavior.[127] This is because the "merits, or lack thereof," of the allegedly "favorable" actions for which Kaufman was rewarded "[are] not an element of the offense."[128] Further, "[i]t is no defense that an official would have taken certain actions" – such as approving the loans or presenting the naming rights agreement to the board – "regardless of any alleged bribe [or gratuity]."[129]

In any event, the government presented ample evidence that, contrary to Kaufman's assertions, the loans that Kaufman gave Georgiton were risky and out-of-policy.  The evidence showed that 50-year amortization loans subjected the credit union to more risk than loans with shorter amortization periods, and that Kaufman knowingly disregarded Melrose's policy to  issue them only if certain requirements were met. Fisher testified that Kaufman repeatedly gave Georgiton 50-year amortization loans that had out-of-policy loan-to-value ratios, debt service coverage ratios, and balloon terms, despite that Fisher and Reiver expressed disapproval of these practices. Moreover, although the NCUA directed Melrose to stop offering 50-year amortization loans in 2011

---

[127]

See, e.g., Alfisi, 308 F.3d at 151 ("For example, if a party to litigation were to pay a judge money in exchange for a favorable decision, that conduct would – and should – constitute bribery, even if a trier of fact might conclude *ex post* that the judgment was on the merits legally proper."); *see also United States v. Zacher*, 586 F.2d 912, 916  (2d Cir. 1978) (observing that bribery encompasses "the corrupt selling of what our society deems not to be legitimately for sale[:] the Senator's vote, the citizen's ballot, the labor leader's negotiating position or the employee's actions taken on behalf of an employer").

[128]

*Alfisi*, 308 F.3d at 151-52 (citing *Sun-Diamond*, 526 U.S. at 404-05).

[129]

*United States v. Silver*, 948 F.3d 538, 562 n.14 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 656 (2021); *see also United States v. Manton*, 107 F.2d 834, 846 (2d Cir. 1939).

– and Melrose revised its policies to prohibit such loans – Kaufman continued to provide Georgiton with 50-year amortization loans into 2012.[130]

Kaufman's arguments do not change this analysis.  He argues that Melrose "addressed any 'risk'" relating to the loans he gave to Georgiton (i) with addenda that required Georgiton to post additional collateral should the loans' loan-to-value ratios exceed a certain threshold, and (ii) by requiring the maintenance of "compensating balances" in Georgiton's Melrose share accounts, which purportedly could be used to make up for any loan with a loan-to-value ratio that was too high.[131]  But the loans that Kaufman gave Georgiton violated Melrose's policies regardless of whether there were mitigating addenda and/or they required the maintenance of compensating balances.  And in any case, the evidence showed that the addenda and compensating balances did not fully address the risks related to Georgiton's loans.[132]  The jury was entitled to weigh – and ultimately reject – Kaufman's evidence about the purported lack of risk related to Georgiton's loans given the ample evidence the government presented that contradicted it.

Likewise, a rational juror could have weighed the evidence presented about the naming rights agreement and found that Kaufman corruptly accepted things of value from Georgiton, intending to be rewarded for it.  Contrary to Kaufman's contentions, the government

---

[130]  It is worth noting also that the government presented evidence that the 50-year amortization loans that Kaufman approved for Georgiton were favorable in ways unrelated to their riskiness and Melrose's policies.  The evidence showed also that such loans required low monthly principal payments and were not commonly given to Melrose's borrowers.

[131]  Dkt. 222 at 23-24.

[132]  For instance, the evidence showed that, in order to compensate for inadequate debt service coverage ratios, Georgiton's Melrose share accounts would have to be frozen. Tr. 340. But there was no evidence that Georgiton's accounts were frozen.

presented evidence that the naming rights agreement in fact was unreasonable – at least from the perspective of Melrose's marketing director – and improper.  Nemeroff testified that he believed the $2 million agreement, which Kaufman singlehandedly presented to the board, was worth only $50,000 annually. And although the board ultimately approved the naming rights agreement, it relied solely on Kaufman's representations in determining its value – a fact that Kaufman subsequently tried to conceal from the NCUA.  Moreover, once the deal was approved, Kaufman fast-tracked the first payment to Georgiton's company, contrary to the board's directive.

Finally, Kaufman argues that there was insufficient evidence of corrupt intent because the evidence showed that he failed to provide favorable loans to Georgiton before the fall of 2010, when Kaufman arranged to live at the Jericho Residence rent-free.[133]  But Kaufman disregards the fact that he provided Georgiton with a group of loans worth over $53 million in June 2010, many of which had 50-year amortization periods. In any case, this argument is meritless because "[a]n illegal gratuity . . . may constitute . . . a reward for some future act that the . . . official will take (and may already have determined to take), or for a past act that he has already taken."[134] Accordingly, a juror reasonably could have concluded that any of the loans that Kaufman approved for Georgiton were the specific acts linked to the illegal gratuities alleged in the indictment, regardless of when Kaufman approved them.

The Court therefore concludes that the evidence was sufficient to establish Kaufman's corrupt intent under Count Two.

---

[133]     *See* Dkt. 222 at 25-26.

[134]     *Sun-Diamond,* 526 U.S. at 405.

2.      *Venue*

Kaufman next argues that the evidence was insufficient to establish venue under Count Two because all of the "essential conduct" with respect to that count was performed in the Eastern District of New York.  This argument also fails.

The government was obliged to prove that venue was proper by a preponderance of the evidence as to each count in the indictment.[135]   Under Federal Rule of Criminal Procedure 18, venue is proper "in a district where the offense was committed."[136]  Where, as here, no federal statute specifies how to determine where the crime was committed, venue lies "only where the acts constituting the offense – the crime's 'essential conduct elements' – took place."[137]  To determine where the essential conduct took place, courts often "examin[e] the 'key verbs' that 'define the criminal offense in the statute.'"[138]  Acts that are "merely preparatory" to the crime's essential conduct do not suffice to establish venue.[139]

---

[135]

*United States v. Stephenson*, 895 F.2d 867, 874 (2d Cir. 1990) (citing *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir.), *cert. denied*, 493 U.S. 933 (1989)).

[136]

Fed. R. Crim. P. 18.

[137]

*United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011) (citing *United States v. Rodriguez-Moreno*, 526 U.S. 275, 280 (1999)).

[138]

*Stephenson*, 895 F.2d at 874 (quoting *United States v. Chestnut*, 533 F.2d 40, 46–47 (2d Cir.), *cert. denied*, 429 U.S. 829 (1976)); *United States v. Mittal*, No. 98-cr-1302 (JGK), 1999 WL 461293, at *4 (S.D.N.Y. July 7, 1999).

[139]

*United States v. Delia*, 944 F.2d 1010, 1014 (2d Cir.1991).

Offenses committed in more than one district – known as "continuing offenses"[140] – "may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed."[141] The Second Circuit has not addressed directly whether Section 215 is a continuing offense.[142] Nevertheless, at least one other court in this district has so treated Section 215,[143] and the Second Circuit has so concluded with respect to an analogous bribery provision.[144] Accordingly, the Court holds that Section 215 is a continuing offense.

Kaufman argues that the government did not meet its burden of proving venue on Count Two because "the 'essential conduct'" in relation to that count "was performed, or concerned locations in, the Eastern District of New York:" Melrose is in Briarwood, Queens, the Jericho Residence is in Jericho, Long Island, the Melrose Ballroom is in Astoria, Queens, and Georgiton's businesses are in Long Island City.[145] The government responds that venue was proper because (i) the closing of Georgiton's purchase of the Jericho Residence in 2010 took place in Manhattan, (ii) Kaufman used a title agency that was located in Manhattan when he purchased the Jericho

---

140

    *See, e.g., United States v. Kim,* 246 F.3d 186, 191-93 (2d Cir. 2001).

141

    18 U.S.C. § 3237(a).

142

    *See United States v. Gross,* No. 15-cr-769 (AJN), 2017 WL 4685111, at *37 (S.D.N.Y. Oct. 18, 2017), *aff'd sub nom. United States v. Lebedev,* 932 F.3d 40 (2d Cir. 2019).

143

    *Id.*

144

    *See Stephenson,* 895 F.2d at 874-75 (treating 18 U.S.C. § 201 (proscribing bribery of public officials and witnesses) as a continuing offense); *see also United States v. Niederberger,* 580 F.2d 63, 69-70 (3d Cir. 1978) (same).

145

    Dkt. 222 at 27.

Residence from Georgiton in 2013, and (iii) the attorney who negotiated the naming rights agreement on Georgiton's company's behalf had an office in Manhattan.[146]

A rational juror could have found that venue was proper on Count Two, at least with respect to the closing on the Jericho Residence in 2010. Section 215(a)(2) provides in pertinent part for punishment of any financial institution official who "corruptly *accepts or agrees to accept* . . . anything of value from any person . . . intending to be . . . rewarded."[147] The closing – which Kaufman attended and significantly facilitated by providing Georgiton with an attorney and real estate broker – was a "crucial component[] of, not merely preparatory to," Kaufman's acceptance of one of the illegal gratuities alleged in Count Two.[148] Indeed, it is hard to imagine what could have been more "part and parcel" of Kaufman's acceptance of "free housing" than his attendance at and facilitation of the closing on the house he selected and at which he lived rent free.[149]

Kaufman's focus on the fact that much of the evidence concerned locations in the Eastern District of New York misses the mark because bribery is a continuing offense. His acceptance of free housing began no later than the closing in the Southern District of New York, which was enough to establish venue regardless of whether other essential conduct occurred in the Southern District. Likewise, Kaufman's argument that venue cannot be based on the closing – because "there was no evidence that it was 'reasonably foreseeable' to" him that the closing "would

---

[146]
  Dkt. 232 at 17-19.

[147]
  (emphasis added).

[148]
  *Stephenson*, 895 F.2d at 874.

[149]
  *Id.* at 875.

take place in Manhattan" – is meritless.[150]  "[V]enue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue *or* (2) it is foreseeable that such an act would occur in the district of venue."[151]  There is no real question that Kaufman intentionally or knowingly caused the closing to occur in Manhattan. As mentioned, Kaufman not only attended the closing but provided Georgiton with an attorney and real estate broker for the transaction.  Whether it was reasonably foreseeable that the closing would occur in Manhattan well before Kaufman attended and ensured it happened there is thus of no consequence.

Accordingly, the evidence was sufficient to establish venue under Count Two.

B.      *Count Four*

With respect to Count Four, Kaufman argues that there was insufficient evidence that the vacations he accepted from Melrose's vendor, CBS Radio, fell outside Section 215's safe harbor provision.  Although the Court agrees with Kaufman that business expenses paid by vendors some times fall within the safe harbor's scope, his argument ultimately fails because a rational juror could have found that Kaufman's vacations at CBS Radio's expense were outside the scope of the safe harbor provision.

1.      *The Safe Harbor's Scope*

The safe harbor provision in Section 215(c) states that "[t]his section shall not apply to *bona fide* salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, *in the*

---

[150]

  Dkt. 222 at 29.

[151]

  *United States v. Svoboda*, 347 F.3d 471, 483-84 (2d Cir. 2003) (emphasis added).

*usual course of business.*"[152]   The Court read this safe harbor provision virtually verbatim to the jury as part of the charge.[153]

As an initial matter, the parties disagree as to the scope of the safe harbor.  According to Kaufman, the vacations he accepted from CBS Radio qualify for safe harbor protection because they were bona fide business expenses paid in the usual course of the business of CBS Radio pursuant to its sales incentive program.[154]   According to the government, the vacations do not qualify for safe harbor protection because the safe harbor only "applies to legitimate compensation or expense reimbursements paid to an employee *by the employer*, not a vendor."[155]

There is very little authority – and apparently none from the Second Circuit – directly interpreting the scope of Section 215(c).  The Court therefore "look[s] closely to [the safe harbor's] language, legislative history, and purpose" to determine whether it encompasses bona fide expenses paid by a vendor in the usual course of business.[156]   The Court begins, as it must, "'with the language

---

[152]

18 U.S.C. § 215(c) (emphasis added).

[153]

*See* Tr. 1161 (instructing the jury "that bona fide salary, wages, fees or other compensation paid or expenses paid or reimbursed in the usual course of business cannot constitute either a bribe or a gratuity. So any such payment cannot constitute a crime.").

[154]

Dkt. 222 at 21.

[155]

Dkt. 232 at 12 (emphasis in original).  In his reply, Kaufman argues that the government has waived and/or should be estopped from making this argument for various reasons, including because it failed to make such an argument at trial, and because it argued in its opposition to Kaufman's motion to dismiss that the issue of whether Kaufman's vacations with CBS Radio were protected by the safe harbor was a question of fact for the jury. *See* Dkt. 234 at 5.  As the Court ultimately agrees with Kaufman that expenses paid by vendors can fall within the scope of the safe harbor, it is not necessary for it reach Kaufman's waiver and estoppel arguments.

[156]

*See Rooney*, 37 F.3d at 851 (citing *Dowling v. United States*, 473 U.S. 207, 214-18 (1985) and *Bifulco v. United States*, 447 U.S. 381, 387 (1980)).

34

employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.'"[157]  "If the statutory terms are unambiguous, [the Court's] review generally ends and the statute is construed according to the plain meaning of its words."*[158]*

The plain language of the safe harbor does not limit its application to payments by employers.  The provision lists a variety of payments – salary, wages, fees, expenses, "other compensation" – but it does not dictate who or what entity must make the payments in order for them to qualify for safe harbor protection.  Although "salary" and "wages" typically are paid by employers, "fees," "expenses," and "other compensation" perhaps may be paid by a variety of entities.[159]  The absence of any qualification regarding who must make the payments counsels against the conclusion that such payments nevertheless must be made only by employers.

The government does not acknowledge that the safe harbor, on its face, appears to be applicable to all of the types of payments listed in it, regardless of their payor.  Instead, the government argues that the legislative history makes "clear" that Congress intended the safe harbor only to apply to payments made by employers.[160]  But the legislative history, read as a whole, does not support this conclusion.

---

[157]

United States v. Aleynikov, 676 F.3d 71, 76 (2d Cir. 2012) (quoting United States v. Albertini, 472 U.S. 675, 680 (1985)).

[158]

Greenery Rehab. Grp., Inc. v. Hammon, 150 F.3d 226, 231 (2d Cir.1998).

[159]

E.g., United States v. Lupton, 620 F.3d 790, 802 (7th Cir. 2010) (assuming that a commission paid between real estate brokers could qualify for safe harbor protection under § 666).

[160]

Dkt. 232 at 12.

Some background on the evolution of Section 215 is useful here.  In the first half of the 1980s, Section 215 was much broader in scope than it is today.  The 1984 version of Section 215 criminalized in pertinent part a financial institution officer's "'recei[pt of] . . . anything of value . . . from any person or entity for or in connection with any transaction or business of such financial institution.'"[161] Notably, that previous version did not require the government to prove a "corrupt purpose."[162] It also had a much narrower safe harbor provision that, in pertinent part, exempted from liability only "'the usual salary or director's fee paid [*by a financial institution*] to an officer'" and "'reasonable fee[s] paid *by such financial institution* to such officer.'"[163]

In 1986, after two days of hearings, Congress overhauled Section 215 with the express purpose of ensuring that "it more precisely defines the prohibited conduct and does not include within its prohibitions otherwise legitimate conduct."[164] The House Report accompanying the 1986 amendments noted a variety of "day-to-day business" scenarios in which legitimate conduct improperly was criminalized by the 1984 version of the statute, including a scenario in which "a person" – not limited to an employer – "pays for a lunch with a financial institution official at which business with the institution is discussed."[165]

---

161

*United States v. Mayfield*, 999 F.2d 1497, 1499-500 (11th Cir. 1993) (quoting 18 U.S.C.§ 215(a) (1984)).

162

*Id.*

163

H.R. Rep. 99-335, 99th Cong., 1st Sess. (1985), *reprinted in* 1986 U.S.C.C.A.N. 1782, 1783-84 [hereinafter "House Report"] (emphasis added) (quoting 18 U.S.C. § 215(d) (1984)).

164

*Id.* at 1782, 1785.

165

*Id.* at 1784.

A series of amendments to the statute resulted, including the addition of the corrupt intent element and the broadening of the safe harbor provision to read as it does today.[166] Specifically, the statute was amended to include in the current safe harbor additional types of payments (such as "expenses") and, more importantly for present purposes, to omit the language regarding who or what entity must make the payments for them to qualify for protection. In line with the House Report, the Second Circuit – interpreting the identical safe harbor provision in 18 U.S.C. § 666[167] – has described the safe harbor's current language as exhibiting a Congressional intent to carve out from liability "normal business dealings," including "'acceptable commercial and business practices'" and "'lawful commercial business transactions.'"[168]

The 1986 amendments to the safe harbor provision, read in connection with the rest of the legislative history and the Second Circuit's interpretation of the safe harbor in Section 666, support the conclusion that safe harbor was broadened to reach some payments made by non-employer entities. Indeed, the phrases "legitimate conduct," "normal business dealings," and "acceptable commercial and business practices" are broad – they undoubtedly encompass more than just "legitimate compensation from the *employer*," as urged by the government.[169] If Congress had intended to limit the payments covered by the safe harbor to payments made by employers – akin

---

[166]

    *Id.* at 1786-87.

[167]

    The identical safe harbor in § 666(c) was meant to "parallel" the safe harbor in § 215(c). *See United States v. Walsh*, 156 F. Supp. 3d 374, 389 (E.D.N.Y. 2016).

[168]

    *Rooney*, 37 F.3d at 854 (quoting H.R. Rep. 797, 99th Cong., 2d Sess. 30 & n. 9 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6138, 6153 & n. 9).

[169]

    Dkt. 232 at 12 (emphasis in original).

to the previous version of the safe harbor – it could have left in limiting language to that effect. But it did not.[170]

The government points to one paragraph of the House Report in support of its argument that Congress intended to limit the safe harbor only to payments made by employers, this despite the plain language of the safe harbor provision and other portions of the House Report itself. That Report stated that the prior version of the safe harbor

> "applie[d] only to salaries paid to officials of a financial institution by the financial institution itself. However, many employees of credit unions receive their salaries directly from the company with which the credit union is connected. This is a normal business practice and ought not be criminal. Moreover, the present exemption would not seem to exclude from criminal punishment a bonus paid an employee or the payment or reimbursement of business expenses incurred by the employee."[171]

The government appears to be arguing that the references to "salaries" and "employees" in the above passages show that Congress was concerned only with salaries, bonuses, and expense reimbursements paid by an employer. The Court disagrees. Like the safe harbor itself, this passage does not contain language limiting the payments covered by the safe harbor to those paid by employers. The Court therefore is not prepared to extrapolate from this paragraph that Congress intended to limit the safe harbor in that way.[172] This is especially so in light of the rest of the

---

[170]

Instead, Congress chose to limit the payments by stating they must be "bona fide" and made "in the usual course of business," which suggests that Congress intended the safe harbor to cover a variety of payments – regardless of their payor – so long as they were found to have been made in connection with lawful and acceptable business practices.

[171]

House Report at 1788.

[172]

See United States v. Albertini, 472 U.S. 675, 680 (1985) ("Courts . . . applying criminal laws generally must follow the plain and unambiguous meaning of the statutory language. '[O]nly the most extraordinary showing of contrary intentions' in the legislative history will justify a departure from that language.") (quoting Garcia v. United States, 469 U.S. 70, 75 (1984) (citations omitted)).

legislative history and the well-established rule of statutory interpretation requiring courts to construe criminal statutes narrowly.[173] Indeed, "[a]s the Supreme Court has warned, 'a statute in [the bribery] field that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter.'"[174]

Accordingly, the Court concludes that the safe harbor provision in Section 215(c) reaches bona fide expenses paid by non-employers, including vendors, in the usual course of business. But that is not the end of the analysis.

### 2.  Whether Kaufman's Vacations Were Within the Safe Harbor

The Court next moves to determining whether a rational juror could have found that the vacations Kaufman solicited and accepted from CBS Radio were not "bona fide" expenses paid "in the usual course of business" and therefore not protected by the safe harbor.[175] Based on the evidence, the Court concludes that a rational juror could have found so.

Kaufman argues that there was insufficient evidence that the vacations he solicited and accepted from CBS Radio were not "expenses . . . paid in the usual course of business" because the evidence showed they were offered and paid in connection with a legitimate sales incentive

---

[173]

See Evans v. United States, 504 U.S. 255 (1992) (Kennedy, J., concurring) ("By placing upon a criminal statute a narrow construction, we avoid the possibility of imputing to Congress an enactment that lacks necessary precision."); see also Bifulco, 447 U.S. at 387 (holding that the rule of lenity requires the construction of criminal statutes in favor of the accused).

[174]

Silver, 948 F.3d at 558 (quoting Sun-Diamond, 526 U.S. at 412).

[175]

See United States v. Williams, 507 F.3d 905, 909 (5th Cir. 2007) (in a prosecution under § 666, noting that "[w]hether wages are bona fide and earned in the usual course of business is a question of fact for the jury to decide"); United States v. Lupton, 620 F.3d 790, 801-802 (7th Cir. 2010) (same); United States v. Dwyer, 238 Fed. App'x. 631, 647-48 (1st Cir. 2007) (same).

program.[176] The Court agrees with the premise that there likely are occasions on which credit union officers properly may accept or receive from vendors (or others with whom their employers deal) benefits, payments, or reimbursements for reasonable business and even perhaps (although I need not now decide) entertainment expenses. Crucially, however, the receipt of such payments must be consistent with the policies of the officer's institution for them to be considered "bona fide" or "in the normal course of business." This is where Kaufman's argument goes astray. Although it is undisputed that CBS Radio's provision of the vacations to Kaufman was bona fide from CBS Radio's perspective and in the normal course of CBS Radio's sales incentive program, the same cannot be said from the perspective of Melrose or Kaufman.

As an initial matter, the Latin phrase "bona fide" means "in good faith."[177] There was ample evidence from which the jury was entitled to find that Kaufman's solicitation and acceptance of vacations, worth thousands of dollars – in direct contravention of Melrose's policy prohibiting its employees from accepting anything worth over $100 from Melrose's vendors – was neither in good faith nor in the normal course of Melrose's business. Moreover, irrespective of the fact that Kaufman's solicitation and acceptance of the vacations violated Melrose's policies, such actions created a significant conflict of interest between Kaufman and Melrose from which a juror reasonably could have reached precisely that conclusion. Indeed, this conflict of interest was apparent from evidence such as Kaufman's email to CBS Radio demanding a trip to the Super Bowl

---

[176]    Dkt. 222 at 20-21.

[177]    *Bona fide*, BLACK'S LAW DICTIONARY (11th ed. 2019).

expressly because he had caused Melrose to spend hundreds of thousands of dollars with it in the past.[178]

The Court thus concludes that the evidence was sufficient to establish that Kaufman's solicitation and acceptance of vacations from CBS Radio was not protected by Section 215's safe harbor.

## II.    *Motion for a New Trial*

In the event his motion for judgment of acquittal fails, as it has, Kaufman seeks a new trial on both Counts Two and Four. He argues that such relief is warranted on Count Two because (i) proposed expert testimony by S. Ilan Guedj, Ph.D., was excluded erroneously, and (ii) the government's proof at trial constructively amended, or a prejudicially varied from, the indictment. His Count Four argument claims error in the Court's response to a jury note. Each of these arguments fails.

Rule 33 provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice."[179] Although a "trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, . . . it nonetheless

---

[178]    GX 774 (Kaufman, after requesting a trip to the Super Bowl, told a representative from CBS Radio that he "better tread carefully . . . . I spent $620K last year and committed over 240K just last week. My patience is growing thin and time is running out"); *see also* GX 788 (Kaufman requesting a trip to the Super Bowl from ESPN Radio because he is "a great client").

[179]    *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (quotation marks and citations omitted).

must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'"[180] To grant a motion under Rule 33, "'[t]here must be a real concern that an innocent person may have been convicted.'"[181]

In addition, the Court excluded the proposed testimony of Kaufman's second proposed expert, Neil J. Zoltowski, an alleged expert regarding naming rights agreements. While Kaufman does not rely on that ruling in support of his motion for a new trial, the Court indicated that it would explain the ruling in writing in the event of a conviction. As the rationale for excluding Zoltowski overlaps that for the ruling with respect to Dr. Guedj, it is convenient to describe the proceedings with respect to both proposed experts in this section but to deal with the substance of the ruling on Zoltowski in Section III.

A.      *Expert Testimony*

1.      *Kaufman's Rule 16 Disclosures and the Rulings*

In August 2020, Kaufman provided the government with a four-page letter that purported to disclose, pursuant to the expert disclosure requirements of Federal Rule of Criminal Procedure 16(b)(1)(C), Dr. Guedj's and Zoltowski's proposed opinions and the bases and reasons for such opinions.[182] The government promptly notified Kaufman that it believed the letter was insufficient to satisfy Rule 16(b)(1)(c) because it "merely identifie[d]," at a general level, the topics

---

[180]      *Id.* (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir.1992)).

[181]      *Id.*

[182]      Dkt. 174-1.

about which Dr. Guedj and Zoltowski intended to testify.[183] The government accordingly requested

that Kaufman supplement the letter with a written summary of the proffered expert testimony.[184]

In January 2021, Kaufman provided the government with a supplemental expert

disclosure – in the form of an approximately two-page letter – which again described, at a very

general level, Dr. Guedj's and Zoltowski's proposed opinions.[185]   The   supplemental expert

disclosure did not include the methodology, bases, or reasons underlying the proposed experts'

opinions. The government subsequently moved *in limine* to exclude testimony from both experts

primarily on the basis of reliability, relevance, and deficient expert disclosures under Rule 16.[186]

The Court heard oral argument on the government's motion *in limine.*[187] Afterward,

it excluded Zoltowski as well as a portion of Dr. Guedj's proposed testimony that related to the

profitability of Melrose's business with Georgiton.[188]   With regard to the rest of Dr. Guedj's

testimony, the Court required Kaufman to further supplement his expert disclosures.  It explained

that it was unable to discern from the two previous disclosures (i) the details of Dr. Guedj's

proposed opinions, (ii) the methodology, if any, supporting his proposed opinions, and (iii) how a

---

[183]

Dkt. 174-2.

[184]

*Id.*

[185]

Dkt. 174-3.

[186]

*See* Dkt. 174.

[187]

The Court heard oral argument on the experts at trial on separate days. On March 17, the Court heard oral argument about Zoltowski. Tr. 35-46. On March 22, the Court heard oral argument about Dr. Guedj. *Id.* 489-526.

[188]

*Id.* 46, 524.

set of slides containing various graphs and charts – which was filed with Kaufman's opposition to the government's motion *in limine*[189] – related to his proposed opinions.[190]

   Kaufman filed his second supplemental – and thus third – expert disclosure on March 24, 2021, halfway through trial.[191]  After further oral argument, the Court excluded the balance of Dr. Guedj's proposed testimony.[192]

    2.  *Applicable Law*

   All evidence, including expert testimony, must be relevant to be admissible.[193] Evidence is relevant if (i) "it has any tendency to make a fact more or less probable than it would be without the evidence" and (ii) "the fact is of consequence in determining the action."[194]  Courts have discretion to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[195]

---

[189] *See* Dkt. 185-1.

[190] Tr. 524-25.

[191] Dkt. 190.

[192] Tr.  841-46.

[193] Fed. R. Evid. 402.

[194] Fed. R. Evid. 401.

[195] Fed. R. Evid. 403.

An expert may be permitted to testify if he or she "is qualified, reliable, and helpful."[196] In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* the Supreme Court charged district courts with a gatekeeping role with respect to expert testimony.[197] This inquiry is "guided" by Federal Rule of Evidence 702,[198] under which courts have discretion to admit expert testimony when

> "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> "(b) the testimony is based on sufficient facts or data;
>
> "(c) the testimony is the product of reliable principles and methods; and
>
> "(d) the expert has reliably applied the principles and methods to the facts of the case."[199]

The proponent of the expert testimony has the burden of establishing reliability – as well as the other admissibility requirements in Rule 702 – by a preponderance of the evidence.[200] The district court, as gatekeeper, must "'ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'"[201] "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on

---

[196]  *United States v. Gatto*, 986 F.3d 104, 117 (2d Cir. 2021) (citing Fed. R. Evid. 702).

[197]  509 U.S. 579, 597 (1993).

[198]  *Gatto*, 986 F.3d at 117 (citing *Daubert*, 509 U.S. at 589-95).

[199]  Fed. R. Evid. 702.

[200]  *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (citing *Daubert*, 509 U.S. at 593 n.10).

[201]  *Id.* (quoting *Daubert*, 509 U.S. at 597).

which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand."[202]

Federal Rule of Criminal Procedure 16(b)(1)(C) provides that "[t]he defendant must, at the government's request, give to the government a written summary of any [expert] testimony that the defendant intends to use . . . as evidence at trial."  "This summary must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications."[203] "Merely identifying the general topics about which the expert will testify is insufficient; rather, the summary must reveal the expert's actual opinions."[204]  "The Advisory Committee notes to Rule 16 explain that [Rule 16's] disclosure requirement 'is intended to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination.'"[205]  "If a defendant fails to provide disclosures in accordance with Rule 16(b)(1)(C), the district court may exclude the expert's testimony at trial."[206]

---

[202]

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).

[203]

Fed. R. Crim. P. 16(b)(1)(C).

[204]

*United States v. Valle*, No. 12-cr-847 (PGG), 2013 WL 440687, at *5 (S.D.N.Y. Feb. 2, 2013) (citing *United States v. Duvall*, 272 F.3d 825, 828 (7th Cir.2001) ("The Rule requires a summary of the expected testimony, not a list of topics.") and *United States v. Mahaffy*, No. 05-cr-613(S-3)(ILG), 2007 WL 1213738, at *3 (E.D.N.Y. Apr. 24, 2007) (same)).

[205]

*United States v. Ulbricht*, No. 14-cr-68 (KBF), 2015 WL 413318, at *5 (S.D.N.Y. Feb. 1, 2015) (quoting Fed. R. Crim. P. 16 advisory committee's note to 1993 amendment), *aff'd*, 858 F.3d 71 (2d Cir. 2017).

[206]

*Valle*, 2013 WL 440687, at *5.

B.      *Count Two*

1.      *Dr. Guedj*

The substance of Dr. Guedj's proposed testimony remains something of a mystery. Despite multiple rounds of expert disclosures – the last of which Kaufman submitted at the eleventh hour, during trial – it is unclear exactly what Dr. Guedj's proposed opinions would have been, what his methodology (if any) had been, and how the slides he produced in response to the government's motion *in limine* would have related to his proposed testimony. This problem was compounded by the fact that Kaufman's expert disclosures have been inconsistent both with each other[207] and with varying arguments made by defense counsel at trial, in opposition to the government's motion *in limine*, and on this motion. This has not sufficed to satisfy the expert disclosure requirements of Rule 16(b)(1)(C) and to enable the Court to properly perform its gatekeeping role under *Daubert*.[208]

Despite these deficiencies, the Court – both at trial and now on this motion – liberally has attempted to determine, based on the information before it, whether portions of Dr. Guedj's proposed testimony would have been admissible. The Court has done so primarily based on the basis of Kaufman's second supplemental expert disclosure, which is the most recent and detailed of his disclosures. But it has considered also Kaufman's earlier (and more general) disclosures as well as defense counsel's assertions on the motion *in limine* and on this motion.

---

[207]     *Compare* Dkt. 173-3 (Kaufman's first supplemental expert disclosure, which lists five high-level opinions Dr. Guedj would have offered without disclosing the methodology, analyses, or bases for such opinions) *with* Dkt. 190 (Kaufman's second supplemental expert disclosure, which contains almost no proposed opinions and instead lists three broad categories of analyses with references to the slides filed with Kaufman's opposition to the government's motion *in limine*).

[208]     *See Ulbricht*, 2015 WL 413318, at *5-9.

The Court understands, and to a material extent infers, that Dr. Guedj would have offered opinions on the following subjects, although the precise nature of his testimony is not entirely clear in every instance.  Each ultimately was inadmissible.

        *a.*      *"Foundational Concepts" Regarding 50-Year Amortization Loans*

In his second supplemental expert disclosure, Kaufman vaguely proffered that Dr. Guedj would have "educate[d] the jury about" Melrose's 50-year amortization loans, including by "illustrat[ing] the similarities and differences between 50-year amortization loans and non-50-year amortization loans at [Melrose]."[209]  This proposed testimony would have been needlessly cumulative and thus properly was excluded.[210]  The government's witnesses testified extensively about Melrose's 50-year and non-50-year amortization loans and amply explained their similarities and differences.  Kaufman, whose counsel extensively cross-examined the government's witnesses about the same issues, has not identified any testimony or proposed opinion by Dr.Guedj that meaningfully would have aided the jury.  Accordingly, Dr. Guedj's proposed testimony purporting to "educate" it about Melrose's 50-year and non-50-year amortizing loans would have been cumulative and in any case would have outweighed substantially any probative value by the danger of undue delay and wasting time.[211]

---

[209]      Dkt. 190 at 2.  Kaufman did not disclose the potential topics about which Dr. Guedj would have educated the jury or what similarities or differences he would have identified.

[210]      *See United States v. Roldan-Zapata*, 916 F.2d 795, 806 (2d Cir. 1990).

[211]      *See id.*

b.      Melrose's "Total Loan Amounts"

Kaufman proffered also that Dr. Guedj would have "compare[d]" Melrose's "total loan amounts" with 50-year amortization periods from 2010 to 2015 to Melrose's "total loan amounts" with non-50-year amortization periods from the same period.[212] According to the second supplemental disclosure, Dr. Guedj would have opined – apparently based on this comparison – that "borrowers who borrow larger amounts have more access to 50-year loan products."[213] On this motion, Kaufman proffers a slightly different opinion. He states that Dr. Guedj would have opined, based on this comparison, that 50-year amortization loans were "generally offered to large borrowers" at Melrose.[214] Kaufman argues that this would have tended to show that such loans "were not 'special' or 'out of the norm,'" supposedly negating the government's theory that Kaufman acted with the corrupt intent to be rewarded by providing such loans to Georgiton.[215]

Kaufman did not meet his burden of showing that this portion of Dr. Guedj's proposed testimony would have been reliable, whatever the exact substance of Dr. Guedj's ultimate opinion would have been. As an initial matter, Kaufman did not disclose Dr. Guedj's methodology for reaching his conclusions. His last disclosure merely pointed to two charts on the proposed set of slides showing that (i) 19 percent of Melrose's total loan balance was issued in connection with 50-year amortization loans and (ii) all of Melrose's 50-year amortization loans had high loan

---

[212]     Dkt. 190 at 2.

[213]     Id.

[214]     Dkt. 222 at 40.

[215]     Id.

balances.[216] But these charts – which are keyed to Melrose's aggregate loan *balances* rather than total loans by borrower – could not support either proffered conclusion. As the government notes, one cannot conclude from Melrose's total loan balance alone whether large borrowers had more access to or commonly were offered 50-year amortization loans. Without knowing the breakdown of loans by borrower, it is possible that one borrower – such as Georgiton – could have received all of the loans making up Melrose's total 50-year amortization loan balance.[217] Accordingly, such an analysis (assuming Dr. Guedj made it) was intrinsically flawed.

Moreover, even if Kaufman *had* shown that it would have been reliable to look to total loan balance here, the charts still would not have supported Dr. Guedj's proposed conclusions. The fact that 19 percent of Melrose's total loan balance was issued in connection with 50-year amortization loans shows that the vast majority of Melrose's total loan balance was issued with *non*-50-year amortization loans. It does not show that 50-year amortization loans were common. Likewise, the fact that all of Melrose's 50-year amortization loans had high loan balances does not necessarily support the conclusion that Melrose commonly offered or allowed large borrowers to access 50-year amortization loans. Indeed, the chart itself appears to show that the majority of Melrose's loans with high balances were issued in connection with non-50-year amortization loans.[218] Under similarly faulty reasoning, one could conclude that most New Yorkers are Yankees

---

[216]   *See* Dkt. 185-1 (slides 3-4); Dkt. 190 at 2.

[217]   *See* Dkt. 232 at 32.

[218]   Dkt. 185-1 (slide 4).

fans solely because most Yankees fans live in New York – assuming of course that the latter proposition was true.[219]

c. *"Comparative Analyses" of Georgiton's Loans*

Kaufman next proffered in the second supplemental expert disclosure that Dr. Guedj would have testified about a series of "comparative analyses" regarding the loans that Georgiton received from Melrose.[220] These analyses – which apparently were represented on eight charts and graphs within the slides[221] – fell into three categories: (i) a comparison of Georgiton's loans at Melrose over time, (ii) a comparison of Georgiton's loans versus other Melrose borrowers' loans, and (iii) a comparison of Georgiton's loans versus loans offered at other financial institutions.

The second supplemental expert disclosure neither described what Dr. Guedj's opinions would have been on the basis of these comparative analyses nor explained his methodology

---

[219]

 Kaufman argues that the flaws in this portion of Dr. Guedj's methodology should go to its weight rather than admissibility. But even if the Court were to agree with Kaufman on that point – which it does not – any probative value of this portion of Dr. Guedj's proposed testimony would have been outweighed substantially by its potential to mislead and confuse the jury. In principle, evidence that Melrose commonly issued 50-year amortization loans to large borrowers may have been relevant to negate the government's proof of corrupt intent. But such evidence would have been *marginally* relevant for a number of reasons. As the Court already has discussed, whether the loans that Kaufman approved for Georgiton were favorable is not an element of the offense. Moreover, the government presented evidence that the loans that Kaufman gave to Georgiton were favorable in a number of other ways, including because they were out-of-policy and had low monthly principal payments. Dr. Guedj's proposed testimony that such loans were common at Melrose would not have negated this evidence. And finally, Dr. Guedj indisputably had no personal knowledge of Melrose's loan practices, so his *post hoc* analyses – based only on spreadsheets produced in connection with this case – would have painted an incomplete picture of Melrose's practices.

[220]

 Dkt. 190 at 2-4.

[221]

 *See* Dkt. 185-1 (slides 8-17) .

for reaching them.  And defense counsel has changed course several times with respect to explaining what exactly the substance of this portion of Dr. Guedj's testimony would have been.[222]  This alone warrants exclusion.[223]  Nevertheless, the Court proceeds by liberally inferring from defense counsel's various statements that Dr. Guedj might have offered the following opinions in connection with some or all of these comparative analyses.  Each would have been inadmissible.

To the extent that Kaufman broadly intended for Dr. Guedj recite loan **data** – disguised as the "comparative analyses" listed in the second supplemental disclosure – Kaufman failed to meet his burden of showing that Dr. Guedj's "scientific, technical, or other specialized knowledge" regarding that data would have been helpful to the jury.[224]  Kaufman has not proffered any meaningful analysis that Dr. Guedj would have provided about these "comparisons" except to

---

[222]  For example, with respect to Dr. Guedj's proposed comparison of Georgiton's loans to other Melrose borrowers' loans, Kaufman's first supplemental expert disclosure stated that Dr. Guedj would testify that Georgiton's loans were "comparable in material respects" to "contemporaneous loans made by [Melrose] to similar customers."  Dkt. 174-3 at 2.  But at oral argument, in response to the Court's concerns about what methodology was used to identify "comparable" loans and "similar customers," counsel changed course and stated that Dr. Guedj "doesn't need to offer an opinion that they are similar.  He will show the data to the jury and they can see . . . ."  Tr. 508.  On the instant motion, counsel now ambiguously states that "[t]he jury . . . would have properly been informed by Dr. Guedj's comparative analysis . . . and could have (or could not have) inferred from this evidence a lack of proof beyond a reasonable doubt of [Kaufman's corrupt intent]."  Dkt. 234 at 16.  Such contradictory and *ipse dixit* representations cannot suffice for the Court to properly analyze the admissibility of the proposed testimony.

[223]  *Ulbricht*, 2015 WL 413318, at *6 ("The lack of any opinions in defense counsel's initial disclosures is a flagrant failure to comply with Rule 16.").

[224]  Fed. R. Evid. 702; *see also* Dkt. 234 at 16 (arguing ambiguously that "[t]he jury . . . would have properly been informed by Dr. Guedj's comparative analysis . . . and could have (or could not have) inferred from this evidence a lack of proof beyond a reasonable doubt of [Kaufman's corrupt intent].").

say generally that he had made them.[225] If Dr. Guedj's testimony would have been simply to narrate

loan **data** – largely already  in evidence – it would not have been a proper subject of expert

testimony.[226]  Moreover, any probative value of such testimony would have been outweighed

substantially by its danger of confusing the issues, misleading the jury, undue delay, wasting time,

and needlessly presenting cumulative evidence.

To the extent that Dr. Guedj would have opined that the comparative analyses

showed that interest rates on Georgiton's loans aligned with interest rates offered generally in the

market – as defense counsel represented at oral argument[227] – Kaufman did not meet his burden of

showing that this opinion would have been reliable.  As the Court indicated during argument, it is

utterly unclear from any of Kaufman's disclosures how Dr. Guedj could have come to such a

conclusion.[228]  Further, putting aside the issue of reliability, any probative value of this proposed

testimony would have been outweighed substantially by its unfair prejudicial effect.  The relevance

of this testimony presumably would have been to show that, although Kaufman provided Georgiton

---

225    *See* Dkt. 185 at 15 (broadly arguing that "[w]hether [Georgiton's] loans were 'too favorable'
cannot be judged in the abstract; the loans must be compared to other loans").

226    *See SEC  v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013) ("Acting simply as a
narrator of the facts does not convey opinions based on an expert's knowledge and
expertise; nor is such a narration traceable to a reliable methodology. Mere narration thus
fails to fulfill *Daubert*'s most basic requirements.") (citations omitted).

227    Tr. 499-502.

228    *Id.*  For instance, Slide 9 of the proposed slides purports to "account[] for interest rate market
conditions" by adjusting the interest rates on Georgiton's loans by LIBOR.  Dkt. 190 at 3.
Despite the Court's questioning at oral argument, Kaufman has not explained how LIBOR
– the benchmark interest rate at which major global banks lend to one another on a short-
term basis – relates to interest rates on taxi medallion loans or why such a comparison would
have shown that the interest rates on Georgiton's loans aligned with a "general market trend"
in taxi medallion lending.

with loans with favorable interest rates, those favorable rates were indicative of general market trends rather than corrupt intent. But the government did not present evidence that Kaufman gave Georgiton loans that were favorable relative to general market interest rates. Its theory was that Georgiton's loans were favorable primarily because they had 50-year amortization periods and were inconsistent with Melrose's internal policies and practices. As the government noted at trial, this portion of Dr. Guedj's testimony therefore would have been a "rebuttal to nothing."[229] Any even if it perhaps would have had some probative value, that value would have been outweighed substantially by a danger of confusing the issues and misleading the jury.

To the extent that Dr. Guedj would have opined that the comparative analyses showed that Georgiton received "more favorable" interest rates from other financial institutions, such proposed testimony likewise would have been more unfairly prejudicial than probative. The Court understands that this portion of the proposed testimony was offered, at least in part, to prove Kaufman's state of mind – *i.e.*, to show that Kaufman provided Georgiton with favorable loans intending to keep him from straying to other financial institutions rather than corruptly intending to be rewarded.[230] But testimony to this effect would have been improper *post hoc* speculation about Kaufman's intent. The comparative analyses relating to loans offered at other financial institutions relied on SEC filings pulled from EDGAR (the SEC's electronic filing system), exhibits filed in

---

229

       Tr. 517.

230

       *See id.* 502-05. To the extent that Kaufman offered this portion of Dr. Guedj's proposed testimony to "rebut[] the government's allegation that" Kaufman approved loans for Georgiton with "good loan terms," it would have been more unfairly prejudicial than probative for the same reasons as the proposed testimony about general market interest rates. *See* Dkt. 222 at 41 (quotations omitted). As mentioned, the government did not contend that Kaufman gave Georgiton loans on financial terms more attractive than the terms he could have received at other financial institutions. The government's evidence focused on favorability with respect to Melrose's internal practices.

2016 in connection with a Capital One lawsuit, and information received from subpoenas issued in connection with this case. Kaufman could not have had knowledge of much of this information during the relevant time period, which was from 2010 to 2013, and in any case failed to show his awareness of any of it that existed during that time.[231]

Lastly, to the extent that Dr. Guedj might have opined – as Kaufman now argues on this motion[232] – that the comparative analyses show that Georgiton received loans with 50-year and non-50-year amortization periods alike throughout the relevant period, such testimony would not have been relevant to any fact of consequence in determining the action. Kaufman asserts that this proposed testimony would have negated the "link" between the alleged gratuities Kaufman accepted and Melrose's business, presumably because it would have shown that Kaufman's actions did not change after he accepted things of value from Georgiton.[233] But such testimony would have been immaterial. As the Court already has discussed, a rational juror could have found that Kaufman acted with the corrupt intent to be rewarded for any action at Melrose that was linked sufficiently to the alleged gratuities, regardless of whether such action occurred before or after Kaufman accepted things of value from Georgiton.[234]

---

[231]

Kaufman argues that he would have known about these materials because he sat on Melrose's asset liability management committee, which generally discussed competitors' rates and terms. *See id.* 105. But such evidence was too vague to extrapolate that Kaufman thus would have known about detailed information that was the subject of specific SEC and court filings.

[232]

Dkt. 222 at 40-41.

[233]

*Id.* at 41.

[234]

*See Sun-Diamond*, 526 U.S. at 405.

      *d.*      *The Profitability of Melrose's Relationship with Georgiton*

Kaufman last proffered that Dr. Guedj would have testified about the profitability of Melrose's relationship with Georgiton.[235]  This is said to have been relevant to support Kaufman's defense that his approval of favorable loans for Georgiton was indicative of a desire to keep Georgiton's business rather than a corrupt intent to be rewarded. But such evidence would have been far more unfairly prejudicial than probative.  Even though one may assume that Kaufman, as Melrose's chief executive officer, had knowledge of the profitability of Georgiton's relationship with the credit union during the relevant period, belated testimony about such matters from Dr. Guedj — who had no personal knowledge of the events that occurred in this case — would have come dangerously close to having been an improper *post hoc* opinion with respect to whether Kaufman acted with corrupt intent. In any event, the question whether Georgiton's business was profitable to Melrose "is legally insignificant" to the issue of whether Kaufman acted corruptly under Section 215.[236]  Accordingly, this proposed testimony inappropriately would have invited the jury to decide that Kaufman did not act corruptly because the credit union was not harmed by his behavior.[237]

*   *   *

In sum, the exclusion of Dr. Guedj's proposed testimony, whatever in fact it precisely would have been, was a proper exercise of the Court's discretion.  Kaufman never sufficiently and specifically articulated the substance of each of the opinions he would have given, which alone

---

[235]      Dkt. 174-3 at 2; Dkt. 185 at 14; Dkt. 185-1 (slides 19-20).

[236]      *United States v. Denny*, 939 F.2d 1449, 1452 (10th Cir. 1991).

[237]      *See Gatto*, 986 F.3d at 118 (no error in excluding expert testimony where it would have "introduced an improper defense – that Defendants were not guilty of wire fraud because they believed the Universities would ultimately benefit from their actions").

warranted exclusion because he failed sufficiently to comply with Rule 16(b)(1)(C)'s requirement that he disclose to the government "the witness's opinions, the bases and reasons for those opinions." To the extent the substance of the opinions could be gleaned from counsel's arguments and the slides discussed above, each was properly excluded because (a) Kaufman failed to (i) establish that the opinion would have rested on reliable methodology, or (ii) establish its relevance, or (iii) satisfy the requirement that the testimony would have been helpful to the jury or a proper subject of expert testimony, or (b) any probative value of the evidence would have been substantially outweighed by a danger of confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence, or (c) a combination of two or more of the foregoing bases.

The exclusion of Dr. Guedj's testimony did not result in any miscarriage of justice or otherwise warrant a new trial.

### 2.    Constructive Amendment or Prejudicial Variance

Kaufman next contends that the government's evidence at trial constructively amended and/or prejudicially varied from the indictment. This argument too fails.

A constructive amendment occurs when the trial evidence is so different from the allegations in the indictment that it effectively "'modif[ies] essential elements of the offense charged to the point that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged by the grand jury.'"[238] Although a constructive amendment is

---

[238]    *United States v. Wozniak*, 126 F.3d 105, 109 (2d Cir. 1997) (quoting *United States v. Vebeliunas*, 76 F.3d 1283, 1290 (2d Cir. 1996)); *see also United States v. Danielson*, 199 F.3d 666, 669 (2d Cir. 1999) ("'[a]n indictment is constructively amended when the proof at trial broadens the basis of conviction beyond that charged in the indictment.'") (quoting *United States v. Patino,* 962 F.2d 263, 265-66 (2d Cir. 1992)).

a *per se* violation of the defendant's Fifth Amendment right to be indicted by a grand jury,[239] the Second Circuit consistently has "'permitted significant flexibility in proof'" at trial, "'provided that the defendant was given notice of the 'core of criminality' to be proven.'"[240]  "[T]he 'core of criminality . . . involves the essence of a crime, in general terms'" and not "'the particulars of how a defendant effected the crime.'"[241]

A variance occurs when the trial evidence "'proves facts materially different from those alleged in the indictment'" – though it does not alter constructively the crime charged.[242] "Although the distinction between constructive amendment and variance may appear 'merely one of degree,' there is an important difference in outcome."[243] Unlike a constructive amendment, a variance is not a *per se* violation of the defendant's Fifth Amendment rights, so the defendant must show "'substantial prejudice'" to require reversal of a conviction on the basis of a variance.[244]  A

---

[239]

    *See e.g., United States v. D'Amelio*, 683 F.3d 412, 417 (2d Cir. 2012).

[240]

    *United States v. Delano*, 55 F.3d 720, 729 (2d Cir. 1995) (quoting *Patino*, 962 F.2d at 266).

[241]

    *United States v. Daugerdas*, 837 F.3d 212, 225 (2d Cir. 2016) (quoting *D'Amelio*, 683 F.3d at 418).

[242]

    *United States v. Salmonese*, 352 F.3d 608, 621 (2d Cir. 2003) (quoting *United States v. Frank*, 156 F.3d 332, 337 n. 5 (2d Cir. 1998)).

[243]

    *Salmonese*, 352 F.3d at 621 (quoting *Frank*, 156 F.3d at 337 n. 5) and *United States v. McDermott*, 245 F.3d 133, 139 (2d Cir. 2001)).

[244]

    *United States v. Dove*, 884 F.3d 138, 149 (2d Cir. 2018).

58

defendant is prejudiced by a variance "only if [the variance] infringe[d] on the notice and double jeopardy protections of an indictment."[245]

Kaufman argues that the government's evidence constituted a constructive amendment to, or a prejudicial variance from, the indictment because, at trial, "the government changed its approach to proving Mr. Kaufman's corrupt intent."[246] According to Kaufman, rather than seeking to prove that he acted corruptly because the loans he gave to Georgiton had "favorable" interest rates – as Kaufman posits was the theory alleged in the indictment – the government sought to prove that the loans had "special," out-of-policy loan terms relating to 50-year amortization loans, including loan-to-value ratios, balloon periods, and debt service coverage ratios.[247]

As an initial matter, Kaufman misinterprets the allegations in Count Two. Count Two clearly alleges that the loans that Kaufman gave Georgiton had favorable interest rates *and* 50-year amortization periods *and* were out-of-policy.[248] The evidence about the loan-to-value ratios, balloon terms, and debt service coverage ratios merely showed *how* such loans were out-of-policy, consistent with the indictment. Similarly, Kaufman appears to interpret the word "favorable" as if it cannot mean that the loans Kaufman gave to Georgiton were "favorable" because they did not comply with Melrose's policies. But neither the indictment nor the government ever has limited the

---

[245]

        *D'Amelio*, 683 F.3d at 417 (citing *United States v. D'Anna*, 450 F.2d 1201, 1204 (2d Cir. 1971)).

[246]

        Dkt. 222 at 34.

[247]

        *Id.* at 35.

[248]

        Indict.¶¶ 9-10 (alleging that the loans Kaufman approved for Georgiton had favorable interest rates and 50-year amortization periods); ¶ 11 (alleging that a Melrose loan supervisor "refused to sign off" on "the loans described in paragraphs 9 and 10 of this Indictment" because "the loans did not comply with [Melrose's] loan policy").

term "favorable" in such a way.  Used generally – as in the indictment[249] – the word "favorable" can

describe a variety of scenarios that are "disposed to favor" or "partial" to someone.[250]  Indeed,

providing a credit union member with a loan in contravention of credit union policies can be

"favorable" to that member, who, in that situation, is "favored" relative to other members who must

comply with such policies.  This is exactly what the government focused on at trial.   The

government's evidence revolved around the various ways in which 50-year amortization loans were

"disposed to favor" or "partial" to Georgiton, including because they were not issued commonly at

Melrose, because they were given to Georgiton and his companies despite that they did not meet

Melrose's policies, and because they had low monthly principal payments relative to other loans.

   In light of this, the Court concludes that the government's evidence did not constitute

a constructive amendment or prejudicial variance to Count Two.

   First, there was no constructive amendment because Kaufman indisputably had notice

of the core of criminality proved in connection with Count Two, which was that Kaufman corruptly

accepted money, "free housing," and other things of value from Georgiton with the intent to be

influenced or rewarded for providing Georgiton with millions of dollars in loans and the naming

rights agreement.[251]  Indeed, Kaufman does not now assert that he lacked notice of the specific loans

---

[249]

  *See, e.g.*, Indict. ¶ 7 ("KAUFMAN personally approved millions of dollars in loans from Melrose CU, and the *favorable* refinancing of over \$60 million in pre-existing loans, for GEORGITON and GEORGITON's companies.") (emphasis added).

[250]

  *See* "Favorable." MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/favorable (last visited Sept. 3, 2021).

[251]

  *See Gross*, 2017 WL 4685111, at *27 (defining core of criminality in § 215 case as "scheme wherein [defendant, the chairman of a federal credit union] agreed to accept money [from bribor] in exchange for ceding control of [the credit union] to [bribor]").

he approved for Georgiton – *i.e.*, the actions at Melrose for which he allegedly intended to be rewarded.[252] Kaufman's issue is with the government's evidence about the "particulars" of the loans he gave to Georgiton, which has no bearing on the constructive amendment analysis. This is so because, as mentioned *supra*, the government was not required to prove that Kaufman provided Georgiton with favorable or out-of-policy loans to secure his conviction. Such evidence therefore "added nothing *essential* to" the scheme alleged, and thus it "d[id]] not define the core of criminality, but [was] ancillary to it."[253]

Second, there was no prejudicial variance because the government's evidence was not "materially different" from the allegations in the indictment. Moreover, even assuming *arguendo* that a variance occurred, Kaufman has not show that he was prejudiced substantially by it. To the extent that Kaufman "had not been on notice of every piece of . . . data" upon which the government's case relied – including the out-of-policy loan-to-value ratios, balloon terms, and debt service coverage ratios – "he was notified by the government's pretrial disclosures of exhibits" about the loans "it intended to rely upon" as well as their out-of-policy terms.[254] And even though Kaufman argues that he was prejudiced because he "might have chosen a different trial strategy, including presenting evidence concerning" the out-of-policy terms "from an expert witness"[255] – the

---

[252]

> For this reason, the government's evidence about such loans did not constitute evidence of "qualitatively different *quos* than those alleged in the indictment" – contrary to Kaufman's assertions. *See* Dkt. 235 at 2.

[253]

> *Id.* at *26 (citing *United States v. Mucciante*, 21 F.3d 1228, 1235 (2d Cir. 1994) (emphasis in original)).

[254]

> *United States v. Khalupsky*, 5 F.4th 279, 2021 WL 3027184, at *8 (2d Cir. 2021).

[255]

> Dkt. 222 at 37 (citations and quotation marks omitted).

argument is not persuasive. Kaufman was the chief executive officer and treasurer of Melrose for almost 20 years – a role in which he routinely negotiated and approved Melrose's loans. He does not now claim that he was unaware of Melrose loan policies, which were mentioned expressly in the indictment. Yet Kaufman chose to proffer an expert to address principally the question of whether the interest rates on Georgiton's loans were "favorable." To the extent that Kaufman could have found an expert who was competent to testify about Melrose's internal policies – which is doubtful – the indictment provided notice that such a witness might have been helpful to his defense.

Accordingly, the Court a new trial is not warranted on Count Two.

C.      *Count Four*

Kaufman argues that a new trial is required on Count Four "because of the Court's erroneous response to a jury note."[256]  This argument is meritless.

A court's response to a jury note "'is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law.'"[257]  Such errors can be "categorized as 'trial errors' or 'structural errors.'"[258] "Trial errors are of relatively limited scope and are subject to harmless error review, while structural errors are those that categorically vitiate all the

---

[256]      Dkt. 222 at 30.

[257]      *United States v. Moran-Toala*, 726 F.3d 334, 342 (2d Cir.2013) (quoting *United States v. Al Kassar*, 660 F.3d 108, 126 (2d Cir.2011)).

[258]      *United States v. Riley*, 90 F. Supp. 3d 176, 190 (S.D.N.Y. 2015), *aff'd*, 638 F. App"x 56 (2d Cir. 2016) (quoting *Moran-Toala*, 726 F.3d at 343).

jury's findings and are not subject to harmless error review."[259]  "Structural errors are the exception and not the rule."[260]

> During deliberations, the jury sent the following note regarding Count Four:
>
> "Question on Jury Instructions
>
> "p. 10 – Elements of the offense
>
>> "Second and third elements
>
> "Is the mere acceptance of a trip with value over $1,000 from a vendor by itself a violation of the law?"[261]

Kaufman requested that the Court respond simply, "no."[262] The government proposed that the Court reiterate each of the elements of Section 215.[263] The Court responded to the jury's note as follows:

> "Because you ask about a trip, I construe the note as relating to Count Four. In order to convict the defendant on Count Four, the government must prove each of the four elements that I described yesterday. It must do so beyond a reasonable doubt. The list of the elements and the explanation of the elements begins at page 10, line 20 of the instruction and continues at least into the following page. I invite your attention to that.
>
> "In the event that the government proves beyond a reasonable doubt each of the first three elements stated in my instructions and it proves also beyond a reasonable doubt that the defendant solicited or accepted a trip valued at over a thousand dollars from a vendor, the solicitation or acceptance of that trip satisfies the fourth element of the offense and you should convict.

---

[259] *Id.* (cleaned up); *see also Hedgpeth v. Pulido*, 555 U.S. 57, 60 (2008).

[260] *Riley*, 90 F. Supp. 3d at 190 (cleaned up).

[261] *See* Court Ex. H; Tr. 1214.

[262] Tr. 1214.

[263] *Id.* 1215.

"In the event, however, that the government proves that the defendant solicited or accepted a trip valued at more than a thousand dollars and fails to prove beyond a reasonable doubt any one, two, or three of the other elements of the offense that I have described before, then you must acquit."[264]

Kaufman does not contend that the Court inadequately instructed the jury on the law in this response. Nor could he, as the Court merely reiterated to the jury that "the government must prove each of the four elements"of bank bribery beyond a reasonable doubt. Instead, Kaufman contends that it was misleading for the Court to respond with anything more than "no." Kaufman appears to be arguing that "no" was the only adequate response to the jury's note because the substance of the note referred only to two elements of bank bribery: "acceptance" (the second element) and a thing of value worth "over $1,000" (the fourth element). And obviously the government must prove all four elements of bank bribery beyond a reasonable doubt to secure a violation of Section 215.

But Kaufman misinterprets the jury's question. Construing the note as a whole – including its reference to the second *and third* elements at the top – the Court interpreted the jury as asking whether it could infer the third element (corrupt intent) from evidence in the record satisfying the second and fourth elements. A simple "no" would have been a misleading answer to the jury's question interpreted in this way. Indeed, if the jury inferred corrupt intent based on Kaufman's acceptance of things of value from vendors worth over $1,000 – which was against Melrose's policies – then three elements of bank bribery would have been satisfied. As the first element (whether Kaufman was an officer of a financial institution) was not in dispute, Kaufman thus would have been guilty of violating Section 215.

---

[264] *Id.* 1221-22.

In any event, Kaufman ignores that the Court instructed the jury that if "the government proves that the defendant solicited or accepted a trip valued at more than a thousand dollars and fails to prove beyond a reasonable doubt any one, two, or three of the other elements of the offense that I have described before, then you must acquit." This effectively was an answer of "no" to jury's question, as Kaufman interpreted it. Therefore, even if the Court erred in failing to respond to the jury's note with "no," the error was harmless.[265]

Kaufman contends, for the first time on this motion, that it was erroneous for the Court to fail to remind the jury about the safe harbor provision in connection with its response to their note. But Kaufman did not request that the Court repeat its instruction on the safe harbor provision at trial. This contention thus is subject to plain error review under Federal Rule of Criminal Procedure 52(b).[266] And the Court's "failure" to reiterate the safe harbor was not plain error. The jury's question did not refer to or ask about the safe harbor, on which the Court clearly instructed at the beginning of the jury charge.[267] As the Second Circuit has noted, the safe harbor

---

[265]

Kaufman does not contend that the Court's allegedly erroneous response to the jury note was a structural error. In the absence of any arguments to the contrary, the Court reviews the error as a trial error.

[266]

*See, e.g., United States v. Vasquez*, 267 F.3d 79, 87 (2d Cir. 2001) (plain error review applies where defendant makes a "general objection" to jury charge at trial but later seeks to argue "a different objection to the charge"); *see also United States v. Londono*, No. S1 00-cr-556 (DAB), 2001 WL 1190997, at *3 (S.D.N.Y. Oct. 5, 2001) (holding plain error review applies to Rule 33 motion where "a party's failure to make an objection is a matter of oversight"); *United States v. Kenner*, 272 F. Supp. 3d 342, 415 (E.D.N.Y. 2017) (same).

[267]

*See* Tr. 1161. The jury was given typed copies of the jury charge to reference during its deliberations.

provision is written "in non-technical terms."[268] The jury was more than capable of drawing its own conclusions from such terms without the Court's unnecessary repetition of them.

III.    *Exclusion of Zoltowski Testimony*

As mentioned, Kaufman does not contend that the Court erred in excluding Zoltowski. The Court nevertheless includes its bases for excluding Zoltowski to the extent that such bases are not already clear from the trial record.[269]

Kaufman's Rule 16 disclosures about Zoltowski were just as deficient as those about Dr. Guedj. They disclosed merely that Zoltowski would have testified about (i) "an explanation of how naming rights agreements were (and are) common in the financial services industry," (ii) "a description of the value of and benefits provided by naming rights agreements," (iii) "an explanation of" unspecified "provisions" of the naming rights agreement, which Zoltowski would have opined were "standard," and (iv) " a description of the potential benefits provided by" the naming rights agreement.[270] According to Kaufman, this proposed testimony would have been relevant to "help the jury understand" whether the naming rights agreement had "minimal marketing value."[271]

Deficient expert disclosures aside, Zoltowski's proposed testimony was inadmissible for two main reasons. First, Kaufman did not show that Zoltowski's proposed testimony about

---

268    *Ford*, 435 F.3d at 216 (upholding jury instruction on the safe harbor in § 666(c) – which, as discussed, is identical in language to the safe harbor in §215(c) – where the district court read the safe harbor provision to the jury).

269    The Court excluded a portion of Zoltowski's proposed testimony in January 2021, in its order on the parties' motions *in limine*. Dkt. 154. This opinion does not reiterate those bases for exclusion.

270    Dkt. 174-3 at 2.

271    Dkt. 185 at 24.

"foundational concepts relevant to understanding naming rights agreements" and "particular provisions of the naming rights agreement" would have been helpful to the jury or proper topics of expert testimony.[272]  Kaufman neither "specified what technical language" in the naming rights agreement "he believes required expert explication, nor has he provided any basis to conclude that" a naming rights agreement is "beyond the ken of the average juror."[273]  The agreement itself was in evidence, and the jury was more than capable of reading and understanding it.[274]

Second, any probative value of Zoltowski's proposed testimony would have been outweighed substantially by its unfair prejudicial effect. To the extent that Zoltowski would have opined that the naming rights agreements are common, standard, or valuable from a marketing perspective – which is not entirely clear from Kaufman's disclosures – such testimony would have had been misleading and confusing.  The government presented evidence that the naming rights agreement was favorable to Georgiton – and therefore indicative of Kaufman's corrupt intent – primarily because Kaufman single handedly advocated for it without Melrose's marketing director (who ultimately thought it was worth a fraction of the $2 million that Melrose paid for it) and because Kaufman caused Melrose to pay Georgiton under the agreement against the board's wishes. Expert testimony that the agreement had some marketing value or that naming rights agreements were common (whatever that might have meant) in the financial services industry would not have

---

[272]

    *Id.* at 23.

[273]

    *Novick v. AXA Network, LLC*, 714 F. App'x 22, 25 (2d Cir. 2017) (finding no error in exclusion of expert testimony about a compensation agreement).

[274]

    *See* GX 602.

rebutted the government's evidence that the agreement nevertheless was neither condoned by Melrose's marketing director nor performed in line with the board's wishes. Moreover, such testimony likewise would have been or invited an inappropriate *post hoc* analysis of Kaufman's state of mind. As with Dr. Guedj's proposed testimony, Kaufman did not show that Zoltowski's proposed testimony about the use by other financial institutions of the naming rights agreements or the value of this particular agreement would have been probative of anything Kaufman actually knew at the relevant time.

Zoltowski's expert testimony thus was excluded properly.

### Conclusion

The defendant's motion for judgments of acquittal or, in the alternative, for a new trial (Dkt. 198) is denied.

SO ORDERED.

Dated: September 7, 2021

Lewis A. Kaplan
United States District Judge